ORIGINAL

FILED

1  BERNSTEIN LITOWITZ BERGER
2      & GROSSMANN LLP
   Blair A. Nicholas (Bar No. 178428)
3  blairn@blbglaw.com
   Timothy A. DeLange (Bar No. 190768)
4  timothyd@blbglaw.com
   Niki L. Mendoza (Bar No. 214646)
5  nikim@blbglaw.com
   Takeo A. Kellar (Bar No. 234470)
6  takeok@blbglaw.com
   12481 High Bluff Drive, Suite 300
7  San Diego, CA 92130
   Tel: (858) 793-0070
8  Fax: (858) 793-0323
9
   KAHN SWICK & FOTI, LLC
10 Kim E. Miller (Bar No. 178370)
   kim.miller@ksfcounsel.com
11 Melissa Ryan Clark (*Pro Hac Vice*)
   melissa.clark@ksfcounsel.com
12 Michael A. McGuane (*Pro Hac Vice*)
   michael.mcguane@ksfcounsel.com
13 500 5th Ave., Suite 1810
   New York, NY 10110
14 Tel: (212) 696-3730
   Fax: (504) 455-1498
15
16
   [additional counsel on signature page]
17
18 *Co-Lead Counsel for Lead Plaintiffs*
19              UNITED STATES DISTRICT COURT
20            CENTRAL DISTRICT OF CALIFORNIA
21                  SOUTHERN DIVISION
22
   IN RE STEC, INC. SECURITIES          Lead Case No.
23 LITIGATION                           SACV 09-01304-JVS (MLGx)
24                                       CLASS ACTION          By Fax
25 This Document Relates To:            **CONSOLIDATED COMPLAINT FOR
                                        VIOLATIONS OF THE FEDERAL
26                                      SECURITIES LAWS**
27      ALL ACTIONS                     DEMAND FOR JURY TRIAL
28

## TABLE OF CONTENTS

Page

I.   NATURE AND SUMMARY OF THE ACTION .............................................1

II.  JURISDICTION AND VENUE...................................................................4

III. THE PARTIES ...............................................................................................5

    A.   Lead Plaintiffs ......................................................................................5

    B.   Defendants............................................................................................5

IV.  CONFIDENTIAL WITNESSES .................................................................7

V.   THE FRAUDULENT CONDUCT ..............................................................10

    A.   Background ..........................................................................................10

    B.   STEC Concealed Its Agreements With Its Largest
        Customer ..............................................................................................11

    C.   Defendants' Fraudulent Practices........................................................14

        1.   Defendants Knowingly Shipped Empty Containers
             And Defective Product .............................................................14

        2.   Defendants Lied To Customers About STEC's
             Product Quality And Altered Reports To
             Improperly Record Revenue ....................................................15

    D.   Defendants Increase Guidance, Citing Purportedly
        Successful Zeus Sales..........................................................................19

    E.   After Artificially Inflating The Price Of STEC Stock,
        Defendants Manouch And Mark Moshayedi Engaged In
        Massive Insider Selling .......................................................................21

    F.   The Aftermath .....................................................................................24

VI.  DEFENDANTS' FALSE AND MISLEADING
    STATEMENTS .............................................................................................25

    A.   STEC's Revenues From Zeus .............................................................25

    B.   The $120 Million Supply Agreement For Zeus ..................................29

    C.   STEC's Customer Base And Growth...................................................30

    D.   STEC's Product Quality ......................................................................36

    E.   STEC's Competition ...........................................................................37

|   |   |   |   |
|---|---|---|---|
| | F. | STEC's Internal Controls And Compliance With GAAP And SEC | 41 |
| | G. | Materially False And Misleading Statements And Omissions Made As The Truth Began To Be Revealed | 43 |
| VII. | | THE TRUTH EMERGES | 45 |
| | A. | The September 17, 2009 Partial Corrective Disclosure | 46 |
| | B. | The November 3, 2009 Partial Corrective Disclosure | 48 |
| | C. | The February 23, 2010 Corrective Disclosure | 56 |
| | D. | Post-Class Period Developments | 60 |
| VIII. | | DEFENDANTS' GAAP VIOLATIONS | 61 |
| IX. | | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE | 66 |
| X. | | NO SAFE HARBOR | 67 |
| XI. | | CLASS ACTION ALLEGATIONS | 68 |
| XII. | | CLAIMS FOR RELIEF | 70 |
| | | COUNT I  For Violation Of § 10(b) Of The Exchange Act And Rule 10b-5 Against STEC, Manouch Moshayedi, Mark Moshayedi, And Raymond D. Cook | 70 |
| | | COUNT II  For Violation Of § 20(a) Of The Exchange Act Against Manouch Moshayedi, Mark Moshayedi, And Raymond D. Cook | 73 |
| XIII. | | PRAYER FOR RELIEF | 74 |
| XIV. | | JURY DEMAND | 75 |

The allegations contained herein are based upon information and belief with information obtained through the investigation made by and through Lead Counsel. Lead Counsel's investigation has included, among other things: (i) interviews of confidential witnesses, including former employees of Defendant STEC, Inc. ("STEC" or the "Company"), as well as third-parties, with specific and first-hand knowledge of the events and practices alleged herein; (ii) review and analyses of STEC's filings with the United States Securities and Exchange Commission ("SEC"), press releases and other public statements; and (iii) review and analyses of news, media and analyst research reports.

I.   NATURE AND SUMMARY OF THE ACTION

1.   Lead Plaintiffs, Keith A. Ovitt and Arman Rashtchi, bring this action on their own behalf and on behalf of all persons and entities who purchased or otherwise acquired STEC common stock between June 16, 2009 and February 23, 2010 (the "Class Period"), and were damaged thereby. This action is brought against STEC and its top executive officers, the Company's Chairman and Chief Executive Officer ("CEO"), Manouch Moshayedi; its President, Chief Operating Officer ("COO"), and Chief Technology Officer ("CTO"), Mark Moshayedi; and its Chief Financial Officer ("CFO"), Raymond D. Cook (collectively, the "Individual Defendants"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.   The facts alleged herein are currently the subject of an ongoing investigation by the SEC. STEC has revealed that certain of STEC's officers and employees, including Defendants Manouch and Mark Moshayedi, have received subpoenas in connection with the SEC's investigation.

3.   STEC purports to be a leading global provider of memory and storage solutions tailored to meet the high-performance, high-reliability needs of original equipment manufacturers ("OEMs") like Sun Microsystems, EMC Corporation, IBM, and Dell. During the Class Period, STEC's core business was its enterprise

scale solid-state drives ("SSD"), such as its flagship product, the ZeusIOPS SSD ("Zeus").

4.      Throughout the brief eight month Class Period, Defendants knowingly engaged in various fraudulent practices to dramatically increase STEC's stock price and create a window for the Company's two most senior executives to sell more than 9 million shares of stock, approximately 50% of their holdings, for proceeds *in excess of $267 million*.   These fraudulent practices centered on Defendants' manipulation of the Company's revenue and revenue guidance to investors and the market – key metrics that determined STEC's financial health.

5.      On June 16, 2009, the first day of the Class Period, and again just one month later in July 2009, Defendants announced a huge increase in STEC's revenue guidance.  This news was a departure from STEC's prior guidance, and the stock price soared.  Defendants explained that the guidance increases resulted from growth in the Company's sales of its flagship product, Zeus, and a $120 million deal with the Company's largest customer, EMC Corporation ("EMC") for third and fourth quarters of 2009.  Defendants highlighted that the increased revenue growth and EMC deal were indicative of future sales and growth.

6.      As the stock price rose to unprecedented levels, STEC's two top executive officers – its CEO and Chairman, Defendant Manouch Moshayedi, and his brother, STEC's President and COO, Defendant Mark Moshayedi – cancelled their newly-adopted Rule 10b5-1 trading plans and sold 9 million shares of STEC stock through a "secondary offering."

