BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
Blair A. Nicholas (Bar No. 178428)
blairn@blbglaw.com
Timothy A. DeLange (Bar No. 190768)
timothyd@blbglaw.com
Niki L Mendoza (Bar No. 214646)
nikim@blbglaw.com
Takeo A. Kellar (Bar No. 234470)
takeok@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

KAHN SWICK & FOTI, LLC
Kim E. Miller (Bar No. 178370)
kim.miller@ksfcounsel.com
Melissa Ryan Clark (*Pro Hac Vice*)
melissa.clark@ksfcounsel.com
Michael A. McGuane (*Pro Hac Vice*)
michael.mcguane@ksfcounsel.com
500 5th Ave., Suite 1810
New York, NY 10110
Tel: (212) 696-3730
Fax: (504) 455-1498

*Co-Lead Counsel for Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. SACV 09-01304-JVS (MLGx)<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:  Hon. James V. Selna<br>Ctrm:   10C<br>Date:   July 12, 2010<br>Time:   1:30 p.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL STANDARDS .........................................................................................4

ARGUMENT ........................................................................................................4

I.   THE COMPLAINT ALLEGES DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS WITH PARTICULARITY .............................4

II.  THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ..................................8

    A.   LEGAL STANDARD FOR SCIENTER .................................................8

    B.   DEFENDANTS' MASSIVE AND UNPRECEDENTED INSIDER SALES SUPPORT A STRONG INFERENCE OF SCIENTER ........................................9

    C.   STATEMENTS FROM CONFIDENTIAL WITNESSES SUPPORT A STRONG INFERENCE OF SCIENTER ...............................................................12

    D.   THE IMPORTANCE OF ZEUS TO STEC'S CORE OPERATIONS SUPPORTS A STRONG INFERENCE OF SCIENTER .................................................16

    E.   DEFENDANTS' GAAP VIOLATIONS SUPPORT SCIENTER ....................18

III. THE COMPLAINT ADEQUATELY ALLEGES CAUSATION ............................18

IV.  THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON LIABILITY ..25

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................ YESH4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................4

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) ..........13, 16, 18

*Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009) ....................15, 16

*Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996) ........................................................25

*Const. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences*, Inc., 2008 WL 2053733 n.10 (S.D. Cal. May 13, 2008) ...............12

*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000) ....................................5

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).................7, 18, 19, 20, 21, 25

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ........................................................................................20

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ....................................................12

*Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40 (D.D.C. 2006) ................................................................................................................19

*Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367 (9th Cir. 2003) ................7

*Glenbrook Capital Ltd. P'ship v. Kuo*, No. 07-CV-02377, 2008 U.S. Dist. LEXIS 80888 (N.D. Cal. Apr. 3, 2008).........................................................9

*In re 21st Century Holding Co. Sec. Litig.*, No. 07-CV-61057, 2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) ................................................................15

*In re Bristol-Meyers Squibb Sec. Litig.*, 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ........................................................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................................................11, 17

*In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ...4, 9, 13, 14, 19, 20

*In re DDi Corp. Sec. Litig.*, No. 03-7063, 2005 U.S. Dist. LEXIS 28216 (C.D. Cal. July 20, 2005).......................................................................7

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ............................4, 20

*In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...................................................................................................12

*In re Hypercom Corp. Sec. Litig.*, No. 05-0455, 2006 WL 726791 (D. Ariz. July 5, 2006) ........................................................................................16

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) ..................................................................................................................19

*In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356 (N.D. Cal. July 18, 2007) ...............................................................................18

*In re LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 42425 (N.D. Cal. May 29, 2008)..........................................................................................13

*In re Metropolitan Sec. Litig.*, 2010 WL 300402 (E.D. Wash. Jan. 20, 2010) ...................................................................................................................19

*In re Northwest Biotherapeutics Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 54028 (W.D. Wash. July 2, 2008)..............................................18

*In re Omnivision Techs, Inc.*, 2005 WL 1867717 (N.D. Cal. July 29, 2005) ...................................................................................................................19

*In re Oracle Corp. Sec. Litig*, 2009 WL 1709050 (N.D. Cal. June 19, 2009) ...................................................................................................................22

*In re REMEC Inc. Sec. Litig.*, --- F. Supp. 2d ----, 2010 WL 1676741 (S.D. Cal. 2010) ........................................................................................9

*In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................................................................18

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. Ill. 2008) ..................................................................................................................17

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297 (C.D. Cal. 1996) ....................................................................................10

*McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) ........................20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) ..............................................................................................20

*Miller v. Thane*, 519 F.3d 879 (9th Cir. 2008) ..........................................7

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ...........................18

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding*, 320 F.3d 920 (9th Cir. 2003) ..........................10, 11, 25

iii

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
   411 F. Supp. 2d 1172 (N.D. Cal. 2005)................................................19

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) .................................8

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) .............................9, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)...............4, 9, 13

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) ....................4

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ....................................................5

15 U.S.C. §§ 78u-4 (b)(2) ......................................................9

iv

Keith A. Ovitt and Arman Rashtchi ("Lead Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Complaint (the "Complaint").[1]

## INTRODUCTION

This is a case of greed – a fraudulent scheme that created a three-month window for the two top executives (and brothers) at STEC to sell off nine million shares of stock, approximately half of their holdings, for proceeds exceeding *$267 million*. On June 16, 2009, the first day of the Class Period, and again on July 16, 2009, Defendants announced huge increases in STEC's revenue guidance. This news was a departure from STEC's prior guidance, and the stock price soared as a result. Defendants explained that the guidance increases resulted from growth in the Company's sales of its flagship product, Zeus IOPS SSD ("Zeus"), and a $120 million deal with the Company's largest customer, EMC Corporation ("EMC") for the third and fourth quarters of 2009. Defendants touted the increased revenue growth and EMC deal as indicative of future sales and growth.