7.      Defendants Manouch and Mark Moshayedi completed their sale at $31 per share – nearly *double* STEC's stock price just two months earlier at the beginning of the Class Period.  Defendant Manouch Moshayedi founded STEC in 1990, and Defendant Mark Moshayedi joined the Company shortly thereafter in 1992.   Prior to this secondary offering, they had never previously sold such massive amounts of their STEC stock.  In fact, the shares sold by the Moshayedis

were, collectively, more than 11 times the number of shares they sold in the six months before the Class Period and 20 times the number of shares they sold in all of 2008. That was the largest insider selling in the history of the Company.

8.    Defendants' manipulation of the Company's revenue and revenue guidance ended following the massive insider sales. As would be revealed through multiple partial disclosures beginning on September 17, 2009, STEC's purported increased revenue was derived from *a single customer*, in a *one-time deal* that – contrary to Defendants' misrepresentations – was not indicative of continuing demand for STEC's products. Following each of these announcements, STEC's stock price plummeted. STEC's stock price currently trades at $11.76, below its price at the beginning of the Class Period, and 72% below the Class Period high.

9.    As illustrated below, while STEC's stock price rose in just two months, the top executive officers unloaded their personally held shares near the all-time high, just one month before the truth began to emerge:



10.    Thirteen confidential witnesses – including former STEC employees and customers with first-hand knowledge – confirm the existence of Defendants'

deceptive business practices which were specifically designed to inflate STEC's financial results and artificially inflate its stock price. The confidential witnesses confirm that Defendants engaged in the following fraudulent practices to inflate STEC's stock price:

- "Shipping bricks": a term utilized internally at STEC to describe its common practice in which the Company ships empty packages or packages containing the wrong product, allowing STEC to immediately record revenue at the end of a fiscal reporting period for product that was not actually shipped;

- Demanding that customers accept inventory by a fiscal quarter's deadline for recording revenue regardless of that customer's actual need for STEC's products at that time;

- Shipping defective or untested product and immediately recording revenue upon shipment despite knowledge that the product was defective and untested;

- Selling product as "new" even though it contained refurbished or rejected parts;

- Lying to customers about product quality, features, certifications, testing, and failure rates;

- Altering error reports before sending them to customers; and

- Manipulating accounting for revenue from the EMC contract, including by violating generally accepted accounting principles ("GAAP").

II.   JURISDICTION AND VENUE

11.   This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

12.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Defendant STEC maintains its principal place of business within this District, the Individual Defendants conduct business in this District, and many of the acts giving rise to the violations alleged herein, including the preparation and dissemination of materially false and misleading information and omissions, occurred in substantial part in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, mail, interstate telephone communications, and the facilities of the national securities markets.

III.  THE PARTIES

A.  Lead Plaintiffs

14. Lead Plaintiff Keith A. Ovitt purchased STEC common stock during the Class Period. As a result of the unlawful conduct alleged herein, Mr. Ovitt suffered damages in connection with his purchases of STEC common stock. Attached hereto is a certification setting forth Mr. Ovitt's transactions in STEC securities during the Class Period.

15. Lead Plaintiff Arman Rashtchi purchased shares of STEC common stock during the Class Period. As a result of the unlawful conduct alleged herein, Mr. Rashtchi suffered damages in connection with his purchases of STEC common stock. Attached hereto is a certification setting forth Mr. Rashtchi's transactions in STEC common stock during the Class Period.

16. Collectively, Mr. Ovitt and Mr. Rashtchi are referred to herein as the "Lead Plaintiffs."

B.  Defendants

17. Defendant STEC is a California corporation with its principal place of business located at 3001 Daimler Street, Santa Ana, California. According to the Company's profile, STEC purports to be a leading global provider of solid-state

computer memory drive technologies and solutions tailored to meet the high-performance, high-reliability needs of OEMs.   The Company claims to manufacture the industry's "most comprehensive line" of SSDs in the storage industry.  Throughout the Class Period, the Company traded in an efficient market on the NASDAQ under the ticker symbol "STEC."  As of February 23, 2010, the Company had nearly 50 million shares issued and outstanding.

18.   Defendant Manouch Moshayedi, co-founder of STEC, is, and at all relevant times was, Chairman of the Board and CEO of STEC.  During the Class Period, Defendant Manouch Moshayedi signed and certified the Company's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").  During the Class Period, Defendant Manouch Moshayedi sold 4.5 million shares of his personally-held STEC stock, collecting nearly $134 million in insider trading proceeds.

19.   Defendant Merhdad "Mark" Moshayedi, is, and at all relevant times was, President, COO, CTO, Secretary and a Director of STEC.  Mark Moshayedi and Manouch Moshayedi are brothers (a third brother, Masoud "Mike" Moshayedi, co-founded the Company, retiring in 2007 and remaining beneficial owner of 8.9% of the total shares of STEC's common stock).  During the Class Period, Defendant Mark Moshayedi signed Company SEC statements, including the Company's August 2009 Registration Statement and Prospectus.  During the Class Period, Defendant Mark Moshayedi sold 4.5 million shares of his personally-held STEC stock, collecting nearly $134 million in insider trading proceeds.

20.   Defendant Raymond D. Cook is, and at all relevant times was, the CFO and Principal Accounting Officer of the Company. During the Class Period, Defendant Cook signed and certified the Company's SEC filings pursuant to Sections 302 and 906 of SOX.

21.   Defendants Manouch Moshayedi, Mark Moshayedi, and Cook, because of their positions with the Company, possessed the power and authority to

control the contents of STEC's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information, the Individual Defendants knew or with deliberate recklessness disregarded that the adverse facts specified herein were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

IV.   CONFIDENTIAL WITNESSES

22.    The allegations herein are supported in part by first-hand accounts of thirteen confidential witnesses, including former STEC employees and customers. As set forth below, the confidential witnesses were each in a position to know the information alleged, and many corroborate the allegations of one another. The confidential witnesses have been identified with particularity but without disclosing identities in order to address concerns about retaliation or career injury:

(a)    Confidential Witness 1 ("CW1") was an STEC Sales and Field Applications Engineer from September 2007 through November 2009. CW1 worked with top tier Network and Enterprise Storage OEM customers to provide pre- and post-technical sales support for SSDs and other products and coordinated internal engineering, manufacturing, testing and failure analysis to resolve product design-in, customer qualification and field related issues. CW1 reported to Field Applications Manager Robert Lopez. As detailed below, CW1 described first-hand accounts of STEC shipping empty containers of products to customers in order to report false revenue, and corroborated the information provided by other confidential witnesses of the direct involvement and knowledge of the fraudulent

1  practices by Manouch and Mark Moshayedi, and of STEC's dependence on one
2  large customer.

3         (b)    Confidential Witness 2 ("CW2") was STEC's Hewlett-Packard
4  ("HP") Inside Sales Representative in Santa Ana, California from June 2004
5  through July 2009 and, prior to that time, was a marketing specialist for STEC's
6  predecessor, SimpleTech, from June 2000 to June 2004.  As detailed below, CW2
7  explained that Defendant Manouch Moshayedi was directly involved in ordering
8  STEC's sales force to pressure customers to move sales into third quarter 2009.
9  CW2 also described STEC shipping products with high failures rates in order to
10  meet sales.

11         (c)    Confidential Witness 3 ("CW3") was a Quality Failure Analysis
12  Technician from November 2007 through November 2008, who worked on
13  products including Zeus.  As detailed below, CW3 corroborated the information
14  provided by other confidential witnesses regarding the defectiveness and high
15  failure rates of STEC SSDs and detailed STEC's practice of lying to customers
16  about problems with the products.

17         (d)    Confidential Witness 4 ("CW4") was a Regional Sales Manager
18  for the San Francisco Bay Area territory who worked for STEC from February
19  2006 through September 2009.  As detailed below, CW4 corroborated that there
20  was a lot of "collaboration" between STEC and EMC, an early adopter of Zeus.

21         (e)    Confidential Witness 5 ("CW5") was a Sales Coordinator for
22  STEC from late 2007 until July 2009, whose sales included Zeus products.  As
23  detailed below, CW5 detailed the importance of EMC's business, including that
24  STEC management directed that EMC's orders were top priority and that they be
25  filled before orders from other customers.

26         (f)    Confidential Witness 6 ("CW6") was a Technical Solutions
27  Architect with EMC from 1996 to mid-2009.   As detailed below, CW6
28

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

corroborated the information provided by other confidential witnesses regarding defective STEC SSD products and high failure rates with the Zeus drive.