As the stock price quickly rose to unprecedented levels, the Moshayedis cancelled their newly-adopted Rule 10b5-1 trading plans and sold nine million shares of STEC stock through a "secondary offering" at $31 per share – nearly *double* STEC's stock price just two months earlier at the beginning of the Class Period. The Moshayedis collectively sold more than 11 times the number of shares they sold in the six months before the Class Period and 20 times the number of shares they sold in all of 2008. In short, this was the largest insider selling spree in the history of the Company. The sequence of events over this short time period elucidates Defendants' fraud:

- May 29, 2009 → the Moshayedis enter into 10b5-1 plans which regulate

---

[1] Defendants are STEC, Inc. ("STEC" or the "Company") and its top executives: Chairman and Chief Executive Officer, Manouch Moshayedi; President, Chief Operating Officer, and Chief Technology Officer, Mark Moshayedi; and Chief Financial Officer, Raymond D. Cook.

the timing, pricing, and quantity of their stock trades

- June 16, 2009 → Defendants increase earnings and revenue guidance, attributing their sudden growth to successful sales of STEC's flagship product, the ZeusIOPS;

- July 16, 2009 → Defendants announce a $120 million contract with EMC for the Company's flagship product and told investors this deal "reflects [EMC's] continued commitment to integrate STEC's SSD technology" and "will help drive further innovation in SSD usage";

- August 3, 2009 → *two weeks* after that announcement (during which the stock rose over 28%), while again touting the EMC deal as a "further indication of the future SSD growth and customer's acceptance of SSDs," Defendants cancelled their 10b5-1 plans and set out to conduct a secondary offering by which they profited in excess of $267 million;

- September 17, 2009 → just *one month* after the secondary offering, the truth begins to be revealed.

The Complaint sets forth in exacting detail Defendants' fraudulent scheme, specifying myriad materially false and misleading statements concerning the Company's revenue, demand, product quality, sales, and competition; the reasons why the statements were false and misleading; and the bases for Defendants' knowledge or reckless disregard in disseminating these statements.[2]

Lead Plaintiffs' detailed allegations are supported by their extensive investigation, which includes reports from thirteen well-placed confidential witnesses ("CW"s) confirming Defendants' corrupt business practices, including: (i) "shipping bricks": STEC's common practice of shipping empty packages or packages containing the wrong product, allowing STEC to immediately record revenue for product that was not actually shipped; (ii) forcing customers to accept inventory by a fiscal quarter's deadline regardless of that customer's actual need for STEC's products at that time; (iii) shipping defective or untested product; (iv) selling product as "new" even though it contained refurbished or rejected parts; (v)

---

[2] *See* ¶¶76-125. "¶" refers to paragraphs in the Complaint.

2

lying to customers about product quality, features, certifications, testing, and failure rates; (vi) altering error reports before sending them to customers; and (vii) manipulating accounting for revenue from the EMC contract in violation of generally accepted accounting principles ("GAAP"). *See* ¶¶22, 37-75, 186-200.

As would later be revealed through multiple partial disclosures beginning on September 17, 2009, and concluding on February 23, 2010, STEC's purported increased revenue was derived from *a single customer*, in a *one-time deal* that – contrary to Defendants' misrepresentations – was not indicative of continuing demand for STEC's products. In fact, STEC's customers were so dissatisfied that at least one of the Company's Tier One customers defected to develop a competing product with a company other than STEC. Contrary to Defendants' prior representations that the EMC transaction was for inventory for only two quarters – it would, in fact, adversely impact STEC's entire first half of 2010. By the time the truth was fully revealed, STEC's stock price had plummeted from a Class Period high of $41.84 to $10.27, falling over 23%.

In seeking to avoid liability, Defendants disregard many of Plaintiffs' most damaging allegations and make illogical conclusions about others. For example, Defendants ignore the SEC's formal investigation relating to the massive, suspiciously-timed insider selling. ¶¶2, 34-35, 67, 171. In addition, Defendants assert the illogical inference that Defendants Manouch and Mark Moshayedis' $267 million in insider trading proceeds were not "suspicious" because STEC's stock price increased slightly *after* Defendants made their spectacular profits. Defendants are wrong. While they may not have accurately predicted the precise peak in STEC's stock price, the only logical inference is that Defendants knowingly, or with deliberate disregard, issued materially false and misleading statements to temporarily increase the price of STEC stock to allow them to sell massive amounts of stock for their own personal gain and to the detriment of Lead Plaintiffs and the Class. For these and other reasons discussed herein, Defendants'

motion should be denied.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) should be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This is not a "probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" a claim for relief. *Twombly*, 550 U.S. at 556. All factual allegations must be taken as true and construed in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th  Cir. 2005).  As the Ninth Circuit explains, "a district court ruling on a motion to dismiss is not sitting as a trier of fact . . . so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

In addition, the reviewing court must "draw all reasonable inferences in favor of the nonmoving party" and "any existing ambiguities must be resolved in favor of the pleading." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). To adequately state a claim under Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), a private plaintiff must allege: (i) a material misrepresentation or omission of fact; (ii) made with scienter; (iii) in connection with the purchase or sale of a security and upon which plaintiff relied; (iv) that the alleged misrepresentation or omission was the proximate cause of plaintiff's injury; and (v) damages. *Daou*, 411 F.3d at 1014.

## ARGUMENT

### I.   THE COMPLAINT ALLEGES DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS WITH PARTICULARITY

The PSLRA requires only that a complaint "specify each statement alleged

4

to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see also Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000). Here, as detailed below, the Complaint sufficiently alleges Defendants' materially false and misleading Class Period statements. ¶¶76-125. Specifically, the Complaint details material misstatements and omissions regarding: (i) revenues from Zeus; (ii) the $120 million supply agreement with EMC; (iii) customer base and future growth; (iv) product quality; (v) competition; and (vi) internal controls and compliance with GAAP and SEC regulations. For example, the Complaint details Defendants' false and misleading statements and omissions on July 16, 2009, and August 3, 2009, regarding the EMC agreement, including that Defendants falsely touted the EMC supply agreement as an indicator of continued revenue growth. ¶¶85-86. The Complaint further explains that Defendants knew or deliberately disregarded, but failed to disclose, *inter alia*, that such significant shipments would over-supply EMC with several quarters' worth of excess inventory, and that this temporary increase in revenue would not continue because EMC intended the order to cover its inventory needs until at least the middle of 2010. ¶87(a)-(d).