(g)    Confidential Witness 7 ("CW7") is a former HP Engineer who worked for HP between August 2007 through May 2009. In that position at HP, CW7 worked with SSDs from STEC. As detailed below, CW7 corroborated the information provided by other confidential witnesses regarding the defective and high failure rates of STEC SSDs.

(h)    Confidential Witness 8 ("CW8") was a Sales and Field Application Engineer for STEC in the San Francisco Bay Area and Pacific Northwest from September 2008 through March 2009 whose work included the Zeus SSD. CW8 reported to Field Applications Manager Robert Lopez. As detailed below, CW8 corroborated the information provided by other confidential witnesses that, among other things, Defendants Manouch and Mark Moshayedi were directly and personally involved in all aspects of the business with EMC and that STEC management had weekly sales meetings at which time they would talk specifically about SSD revenue.

(i)    Confidential Witness 9 ("CW9") was an Engineer for STEC in Santa Ana, California from February 2005 through December 2008. As detailed below, CW9 corroborated the information provided by other confidential witnesses regarding the defective and high failure rates of STEC SSDs, and detailed STEC's practice to ship untested product in order to recognize quarterly revenue on the transaction.

(j)    Confidential Witness 10 ("CW10") was a Test Engineer for STEC for 13 years until July 2009. CW10 provided production test solutions for STEC's flash products and SSD products. As detailed below, CW10 described STEC's production and projections process, including that STEC based its projections on purchase orders by customers such as EMC, and then purchased the components to build the SSDs.

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

(k)     Confidential Witness 11 ("CW11") was a Process Engineer for STEC from December 2006 through July 2009, who worked on all of STEC's SSD products.  As detailed below, CW11 corroborated the information provided by other confidential witnesses that Defendants Manouch and Mark Moshayedi were directly and personally involved in all aspects of the business with EMC.

(l)     Confidential Witness 12 ("CW12") was a Chief Technologist of Storage and Data Management at Sun Microsystems from 1999 to April 2009, and currently works for Pillar Data Systems as a Network Attached Storage Technologist.  CW12 worked with STEC SSDs.  As detailed below, CW12 corroborated the information provided by other confidential witnesses regarding the defective and high failure rates of STEC SSDs.

(m)     Confidential Witness 13 ("CW13") was a Product Marketing Specialist for STEC from June 2002 through October 2008, whose job included marketing for the ZeusIOPS, among other products.  As detailed below, CW13 corroborated the information provided by other confidential witnesses that Defendants Manouch and Mark Moshayedi were directly and personally involved in all aspects of the business with EMC.

V.     THE FRAUDULENT CONDUCT

A.     Background

23.     STEC purports to be a leading global provider of memory and storage solutions tailored to meet the high-performance, high-reliability needs of OEMs like Sun Microsystems, EMC, IBM, and Dell.  During the Class Period, STEC's core business was its enterprise scale SSDs, such as its flagship product, Zeus.

24.     STEC, then named Simple Technology, Inc. ("SimpleTech"), was founded in 1990 by Manouch Moshayedi and his brother, Masoud "Mike" Moshayedi.  At that time, they introduced a line of memory products for PCs, notebooks, servers, printers and devices.

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

25.     Throughout the 1990s, the Company grew rapidly, expanding its manufacturing facilities, acquiring a Flash controller design team from Cirrus Logic, establishing an OEM Sales Division, acquiring Kelly Microsystems and Silicon Tech, and opening European offices.   In 1995, the Company was recognized on the Inc 500 list as one of the 50 fastest-growing businesses in the United States.   The Company completed its initial public offering in September 2000, trading on the NASDAQ under the ticker symbol STEC.

26.     As the Company continued to expand through acquisitions, in 2005, it introduced its high-end Zeus SSD product.  Two years later, STEC introduced its flagship product, the ZeusIOPS SSD, with Enterprise grade storage systems.

27.     During the Class Period, Defendants touted STEC as the only manufacturer of enterprise-scale SSDs, with promises of extraordinary revenue growth.   As illustrated below, Defendants repeatedly announced increasingly higher earnings per share ("EPS") and revenue guidance as a result of its purported monopoly of the SSD market and, in particular, its flagship product, Zeus:



B.      STEC Concealed Its
        Agreements With Its Largest Customer

28.     Throughout its history, STEC heavily aligned itself with one large customer to purchase its SSDs.  CW1 explained that STEC was a "one customer

1  dog" that would "get in bed" with one customer at a time.  CW1 elaborated that

2  Cisco was STEC's primary customer for SSDs in 2006, 2007, and 2008, until

3  Cisco "turned off their faucet, so to speak, and no longer was STEC's 'top dog.'"

4      29.    Throughout the Class Period, STEC's "top dog" was EMC.  EMC was

5  STEC's largest customer overall and its largest account in its core business of

6  SSDs, and, in particular, Zeus.  CW5 reported that once EMC became STEC's key

7  customer, STEC relied heavily on EMC to generate business through its

8  acceptance of STEC's products.  The focus on EMC was so great that CW5

9  reported that other, smaller customers were forced to wait increased lag time –

10 sometimes double that of EMC – for product orders.

11     30.    As corroborated by several confidential witnesses, including CW8,

12 CW11, and CW13, Defendants Manouch and Mark Moshayedi were directly and

13 heavily involved in all aspects of the business with EMC, including, but not limited

14 to, working with the Company's marketing efforts toward EMC and EMC's

15 purchasing and selling of STEC's products.

16     31.    As STEC's largest customer, EMC regularly communicated with the

17 Company, and, in particular, with Defendant Manouch Moshayedi, who was

18 heavily involved with the EMC account.  For example, as explained by CW4, there

19 was a lot of "collaboration" between STEC and EMC.  CW8 further confirmed that

20 STEC management had weekly sales meetings at which time they would talk

21 specifically about SSD revenue, and that Manouch and Mark Moshayedi would

22 have weekly conversations with EMC.

23     32.    Further, as stated by an analyst during a November 3, 2009 analyst

24 conference call, STEC had "engineers co-located with EMC," and thus STEC had

25 "good insight" into what amount of inventory was actually pulled off of EMC's

26 shelf.

27     33.    As admitted by Defendant Manouch Moshayedi, STEC's customers,

28 including EMC, provided STEC with *very solid forecasts* in advance of STEC

agreeing to commit to supply the customer with products.  (August 3, 2009 earnings call.)

34.    Even before the truth about STEC's sales and demand began to be revealed, STEC's relationship with EMC caught the attention of the SEC. Following the unusually fast rise of STEC's stock price after announcements about deals with EMC, and the massive insider selling by the Moshayedis, the SEC questioned whether STEC had been forthcoming with investors, in particular with respect to its dependence on EMC.

35.    For example, the SEC inquired on August 28, 2009, why, despite the fact that the Company depends on EMC for a significant portion of its revenue, the Company has not disclosed any agreements with EMC.  The Company responded by letter dated September 10, 2009, that the EMC agreements are not ones upon which the Company is substantially dependent.  The SEC then followed up by letter dated September 30, 2009, inquiring why the Company believed it is not substantially dependent upon its agreements with EMC and another top customer, and requested that STEC advise, in quantitative terms, whether sales to these customers were based on a few large purchase orders or multiple small ones. STEC responded by letter dated October 13, 2009, and continued to maintain that the Company is not substantially dependent upon its agreements with EMC.

36.    As a result of STEC's refusal to disclose STEC's agreements with its largest customers, or even disclose the identity and percentage of revenue from such customers, analysts and investors were forced to rely during the Class Period on management's statements to gauge the strength of STEC's current and forecasted sales and demand.  In particular, analysts and investors focused on management's increased revenue guidance and statements regarding demand for Zeus, including stating, for example, "*We are adjusting our estimates to reflect the improved guidance [from Zeus]*," (Thomas Weisel Partners, June 16, 2009); "*STEC Announces Supply Contract [for Zeus], Improving Visibility:  Reiterate Strong Buy*,

*Raising Target to $40*" (Needham, July 16, 2009); and "*STEC reported solid results and gave upbeat outlooks as the growth acceleration driven by the enterprise-SSD ZeusIOPS segment continues to ramp.*" (Thomas Weisel Partners, August 3, 2009).