In response, Defendants assert that "even EMC did not know that it would be unable to sell through its inventory to customers." Defendants' Motion to Dismiss ("Br.") at 8-9 (emphasis omitted). This contention directly contradicts EMC's own statements that it had always planned to carry over inventory into 2010, and that STEC had a close-knit and communicative relationship with EMC and thus had reason to know EMC's inventory needs. ¶¶74, 143, 148. Furthermore, GAAP required Defendants to monitor EMC's use and sales of inventory in order to properly record revenue. ¶¶193-194, 196-199. Clearly, Defendants' statements regarding the EMC agreement and its impact on future revenues and growth were materially false when made.

The Complaint further alleges that Defendants' statements touting Zeus's

"performance, capacity, [and] reliability" were materially false and misleading. Specifically, STEC's products, including Zeus, had material problems including, *inter alia*, unusually high failure rates, bugs, software issues, hardware wear leveling, thermal problems, poor coding, problems with controllers, and battery problems. ¶100. In fact, STEC's customers had trouble integrating Zeus with their systems. *Id.* Indeed, numerous CWs corroborate and confirm the "unusually high failure rate" for STEC's solid state drives (SSDs) (¶42, *see infra* at [§III C]). The Complaint details specific instances of Defendants lying to customers regarding Zeus's high failure rates (¶¶ 22(c), 22(f)-(g), 47) and knowingly supplying customers with false product specifications (¶¶49, 43, 48). The Complaint sufficiently identifies the false statements regarding Zeus's performance, and details why those statements were false when made.

Likewise, Defendants made misstatements and omissions regarding STEC's improper accounting and revenue practices. ¶¶186-200. For example, the Complaint details how Defendants violated at least three out of four of the SEC SAB 104 criteria because at the time STEC recognized revenue from the EMC deal: (i) there was not "persuasive evidence of an arrangement"; (ii) STEC had not provided all of the required services; and (iii) STEC's price to the buyer was not fixed or determinable. ¶190. Completely ignoring the first and third independent bases for Defendants' violations, Defendants instead contend only that Lead Plaintiffs plead no facts suggesting that there were "required services" under the EMC agreement. *See* Br. at 15-16. Defendants are wrong. In truth, the Complaint alleges in detail – citing Manouch Moshayedi's own statements – that the EMC manufacturer's development fund ("MDF") did, in fact, constitute required services under GAAP. ¶¶191-92.[3]

---

[3] Defendants' conclusory assertion (Br. at 19, n. 6) that certain statements are protected by the Safe Harbor is devoid of argument or analysis. The Ninth Circuit is clear, however, that "[d]ismissal on the pleadings under the bespeaks caution

The Complaint further details Defendants' false and misleading statements and omissions regarding STEC's competition, including, for example, Manouch Moshayedi's insistence that "we have no competition at this stage" and that the probability of another company coming out with a product like Zeus is "zero." *See* ¶¶101-12. Defendants factually dispute the plain meaning of Manouch Moshayedi's statements and omissions, and argue that his statements were not false because he did not expressly state that STEC would "never" face competition. Br. at 20. As the Ninth circuit has made clear, however, "statements literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane*, 519 F.3d 879, 886 (9th Cir. 2008)

Defendants' assertion that their statements are shielded from liability because they were "puffery" should be rejected. Br. at 17-18, 21-22. Only "generalized, vague, and unspecific assertions" upon which no reasonable investor could rely may constitute puffery. *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003). This fact-based defense is premature, *see In re DDi Corp. Sec. Litig.*, No. 03-7063, 2005 U.S. Dist. LEXIS 28216, at *53-*54 (C.D. Cal. July 20, 2005), and unavailable where, as here, "there is no reasonable basis for the belief, or [] the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006).

Defendants' contention that Lead Plaintiffs failed to "support an inference that there was a *material* misstatement of STEC's revenues" ignores the detailed allegations of the Complaint, including the chart precisely quantifying Defendants' overstatement of revenues, operating income, and earnings. ¶196. Furthermore, the very existence of STEC's pervasive and improper revenue inflation practices, which according to CW9 occurred with such frequency that they were "some sort

---

doctrine . . . requires a stringent showing," *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).

of tradition" at STEC, is material apart from any tangible relationship to revenues. A reasonable investor would surely want to know whether a Company had been "shipping bricks" "for years" (¶¶40-41), accelerating sales on the CEO's directive to make revenue numbers "look grand" (¶51), or lying to customers regarding product failure rates and specifications, which management considered a "business decision" (¶48). *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Materiality is established by showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information.").

Finally, Defendants' assertion that "STEC actually exceeded its guidance for both the second and third quarters of 2009" is misplaced. Br. at 19. In fact, as detailed in the Complaint, the accounting manipulations and GAAP violations enabled STEC to exceed its guidance. ¶58 (noting "such reported revenue growth was only obtained through accounting manipulations and GAAP violations").

## II.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

The Complaint creates a compelling inference of scienter, with extensive allegations that Defendants made material false and misleading statements and omissions in order to reap $267 million on insider sales. These suspicious sales are now the subject of a formal SEC investigation. Defendants' scienter is further corroborated by 13 CWs who attested that Defendants acted intentionally, were well-informed of, and in some cases *directed,* STEC's bad business practices of shipping bricks, lying about product quality and product failure rates, prematurely recording revenue, forcing customers to accept inventory to show "grand" revenue numbers, and shipping faulty or refurbished products as new – all while falsely representing that STEC's increased revenue growth and the EMC deal were indicative of future sales and growth.