      C.    <u>Defendants' Fraudulent Practices</u>

      37.    Defendants were only able to meet their increasing guidance through fraudulent practices.    Numerous confidential witnesses have confirmed that STEC's standard practice was to force sales so that revenue could be immediately recorded.  As detailed below, Defendants did so by, among other things:   (i) "shipping bricks"; (ii) sending defective or untested products; (iii) lying to customers and altering error reports; and (iv) announcing an extraordinary deal with EMC which purported to represent continued growth and demand.    In addition, as detailed in Section VIII below, Defendants engaged in accounting manipulations with respect to the EMC contract in order to improperly record revenue.

      38.    As detailed below, the Company's top officers, Manouch and Mark Moshayedi, themselves were directly involved in these fraudulent practices. Defendant Manouch Moshayedi ordered the practices because Defendants wanted the quarterly revenue numbers to "look grand," and Defendant Mark Moshayedi declared such practices were Defendants' "business decision."

      1.    Defendants Knowingly Shipped Empty
           <u>Containers And Defective Product</u>

      39.    Numerous confidential witnesses corroborate that STEC frequently and knowingly shipped empty containers and defective and untested products in order to report false quarterly revenue and boost STEC's stock price.

      40.    For example, CW1 stated that STEC would regularly engage in "*shipping bricks*."   CW1's supervisor explained that "shipping bricks" is the process of shipping boxes – which, unbeknownst to the recipient, were empty or

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1  contained the wrong product – just before the quarter ends, allowing STEC to

2  receive a Federal Express notification that purported inventory had been shipped so

3  that STEC could record it on the books for that quarter.  It then would take a few

4  days before the customer realized that the package did not contain the product it

5  ordered, at which time the customer would call STEC sales people, including

6  CW1, to complain.  When CW1 directly questioned his supervisor about this

7  recurring problem, CW1's supervisor explained what "shipping bricks" was and

8  stated that STEC had been "shipping bricks" "for years."

9      41.    CW9 further noted that, at the end of each quarter, STEC would ship

10  products that had not been tested in order to recognize revenue on the transaction.

11  For example, CW9 detailed that, in the fourth quarter of 2008, STEC's Vice

12  President of Operations shipped product that was not even working – to someone

13  other than the customer – in order to include the shipment of products as a "sale."

14  CW9 reported that this type of attempt to move sales into a quarter was "some sort

15  of tradition" at STEC, and that this particular transaction was for "huge money."

16                    2.    Defendants Lied To Customers
                          About STEC's Product Quality And Altered
17                          Reports To Improperly Record Revenue

18      42.    With respect to Zeus in particular, CW6 explained that this core

19  product had an "unusually high failure rate."  Several confidential witnesses,

20  including CW7, CW3, CW12, and CW9, corroborated that the unusually high

21  failure rate for STEC SSDs was a result of, for example, the drive burning out,

22  bugs, software issues, hardware wear leveling, the small computer systems

23  interface, thermal problems, and poor coding.

24      43.    Numerous confidential witnesses reported that Defendants, having

25  knowingly manufactured defective products, falsified fail rate numbers for SSDs

26  (and Zeus in particular) and withheld other relevant information from STEC's

27  customers.

28

-15-

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

44.    For example, CW9 detailed how STEC "cheated a lot of customers." Specifically regarding Zeus, CW9 confirmed that it performed poorly and the quality of the product was poor. STEC nevertheless promised customers a certain level of performance, but hid information about the integrity of the product. CW9 explained that tests showed that the product did not meet the performance level STEC purported to sell, but STEC continued to falsely represent that it met certain performance standards. Further, with respect to Zeus specifically, CW9 reported that STEC's biggest customer, EMC, was "asking a lot of questions" because Zeus was not meeting basic customer expectations. According to CW9, EMC also returned thousands of Zeus products because of errors, the inability to keep up with the systems, and the product continuously failing.

45.    CW3 also confirmed that STEC's practice was to lie to customers. Many times after an analysis of a product's problem was performed, "it would be decided to not tell the customer." CW3 provided the following example: STEC experienced a "black pad issue" during the time he was with the Company. According to CW3, this is a very serious problem that affects memory and flash products. He described the problem as a "process issue" which is caused during the chemical cleaning process. A black film forming prevents solder from adhering to the pad and, over time, the pad opens up and the connectivity between the memory chip and the pad is broken. The result is that the memory or flash becomes unreliable. CW3 found that this problem occurred in many cases and even wrote reports documenting the problem. STEC management, however, *altered the reports* because it did not want the customer to know the truth about the problems. As described by CW3, STEC management went as far as doctoring reports with pictures from another case.

46.    CW10 confirmed that when CW10 was assisting STEC's quality department, failed devices were given to CW10 to test and determine the failure mode. CW10 would relay the information to STEC's quality group and the quality

-16-

group would say: "We can't tell the customer that; we have to say something different." As confirmed by CW10, the pressure to lie to customers came directly from Defendants Manouch and Mark Moshayedi.

47.   CW1 corroborates that STEC management expressly told STEC employees to lie, explaining that in one particular situation involving sales to Cisco, CW1 received emails and directives from STEC management, directors and STEC's quality assurance representatives, ordering as follows: *"Don't tell them we have these many failures.  Tell them whatever you want [but don't tell them the truth]."*

48.   CW10 explained that STEC's corporate policy of lying to customers about STEC's products was said by Defendants to be their "business decision." For example, CW10 experienced quality concerns with STEC's industry-grade Flash products.  Those Flash products that were bought by customers for industrial use were required to go through a screening process that involved testing at extreme temperatures and a guarantee that the product would work under those extreme conditions.  The products that would pass would be sold as industrial grade and those that did not would be sold as commercial grade.  STEC disseminated information to customers through specification sheets that extreme temperature testing was done 100 percent of the time when, in truth, STEC had stopped doing the extreme temperature testing.  CW10 brought this wrongful practice to the direct attention of Defendant Mark Moshayedi towards the end of 2008.  In response Mark Moshayedi said, *"It's a business decision and that's what we're going to do."*  As a result of Defendant Mark Moshayedi's response, CW10 then spoke with Dan Moses (STEC's CFO until November 2008), who at the time was on the Ethics Committee.  Dan Moses responded that he would speak to Mark Moshayedi about the issue.

49.   CW1 also corroborated that Defendant Mark Moshayedi was directly involved and had actual knowledge of the failures with Zeus.  CW1 explained that

STEC led at least one of its customers, Sun Microsystems, to believe that Zeus was programmed to check the battery voltage of the super capacitors once or twice per day, which was important to Sun Microsystems because it used Zeus in applications that ran twenty-four hours per day. In truth, STEC's super capacitors in Zeus were notorious for going bad. CW1 learned through two independent sources (an STEC failure analysis engineer who dealt directly with Sun Microsystems, and an STEC sales person who dealt directly with Sun Microsystems) that in 2009 while Defendant Mark Moshayedi was having lunch with Sun Microsystems representatives, a conversation took place specifically regarding the monitoring of the super capacitors in Zeus. During the conversation, Mark Moshayedi revealed for the first time to Sun Microsystems that Zeus would check the super capacitors only when the units were actually powered on, not automatically throughout the day as previously represented by STEC to Sun. This reportedly caused a huge blowup between Mark Moshayedi and Sun, which resulted in Sun Microsystems cancelling all orders with STEC. Sun Microsystems expressly told Defendant Mark Moshayedi that Sun Microsystems would no longer accept STEC SSDs because they were not what Sun Microsystems believed it had purchased.

50.    By way of further example, CW2 described an incident in February 2009 wherein STEC falsified fail rate numbers on a shipment to its customer HP. STEC shipped an order to HP of DRAM modules, STEC part #hpqd2-1gd00-667-eba, HP part #405476-051, in late 2008 or early 2009. A certain percentage of the units failed and HP shipped the entire order back to STEC for retesting and put STEC on "worldwide stop ship." The retesting process took two weeks and revealed that 45 units out of the 402 failed. However, STEC, under the direction of STEC's Vice President of Sales, informed HP that only 2 units of the 402 had failed under retesting. Despite the "stop ship" order, STEC replaced the 45 failed units and shipped them back to HP. When CW2 inquired by e-mail, copying

numerous STEC employees regarding why HP was not being told the truth about the failed units, CW2 was told not to "broadcast" this type of information by e-mail.  CW2 later received an e-mail from an HP employee confirming that the original 402 modules had "failed miserably" and should not have been shipped back to HP as STEC had been put on stop ship at that point.