### A.   LEGAL STANDARD FOR SCIENTER

A "strong inference" of scienter is raised when "a reasonable person would

deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 310. A plaintiff pleads a strong inference of scienter by alleging "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Daou*, 411 F.3d at 1014-15. "A corporate defendant's scienter is necessarily derived from its employees." *In re REMEC Inc. Sec. Litig.*, --- F. Supp. 2d ----, 2010 WL 1676741, 45 (S.D. Cal. 2010) (quotation omitted).

Courts are to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA [scienter] requirement." *South Ferry LP*, *No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (suggesting previous jurisprudence was "too demanding").

Moreover, "[b]ecause falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," the Ninth Circuit has "incorporated the dual pleading requirements of [falsity and scienter] into a single inquiry." *Glenbrook Capital Ltd. P'ship v. Kuo*, No. 07-CV-02377, 2008 U.S. Dist. LEXIS 80888, at *19 (N.D. Cal. Apr. 3, 2008). Thus, the Complaint's well-pled allegations supporting the false and misleading nature of Defendants' misstatements and omissions also support a strong inference of scienter.

## B. DEFENDANTS' MASSIVE AND UNPRECEDENTED INSIDER SALES SUPPORT A STRONG INFERENCE OF SCIENTER

Allegations of "unusual" or "suspicious" stock sales that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" are particularly relevant to the scienter inquiry. *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (quotations omitted). In making this determination, courts look to: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether

the sales were consistent with the insider's prior trading history." *Id.* Here, Lead Plaintiffs' allegations of Defendants' massive and unprecedented insider trading, totaling $267 million, in a remarkably short window of opportunity, are acute evidence of scienter.

Defendants address their insider trading without ever mentioning the SEC's formal investigation into Defendants' sales, the massive quantity of shares sold, or their proceeds. The Complaint details how, after falsely fueling an extraordinary rise in the price of STEC stock from $4 per share in December 2008 to $35.50 per share on August 3, 2009 – an increase of over 850% – Defendants Manouch and Mark Moshayedi sold nine million shares of STEC stock – constituting a majority of their total STEC holdings – for proceeds of $267.8 million in a single day. ¶¶18-19, 60-72. These sales were perfectly-timed – just two months after Defendants' false statements and omissions sent the stock price soaring, and just a month before the truth began to be revealed, sending the stock price plummeting. *See* ¶¶9, 60-72.

Thus, as the Ninth Circuit held in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding*, 320 F.3d 920 (9th Cir. 2003), both the large amount of the sales and the near-perfect timing of the sales support a strong inference of scienter. *Id.* at 939 (finding fact that sales occurred just before peak stock price and just prior to the stock's decline as "troubling" and supporting scienter); *see also Marksman Partners*, *L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1312-13 (C.D. Cal. 1996) (sales of 20% of insider's shares, "especially where the dollar amounts involved are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation," inference was strengthened because sales took place "while the market was still receiving allegedly misleading revenue information" and the insider had not sold in the previous three years).

Defendants concede, as they must, that Mark and Manouch Moshayedi's sales were dramatically out of line with their prior trading history. *See* Br. at 7 (explaining Defendants' decision to abandon their "long-term strategy for asset

diversification, estate planning, and liquidity" embodied in their 10b5-1 trading plans in favor of the secondary offering). In fact, in the short three month window, Mark and Manouch Moshayedi sold more than *11 times* the number of shares sold in the six months preceding the Class Period and *20 times* the number of shares sold in all of 2008. ¶68.

Faced with these uncontroverted facts, Defendants resort to the unremarkable argument that "Mark and Manouch left over $100 million on the table," and therefore their trades somehow cannot be suspicious. Br. at 24-25. It is beyond dispute, and the Complaint alleges, that Mark and Manouch Moshayedi timed their sales to take advantage of a near all-time high of $31 per share *before* negative news was revealed. Indeed, there are only two months in the Company's entire history in which its stock price traded higher. ¶68. Defendants need not have sold exactly at the peak price. The fact that they sold just before the peak price, and just prior to the stock price decline, is sufficiently suspicious so as to support a strong inference of scienter. *See Am. West*, 320 F.3d at 939.[4]

The timing of Defendants' insider sale is also suspicious because it occurred immediately after the Moshayedis abandoned their 10b5-1 trading plans. 10b5-1 trading plans are intended to dispel concerns over insider trading by "allow[ing] corporate insiders to 'passively' sell their stock based on triggers, such as specified dates and prices, without direct involvement." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (citation omitted). As a result, "[s]tock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious." *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008); *see also Const. Laborers Pension Trust of*

---

[4] In *Ronconi*, relied on by Defendants, defendants "sold at about what the stock was worth *after* the bad news was public, not when they might have gained market advantage from as yet undisclosed bad news." 253 F.3d at 435 (emphasis added). Here, Defendants sold at $31 per share, far above the $10.27 share price at which the stock closed after the truth was revealed.

*Greater St. Louis v. Neurocrine Biosciences*, Inc., 2008 WL 2053733, at *7 n.10 (S.D. Cal. May 13, 2008). Defendants' contention (Br. at 7) that the Moshayedis cancelled their 10b5-1 plans and dumped nine million shares of STEC stock in the wake of the Company's announced $120 million supply agreement with EMC – *for the purpose of dispelling concerns over insider trading* – is ridiculous. To the contrary, their abrupt 10b5-1 plan cancellation and formulation of a plan to dispose of their holdings following the $120 million agreement with EMC is compelling evidence of Defendants' scienter. *See Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995) ("In addition, the Complaint pleads facts that show that the decision to terminate the expansion program was made very shortly after the optimistic statements were made. . . . This shortness of time is circumstantial evidence that the optimistic statements were false when made.").