51.   Defendant Manouch Moshayedi was directly involved in ordering STEC's sales force to move sales into third quarter 2009 – the same quarter in which Defendants Manouch and Mark Moshayedi unloaded 9 million shares at a near all-time high price.  For example, CW2 explains that Manouch Moshayedi directly told STEC's Vice President of Sales to pull all of Cisco's sales from the fourth quarter 2009 into third quarter 2009 to make the third quarter sales look better.  As discussed at one weekly Monday meeting, Defendant Manouch Moshayedi told the Vice President of Sales:  "You go to Cisco and tell them they have to take everything this quarter."  As explained by CW2, if Manouch Moshayedi needed the sales, he would pull the sales to that quarter.  Defendant Manouch Moshayedi gave this instruction because he wanted the third quarter 2009 revenue numbers to *"look grand."*

D.   Defendants Increase Guidance, Citing Purportedly Successful Zeus Sales

52.   Also in the third quarter 2009, the same quarter in which Defendant Manouch Moshayedi ordered that sales be accelerated so that STEC's revenue would "look grand," STEC announced a $120 million deal with its largest customer, EMC.  The artificial inflation of stock price associated with the incomplete and misleading announcement of this deal allowed Defendants Manouch and Mark Moshayedi to dump 9 million shares of their personally held STEC stock in a rushed secondary offering at a near all-time high price.

53.   Although Defendants claimed that the $120 million deal would cover EMC's product needs for the third and fourth quarters of 2009, Defendants knew

or deliberately disregarded that the contract would oversupply EMC and meet its
inventory needs well into 2010.

54.   Before the open of the stock market on June 16, 2009 (the beginning
of the Class Period), STEC issued a press release announcing increased earnings
and revenue guidance for second quarter 2009. As detailed further below, the press
release explained that the increased earnings and revenue are "*primarily the result
of increases in the Company's Zeus IOPS sales which now are estimated to
exceed $55 million during the second quarter of 2009*."

55.   On STEC's announcement, the price of STEC stock increased 27% in
a single day to close at $22.88 per share on June 16, 2009, a $4.86 increase from
the prior day's closing price of $18.02, on extraordinarily high trading volume of
10.4 million shares. At the time, STEC's stock price represented an all-time high.

56.   Just one month later, on July 16, 2009, STEC issued another press
release announcing an agreement with its largest customer, EMC, to purchase $120
million of Zeus in the second half of 2009, resulting in an increase in the
Company's forecast for Zeus sales to more than $220 million in the second half of
2009. In the press release STEC represented that "this agreement reflects [EMC's]
continued commitment to integrate STEC's SSD technology . . . ."

57.   Following STEC's announcement, the price of STEC stock rose
another 15.2%, or $4.20 per share in a single day, over the previous day's closing
price to close at $31.79 per share on July 16, 2009, on extraordinarily high trading
volume. STEC's stock price thus reached another all-time high.

58.   In the following weeks, the price of STEC stock continued to climb.
On August 3, 2009, the price of STEC stock closed at yet another new all-time
high of $35.50 per share. After the market closed that day, STEC issued a press
release announcing the Company's financial results for the second quarter of 2009.
Defendants highlighted the reported revenue growth from Zeus. As detailed below

in Section VIII, such reported revenue growth was only obtained through accounting manipulations and GAAP violations.

59.    Also on August 3, 2009, Defendant Manouch Moshayedi assured the market of continued growth from Zeus, emphasizing that the $120 million agreement with EMC *"is a further indication of future SSD growth and customers' acceptance of SSDs into this growing market,"* and that the chances of emerging competition was *"zero."*

E.    After Artificially Inflating The Price Of STEC Stock, Defendants Manouch And Mark Moshayedi Engaged In Massive Insider Selling

60.    After falsely fueling an extraordinary rise in the price of STEC stock from $4 per share in December 2008 to $35.50 per share on August 3, 2009 – an increase of over 850% – Defendants Manouch and Mark Moshayedi timely unloaded 9 million of their own STEC shares.  Specifically, on August 3, 2009, Defendants announced that they would conduct a "Secondary Offering" of at least 7.5 million shares, all for the personal profit of Defendants Manouch and Mark Moshayedi, with no proceeds going to the Company.

61.    With this announcement, Defendants also announced that Defendants Manouch and Mark Moshayedi *had cancelled their 10b5-1 trading plans which they had adopted just two months earlier*.  The 10b5-1 trading plan program enables insiders to set predetermined contractual sales of stock in advance regardless of the knowledge of material information.  Here, because the insiders (Defendants Manouch and Mark Moshayedi) urgently wanted to take advantage of the newly inflated stock price before the truth was revealed, they promptly cancelled their new 10b-5 plans and quickly unloaded their stock in massive quantities in an offering.

62.    Just three days after announcing the secondary offering, STEC announced on August 6, 2009, the price of the price of the offering, $31 per share.

STEC also announced that the amount of the secondary offering would be raised to 9 million shares.

63.     Manouch and Mark Moshayedi sold their 9 million shares of STEC stock in the secondary offering on August 11, 2009, *reaping $267.8 million in a single day.* These sales dramatically reduced the Moshayedis' insider holdings in STEC. On that day, the Moshayedis went from collectively owning 35.5% of the Company's stock, down to owning just 17.4%.   Defendant Manouch Moshayedi reduced his STEC holdings from 14.8% of the Company to 6.5% and Defendant Mark Moshayedi reduced his STEC holdings from 20.7% to 10.9%.  This was by far the historically largest sale of their personally held STEC stock.

64.     This sale was in addition to the more than $25 million in shares that Manouch and Mark Moshayedi's third brother and STEC co-founder, Masoud ("Mike") Moshayedi, had sold in June and July, beginning the day after STEC's June 16, 2009 announcement.  According to Mike Moshayedi's Form 4s, he sold over one million shares at that time.

65.     Conveniently for Defendants, as the full truth was later revealed in STEC's February 23, 2010 Form 10-K and the Company stock plummeted, STEC reported that its board of directors had authorized a stock repurchase program effective November 10, 2009 – just three months after Defendants Mark and Manouch Moshayedi's massive secondary offering.   This repurchase program allows STEC to repurchase up to $75 million of its shares at their now devastated price.

66.     A commentator at Seeking Alpha later explained the suspicious and unusual trading preceding the eventual announcement that the EMC deal was only a one time deal, as follows: *"Whether management knew about the demand/inventory issue in advance or not, the market found it too coincidental that top management made such a substantial sale of stock in the very quarter they blew up."*

67.   Following STEC's November 3 announcement, the SEC instituted a formal investigation into insider trading at STEC.   The Company's February 23, 2010 Form 10-K announced for the first time:   "The [SEC] is conducting a formal investigation involving trading in our securities.   Certain of our officers and employees, including our CEO and President, have received subpoenas in connection with the SEC's investigation."

68.   Indeed, the Moshayedis were remarkably successful in timing their offering, selling at a near all-time high of $31 per share.   There are only two months in the Company's entire history in which its stock price traded higher, just before the truth began to be revealed.

69.   In the prior calendar year, 2008, Defendant Manouch Moshayedi did not sell *any* stock, and sold only 400,000 shares in March 2009 for proceeds of $3 million.   Defendant Mark Moshayedi sold only 466,292 shares in June 2008 and another 400,000 shares in March 2009, for proceeds of $6.5 million and $3 million, respectively.   The number of shares sold by the Moshayedis in the August 2009 secondary offering were collectively more than *11 times* the number of shares they sold in the six months before the Class Period and nearly *20 times* the number of shares they sold in all of 2008.   Thus, as demonstrated in the chart below, the Moshayedis' trading was highly suspicious in volume and timing:



-23-                       CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

70.    In sum, the Moshayedis' Class Period stock sell-off was the biggest insider stock liquidation in the history of STEC.