Finally, Defendants' assertion that Defendant Cook's lack of insider sales is inconsistent with knowledge of the fraud is obfuscation. As STEC's Form DEF 14A Proxy Statement filed in connection the 2010 Annual Meeting of Shareholders makes clear, Cook's total beneficial ownership consisted of options yet to be exercised as of May 27, 2010. Defendant Cook had no shares to sell and, therefore, the absence of sales cannot shield Defendants from the strong inference of scienter.[5]

## C.   STATEMENTS FROM CONFIDENTIAL WITNESSES SUPPORT A STRONG INFERENCE OF SCIENTER

The Complaint details how the Company's top officers, Manouch and Mark Moshayedi, directly engaged in manipulative practices specifically designed to inflate STEC's stock price. Defendant Manouch Moshayedi ordered such practices because Defendants wanted the quarterly revenue numbers to "look grand," and

---

[5] Defendants' reliance on *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007), is misplaced. In *Hansen*, the court found that plaintiffs improperly lengthened the class period to sweep in sales unrelated the fraud. *Id*. at 1160-61.

Defendant Mark Moshayedi declared such practices were Defendants' "business decision." ¶¶48, 51. Based on the eyewitness accounts of thirteen former STEC employees and customers with direct knowledge of and participation in the occurrences alleged, the Complaint details how Defendants systematically inflated STEC's stock price by making materially false and misleading statements and omissions regarding their corrupt business practices and future growth prospects. *See* ¶¶22, 37-75.

Here, the Complaint's CWs "are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." *Tellabs*, 513 F.3d at 712. With respect to each CW, the Complaint sets forth his/her specific job title or description, duration of employment, and what the witness knew in relation to the fraudulent practices at STEC. ¶22(a)-(m). The Complaint also identifies specific transactions, providing approximate date(s) and places. ¶¶37-51. In sum, the Complaint more than satisfies the Ninth Circuit requirement for pleading confidential sources with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'" *Daou*, 411 F.3d at 1015.

Instead of addressing these detailed factual allegations, Defendants merely attack the credibility of the CWs. *See*, *e.g.* Br. at 16-17. Defendants' efforts fail. CWs need not have been in a position to know facts "first-hand" so long as they are described with "sufficient particularity to support the probability" the witnesses were "in a position to infer" or "could reasonably deduce" the facts attributed to them. *Berson v. Applied Signal Tech.*, *Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).[6]

---

[6] *See also In re LDK Solar Sec. Litig.*, 2008 U.S. Dist. LEXIS 42425 at *23 (N.D. Cal. May 29, 2008) ("For pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense. Rather, the source must be one whose context and access to critical information makes him or her

Where, as here, Defendants make "speculat[ative]" arguments in support of dismissal that are contrary to well-pleaded facts established by CWs, "these disputes must at least await discovery" as such factual determinations are not appropriately determined at this stage of the proceedings. *Id.* Courts look to the level of detail provided by the confidential source, the corroborative nature of other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia. *Daou*, 411 F.3d at 1015.

Defendants ignore the lion's share of the Complaint's CW allegations and instead baldy contend that "plaintiffs have not come close to alleging facts creating a 'strong inference' of scienter with regard to STEC's recognition of revenue" and that Lead Plaintiffs failed to plead "any facts suggesting knowledge or intent on Defendants' part." Br. at 16-17. In truth, however, the Complaint alleges, for example, detailed facts of directives from Defendant Manouch Moshayedi to move sales into the third quarter of 2009 to make the revenue numbers "look grand" (¶51), and detailed facts regarding Mark Moshayedi's statement that lying to customers regarding product specifications was "a business decision" (¶48).

Defendants' attacks on the Complaint's witnesses without regard to their statements or basis of knowledge (s*ee* Br. at 14-17) is suspect. For instance, Defendants attempt to discredit CW6 solely because s/he was not "associated" with STEC during the Class Period. *See* Br. at 10. CW6 worked as an EMC Technical Solutions Architect from 1996 to mid-2009 (¶22(f)), and, in this capacity, learned of the Zeus's "unusually high failure rate." ¶42. As a Technical Solutions Architect at the customer responsible for 90% of STEC's Zeus sales (¶87), CW6 was well-placed to know of the product quality issues with Zeus.[7]

---

reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed.").

[7] A class period misstatement does not cease to become false and misleading merely because the reasons for falsity arose before the beginning of the class

Similarly, Defendants claim that "[n]one of the 13 CWs is alleged to have known, in advance, about the facts whose disclosure allegedly caused STEC's stock price to decline." *See* Br. at 10. To the contrary, numerous CWs provide reliable support for STEC's product quality issues (¶¶42-50); practice of lying to customers regarding product failure rates and specifications (¶¶43-50); dependence on one large customer (¶¶20(a), 28-31)); and revenue manipulation practices (¶¶39-41, 51-52). The Complaint's CWs describe in detail Defendants' fraudulent revenue and accounting practices (¶¶39-51) and, contrary to Defendants' suggestion (Br. at 16), there is no requirement that CWs must work in a company's accounting department for their revenue recognition allegations to be credited. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009).

Here, unlike *Brodsky*, the CWs have first-hand knowledge of Defendants' fraudulent revenue recognition and accounting practices learned in the normal course of their employment. *See Brodsky*, 630 F. Supp. 2d at 1115 (rejecting CWs' estimates of percentage of revenues due to complex "click fraud" scheme where plaintiffs failed to "describe with particularity the CW's personal knowledge of Yahoo!'s revenue recognition process"). For example, in response to customer complaints, CW1, a STEC Sales and Field Applications Engineer, learned first-hand from his supervisor of Defendants' practice of "shipping bricks" and that STEC had been "shipping bricks" "for years" (¶40),[8] facts further confirmed by CW9[9] (¶41).

---

period. *See In re 21st Century Holding Co. Sec. Litig.*, No. 07-CV-61057, 2008 WL 5749572, at *7 (S.D. Fla. Nov. 7, 2008) (relying on allegations from pre-class period to sustain complaint).