71.    This, however, was not the first time that the Moshayedis were, as one commentator characterized it, "spot-on" for the timing of an extraordinary offering of their own personal shares.  For example, on October 1, 2003, STEC (then-called SimpleTech, with Manouch Moshayedi serving as the CEO, Mark Moshayedi serving as the COO and CTO, and their brother, Masoud Moshayedi, serving as the President) announced the Company's third quarter 2003 guidance as a result of a purported increased demand for the Company's products.   The Company raised revenue guidance to $57 to $58, from the earlier guidance of $48 to $50, and raised the EPS to $0.01 from its previous guidance of $-0.01.

72.    The very same day, the Company announced a secondary offering of 10 million shares, including 2.5 million shares personally held by the three Moshayedi brothers and other insiders.  The Company disclosed that the proposed offering would allow the three Moshayedi brothers to go from 78.6% ownership to 51.5% ownership.  When they made the announcement, STEC shares were near their then all-time high.  As with Defendants Manouch and Mark Moshayedi's most recent offering of their own personal STEC shares, within just months after the Moshayedis cashed in their shares of STEC at inflated prices, the stock price plummeted back to what its price had been before the Moshayedis increased guidance.  Not surprisingly, the stock price chart for that 2003 time period looks nearly identical to the stock price chart related to the Moshayedis' most recent sell-off.

F.    The Aftermath

73.    As detailed below, only after the three Moshayedi brothers reaped the benefits of the artificially inflated stock price by selling their stock at unprecedented high prices, did the truth about STEC's business and operations begin to be revealed.   The Company eventually admitted that, contrary to

Defendants' prior representations that the $120 million EMC deal was indicative of future Zeus revenue growth, it was merely a one-time deal for excess inventory with a single customer, and there were no prospects for a future commitment from EMC.

74.   EMC, itself, later openly stated to analysts that the order to STEC intentionally included excess inventory, not just for 2009, but also into 2010. For example, EMC explained during its January 26, 2010 earnings conference call that "[w]e have good relationships with all of our suppliers," and the order with STEC for excess inventory "was designed to protect ourselves going into first quarter against what we knew would be a tight supply environment."

75.   STEC's stock price currently trades at $11.76, below the stock price at the beginning of the Class Period, and 72% below the Class Period high just seven months ago. The 9 million shares that Defendants Manouch and Mark Moshayedi unloaded to shareholders in the market at $31 per share are now worth only one-third of that.

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

76.   As set forth below, Defendants made repeated materially false and misleading statements to investors and the market throughout the Class Period regarding STEC's revenues, demand, and competition. Specifically, Defendants made false and misleading statements and omissions regarding: (i) STEC's revenues from Zeus; (ii) the $120 million supply agreement with EMC; (iii) STEC's customer base and future growth; (iv) STEC's product quality; (v) STEC's competition; and (vi) STEC's internal controls and compliance with GAAP and SEC regulations.

A.   STEC's Revenues From Zeus

77.   Before the open of the stock market on June 16, 2009, the first day of the Class Period, STEC issued a press release entitled "STEC Increases Its Guidance for the Second Quarter of 2009." The release highlighted the purported

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

increase in demand for the Company's ZeusIOPS SSD.   Specifically, the release
stated, in part:

> The Company expects to report Non-GAAP diluted earnings per share
> in the range of $0.32 to $0.36, versus the previous guidance of $0.20
> to $0.22 per diluted share announced on May 11, 2009.
>
> **The Company also expects to report revenue in the range of $82
> million to $84 million, versus the previous estimate of $68 million to
> $70 million.**
>
> The increased Non-GAAP diluted earnings per share and revenue
> guidance are **primarily the result of increases in the Company's
> ZeusIOPS sales** which are now estimated to exceed $55 million
> during the second quarter of 2009.
>
> The Company previously estimated revenue from ZeusIOPS SSDs to
> surpass $65 million during the first half of 2009.  With this increase in
> revenue, the Company now expects ZeusIOPS SSD sales to exceed
> $80 million during the first half of 2009.[1]

78.    Defendants' June 16, 2009 statements had a direct effect on STEC's
stock price, which immediately increased more than 27%, to $22.80 per share on
unusually high trading volume.

79.    Thereafter, on August 3, 2009, STEC issued a press release
announcing final results for the second quarter of 2009, entitled "Revenue, Gross
Profit Margin and EPS Higher On Faster-Than-Expected Adoption of Its Enterprise
Class Solid State Drives."  This release stated, in part, as follows:

> Revenue for the second quarter of 2009 was $86.4 million, an increase
> of 53.7% from $56.2 million for the second quarter of 2008, and an
> increase of 35.9% from $63.5 million for the first quarter of 2009.

---

[1] Unless otherwise noted, all emphasis is added.

Shipments of our ZeusIOPS Solid-State drives ("SSD") into the Enterprise-Storage market grew to $57.7 million for the second quarter of 2009, an increase of approximately 375% from $12.1 million for the second quarter of 2008, and an increase of approximately 125% from $25.7 million for the first quarter of 2009.

GAAP gross profit margin was 50.0% for the second quarter of 2009, compared to 32.3% for the second quarter of 2008 and 36.3% for the first quarter of 2009.   GAAP diluted earnings per share from continuing operations was $0.38 for the second quarter of 2009, compared to $0.03 for the second quarter of 2008, and $0.07 for the first quarter of 2009.

80.    The press release also provided the following guidance to analysts and investors:  "[w]e currently expect third quarter of 2009 revenue to range from $95 million to $97 million with diluted non-GAAP earnings per share to range from $0.45 to $0.47."

81.    The foregoing statements regarding increased second quarter revenue and second and third quarter guidance were materially false and misleading when made because Defendants knew or deliberately disregarded, but failed disclose, *inter alia*, that:

>    (a)    STEC was "shipping bricks," allowing it to record sales for goods that had not actually been shipped;

>    (b)    STEC's sales could not be sustained because some of the Company's customers, including IBM and Sun Microsystems, were having significant difficulties integrating STEC's products such that the Zeus was not being adopted by these important OEMs;

(c)     STEC pressured customers to accept orders before the quarter's end, regardless of the customers' need for that product at that time;

(d)     STEC reported revenues for products that were often rushed out prematurely without sufficient testing, and were later found to be faulty, causing frequent returns; and

(e)     STEC's revenues were based on products that were being shipped and paid for as new, despite having refurbished or damaged parts.

82.     The August 3, 2009 release quoted Defendant Manouch Moshayedi, in part, as follows:

"It is exciting to share such outstanding results today and to deliver significant revenue, gross profit margin and EPS growth for the second quarter of 2009," said Manouch Moshayedi, STEC's Chairman and Chief Executive Officer.  *"We have shown a significant improvement in our already strong balance sheet – particularly in the generation of cash and effective management of inventory – added four more major Enterprise-Storage OEMs to our blue chip customer list,* and surpassed our stated year-end 2009 non-GAAP gross profit margin goal of 40%, expanding it to 50% in the second quarter of 2009."

83.     These statements were materially false and misleading when made because Defendant Manouch Moshayedi knew or deliberately disregarded that the "generation of cash" and purported "effective management of inventory" were a result of STEC oversupplying customers, "shipping bricks," and accelerating sales to show increased revenue by quarter's end.

84.    Further, Defendants failed to disclose that it did not have the ability to develop quality products for or integrate its products with the four new "major Enterprise-Storage OEMs."

B.    The $120 Million Supply Agreement For Zeus

85.    On July 16, 2009, STEC issued a press release entitled "STEC Signs a $120 Million Supply Agreement for ZeusIOPS SSDs for 2H 2009 and Now Forecasts Sales of ZeusIOPS SSDs to Exceed $220 Million in 2009 – STEC and Its Major Enterprise Storage Customers Continue Collaboration to Drive Adoption of SSD Technology Into High-Performance Enterprise Storage Systems," which stated, in part:

> STEC, Inc. (Nasdaq: STEC), announced today that it has signed an agreement with one of its largest enterprise storage customers for sales of $120 million of ZeusIOPS SSDs in the second half of 2009. ***STEC believes that this agreement reflects the enterprise storage manufacturer's continued commitment to integrate STEC's SSD technology into the manufacturer's systems and validates significant storage system performance improvements enabled by STEC's ZeusIOPS SSDs in these enterprise systems. With this agreement signed, STEC now forecasts revenue from the sale of its ZeusIOPS drives will exceed $220 million in 2009.***

86.    Further, the Company's August 3, 2009 press release emphasized the $120 million contract as a "highlight[] for the second quarter of 2009": "[STEC] signed a recently-announced $120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer for the second half of 2009."