[8] CW1 statements regarding STEC's product quality are reliable and support a strong inference of scienter. CW1 received specific directives from STEC management to lie to customers regarding high product failure rates (¶47) and documented a specific disagreement between Sun Microsystems and Defendant Mark Moshayedi over false product specifications for the Zeus (¶49).

[9] CW9 described an extensive pattern of improper revenue practices at STEC so pervasive that Defendants' end of quarter attempts to move sales were "some sort

15

Moreover, unlike *Brodsky* which involved complex allegations of "click fraud," Lead Plaintiffs here have "shown how CW [1] knows that this problem translated into misstated revenues."[10] *See* 630 F. Supp. 2d at 1115.

### D.   THE IMPORTANCE OF ZEUS TO STEC'S CORE OPERATIONS SUPPORTS A STRONG INFERENCE OF SCIENTER

Zeus is STEC's high-end enterprise scale SSD and the Company's "flagship product." ¶¶3, 26, 29. EMC was responsible for 90% of Zeus sales and half of STEC's overall revenue. ¶97. Under the core operations inference, knowledge of "facts critical to a business's core operations" may be imputed to individual corporate officers in support of a finding of scienter. *South Ferry*, 542 F.3d at 781; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008).

In the Ninth Circuit, core operation allegations can satisfy the PSLRA's scienter requirement in three ways: (a) "the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations'"; (b) "such allegations may independently satisfy the PSLRA where they are particular and suggest that Defendants had actual access to the disputed information"; and (c) "such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry*, 542 F.3d at 785-86.

---

of tradition." ¶41. CW9 documented one instance where STEC's Vice President of Operations shipped a *nonconforming* product to a *noncustomer* at the quarter's end. *Id.*

[10] The same is true for *In re Hypercom Corp. Sec. Litig.*, No. 05-0455, 2006 WL 726791, at *8 (D. Ariz. July 5, 2006), which involved allegations of revenue inflation due to accounting misclassifications for certain leases. Here, by contrast, the consequences of shipping empty boxes at the quarters' end are "very straightforward." *See id.*

Here, the Complaint satisfies all three approaches. As STEC's flagship product in its core business, Zeus was vital to the Company's viability. ¶23. Throughout the Class Period, Defendants repeatedly increased guidance as a result of increased Zeus sales and, in 2009, forecasted $220 million in Zeus sales alone based on STEC supply agreement with EMC. *See* ¶¶55-70, 77; Br. at 5-6. Analysts following STEC based their ratings on Zeus sales (¶36) and on Zeus's purported lack of competition (¶¶128-133), further evidencing the product's critical importance to the Company's core operations. STEC management held weekly sales meetings to discuss SSD revenue and Manouch and Mark Moshayedi had weekly conversations with EMC (¶31) – STEC's largest customer responsible for 90% of Zeus sales and half of STEC's overall revenue (¶97).

Manouch and Mark Moshayedi were directly involved in all aspects of the business with EMC, including, but not limited to, the Company's marketing efforts geared toward EMC and EMC's purchasing and selling of STEC's SSD products (¶30). Zeus sales to EMC were so critical to the Company's core operations that STEC had "engineers co-located with EMC" (¶32) and Defendants forced other customers to endure increased lag time, sometimes double that of EMC, for product orders (¶29). Under these circumstances, knowledge of the nature and import of STEC's "core operations" may be imputed to Defendants in support of a finding of scienter. *See  Countrywide Fin.*, 588 F. Supp. 2d at 1189 (defendant's position within a company support a strong inference of scienter when the alleged misrepresentations relate to the company's core operations, and may do so standing alone where it is "absurd to suggest" that a defendant did not know); *Makor Issues & Rights*, *Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. Ill. 2008) (finding a strong inference of scienter and noting: "Is it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable,

yes, but it is exceedingly unlikely.").[11]

The strong inference of scienter is further bolstered by Defendants' high-level positions within the Company. Manouch Moshayedi was the Company's co-founder, Chairman, and CEO (¶18); Mark Moshayedi was President, COO, Chief Technical Officer, Secretary, and a Director (¶19); and Cook was CFO and Principal Accounting Officer (¶20). These positions, coupled with the paramount importance of Zeus sales to the Company, support a strong inference that Defendants were aware of or were deliberately reckless in disregarding their misstatements and omissions regarding Zeus. *See Berson*, 527 F.3d at 988.

### E.   DEFENDANTS' GAAP VIOLATIONS SUPPORT SCIENTER

The Complaint's detailed GAAP allegations further support scienter. "Violations of GAAP standards can provide evidence of scienter when significant violations are described, they provide powerful indirect evidence of scienter." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (quoting *In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356, at *24 (N.D. Cal. July 18, 2007)). The Complaint alleges a variety of GAAP violations, including revenue overstatements, and details their impact on STEC's financial statements. ¶¶186-200. The magnitude and extent of the GAAP violations further support a strong inference of scienter. *UTStarcom*, 617 F. Supp. 2d at 975.

### III.   THE COMPLAINT ADEQUATELY ALLEGES CAUSATION

In *Dura*, the Supreme Court clarified the standard for pleading loss causation under Section 10(b): loss causation is governed by Fed. R. Civ. P. 8(a)(2) and plaintiffs need only plead a "short and plain statement" that provides "some indication of the loss and the causal connection that the plaintiff has in mind." 544 U.S. at 347. Pleading loss causation "[is] not meant to impose a great burden" and

---

[11] *See also In re Northwest Biotherapeutics Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 54028 at *13 (W.D. Wash. July 2, 2008); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003).

plaintiffs need only set forth "what the causal connection might be" between their loss and defendants' misconduct. *Id*.

Lead Plaintiffs are not required to "show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud." *In re Bristol-Meyers Squibb Sec. Litig.*, 2005 WL 2007004, at *18 (D.N.J. Aug. 17, 2005) (denying defendants' motion for summary judgment); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1014 (S.D. Cal. 2005) (stock price dropped following an announcement by a business partner to end its participation in a drug's development without disclosing specific problems with the drug). Moreover, loss causation may be sufficiently pled as a series of partial disclosures from a number of sources over time. *See Daou*, 411 F.3d at 1026-27. This is logical, as "reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures." *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006).