87.    Each of these statements regarding STEC's $120 million supply agreement for Zeus was materially false and misleading because, as detailed herein, Defendants knew or deliberately disregarded, but failed to disclose, that:

(a)    Such significant shipments would over-supply EMC – STEC's largest customer accounting for more than 90% of its Zeus sales – with several quarters' worth of excess inventory;

(b)    This increased revenue could not continue because EMC intended this $120 million order to cover its inventory needs until at least the middle of 2010, such that STEC's revenue would decline dramatically if it did not find additional large customers for the first half of 2010. As EMC stated in its January 26, 2010 earnings conference call, its $120 million build up of inventory in the fourth quarter "was designed to protect" EMC going into 2010 against a "tight supply environment." A February 23, 2010 Thomas Weisel Partners' report also noted that "EMC has *repeatedly indicated* that the SSD inventory build-up reflected a management choice to protect EMC against potential tightness of supply in 1H10";

(c)    The agreement did not validate significant storage system performance improvements because STEC supplied EMC with faulty products with high rates of failure; and

(d)    STEC's major commitment to EMC and other large customers meant that smaller customers suffered and were forced to wait double the lead time for products.

C.    <u>STEC's Customer Base And Growth</u>

88.    The July 16, 2009 release also quoted Defendant Manouch Moshayedi as follows:

"We are pleased to see that sales of our customer's enterprise storage systems utilizing our ZeusIOPS drives have grown significantly over the past few years," said Manouch Moshayedi, Chairman and Chief Executive Officer of STEC. ***"Our customers have helped evangelize***

1    *this technology and we are glad to be partnered with them as we*
2    *expect that they will help drive further innovation in SSD usage in*
3    *the highest-end of the enterprise storage markets."*

4    89.   Defendant Manouch Moshayedi's foregoing statement was materially
5    false and misleading because Defendants knew or deliberately disregarded that the
6    expectation that STEC's customers would "help drive further innovation in SSD
7    usage" was unrealistic because STEC was shipping "bricks" and faulty products to
8    its customers.   Defendants' statements regarding STEC's customers' help in
9    "evangeliz[ing] this technology" omitted the truth that STEC's customers were
10   having difficulty integrating its products and were frequently returning products as
11   a result of failures.   Undisclosed to investors, STEC was lying to customers about
12   failure rates and the steps the Company was taking to fix products and remedy
13   customers' concerns.   In fact, other major OEM's chose not to adopt STEC's
14   products because they heard of the high failure rates.

15   90.   STEC's August 3, 2009 press release also stated, in part:
16   In our prior quarter's earnings announcement we had estimated that
17   ZeusIOPS revenue for the first half of 2009 would surpass $53
18   million.   I am pleased to report that we have actually achieved $83
19   million in ZeusIOPS revenue for this period.   Although we are still
20   early in the process of the adoption of SSDs into the Enterprise-
21   Storage market, I believe that the $120 million supply agreement that
22   we signed for the second half of 2009 is a *further indication of the*
23   *future SSD growth and customers' acceptance* of SSDs into this
24   growing market.   I am very excited about our product road map –
25   specific to the Enterprise-Storage, Enterprise-Server and related
26   markets.

27   91.   Also on August 3, 2009, Defendants filed STEC's quarterly report
28   with the SEC on Form 10-Q for the second quarter 2009 ("2Q09 Form 10-Q").

Defendants Manouch Moshayedi and Cook signed the Company's 2Q09 Form
10Q, affirming the financial results and stating, in part:

> *We expect continued growth in the sales of our Flash-based SSD*
> *ZeusIOPS products through 2009 based on the accelerated adoption*
> *of our ZeusIOPS SSDs by most of our major enterprise-storage and*
> *enterprise-server OEM customers into their systems.* As part of this
> expected growth, on July 16, 2009 we announced an agreement with
> one of our largest enterprise storage customers for sales of $120
> million of ZeusIOPS SSDs in the second half of 2009.

92.    Defendants' statements in the August 3, 2009 press release and
STEC's 2Q09 Form 10-Q were materially false and misleading when made.  The
statements that the $120 million supply agreement "is a further indication of the
future SSD growth and customers' acceptance of SSDs into this growing market"
and touting "accelerated adoption" failed to disclose that customer "acceptance"
and "continued growth" would *not* continue once customers realized the poor
product quality they were receiving from STEC. Further, Defendants knew or
deliberately disregarded that the EMC deal was a "one-off" (*i.e.,* one time) deal
that would supply EMC for several months, was not an "indication of future SSD
growth," and, in accordance with GAAP, the EMC deal could not be recognized in
full during 2009.

93.    The same day, August 3, 2009, Defendants hosted a conference call
with analysts and investors to discuss STEC's second quarter 2009 financial results
and guidance.  Defendants Manouch Moshayedi and Cook participated in the call.
On that call, Defendants stated, in part:

> [ANALYST:] If I'm looking at the math right, with the 39% of
> revenue that you got from your largest customer, be it maybe EMC,
> we'll assume, and what you're guiding, I guess still reiterating the 220
> in terms of Zeus revenue for the full year, it seems to me that you're –

1   are you being relatively pretty conservative with regard to the ramp to

2   the other customer opportunities, which I think last quarter you said

3   would reach into full production in Q3?

4   [MANOUCH MOSHAYEDI:] *Yes, so I think other customers are*

5   *taking a little bit longer than expected in terms of full production.*

6   They're introducing the systems into the market. *It looks like*

7   *everybody is going through the same trials and tribulations that our*

8   *first customer went through in terms of sales and marketing side.*

9   So, it's still a, I would say, maybe a quarter or two away from full

10  ramping production.

11                          *        *        *

12  [ANALYST:] Quick question on EMC, your largest customer.  They

13  made a comment about, on their earnings call about shipping close to

14  a petabyte [or] actually over a petabyte of Flash related storage year to

15  date.  And that conference call took place three weeks into the month

16  of July.  Obviously there's been a fairly steep ramp, particularly in

17  light of, if we're guessing correctly, to that large supply contract you

18  signed for second half of the year involved, but how much of – if

19  we're thinking about that petabyte shift, was July a fairly big month

20  for you guys in terms of shipments so far?  Just want to get my hands

21  around the steepness of the ramp going into the second half of the

22  year.

23  [MANOUCH MOSHAYEDI:] [W]e think that ZeusIOPS sales from

24  Q to Q is going to go up about $10 million from Q2 to Q3. *So the*

25  *ramp right now about 20% rate on a quarterly basis.*  That's

26  basically based on one customer in production, *four customers are*

27  *still in pre production type of stage.*  So I think we will start seeing a

28  ramp on a few things.  One of our customers is in the middle of

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

discussions in terms of M&A discussions. I think once that gets resolved, the customer will kick back in and start buying at its original rate. ***The other three customers are very large, and it takes them a little longer to get all the parts right. So I think once they start kicking in, we will see huge ramps in sales of ZeusIOPS going forward.*** I don't know if it's going to be next quarter, the quarter after, but it will come sooner or later.

94. Defendants' statements that STEC's new customers were "going through the same trials and tribulations that our first customer went through in terms of sales and marketing side" and that these customers were "very large, and it takes them a little longer to get the parts right" were materially false and misleading when made because Defendants knew or deliberately disregarded that these customers were actually facing significant problems integrating STEC's products. In particular, Defendants knew or deliberately disregarded, but failed to disclose that:

> (a) STEC promised customers features that the products lacked, and that could not be added without the Company taking a complete loss on its existing version of the product;

> (b) STEC pressured its major customers to design their products to suit STEC's offerings, rather than tailoring its products to suit its customers' needs;

> (c) Prior customers, including Sun Microsystems, refused to continue to do SSD business with STEC due to a lack of product quality; and

> (d) Similar product quality issues and STEC's misrepresentations regarding failure rates and reasons for failure strained STEC's relationship with Cisco – its biggest customer before EMC.