Courts in the Ninth Circuit have found that allegations of a stock price decline following a disclosure of alleged misconduct provide the necessary "causal connection" at the pleading stage. *See Daou*, 411 F.3d at 1025; *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1177-78 (N.D. Cal. 2005) (stock declines following partial disclosures sufficient to plead loss causation under *Dura*); *In re Omnivision Techs, Inc.*, 2005 WL 1867717, at *5 (N.D. Cal. July 29, 2005) (allegation that plaintiffs "suffered damages when revelation of the true facts caused a decline in the value of their investments" satisfies *Dura*).

Moreover, "[t]here are many ways in which the relevant truth may emerge in the marketplace. . . . [A] company may disclose to the public, either directly or indirectly, that a previously concealed risk exists, [or], a previously concealed risk may materialize." *In re Metropolitan Sec. Litig.*, 2010 WL 300402, at *4 (E.D. Wash. Jan. 20, 2010) (citation omitted). "[N]either *Daou* nor *Dura* require an

admission or finding of fraud before loss causation can be properly pled." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008).

For example, in *Daou*, 411 F.3d at 1026-27, the Ninth Circuit found that disclosures regarding a company's deteriorating financial health could be linked to the allegations that the company had prematurely recognized revenue, even though defendants did not admit they had prematurely recognized revenue or restate the company's financials.

Finally, loss causation is a fact-intensive inquiry that is best left until the record is more fully developed. *See In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008) ("so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation "is a matter of proof at trial and need not be decided on a Rule 12(b)(6) motion to dismiss"); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007) ("loss causation 'becomes most critical at the proof stage'").

Here, the Complaint's loss causation allegations far exceed the "short and plain statement" required by *Dura*. Indeed, the Complaint details how Defendants' false statements and omissions regarding STEC's sales, demand, and competition artificially inflated STEC's stock price, and alleges a series of partial disclosures, each of which contained new information relating to STEC's sales, demand, and competition, followed by an immediate stock price decline. ¶¶126-80.

For example, the Complaint alleges that the first partial disclosure occurred on September 17, 2009, when it was first revealed to investors that there was actual competition for STEC's Zeus, contrary to Defendants' adamant and repeated denials of any such competition. ¶¶128-37. STEC's stock price reacted immediately, dropping 16% in a single day. ¶134.

Thereafter, STEC's November 3, 2009 announcement that the $120 million EMC deal was a "one-off type of a deal" that had supplied EMC with excess inventory into first quarter 2010 resulted in an immediate 39% stock price drop. ¶151. This disclosure contrasted with Defendants' prior representations that the EMC deal was indicative of future growth and widespread acceptance of STEC's products in a growing market. ¶¶ 90, 92, 140. Defendant Manouch Moshayedi, however, assured investors that the excess inventory would not impact STEC's second quarter revenue numbers. ¶145.

Finally, on February 23, 2010, STEC announced for the first time that, despite Manouch Moshayedi's assurances just two months earlier, the inventory carry-over at EMC would negatively impact STEC's sales for not only the first quarter of 2010, but the entire first half of 2010. ¶¶164-80. The market reacted swiftly and harshly to the new, previously undisclosed information (which Defendants' motion virtually ignores), sending STEC's stock price down an additional 23% – back to its pre-Class Period prices before the Moshayedis unloaded their nine million shares.

Thus, here, the Complaint sufficiently alleges loss causation by alleging a "causal connection betwn the material misrepresentation and the loss." *Dura*, 544 U.S. at 342.

Defendants nevertheless contend that "[n]one of the allegedly fraudulent practices Lead Plaintiffs identify was ever revealed to the market through a corrective disclosure." Br. at 18. This is not true. To be clear, the "fraudulent practices" that form the basis of this action are the false and misleading statements and omissions and Defendants' concealment of the truth. As Defendants concede, this needs merely be a "logical link," *i.e.*, the disclosure must reveal a "*relevant truth*." Br. at 12. To prove loss causation, the market need not ever learn about Defendants' underlying "practices" – *e.g.*, that the Company was "shipping bricks" and lying to customers at every opportunity – rather, the market must understand

21

that Defendants' statements were false and/or misleading, because either true facts or a risk had been concealed.

In addition, Defendants characterize the September 17, 2009 Wedbush Report as a report "*suggesting* that STEC *might* see competition in the SSD market *sooner* than analysts had expected." Br. at 1, 8 (emphasis added). In truth, the Wedbush Report disclosed that a major competitor, Toshiba, was already in the *final qualification stages* with one of STEC's *Tier I customers.* ¶130. This disclosure revealed that one of STEC's key customers was defecting and developing competing products with a competing company. ¶132. Defendants failed to disclose that its products were riddled with defects and its customers were dissatisfied, thus concealing the foreseeable risk that these unhappy customers would seek to develop products with competitors. ¶¶131-32. The Wedbush report revealed that Defendants' statements regarding competition (¶¶131-32) had deliberately disregarded the risk that competition was just around the corner, and had concealed the detrimental impact competition would have on STEC's success (¶136).

Defendants' reliance on *In re Oracle Corp. Sec. Litig*, 2009 WL 1709050, at *12-16 (N.D. Cal. June 19, 2009), is misplaced. Br. at 13. Plaintiffs in *Oracle* argued that misrepresentations regarding the company's product quality set "unrealistically high earnings expectations" which were corrected when an analyst report "communicated to investors that issues concerning the [product's] functionality . . . had not in fact been cured . . . ." *Id.* at *12. The court noted that the alleged disclosure stated that the company's "miss in [] sales was caused by *nervousness about the slowing economy*, not problems with Oracle's products." *Id.* (emphasis added). Here, by contrast, Lead Plaintiffs are not required to make any leap of logic between the report and Lead Plaintiffs' allegations. The Wedbush Report disclosed Company-specific information, namely that STEC was facing previously-concealed competition and that this competition was stemming from a

*key STEC customer* that had deserted STEC. This competition and customer-loss is the materialization of the previously-concealed risk that poor product quality would cause customers to defect.