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

95.   On September 10, 2009, STEC issued a letter responding to an August 28, 2009 comment letter from the SEC that inquired, in part, regarding whether STEC was "substantially dependent" on EMC.  In that letter, which was publicly filed with the SEC, STEC stated, in part:

> [I]n the unlikely event a customer should default under a purchase order or other sales agreement, STEC generally believes it could find a replacement customer for the relevant product. STEC additionally could enter into a sales agreement with a new customer which would, in turn, reduce the corresponding percentage of revenues attributable to ongoing customers during a specific period.
>
> STEC recognizes the loss of a customer or a significant reduction in purchases by a customer could impact revenues. STEC does not believe, however, that its business would be fundamentally altered without a specific customer sales agreement to suggest the Company's business is substantially dependent upon that agreement.

96.   STEC reiterated this contention in a second letter to the SEC, dated October 13, 2009. In that publicly filed letter, STEC stated again that: "STEC does not believe that it was substantially dependent upon the underlying agreements in place with these customers . . . ."

97.   In truth, EMC accounted for 90% of STEC's sales of Zeus and approximately half of STEC's overall revenue. However, by the time STEC sent this October letter to the SEC, still undisclosed to investors, the Company had already accrued $1.5 million in expenses for a joint marketing project designed to assist EMC in selling its excessive inventory of STEC products. At the time these statements were made, Defendants knew or deliberately disregarded that EMC would have an inventory carryover in 2010 that would reduce STEC's sales and would force STEC's revenues to suffer significantly for at least the first quarter of 2010. In fact, STEC eventually announced that its 1Q10 revenue would be as

1  much as 53% lower than Wall Street's expectations as a result of oversupplying
2  inventory to EMC.

3          D.    <u>STEC's Product Quality</u>

4          98.    In STEC's July 16, 2009 press release, STEC stated:

5        The STEC ZeusIOPS SSD product family offers a comprehensive
6        array of options for enterprise system architects.   ZeusIOPS SSD
7        provides a wide range of interface options, spanning Fibre Channel to
8        SAS to SATA, as well as the widest range of capacity options,
9        spanning 73GB to 1TB.   Fundamental to the ZeusIOPS product
10       family is the proprietary SSD architecture which renders an
11       enterprise-optimized storage device ***with an unprecedented***
12       ***combination of performance and energy efficiency.***

13         99.    In addition, STEC's 2Q09 Form 10-Q stated:

14       Our products are designed specifically for storage systems and servers
15       that run applications requiring a high level of input/output operations
16       per second, or IOPs, performance, capacity, ***reliability*** and a low
17       amount of latency.

18         100.   The foregoing statements touting the quality and reliability of STEC's
19 products were materially false and misleading when made because, as detailed
20 herein, Zeus was not an "enterprise-optimized storage device with an
21 unprecedented combination of performance and energy efficiency" nor was it
22 "reliab[le]."   In truth, Defendants knew or deliberately disregarded that STEC's
23 customers had trouble integrating Zeus with their systems. Moreover, STEC's
24 products, including Zeus, had material problems including, *inter alia*, unusually
25 high failure rates, bugs, software issues, hardware wear leveling, thermal problems,
26 poor coding, problems with the controllers, and battery problems.

27

28

E.    STEC's Competition

101.   During STEC's August 3, 2009 earnings conference call, Defendants
emphasized that STEC had no competition.  Specifically, Defendants represented
the following:

> [MANOUCH MOSHAYEDI:] We think that go forward – on a go-
> forward basis, our margins business I think will remain in the 50 to
> 60% area.  As you know, *we have no competition at this stage*. In
> addition to that, the current hard drive manufacturers in the enterprise
> area are still making upwards of 40% margin in that business. So we
> feel that even going forward, if we have competition in the area of
> enterprise, with moving to Malaysia, with combination of changing
> our FPGAs to ASIC next year, and also the capacity that we've built
> in Malaysia and being able to build all of these – streamline all of the
> buildings of the SSDs, I think we will be able to maintain about 50%
> margin for ZeusIOPS. And as ZeusIOPS grows to be the biggest part
> of our sales, I think we'll maintain the same type margins.

102.   Also on the August 3, 2009 call, Defendant Manouch Moshayedi
stated that the probability of another company coming out with a product like
ZeusIOPS was "**zero**."

103.   On August 3, 2009, pursuant to Form S-3ASR, STEC filed a
Registration Statement with the SEC for the offering of the Moshayedis' personally
held shares of STEC.  The Registration Statement was signed by Defendants
Manouch Moshayedi, Mark Moshayedi, and Cook, and certain directors.

104.   The Company filed a Prospectus for the offering with the SEC on
August 7, 2009, which was incorporated into the Registration Statement filed on
August 3, 2009.  The Prospectus also incorporated by reference the 2Q09 Form
10-Q, in addition to other SEC filings.  The Prospectus included the following
representations that it would be difficult for competitors to catch up with STEC:

-37-                    CONSOLIDATED COMPLAINT
                        Lead Case No. SACV 09-01304-JVS (MLGx)

We believe that we are a technology leader in solid-state storage due to our nearly 20 years of focus on advanced memory solutions. Throughout our history, we have delivered advanced memory and storage solutions to a wide range of customers in various market segments, and we continue to develop products to meet the need of enterprises to constantly improve the retention of, and access to, critical data at high performance levels.

**Our solutions**

The key features of our products include:

- *Proprietary controller IC technology.* In order to be first-to-market with innovative storage technologies, we design the fundamental logic for our SSD products. The controllers within our various SSD products are the key to enabling high levels of performance and reliability.

- *High degree of customization.* Products sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements.

* * *

- *High reliability.* Our products are built utilizing sophisticated error detection and correction processes to provide high data reliability and integrity. In addition, our products are designed to withstand high levels of shock and vibration as well as extreme temperature fluctuations.

105. These statements were materially false and misleading when made. STEC's products did not have "high levels of performance and reliability" or "meet . . . customers' specific design requirements." In truth, Defendants knew and/or deliberately disregarded that STEC's customers had difficulty integrating

CONSOLIDATED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

Case 8:09-cv-01304-JVS -MLG   Document 83   Filed 04/09/10   Page 42 of 42   Page ID #:1062

STEC's products, received faulty products with high failure rates, were promised product features that STEC never delivered, and were expected to adjust their products and test STEC's products by trial and error, rather than receiving products that met those customers' design requirements.

106. Furthermore, STEC's products did not "utilize[] sophisticated error detection and correction processes" or "provide high data reliability and integrity." In truth, Defendants knew and/or deliberately disregarded that STEC's products were unreliable and entire orders frequently had to be shipped back to STEC for error detection, after which STEC would lie about the quantity and type of errors. Further, certain STEC customers were expected to test out several versions of a product to see what worked when STEC lacked the ability to do a failure analysis.

107. Nor did STEC's products "withstand . . . extreme temperature fluctuations." In truth, Defendants knew and/or deliberately disregarded that STEC's products failed environmental tests, failing immediately under any high temperature, and Defendants lied to customers about the products' certification.

108. In truth, Defendants knew and/or deliberately disregarded that competition would likely enter the market within the next six months. For example, Defendants knew and/or deliberately disregarded that STEC's competitor, Pliant Technology, had begun sampling an enterprise SSD with customers and expected an initial qualification in the fourth quarter. They also knew and/or deliberately disregarded that other competitors, such as Hitachi, were on track to qualify its SSD in early 2010. Defendants knew this and other information showing actual competition at least as early as July 2, 2009, when an industry-specific website, Enterprise Storage Forum, published an article entitled "Solid State Drive Developers Try To Catch STEC."

109. Defendants also knew or deliberately disregarded that STEC faced the risk that its customers would seek new vendors to develop and qualify better products, and not continue its relationship with STEC if it continued to "ship

-39-                          CONSOLIDATED COMPLAINT
                                      Lead Case No. SACV 09-01304-JVS (MLGx)