Defendants also attempt to re-write the Complaint to support their argument that loss causation is not sufficiently pleaded as to the November 3, 2009 disclosure. In the November 3 announcement, STEC revealed that EMC would carry over inventory of Zeus into 2010. This announcement was a departure from Defendants' prior representations that the EMC transaction would cover EMC's product needs for *only* the third and fourth quarters of 2009.

Defendants likewise try to avoid liability with respect to the November 3, 2009 disclosure because "STEC has never adjusted or restated its financial statements." Br. at 15. Defendants are not insulated from liability simply because they have chosen not to publicly acknowledge their fraud and restate earnings. The Complaint alleges that STEC violated GAAP by including revenues for shipments of defective or unordered products and by prematurely recording revenue for the EMC deal. ¶¶ 10, 39, 187. During the November 3 announcement, Manouch Moshayedi made a number of statements revealing that Defendants had recorded millions of dollars in revenue from the EMC deal despite having no idea how quickly or how much inventory was moving through EMC. ¶¶189-96. Manouch Moshayedi stated on the call that "we don't know exactly how many [EMC] shipped across each system in Q3…. Frankly… [t]hey don't tell us how much inventory they've got." Br. at 9. This lack of information is exactly the basis for Defendants' GAAP violations – which requires persuasive evidence of an arrangement, delivery, that the seller's price is fixed or determinable, and that collectability is reasonably assured before revenue can be recorded. ¶¶189-92 (citing SAB 104).

Moreover, STEC's arrangement with EMC was a contract for a set amount of inventory worth $120 million. Thus, the accounting issues here do not just

23

concern *how much* revenue the Company should have recorded, but *when*. If STEC had recorded revenue in compliance with GAAP, it would have recorded *less* revenue in the third and fourth quarters, which would have *revealed* to investors that customers were *not* buying STEC products from EMC and that EMC would carry-over inventory (¶¶10, 73-74, 87, 97, 121, 140, 193-194, 196-199), thus indicating the uncertainty of STEC's future revenue, difficulties selling Zeus, and problems with STEC's relationship with EMC. *Id.; see also* ¶ 92.

Finally, Defendants characterize their February 23 press release as simply a statement in which: "STEC explained that it expected EMC's inventory carryover to continue through the first half of 2010." Br. at 9. The Complaint alleges much more. *See* ¶¶164-180. Defendants ignore Lead Plaintiffs detailed allegations that, on that day, the market also learned that:

- STEC's revenue for the first quarter of 2010 would be *less than half* that projected by analysts, who had relied on Defendants' previous misrepresentations, ¶165;

- the loss of EMC would so greatly impact STEC's revenue that it became clear to investors that STEC could not "find a replacement customer for the relevant product" as previously represented to the SEC, ¶169;

- the Company *was* "fundamentally altered without a specific customer sales agreement," contrary to Defendants' previous representations to the SEC, ¶169 ;

- the multi-million dollar joint marketing program STEC had employed was not as successful as hoped and would not clear EMC's excess inventory, ¶170; Nevertheless, the Company had started to implement marketing programs with its other customers, because they too were having difficulty selling through STEC's faulty products, ¶167;

- the SEC had instituted a "formal investigation" into Defendants' insider trading, ¶171; and

- EMC "repeatedly indicated" that the SSD inventory build-up reflected a management choice to protect EMC against potential tightness of

supply in 1H10, ¶ 87.

- Defendants' gross oversimplification of this and the other disclosures speaks volumes about the significance and nature of the revealed information.

In sum, the series of partial disclosures detailed in the Complaint readily satisfy *Dura* and Fed. R. Civ. P. 8. Lead Plaintiffs have put Defendants on notice as to how the revelation of the truth about STEC's sales, demand, and competition caused investors' losses.

## IV.   THE COMPLAINT ADEQUATELY PLEADS CONTROL PERSON LIABILITY

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5 and that the Individual Defendants controlled STEC, Lead Plaintiffs have adequately alleged a *prima facie* case under § 20(a). *See Am.West*, 320 F.3d at 945.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.[12]

Dated: June 11, 2010              Respectfully submitted,


                                 KAHN SWICK & FOTI, LLC

                                 By:    /s/ Kim E. Miller

                                 Kim E. Miller (Bar No. 178370)
                                 Melissa Ryan Clark (*Pro Hac Vice*)
                                 Michael A. McGuane (*Pro Hac Vice*)
                                 500 5th Ave., Suite 1810
                                 New York, NY 10110
                                 Tel: (212) 696-3730
                                 Fax: (504) 455-1498

---

[12] If the Court dismisses all or any portion of the Complaint, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a). *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996) (a district court should provide leave to amend unless it is clear amendment would be futile).

-and-

Lewis S. Kahn (*Pro Hac Vice*)
Paul Balanon (*Pro Hac Vice*)
Sarah C. Boone (Bar No. 268813)
206 Covington Street
Madisonville, LA 70447
Tel: (504) 455-1400
Fax: (504) 455-1498


BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

By:   /s/ Timothy A. DeLange

Blair A. Nicholas (Bar No. 178428)
Timothy A. DeLange (Bar No. 190768)
Niki L. Mendoza (Bar No. 214646)
Takeo A. Kellar (Bar No. 234470)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

*Co-Lead Counsel for Lead Plaintiffs and
the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 11, 2010.

/s/ Kim E. Miller
Kim E. Miller
KAHN SWICK & FOTI, LLC
500 5th Ave., Suite 1810
New York, NY 10110
Tel: (212) 696-3730
Fax: (504) 455-1498