Christopher Kim (Bar No. 082080)
christopher.kim@limruger.com
Lisa J. Yang (Bar No. 208971)
lisa.yang@limruger.com
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017-2554
Telephone: (213) 955-9500
Facsimile: (213) 955-9511

Thomas A. Dubbs (*Pro Hac Vice*)
tdubbs@labaton.com
Martis Alex (Bar No. 77903)
malex@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Allyn Z. Lite (*Pro Hac Vice*)
alite@litedepalma.com
Bruce D. Greenberg (*Pro Hac Vice*)
bgreenberg@litedepalma.com
LITE DePALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Attorneys for New Jersey and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION | ) No.  SACV 09-01304-JVS (MLGx) ) ) **CONSOLIDATED AMENDED** ) **COMPLAINT FOR VIOLATION** ) **OF THE FEDERAL** ) **SECURITIES LAWS** ) |
| This Document Relates To: | ) ) **CLASS ACTION** |
| ALL ACTIONS | ) ) **DEMAND FOR JURY TRIAL** ) Judge: Hon. James V. Selna ) ) ) |

# **TABLE OF CONTENTS**

Page

I. NATURE AND SUMMARY OF THE ACTION ...........................................1

II. JURISDICTION AND VENUE ....................................................................5

III. THE PARTIES ..............................................................................................6

    A. The Plaintiffs...........................................................................................6

    B. The Issuer Defendant .............................................................................7

    C. The Individual Defendants......................................................................8

    D. The Director Defendant ..........................................................................9

    E. The Underwriter Defendants.................................................................10

IV. CONFIDENTIAL WITNESSES................................................................12

V. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS .....14

    A. The Exchange Act Defendants Inflate Earnings Guidance For The Second Quarter Of 2009, Citing Purportedly Increasing Sales Of ZeusIOPS ...............................................................................14

    B. At The Close Of The 2009 Second Quarter, The Exchange Act Defendants Make Misrepresentations And Misleading Omissions Regarding A New Supply Agreement With EMC, STEC's Largest Customer For The ZeusIOPS Product ...................15

        1. The Exchange Act Defendants Assert, Essentially, That The EMC Supply Agreement Covers EMC's Requirements For Only The Second Half Of 2009, And, That EMC Will Be Making Similar Purchases Every Six Months ...............................................................................15

        2. Additional Evidence Of The Exchange Act Defendants' Scienter For Their Misleading Statements Regarding The EMC Supply Agreement Is Their Failure, In Knowing Violation Of Reg. S-K, To Disclose The Terms Of The EMC Supply Agreement..........................................................21

C.   The Exchange Act Defendants Misrepresent That STEC's Other OEM Customers Will Follow In EMC's Footsteps By Increasing Their Orders Of ZeusIOPS During The Second Half Of 2009 ........................................................................25

D.   The Exchange Act Defendants Artificially Inflate STEC's Revenues By Reporting Unearned Revenues And By Channel Stuffing..........................................................................30

1.   The Exchange Act Defendants Shipped Defective, Unusable Product To Customers In Order To Report Revenue.......................................................................30

2.   The Exchange Act Defendants Inflated Revenues By Shipping Customers Product They Had Not Ordered .............32

3.   The Exchange Act Defendants Inflated Revenues By Channel Stuffing ...........................................................33

4.   The Exchange Act Defendants Inflated Revenues By "Shipping Bricks" and Empty Boxes.........................................34

5.   STEC's 2009 Second Quarter Revenue Is Inflated .................35

6.   By Inflating Its Revenues, STEC Violates GAAP And Regulation S-K...............................................................38

E.   The Exchange Act Defendants Misrepresent ZeusIOPS Competition..........................................................................40

F.   After The Exchange Act Defendants Artificially Inflate The Price Of STEC Stock, Defendants Manouch And Mark Moshayedi Engage In Massive Insider Selling ..................................42

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER......................................43

A.   Each Of Defendants' False Statements And Omissions Involved A Core Operation Of STEC ...............................................................43

B.   The Scienter Of Manouch Moshayedi And Raymond Cook Is Supported By Their Own Sworn Certifications..................................45

VII.   THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS RELATING TO THE EXCHANGE ACT CLAIMS..............................................................................................46

A.     June 16, 2009 Press Release ...................................................... 46

B.     July 16, 2009 Press Release ...................................................... 46

C.     August 3, 2009, Earnings Release, 2Q09 Form 10-Q, Earnings Conference Call And Form 424B3 ....................................... 46

D.     September 10, 2009, Publicly Filed Letter To The SEC .................. 48

VIII.  LOSS CAUSATION ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS .................................................................. 48

A.     The September 17, 2009 Partial Corrective Disclosure ................... 48

B.     The November 3, 2009, Partial Corrective Disclosures ................... 51

C.     The February 23, 2010 Corrective Disclosures ............................ 54

D.     Post-Class Period Developments ............................................. 57

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE TO EXCHANGE ACT CLAIMS .................................................................. 57

X.     NO SAFE HARBOR ............................................................................. 58

XI.    CLASS ACTION ALLEGATIONS RELATING TO ALL CLAIMS ........ 59

XII.   EXCHANGE ACT CLAIMS ................................................................. 62

COUNT I For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against STEC And The Individual Defendants ................................. 62

COUNT II For Violation Of Section 20(a) Of The Exchange Act Against Manouch Moshayedi, Mark Moshayedi And Raymond D. Cook .............. 66

COUNT III For Violation Of Section 20A Of The Exchange Act Against Manouch Moshayedi And Mark Moshayedi ......................................... 67

XIII.  FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO THE SECURITIES ACT CLAIMS ..... 68

A.     False And Misleading Statement and Omission Regarding STEC's Relationship With The Company's Largest Customer, EMC .......................................................................................... 69

1        1.    Defendants Statements Regarding The EMC Supply
2             Agreement Were False And Misleading Because The
            Agreement Was An Exceptional, One-Time Deal ..................69

3        2.    The Failure To Publicly Disclose The EMC Supply
4             Agreement Was a Violation of Regulation S-K and
5             Therefore a Material Omission ..................................................70

6        3.    The MD&A Section of the Second Quarter 10-Q Was
7             Misleading Because it Omitted to Explain that the EMC
            Contract Was a One-Time Purchase..........................................71

8    B.    False And Misleading Statements Regarding Other OEMs'
9        Increased Orders Of ZeusIOPS During The Second Half Of
10       2009..........................................................................................72

11    C.    False and Misleading Statements Regarding STEC's Revenues.......73

12        1.    The Falsity of STEC's Reported Revenues was Disclosed
13             by STEC's Guidance for the First Quarter of 2010..................74

14        2.    STEC Revenues Had Been Inflated By Shipments of
15             Defective Product....................................................................75

16        3.    STEC Revenues Had Been Inflated By Product That Had
17             Been Shipped Despite Not Having Been Ordered by the
            Customers................................................................................77

18        4.    STEC Revenues Had Been Inflated Because Boxes
19             Shipped By STEC Often Had Been Empty .............................77

20 XIV. DEFENDANTS' FALSE AND MISLEADING STATEMENTS
21      RELATING TO THE SECURITIES ACT CLAIMS...................................77

22 XV.    SECURITIES ACT CLAIMS ......................................................................79

23 COUNT IV For Violation Of Section 11 Of The Securities Act Against All
24      Defendants.............................................................................................79

25 COUNT V For Violation Of Section 12(a)(2) Of The Securities Act
26      Defendants STEC, Oppenheimer, Mark Moshayedi and Manoush
27      Moshayedi .............................................................................................81

28 COUNT VI For Violation Of Section 15 Of The Securities Act Against
     Manouch Moshayedi, Mark Moshayedi And Raymond D. Cook ..............84

XVI.  PRAYER FOR RELIEF ................................................................85

XVII. JURY DEMAND ........................................................................86

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   Court appointed Lead Plaintiff, the State of New Jersey, Department of

2   Treasury, Division of Investment ("Lead Plaintiff"), individually and on behalf of a

3   class of similarly situated persons and entities, by its undersigned counsel, for its

4   Consolidated Amended Class Action Complaint for Violation of the Federal

5   Securities Laws asserting claims against STEC, Inc. ("STEC" or the "Company")

6   and the other Defendants named herein, alleges the following upon personal

7   knowledge as to itself and its own acts, and upon information and belief as to all

8   other matters.

9   Lead Plaintiff's information and belief as to allegations concerning matters

10  other than itself and its own acts is based upon an investigation by its counsel

11  which included, among other things: (i) review and analysis of documents filed

12  publicly by STEC with the Securities and Exchange Commission (the "SEC"); (ii)

13  review and analysis of press releases, news articles, and other public statements

14  issued by or concerning STEC and other Defendants named herein; (iii) review and

15  analysis of research reports issued by financial analysts concerning STEC's

16  securities and business; (iv) interviews of former STEC employees; (v) interviews

17  of employees and former employees of computer manufacturing companies; and

18  (vi) review and analysis of news articles, media reports and other publications

19  concerning the computer industry. Lead Plaintiff believes that substantial

20  additional evidentiary support for the allegations herein exists and will continue to

21  be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

22  **I.    NATURE AND SUMMARY OF THE ACTION**

23  1.    This is a class action on behalf of all persons who purchased or

24  otherwise acquired STEC common stock between June 16, 2009, and February 23,

25  2010, inclusive (the "Class Period"), seeking to pursue remedies under the

26  Securities Exchange Act of 1934 (the "Exchange Act"), and the Securities Act of

27  1933 (the "Securities Act").

28

2.      STEC is a manufacturer of data storage technologies and solutions for high-performance computer equipment made by companies such as IBM, Dell, Hewlett-Packard and EMC.  The Company claims to manufacture the industry's most comprehensive line of solid-state drive ("SSD") memory technologies.  Its flagship product, the ZeusIOPS SSD, is a high-performance, flash SSD advertised by the Company as being able to access stored data at much faster speeds than traditional hard drives with moving parts.

3.      The Company was founded by the Moshayedi brothers – Manouch, Mehrdad ("Mark") and Masoud ("Mike") Moshayedi in 1989.  The Moshayedi brothers have been longtime STEC officers and directors.  Manouch Moshayedi is STEC's Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors.  Mark Moshayedi is the Company's President, Chief Operating Officer ("COO"), Chief Technical Officer ("CTO") and Secretary, as well as a member of STEC's Board of Directors and Equity Awards Committee.  Mike Moshayedi, who retired in 2007, but retained at that time an 8.99% ownership interest in the company, was formerly the Company's President.

4.      The Moshayedi brothers are also major shareholders of the Company.  At the beginning of the Class Period they collectively held 45% of the Company's stock.

5.      As detailed herein, during the Class Period, Defendants issued or caused to be issued materially untrue statements and omissions as to STEC's financial performance and condition.  These statements created a materially false impression of STEC's business and financial condition, by, among other things, creating a false impression of exceptional revenue growth, and of conditions that ensured a near and long term continuation and even acceleration of this growth.

6.      In summary form, these materially untrue statements and omissions included:

(a) that a new agreement signed by STEC with its largest customer
for a huge volume of purchases, satisfied that customer's
requirements for a period of only six months—the second half of
2009—and represented a new, heightened level of purchases by
that customer that would be repeated, essentially, every six
months;

(b) that during the second half of 2009, STEC's four other large
customers would be making similar agreements to increase the
volume of their own purchases to a similar extent;

(c) that, after STEC's revenue grew substantially during the first
quarter of 2009, it would grow—and then did grow—during the
second quarter of 2009 at a rate even faster than it had grown
during the first quarter of 2009; and

(d) that STEC had no competition for its signature product, called
ZeusIOPS.

7.     The initial effect of these false statements and omissions was to
dramatically inflate the price of STEC's stock.  As indicated in the chart below, the
second quarter of 2009 marked a tremendous growth spurt in the price of STEC
stock, buoyed by the Company's public statements about increasing sales and
revenues.

8.     Indeed, as illustrated by the below chart, by August 3, 2009, STEC
stock had enjoyed a 900% increase over its price just eight months earlier in
December 2008.  However, during the subsequent five months, when the falsity of
these statements and omissions was disclosed by several successive partial
disclosures, the price of STEC's stock collapsed all the way back to where it had
been before the start of the Class Period.

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

Class Period
Jun 16 2009 - Feb 23 2010

August 11, 2009:
Defendants Manouch
and Mark Moshayedi
sold 9M shares for
$267.8M."

9.      After the initial inflation of STEC's stock price, and just prior to the subsequent collapse, when the false impression created by Defendants' misstatements and omissions was at its most intense, and the resulting rise in the price of STEC's stock was nearing its high point, STEC issued a secondary offering of stock, comprised entirely of stock held personally by Manouch and Mark Moshayedi, the Company's CEO and COO. These two defendants, who are brothers, sold more than 50% of their STEC stock in the offering, and received thereby, a total of $267.8 million.

10.      Five months later, as the price of STEC's stock was hitting a new low, STEC announced that certain of its employees, including its CEO, had been subpoenaed by the SEC, as part of a formal investigation by the SEC of STEC's stock sales.

11.      Under Counts I through III, which Lead Plaintiff brings under the Exchange Act, and only under such counts, Lead Plaintiff alleges that STEC and each of the Individual Defendants committed fraud, by making some or all of the

1  alleged materially untrue statements and/or omissions with knowledge—or

2  reckless disregard—of their falsity, and that three of the Individual Defendants are

3  liable as control persons.

4       12.    Under Counts IV through VI, which Lead Plaintiff brings under the

5  Securities Act, Lead Plaintiff alleges that each defendant is liable for his/its

6  negligence regarding the untrue statements and omissions to the extent that they

7  were made or incorporated into the registration statement and/or prospectus for the

8  secondary offering, and that three of the Individual Defendants are also liable as

9  control persons.  Lead Plaintiff does not allege fraud as to any of its claims under

10  the Securities Act.

11  **II.    JURISDICTION AND VENUE**

12       13.    The claims asserted herein arise under and pursuant to Sections 11,

13  12(a)2, and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), 77o, Sections

14  10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78-t1(a)

15  and Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. §

16  240.10b-5, and 15 U.S.C. § 78r.

17       14.    This Court has jurisdiction over the subject matter of this action

18  pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the

19  Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1367.

20       15.    Venue is proper in this District pursuant to Section 22 of the

21  Securities Act, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §

22  1391(b).  Defendant STEC maintains its principal place of business within this

23  District, the Individual Defendants conduct business in this District, and many of

24  the acts giving rise to the violations alleged herein, including the preparation and

25  dissemination of materially false and misleading information and omissions,

26  occurred in substantial part in this District.

27       16.    In connection with the acts alleged herein, Defendants, directly or

28  indirectly, used the means and instrumentalities of interstate commerce including,

1   without limitation, the United States mail, interstate telephone communications and

2   the facilities of the national securities markets.

3   **III.    THE PARTIES**

4        **A.    The Plaintiffs**

5        17.    The State of New Jersey, through its Division of Investment, is a large

6   institutional investor, managing in excess of $75 billion for the benefit of over

7   600,000 current and former public employees of the State of New Jersey.  Lead

8   Plaintiff purchased STEC common stock during the Class Period and suffered

9   losses as a direct or proximate result of Defendants' wrongful conduct alleged

10   herein.  On July 14, 2010, the Court appointed New Jersey as Lead Plaintiff and

11   gave New Jersey leave to file a Consolidated Amended Complaint if it chose to do

12   so.

13        18.    Representative Plaintiff the International Brotherhood of Electrical

14   Workers, Local 103 ("Local 103"), located in Dorchester, Massachusetts, oversees

15   the Electrical Workers Pension Fund, with assets of approximately $913 million.

16   Local 103 alleges violations of Section 20A of the Exchange Act on behalf of itself

17   and all Class members who purchased STEC securities contemporaneously with

18   Defendants Manouch and Mark Moshayedi's sales of STEC stock during the Class

19   Period.  As set forth in the certification annexed hereto as Exhibit A,

20   Representative Plaintiff Local 103 purchased STEC securities contemporaneously

21   with the sales of STEC securities by Manouch and Mark Moshayedi and suffered

22   damage as a result of the misconduct alleged herein.

23        19.    Representative Plaintiff The Norfolk County Retirement System

24   ("Norfolk County"), located in Massachusetts, has more than 9,500 active and

25   retired members from forty governmental units throughout the County of Norfolk,

26   Massachusetts, and has approximately $480 million in assets.  Norfolk County

27   alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of

28   itself and all Class members who acquired shares of STEC common stock pursuant

1   to or traceable to the registration statement (the "Registration Statement") and/or

2   the prospectuses (the "Prospectus") issued in connection with the Offering.

3   Norfolk County purchased shares of STEC stock on the Offering.  As set forth in

4   the certification annexed hereto as Exhibit B, Representative Plaintiff Norfolk

5   County purchased STEC securities pursuant to or traceable to the Registration

6   Statement and/or Prospectus and suffered damages as a result of the false

7   statements contained therein.

8            **B.    The Issuer Defendant**

9            20.    Defendant STEC is a California corporation with its principal place of

10  business located at 3001 Daimler Street, Santa Ana, California.  STEC purports to

11  be a leading global provider of solid-state computer memory drive technologies

12  and solutions tailored to meet the high-performance, high-reliability needs of

13  original equipment manufacturers ("OEMs") like Sun Microsystems, EMC, IBM,

14  and Dell.  During the Class Period, STEC's core business was its enterprise scale

15  SSDs, such as the ZeusIOPS.  STEC claims to manufacture the industry's "most

16  comprehensive line" of SSDs in the storage industry.

17           21.    Defendants Manouch Moshayedi and his brothers, Mark and Mike

18  Moshayedi founded STEC, then named Simple Technology, Inc. ("SimpleTech"),

19  in 1990.  Simple Tech sold memory products for PCs, printers and servers.

20           22.    The Company grew rapidly through acquisitions and expansions both

21  domestically and abroad.  Eventually the Company opened locations in Italy,

22  Japan, China and Taiwan.  In 2007, the Company's Malaysian facility was opened

23  with complete design, manufacturing and logistics capabilities.

24           23.    The Company went public in September 2000.

25           24.    In 2007, STEC introduced its high-end, flagship product, the

26  ZeusIOPS.

27           25.    Throughout the Class Period (June 16, 2009 through February 23,

28  2010), the Company's stock traded in an efficient market on NASDAQ under the

                                                     7      CONSOLIDATED AMENDED COMPLAINT
                                                            Lead Case No. SACV 09-01304-JVS (MLGx)

1 | ticker symbol, "STEC."  As of March 30, 2010, the Company had nearly 51

2 | million shares of common stock outstanding.

3 |      **C.**    **The Individual Defendants**

4 |     26.    At all relevant times Defendant Manouch Moshayedi has been CEO,

5 | Chairman of STEC's Board of Directors and a member of the Equity Awards

6 | Committee.  During the Class Period, Manouch Moshayedi signed and certified

7 | STEC's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act

8 | of 2002, including, without limitation, the Company's quarterly report for the

9 | second quarter of 2009 ("2Q09 Form 10-Q") and the annual report for 2009 ("2009

10 | Form 10-K").  He also signed the documents in connection with the Offering

11 | including the Registration Statement on Form S-3 ("Registration Statement"), and

12 | the Prospectus contained in the Registration Statement.  Manouch Moshayedi sold

13 | 4.5 million shares of his STEC common stock for $133,920,000 in the Offering.

14 |     27.    At all relevant times Defendant Mark Moshayedi, has been STEC's

15 | President, COO, CTO, and Secretary, as well as a member of the Company's

16 | Board of Directors and a member of the Equity Awards Committee.  During the

17 | Class Period, Mark Moshayedi signed STEC's SEC filings, including, without

18 | limitation, the Registration Statement, and the 2009 Form 10-K.  Mark Moshayedi

19 | sold 4.5 million shares of his STEC common stock for $133,920,000 in the

20 | Offering.

21 |     28.    At all relevant times Defendant Raymond D. Cook has been STEC's

22 | Chief Financial Officer, ("CFO") and Principal Accounting Officer.  During the

23 | Class Period, Defendant Cook signed STEC's SEC filings including the

24 | Registration Statement, the 2Q09 Form 10-Q and the 2009 Form 10-K.

25 |     29.    Because of their positions with the Company, Defendants Manouch

26 | Moshayedi, Mark Moshayedi, and Raymond D. Cook (collectively, the "Individual

27 | Defendants") possessed the power and authority to control the contents of STEC's

28 | quarterly reports, press releases, and presentations to securities analysts, money

1  and portfolio managers, and institutional investors. They were provided with

2  copies of the Company's reports and press releases alleged to be misleading prior

3  to or shortly after their issuance, and had the ability and opportunity to prevent

4  their issuance or cause them to be corrected. Because of their positions with the

5  Company, and their access to material non-public information, the Individual

6  Defendants knew, or with deliberate recklessness disregarded, that the adverse

7  facts specified herein were being concealed from the public, and that the positive

8  representations being made were then materially false and misleading.

9      30.    As officers and controlling persons of a publicly-held company whose

10  common stock was, and is, registered with the SEC pursuant to the Exchange Act,

11  traded on NASDAQ, and governed by the provisions of the federal securities laws,

12  the Individual Defendants each had a duty promptly to disseminate accurate and

13  truthful information with respect to the Company's financial condition and

14  performance, growth, operations, financial statements, business, products, markets,

15  management, earnings, and present and future business prospects, and to correct

16  any previously-issued statements that had become materially misleading or untrue,

17  so that the market price of the Company's publicly traded common stock would be

18  based on truthful and accurate information. The Individual Defendants'

19  misrepresentations and omissions during the Class Period violated these specific

20  requirements and obligations. The Individual Defendants are therefore liable for

21  the false and misleading statements pleaded herein. (The Company and the

22  Individual Defendants are collectively referred to as the "Exchange Act

23  Defendants.")

24      **D.    The Director Defendant**

25      31.    Rajat Bahri was, at all relevant times, a member of STEC's Board of

26  Directors, and Chair of the Board's Audit Committee. During the Class Period,

27  Defendant Bahri signed the Company's SEC filings, including, without limitation,

28  the Registration Statement and the 2009 Form 10-K.

32.    STEC's Board of Directors has determined that Mr. Bahri is an "audit committee financial expert," as that term is defined in Item 407(d)(5) of Regulation S-K, which means that the Company's Board determined that Defendant Bahri has the following attributes:

(a)    An understanding of generally accepted accounting principles and financial statements;

(b)    The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

(c)    Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

(d)    An understanding of internal control over financial reporting; and

(e)    An understanding of audit committee functions.

33.    Because of Defendant Bahri's positions with the Company, he was aware of undisclosed material adverse information about STEC's business, finances, markets and business prospects, via access to internal corporate documents, conversations and interactions with STEC corporate officers and employees.

**E.    The Underwriter Defendants**

34.    Defendant Barclays Capital Inc. ("Barclays Capital") is an investment bank that acted as an underwriter with respect to STEC common stock sold in the Offering.  Barclays Capital's headquarters are located at 745 Seventh Avenue, New York, New York 10019.

35.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank Securities") is an investment bank that acted as an underwriter with respect to

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

STEC common stock sold in the Offering.  Deutsche Bank Securities' headquarters are located at 60 Wall Street, New York, New York 10005.

36.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is an investment bank that acted as an underwriter with respect to STEC common stock sold in the Offering.  J.P. Morgan Securities' headquarters are located at 277 Park Avenue, New York, New York 10172.

37.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") is an investment bank that acted as an underwriter with respect to STEC common stock sold in the Offering.  Oppenheimer's headquarters are located at 125 Broad Street, New York, New York 10004.

38.    The Underwriter Defendants acted as Underwriters of the Offering and distributed at least nine million shares of STEC common stock to investors. The distribution of shares to the Underwriters (excluding the 1,350,000 share over-subscription allotment) was:

| Name | Number of shares |
|------|------------------|
| J.P. Morgan Securities | 2,925,000 |
| Deutsche Bank Securities | 2,925,000 |
| Barclays Capital | 1,800,000 |
| Oppenheimer | 1,350,000 |

39.    In connection with the Offering, the Underwriter Defendants were granted an option for a period of 30 days to purchase up to an additional 1,350,000 shares to cover overallotments.

40.    The Underwriter Defendants received an underwriting discount of at least $11.16 million, indirectly paid by Lead Plaintiff and other Class members who purchased STEC common stock in the Offering.

41.    The Underwriter Defendants failed to conduct an adequate due diligence investigation, which was a substantial contributing factor leading to the harm complained of herein.

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

## IV.   CONFIDENTIAL WITNESSES

42.   The allegations herein are supported in part by information provided
to date by eleven confidential witnesses, including former STEC employees and
employees of STEC's customers.  As described below, the confidential witnesses
have provided information about the Company and its management that may be
adverse to Defendants in this litigation.  Accordingly, the confidential witnesses
have not been identified by name, but rather by job title and date in order to protect
the confidential witnesses against retaliation and career injury.  As described
below, each of the confidential witnesses, because of his or her employment
position and tenure, was in a position to know, and in fact knew, about the
information they provided that is alleged herein.

(a)   Confidential Witness 1 ("CW1") was employed at STEC from
June 2004 through July 2009.  She worked as a Sales Coordinator for STEC's sales
to Hewlett-Packard ("HP").  CW1 assisted STEC's Vice Presidents of Sales who
dealt with sales of STEC memory products to HP.  CW1's duties included
obtaining and pricing purchase orders, coordinating sales calls and meetings, and
assisting with delivery issues and timing of shipments.  CW1 reported to Steve
McCarthy until 2008, when she began reporting to Lorenzo Salhi.  Both McCarthy
and Salhi reported directly to STEC's CEO, Manouch Moshayedi.  CW1
described her experiences at STEC relating to STEC's sales practices.

(b)   Confidential Witness 2 ("CW2") worked as a Hardware Design
Engineer for STEC from October 2009 through May, 2010.  CW2 described
problems, including "power issues" with the ZeusIOPS, and that EMC returned
many ZeusIOPS units because of those "power issues."

(c)   Confidential Witness 3 ("CW3") was employed by HP as a
Principal Hardware/Firmware Test Engineer from September 2007 through
September 2009.  CW3 also worked as a Failure Analysis and Qualification

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1  Engineer for SSDs including the ZeusIOPS.  CW3 had daily meetings with STEC

2  engineers.

3        (d)    Confidential Witness 4 ("CW4") was employed by Sun

4  Microsystems from 1999 to June 2009 as Sun Microsystems' Chief Technologist

5  of Storage and Data Management.  Sun Microsystems was one of STEC's largest

6  customers.  CW4 was later employed by Pliant Technologies, one of STEC's

7  customers.  CW4 provided information about quality problems with ZeusIOPS

8  product, STEC's communications about product re-orders, and industry knowledge

9  about sales by EMC of ZeusIOPS Units.

10        (e)    Confidential Witness 5 ("CW5") worked for STEC from

11  February 2006 through July 2009.  He was the Company's Regional Sales

12  Manager for the San Francisco Bay Area and Pacific Northwest.  He reported to

13  Mike Nilsson, STEC's Worldwide Vice President of Sales.  CW5 described the

14  close relationship between EMC and STEC, as well as Mark and Manouch

15  Moshayedi's personal involvement in STEC's sales to EMC.

16        (f)    Confidential Witness 6 ("CW6") worked as a Product Test

17  Engineer in STEC's main facility in Santa Ana, California from February 2005

18  through December 2008.  CW6 detailed his experiences at STEC relating to the

19  large number of ZeusIOPS products that EMC returned to STEC and the practice

20  of shipping customers used, dysfunctional or defective product.

21        (g)    Confidential Witness 7 ("CW7") worked for STEC from June

22  2002 through October 2008.  CW7 was a Product Marketing Specialist for STEC

23  (with a focus on marketing DRAM and Compact Flash products).  CW7 provided

24  information about Defendants Manouch and Mark Moshayedi's direct and personal

25  involvement in business dealings with EMC.

26        (h)    Confidential Witness 8 ("CW8") worked at STEC as a Cisco

27  Program Manager from January 2007 until March 2009.  CW8's responsibilities

28

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   included managing the manufacture, sale and distribution of flash and DRAM

2   modules to Cisco.  CW8 described STEC's sales practices .

3            (i)      Confidential Witness 9 ("CW9") worked at STEC as a

4   Manufacturing Maintenance Mechanic Technician from October 2006 through

5   March 2009.  CW9 explained that customers returned ZeusIOPS units due to a

6   defect in the capacitor that caused overheating and burning.

7            (j)      Confidential Witness 10 ("CW10") worked at STEC as a Sales

8   and Field Applications Engineer from September 2007 through November 2009.

9   CW10 confirmed that STEC's practice of shipping empty boxes to customers,

10  known as "shipping bricks."

11           (k)      Confidential Witness 11 ("CW11") worked at STEC as a

12  Failure Analysis Technician from November 2007 through November 2008.

13  CW11 was responsible for analyzing failed products returned to STEC by its

14  customers and documenting his findings in reports.  CW11 described his

15  experiences at STEC relating to the shipment of defective product .

16  **V.      FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

17       **RELATING TO THE EXCHANGE ACT CLAIMS**

18       **A.      The Exchange Act Defendants Inflate Earnings Guidance For The**

19            **Second Quarter Of 2009, Citing Purportedly Increasing Sales Of**

20            **ZeusIOPS**

21           43.      Before the market opened on June 16, 2009 (the beginning of the

22  Class Period), the Exchange Act Defendants issued a press release announcing

23  increased revenue guidance for the second quarter of 2009.  First quarter revenue

24  had been $63.5 million, previous guidance for the second quarter was $68-70

25  million, and the increased guidance was for revenue of $82-84 million.  The press

26  release asserted that the increased revenues are *"primarily the result of increases*

27

28

*in the Company's ZeusIOPS sales which now are estimated to exceed $55 million during the second quarter of 2009.*"[1]

44.     On STEC's June 16 announcement, the price of the Company's stock increased 27% in a single day to close at $22.88 per share, a $4.86 increase from the prior day's closing price of $18.02, on extraordinarily high trading volume of 10.4 million shares.  At the time, STEC's stock price represented an all-time high.

45.     Contrary to the June 16 announcement, revenues from ZeusIOPS sales were not increasing so as to justify the increased guidance.  For the same reasons, explained, *infra*, showing that the revenue subsequently reported for the second quarter of 2009 was misleadingly inflated by Defendants, so too this revenue guidance was inflated, and, therefore, false.

**B.     At The Close Of The 2009 Second Quarter, The Exchange Act Defendants Make Misrepresentations And Misleading Omissions Regarding A New Supply Agreement With EMC, STEC's Largest Customer For The ZeusIOPS Product**

**1.     The Exchange Act Defendants Assert, Essentially, That The EMC Supply Agreement Covers EMC's Requirements For Only The Second Half Of 2009, And, That EMC Will Be Making Similar Purchases Every Six Months**

46.     On July 16, 2009, just one month after increasing STEC's revenue guidance for the second quarter of 2009, STEC issued a press release announcing an agreement with "one of its largest enterprise storage customers"—later revealed to be EMC—to purchase $120 million worth of ZeusIOPS SSDs "*in the second half of 2009*," and forecasting that this would result in total ZeusIOPS sales during the second half of 2009 increasing to more than $220 million.

---

[1] Unless otherwise noted, all emphasis is added.

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

47.   EMC's purchase of $120 million of ZeusIOPS product under the EMC Supply Agreement was a purchase more than *three times as large* as EMC's total purchases from STEC *during the entire preceding year*—as shown by information in STEC's 2008 10-K.

48.   The press release suggested that the huge size of the purchase resulted not from any extraordinary terms of purchase and sale, but, rather, from the asserted fact that "sales of [EMC's] enterprise storage systems utilizing our ZeusIOPS drives *have grown significantly.*"

49.   Following STEC's July 16 assertions regarding the EMC Supply Agreement, the price of STEC stock rose another 15.2%, or $4.20 per share in a single day, over the previous day's closing price, to close at $31.79 per share on July 16, 2009, on extraordinarily high trading volume.  STEC's stock price thus reached another all-time high.

50.   On August 3, 2009, in STEC's second quarter earnings release, the Exchange Act Defendants implied that the EMC Supply Agreement covered EMC's requirements for just the second half of 2009, describing it as "the $120 million supply agreement that we signed *for the second half of 2009.*"

51.   Also on August 3, 2009, during STEC's second quarter earnings conference call, the Exchange Act Defendants asserted that the difference between the size of the EMC Supply Agreement and the size of previous purchases of ZeusIOPS by EMC and other OEM customers was that, the previous level of purchases was only sufficient to support the assembly of mere samples of OEM products incorporating ZeusIOPS, whereas the EMC Supply Agreement represented the quantity of purchases necessary to support actual "production" of such OEM products for the market.  Thus, Defendant Manouch Moshayedi stated, "right now," ZeusIOPS sales were based on "one customer *in production*, four customers are still in pre-production, type of stage . . . . So I think once [the

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1 | pre-production customers] start kicking in, we will see huge ramps in sales of
2 | ZeusIOPS *going forward*."

3 |     52.     Also on August 3, 2009, in its Form 424B3 filed as part of its
4 | secondary offering, STEC stated that "we expect sales to EMC will represent a
5 | significant percentage of our total revenues *for the foreseeable future*."

6 |     53.     On August 28, 2009, reflecting investors' understanding that the $120
7 | million contract represented a new level of on-going purchases by STEC's primary
8 | ZeusIOPS customer to be made every six months, Needham published an analyst
9 | report stating that "looking forward, we see a high likelihood of a *follow-on*
10 | *contract order* with at least STEC's top OEM customer in 1H10 getting signed
11 | within the next 3 months."

12 |     54.     However, contrary to the impression STEC had created that the $120
13 | million EMC Supply Agreement was intended to cover EMC's needs for only the
14 | second half of 2009, in the Company's November 3, 2009 earnings release for the
15 | third quarter, STEC disclosed that "[EMC] might carry inventory of our ZeusIOPS
16 | at the end of 2009 which they will use in 2010."

17 |     55.     Moreover, contrary to the impression that STEC had created on July
18 | 12 and August 3, that the EMC Supply Agreement represented a new, higher level
19 | of ongoing purchases by EMC, Manouch Moshayedi admitted during the
20 | November 3, 2009, conference call that it was "a one-off type of a deal," while
21 | now asserting that STEC felt no need to duplicate it with EMC or anyone else.

22 |     56.     Still further, on February 23, 2010, in its earnings release for the 2009
23 | fourth quarter and full year, the Exchange Act Defendants stated, "[W]e now
24 | anticipate this inventory carryover to continue to negatively impact our sales to this
25 | customer during the first half of 2010, as we do not expect any meaningful
26 | production orders from this customer during that time."

27 |     57.     An indication of the way in which investors had been misled is
28 | provided by the February 24, 2010, analyst report published by Oppenheimer,

17 | CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

which stated, "Now that *EMC's supply contract with STEC for $120M is indicative of a full-year run rate vs. half year*, we are resetting our '10E EPS . . . and dropping our PT . . . ."

58.   Multiple mutually reinforcing pieces of evidence create a strong inference that on July 12, 2009, when STEC announced the EMC Supply Agreement, and on August 3, 2009, when STEC discussed the EMC Supply Agreement with analysts, the Exchange Act Defendants already knew that the $120 million contract was an exceptional one time purchase, and *not* indicative of a new ongoing level of demand for STEC's ZeusIOPS product from EMC.

59.   First, EMC, which had *never* publicly stated that the EMC Supply Agreement covered its requirements only for the second half of 2009, subsequently explained, during its January 26, 2010 earnings conference call, that the EMC Supply Agreement "was *designed* to protect ourselves *going into first quarter* against what we knew would be a tight supply environment."

60.   Second, by the end of the second quarter of 2009, STEC knew the size of EMC's requirements, because STEC had been, in Manouch Moshayedi's own phrase, a "partner" with EMC, since as early as January 14, 2008, when a STEC press release announced that EMC had chosen the ZeusIOPS line of SSD's for "deployment" in its high end storage systems.  As an analyst observed during the November 3, 2009, earnings conference call without being contradicted by Defendants, STEC had its own engineers "co-located with EMC."

61.   Third, although, on August 3, 2009, STEC had announced that the EMC Supply Agreement was "for the second half of 2009," and although three months later, during the November 3, 2009, third quarter earnings conference call, Manouch Moshayedi disclosed that, up to that point, STEC still had shipped only $55 million of the $120 million order to EMC, nevertheless, during the same November 3, 2009, conference call, STEC already announced that, in 2010, EMC would still have inventory on hand from the $120 million purchase.  This

18

1 | disclosure that EMC's order would cover its requirements not only for the second
2 | half of 2009, but also, well into 2010 was timed very conveniently by Defendants
3 | to follow rather than precede, not only the initial, misleading explanation of the
4 | EMC Supply Agreement, but also, the Moshayedi brother's sale of nine million of
5 | their own personal shares of STEC, for $268.7 million.

6 |     62.    Fourth, at the time when STEC and EMC had signed the EMC Supply
7 | Agreement, if STEC and its senior officers had really believed that EMC was now
8 | generating $120 million of demand for ZeusIOPS every two quarters on an
9 | on-going basis—or even if they had merely believed that EMC would be making
10 | any substantial purchases at all during the first half of 2010—and if STEC and its
11 | senior officers had been producing product to meet that new, higher level of
12 | demand from EMC, then, when it subsequently turned out that EMC would not be
13 | making **any** ZeusIOPS purchases during the first half of 2010, STEC itself should
14 | have been left with huge excess inventory that it had generated for the purpose of
15 | satisfying EMC's expected purchase requests during the first half of 2010.  As
16 | CW5 has stated, STEC needed "months" of lead time to manufacture SSDs.

17 |     63.    However, completely contrary to any such scenario, STEC reported
18 | *no* excess inventory of its own in the fourth quarter of 2009. Indeed, STEC's 2009
19 | 10-K reported inventory of approximately $43 million, which was *substantially*
20 | *less* than the $64 million of inventory that STEC had reported *a year earlier* in its
21 | Form 10-K for 2008. This is a 33% *decline* in STEC's inventory, after a year in
22 | which reported sales had *increased* by 55.8%—*clearly not what one would expect*
23 | *from a company planning for sustained growth in sales.*

24 |     64.    Nor can this inventory decline be attributed to any change in STEC's
25 | volume of production after it made the November 3, 2009, disclosure that EMC
26 | had excess inventory. As reported in STEC's 10-Q for the third quarter of 2009,
27 | STEC's inventory at the end of the third quarter was already down to $35.6
28 | million—a 44% decline from the end of 2008.

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

65.     Moreover, the decline in STEC's inventory also cannot be attributed to any problem on STEC's part in increasing its production to meet an expected increase in demand from EMC—or from anyone else.  During the August 3, 2009, conference call, when an analyst asked whether there would be "any inventory impacts" on STEC as a result of the $120 million contract, Manouch Moshayedi responded, "I think we'll be comfortable."  Similarly, the fact that STEC was having no problem meeting the demand for product from EMC is shown by the fact that EMC ended up with excess inventory.

66.     Fifth, because EMC's purchase of $120 million of ZeusIOPS product was a purchase more than *three times as large* as EMC's total purchases from STEC *during the entire preceding year*, it was, *at a minimum*, reckless for STEC to make statements suggesting that the Agreement represented a new, higher, on-going level of purchases by EMC.

67.     Sixth, as stated by CW4, the former Chief Technologist for Storage and Data Management at Sun Microsystems, 2009 was a very bad year for the IT (Information Technology) business, and in fact companies such as Sun were having layoffs.  According to CW4, the poor climate in the IT world in 2009 made the $120 million EMC Supply Agreement "peculiar."  This too made it at least reckless for STEC to have led investors to believe that the EMC Supply Agreement would cover EMC's requirements for only two quarters.

68.     As early as the first announcement of the EMC Supply Agreement, on July 12, 2009, Manouch and Mark Moshayedi each knew or was reckless in not knowing that the Agreement covered EMC's needs well beyond the second half of 2009.  According to CW7, the Moshayedi brothers were directly and personally involved in all aspects of the EMC business, and stated that they were "very involved" with the business and "larger opportunity deals" (like EMC).  CW5 confirmed that the Moshayedi brothers were heavily involved in the Company's

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

large deals, explaining that "nothing happened at that place without those two."

According to CW1, Manouch Moshayedi directly oversaw all sales.

### 2. Additional Evidence Of The Exchange Act Defendants' Scienter For Their Misleading Statements Regarding The EMC Supply Agreement Is Their Failure, In Knowing Violation Of Reg. S-K, To Disclose The Terms Of The EMC Supply Agreement

69.    The above-referenced circumstances strongly support an inference that, with the knowledge of the Exchange Act Defendants, the EMC Supply Agreement represented the advancing into the second half of 2009 of purchases intended by EMC to cover its needs well into 2010.

70.    The same inference is supported by the statements of CW4, the Chief Technologist for Storage and Data Management at Sun Microsystems, who stated that, based on his industry experience, EMC would have "pre-bought" ZeusIOPS units in order to get better pricing.   CW4 opined that the EMC Supply Agreement was at least partly the result of STEC having reduced its price in order to induce EMC to advance its purchases.

71.    Moreover, the same inference is supported by STEC's failure—in knowing violation of Item 601(b)(10) of the SEC's Regulation S-K ("Reg. S-K")—to disclose the terms of the EMC Supply Agreement by publicly filing a copy of it with the SEC.

72.    Pursuant to Item 601(b)(10) of Reg. S-K and its instructions, "[e]very contract not made in the ordinary course of business which is material to the registrant," and, even if made in the ordinary course of business, "[a]ny contract upon which the registrant's business is substantially dependent" must be filed with the Form 10-Q or 10-K for the period during which the contract was executed. Among other justifications for this requirement, by disclosing to investors the terms of the contract, it protects them from being misled into believing that a

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1  significant one-time contract obtained, for example, by the registrant having made

2  extraordinary promises, is indicative of an ongoing trend in the issuer's results of

3  operations.

4      73.    To this day, STEC has never filed the $120 million EMC Supply

5  Agreement with the SEC.

6      74.    Moreover, no later than at the end of August 2009, STEC was on

7  notice that failure to file a contract of such central importance to its business would

8  be viewed as highly questionable by the SEC, because, by letter dated August 28,

9  2009, the SEC wrote to STEC questioning STEC's failure to file *other* agreements

10  with EMC that were made during the previous year, when EMC did not even

11  account for as large a portion of STEC's business at it would come to account for

12  at the time of the EMC Supply Agreement.

13      75.    Thus, by letter dated August 28, 2009, the SEC asked why no "master

14  agreement" with EMC, such as was referred to in STEC's 2008 10-K, had been

15  filed with that Form 10-K, given that, even at that early date, EMC already

16  accounted for 15.2% of STEC's total revenues.  The SEC also stated that, "If it is

17  your belief that you're not substantially dependent on any such agreement such

18  that it is not required to be filed pursuant to Item 601(b)(10)(ii)(B) of Reg. S-K,

19  please provide analysis in support of this belief in your response letter."

20      76.    STEC's only proffered defense for this earlier failure was an argument

21  that STEC knew could not excuse its failure to file the EMC Supply Agreement.

22  Thus, by publicly filed letter, dated September 10, 2009, signed by Defendant

23  Raymond Cook, the Exchange Act Defendants responded to the SEC that,

24  "STEC's master agreements typically are non-exclusive and ***do not contain any***

25  ***binding long-term volume commitments*** . . . actual sales of STEC products are

26  made through more specific sales agreements such as individual purchase orders."

27

28

77.     Even as regards STEC's earlier agreements with EMC, the SEC was not satisfied with STEC's answer.  Thus, by letter dated September 30, 2009, the SEC again wrote to STEC, stating

> *[I]t remains unclear to us how you have concluded that*
> *you are not substantially dependent upon any of your*
> *agreements with . . . EMC Corporation*, such that they
> are not required to be filed pursuant to Item
> 601(b)(10(ii)(B) of Regulation S-K.  We note your
> statements that STEC's master agreements typically are
> nonexclusive and that they do not contain any binding
> long-term volume commitments, and that actual sales are
> made through more specific sales agreements such as
> purchase orders.  . . . *With respect to any individual*
> *purchase order that accounted for a significant amount*
> *of the company's revenues, please advise how you*
> *concluded that any such purchase order is not required*
> *to be filed as a material contract under Item 601(b)(10)*.

78.     By publicly filed letter dated October 13, 2009, and again signed by Raymond Cook, STEC responded that "STEC received over 100 individual purchase orders from EMC related to 2008 deliveries. *The amounts of these purchase orders ranged from $450 up to approximately $5.2 million for the largest individual purchase order*. . . .  As a result, STEC believes that none of the individual EMC purchase orders received for 2008 shipments constitutes a material contract under Item 601(b)(10) of Regulation S-K.

79.     Some time after STEC sent its second letter to the SEC and before STEC issued its 2009 Form 10-K, the SEC launched its formal investigation of STEC stock sales and issued subpoenas to Manouch Moshayedi and other STEC employees.

80. The Exchange Act Defendants knew or were reckless in not knowing that their attempted excuse for STEC's failure to file any agreements with EMC at the time of its 2008 Form 10-K could not excuse STEC's failure to file the EMC Supply Agreement at the time of its 2Q09 Form 10-Q. The only excuse that STEC even attempted for its failure to file an EMC Supply Agreement with the 2008 Form 10-K was that the largest actual purchase order by EMC during 2008 was for only $5.2 million. Obviously, such an argument could not possibly excuse STEC's failure to file the EMC Supply Agreement, since that agreement was for $120 million—an amount *23 times larger* than STEC's largest previous binding commitment from EMC.

81. Moreover, while the SEC expressed concern about STEC's failure to file any agreement with EMC during a period in 2008 in which EMC accounted for as much as *15.2%* of STEC's revenues, EMC's importance to STEC subsequently increased, until, by the second quarter of 2009, EMC accounted for *38.9%* of STEC's revenues, as disclosed in STEC's Form 424B3 filed on August 3, 2009.

82. Therefore, the Exchange Act Defendants' failure to file the EMC Supply Agreement along with the 2Q09 Form 10-Q violated Reg. S-K, the violation was committed with knowledge that it could not be justified, and the fact that it was a knowing violation raises an inference that Defendants were motivated by a desire to conceal the truth about the EMC Supply Agreement from investors. Moreover, STEC's September 10, 2009, letter to the SEC falsely asserted that, "in the unlikely event a customer should default under a purchase order or other sales agreement, ***STEC generally believes it could find a replacement customer for the relevant product***." As further explained, *infra*, in the next section, at the time of STEC's September 10, 2009, letter to the SEC, Defendants knew that no other customer was currently ready to make purchases of ZeusIOPS on the same scale as the purchases under the EMC Supply Agreement.

**C.**   **The Exchange Act Defendants Misrepresent That STEC's Other OEM Customers Will Follow In EMC's Footsteps By Increasing Their Orders Of ZeusIOPS During The Second Half Of 2009**

83.    Throughout most of the Class Period, the Exchange Act Defendants strove to create a false impression that STEC's revenues from its sales of ZeusIOPS were expected to continue increasing hugely from quarter to quarter, as additional OEM customers increased the volume of their purchases in the same way that the $120 million EMC Supply Agreement had increased the volume of EMC's purchases.

84.    In particular, during STEC's earnings conference call on August 3, 2009, the Exchange Act Defendants made misleading statements creating a false impression that, within the following two quarters, each of four other large OEM customers[2] were expected to increase the volume of their purchases of ZeusIOPS to a level equivalent to the new level of ZeusIOPS purchases recently announced by EMC.

85.    When analyst Aaron Rakers questioned when STEC's large OEM customers other than EMC would reach "full production" of their products incorporating ZeusIOPS, Manouch Moshayedi responded, "It's still a, I would say, maybe *a quarter or two away from full ramping production*."

86.    As explained, *supra*, "full production" as the phrase was used during STEC conference calls was to be contrasted with "pre-production"—a period during which an OEM creates only samples of its product incorporating ZeusIOPS. Therefore a transition to full production by the other OEMs would mean a transition by them to a phase currently being experienced only by EMC, and an

---

[2] During the earnings release conference call on November 3, 2009, Manouch Moshayedi explained that STEC's five largest customers were "EMC, IBM, Hitachi Data Systems, Hewlett-Packard, and Sun."

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   increase in the volume of the purchases of ZeusIOPS by these other OEMs

2   equivalent to, as Manouch Moshayedi said on August 3, "those sort of volumes"

3   being purchased by EMC.

4        87.   Analysts' response to Manouch Moshayedi's assertions show their

5   understanding that he was predicting continued quarter to quarter revenue growth

6   based on STEC's OEM customers other than EMC immediately following in

7   EMC's footsteps.

8        88.   On August 4, 2009, Needham published an analyst report reiterating a

9   "strong buy" rating, and stating:

10           STEC's string of successes continued in the June quarter,

11           with strong growth in ZeusIOPS and impressive margins.

12           ***We expect this trend to repeat*** as STEC's customers

13           ramp and deploy enterprise SSDs into the marketplace.

14        89.   On August 10, 2009, Wedbush Morgan ("Wedbush") initiated

15   coverage of STEC with an "outperform" rating, and stated:

16           STEC has secured a $120 [million] supply agreement

17           with one of its leading customers who we believe to be

18           EMC Corporation.  We expect due to STEC's monopoly

19           of the fibre channel SSD market that ***it will likely secure***

20           ***similar supply agreements with the company's other***

21           ***Tier I OEMs.  We expect these announcements*** to be

22           positive catalysts ***in the near term*** driving shares higher.

23        90.   On August 16, 2009, Deutsche Bank initiated coverage of STEC with

24   a "buy" rating, stating:

25           STEC has a considerable lead over competitors in the FC

26           market, where its products are shipping in EMC systems.

27           STEC is also ramping new business with IBM, HP,

28

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

Hitachi and Sun, and we expect these customers'

volumes to grow *over the next few quarters*.

91.  On September 10, 2009, STEC reinforced its assertion that its other OEM customers would be ramping their purchases to a level like EMC's before the end of 2009, when it stated in its publicly filed response to the SEC's inquiries concerning STEC's contracts with EMC that "in the unlikely event a customer should default under a purchase order or other sales agreement, STEC generally believes it could find a replacement customer for the relevant product."

92.  However, one quarter later, during the November 3, 2009 earnings conference call, when increased purchases by STEC's OEM customers other than EMC had not yet materialized, analysts believed that STEC's assertions at the August 3 conference call and in STEC's letter to the SEC had proven to be false. Thus, when Defendant Manouch Moshayedi admitted that "most of our ZeusIOPS is done through EMC[; t]he rest of the customers are pretty small in terms of the ZeusIOPS sales," and blamed the absence of purchases by the other OEMs on resistance to ZeusIOPS by the other OEMs' own customers, analyst Matthew Gretsch responded:

> I still, after an hour on this call, don't seem to grasp what
>
> the basis of [the OEMs'] customers' skittishness is. . . .
>
> [Y]ou must, at this point, have some feedback from your
>
> customers' customers as to what they are looking for and
>
> why *this thing hasn't progressed as quickly as you had*
>
> *thought*.

93.  Moreover, at the November 3, 2009 conference call, Defendant Manouch Moshayedi implicitly admitted that that his previous statements had been intended to create an expectation of increased purchases within two quarters, and attempted to recycle that very prediction—though he now referred to a different two quarters (*i.e.*, now, at the end of the 2009 third quarter, he predicted increased

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   purchases by the end of the 2010 first quarter), and re-characterized the recycled

2   prediction as a mere "hope." Thus, during the November 4, 2009, conference call,

3   he stated, "maybe [the OEMs other than EMC] took their foot off of the pedal a

4   little bit. But I think their foot is back on the pedal again, and hopefully we'll see

5   the results of it in the next couple of quarters."

6        94.    By the time of the 2009 fourth quarter earnings conference call on

7   February 23, 2010, when increased purchases by the OEMs other than EMC **still**

8   had not materialized, the Exchange Act Defendants' prior assertions during the

9   August 3, 2009, conference call and September 10, 2009, letter to the SEC had

10  been shown to be transparently false. When analyst Sherri Scribner asked if STEC

11  expected "some revenue from some of your other ZeusIOPS customers" during the

12  first quarter of 2010, Manouch Moshayedi finally gave up his prior practice of

13  predicting a huge ramp of purchases within the next two quarters, and, instead,

14  stated "we put second half [of 2010, *i.e.*, within the next **four** quarters] as the time

15  to see growth again in this market."

16       95.    The contrast between the Exchange Act Defendants' assertion during

17  the August 3, 2009 conference call, and their admission during the February 23,

18  2010, conference call is reflected in the contrast between the Needham analyst

19  report following the August 3, 2009, conference call—which predicted second

20  quarter growth to ***"repeat" "as STEC's customers ramp,"***—and the Needham

21  analyst report published on February 24, 2010, which forecasted two successive

22  quarters of *losses* and stated that "the company remains heavily levered to pulls

23  from its first and primary customer," while ***"the remaining customers [are] far***

24  ***behind in their own ramps."***

25       96.    Although the analysts had been fooled, the Exchange Act Defendants

26  had known from as early as August 3, 2009, when they made their first false

27  statement about their other OEM customers, that no ramping of purchases of

28  ZeusIOPS by these customers would be forthcoming during the second half of

1   2009—or else they recklessly ignored their own ignorance while making the
2   statement.

3        97.    At all relevant times, the Exchange Act Defendants knew whether
4   there would be a major change in the volume of the purchase orders that STEC
5   would be receiving within the next six months, as shown by the fact that, in
6   STEC's earnings release for the fourth quarter of 2008, filed on March 12, 2009,
7   STEC stated that it expected ZeusIOPS revenue "for just the first six months of
8   2009" to "surpass the total of ZeusIOPS revenue achieved during the full-year
9   2008," *"[b]ased on current customer indications and momentum."* In addition to
10  showing that Defendants received customer indications of major purchases six
11  months in advance, this statement also led investors to *believe* that STEC received
12  customer indications of major purchases six months in advance.

13       98.    In addition, as early as August 3, 2009, the Exchange Act Defendants
14  had to know whether a ramp in purchase orders was coming during the next two
15  quarters on a scale equivalent to *up to four times the ramp resulting from EMC's*
16  *increased volume of purchases during the second half of 2009*, because without
17  some advance notice from the purchasers as to whether such a huge ramp was
18  coming, STEC would never have been able to ramp its production in time to meet
19  the orders.  As Defendant Manouch Moshayedi stated during the August 3, 2009
20  conference call, "when you get to a point where the amount of components that
21  you need are extremely large, we can't, or we won't, at least, go make those
22  commitments to our suppliers and bring the parts in on a whim.  We need to have
23  [a] *very solid forecast and solid commitments* in order to do that."

24       99.    The absence of any such advance notice having been given to STEC is
25  shown by the fact that, after the second half of 2009, STEC never reported that it
26  had any substantial unsold ZeusIOPS product resulting from failures by the OEMs
27  to follow through on purchases that they had given STEC reason to believe were
28  coming.

29   CONSOLIDATED AMENDED COMPLAINT
     Lead Case No. SACV 09-01304-JVS (MLGx)

100.   Still further, Defendants knew at all relevant times that their OEM customers other than EMC would not be ramping their purchases during the second half of 2009 to a volume like that of the EMC Supply Contract, because, for the reasons stated, *supra*, they knew that *even EMC* was not capable of selling in six months, all of the ZeusIOPS that it had agreed to purchase for that period. As stated by CW4 who worked at Sun MicroSystems, it would have taken Sun *three years* to sell as much product incorporating ZeusIOPS as EMC had undertaken to sell with its $120 million purchase.

**D.    The Exchange Act Defendants Artificially Inflate STEC's Revenues By Reporting Unearned Revenues And By Channel Stuffing**

101.   As numerous mutually reinforcing statements of confidential witnesses establish, in the period leading up to and including the Class Period, STEC developed practices generally used for inflating revenues, and as the history of STEC's reported revenues before, during and after the Class Period demonstrate, these practices were used to inflate STEC's revenues and revenue guidance during the Class Period and especially as reported just prior to the secondary stock offering on August 6, 2009.

**1.    The Exchange Act Defendants Shipped Defective, Unusable Product To Customers In Order To Report Revenue**

102.   According to CW6, who was a Test Engineer at STEC's main facility in Santa Ana, California from February 2005 until December 2008, at the end of a quarter STEC shipped out units that had errors in them. He said that the reason this was done was to get the product shipped out, and to get proof of delivery from the customer's location so that STEC could book the sale. He said that some of these units were not even functional. STEC even sent customers "second hand" units, meaning units that were returned by one customer and then sent to another.

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

103.   CW6 also said that STEC's Test Engineers were told to skip tests that were supposed to be run on the units prior to shipping, in order to speed up the shipment of units to customers, in order to book sales.  Test Engineers were instructed to skip tests on the speed at which the units processed reading and writing data.  He believed that the instructions to skip tests came from STEC's marketing department or the Moshayedis.  CW6 also stated that when EMC returned products, STEC would make, or "allegedly" make, corrections and resend them to EMC, only for EMC to return the units again.

104.   CW1 worked at STEC for five years, from June 2004 until July 2009. She was coordinator of sales to Hewlett-Packard and in 2009 reported to Lorenzo Salhi, who reported directly to Manouch Moshayedi.  CW1 said she saw Manouch Moshayedi on a daily basis.

105.   CW1 explained that STEC shipped products that had a high failure rate to HP, but then lied to HP about the failure rate.  When CW1 discovered that STEC was shipping failed products to HP, she reported it by email, around May 2009, to Eddie Martinez, STEC's Director of Production.  The Director of Production told her "not to broadcast it [the fact that STEC was shipping failed products] on email," and to discuss it with her boss, Lorenzo Salhi.  Mr. Martinez later told CW1 that Mr. Salhi (who reported directly to Manouch Moshayedi) told Mr. Martinez to "make up those numbers."

106.   CW1 described an incident where STEC sent HP defective products and falsified the failure rate in order to make STEC's sales numbers for the second quarter of 2009.  When STEC tested the modules, 35 (or about 10%) failed.  Mr. Salhi replaced the failed modules and returned them in May or June of 2009, to HP with a report that falsely stated only 2 of the units had failed.  HP shipped these modules to its customers, where they again failed.  CW1 said the modules were shipped back to HP because STEC needed to make its numbers for that month or

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   quarter.  CW1 said that Manouch Moshayedi told Mr. Salhi "I don't care what you

2   have to do, get those modules back to HP."

3      107.   CW11, a Failure Analysis Technician at STEC responsible for

4   analyzing and reporting on failed STEC products, confirmed that STEC

5   management was dishonest in reporting product failures to customers, including

6   denying known product failures, altering failure reports, and changing serial

7   numbers on products.

8      108.   Several CWs reported that the ZeusIOPS was not "up to snuff," and

9   that there was some "real struggling" with "quality issues."  CW3 said there were

10   substantial problems with ZeusIOPS – it was "like a brick; all it would do, just the

11   light would flash on and off."  CW2 said EMC returned many ZeusIOPS units due

12   to "power issues" and overheating.  CW9 described occasions when customers

13   returned products to STEC, STEC repaired and returned the product, only to have

14   the unit fail again.

15         2.      **The Exchange Act Defendants Inflated Revenues By**

16                 **Shipping Customers Product They Had Not Ordered**

17      109.   Another way in which the Exchange Act Defendants artificially

18   inflated revenues was by channel stuffing, or sending customers unwanted product.

19   For example, CW1 reported that when Hewlett-Packard received from STEC a

20   shipment of which 10% of the products failed, HP placed STEC on a "world wide

21   stop shipment" hold.  Manouch Moshayedi nonetheless ordered that replacement

22   product be shipped to HP.  According to CW1, the modules were shipped to HP in

23   May or June of 2009 because STEC needed the sales that month/quarter.  When

24   HP received the modules, HP's procurement engineer "hit the roof" and said that

25   STEC should not have shipped them.

26

27

28

### 3.   The Exchange Act Defendants Inflated Revenues By Channel Stuffing

110.   Another deceptive practice used by the Exchange Act Defendants to artificially inflate revenues was to pressure customers to accept in a current quarter product that they did not need until a later quarter, so that STEC could record that revenue from the sale in the current quarter.

111.   CW1 reported that Manouch Moshayedi directed her boss, Lorenzo Salhi, to pull all sales of product to Cisco from a future quarter in 2009 to an earlier quarter. She did not recall the precise quarter in which this happened since "it happened all the time." She also recalled an instance where STEC pulled sales from the first quarter of 2009 into the last quarter of 2008 in order to make its 2008 numbers.

112.   CW1 stated that she was told by a Sales Director, who reported to Manouch Moshayedi and who attended sales meetings with Manouch Moshayedi, that at those sales meetings, Manouch would tell everyone to push sales from a future quarter to the present quarter. This was done to make the current quarter look good. The future quarter would then look bad, so Manouch would again pressure customers to move sales from a future to a current quarter, and thus the process continued. CW1 stated that Manouch "had his hands on everything when it came to sales."

113.   CW1 stated that she was told by STEC salesperson, who worked in Houston on the HP account and reported to Lorenzo Salhi (and who was in charge of Cisco sales), that "Cisco must take everything this quarter" because he wanted "grand numbers" that quarter.

114.   CW1 stated that she was told by STEC salesperson, who worked in Houston on the HP account and reported to Lorenzo Salhi (and who was in charge of Cisco sales), that "Cisco must take everything this quarter" because he wanted "grand numbers" that quarter.

115.   CW8 noted that STEC would ask customers whether they would accept product in the current quarter to meet their needs for the following quarter: "[W]e did ask the customers, 'Hey, look, we're trying to make our number, quarter number, and will you work with us?  Would you take extra product that would be for the next quarter?'"

### 4.   The Exchange Act Defendants Inflated Revenues By "Shipping Bricks" and Empty Boxes

116.   Another deceptive practice the Exchange Act Defendants used to manipulate reported revenues was to "ship bricks" and empty boxes so that they could record revenue from those phantom shipments to meet revenue goals.

117.   During his tenure at STEC (2005-2008), CW6 witnessed STEC's practice of "shipping bricks."  According to CW6, the phrase "shipping bricks" originated because when the shipping palette is loaded with boxes, the boxes look like bricks.  According to CW6, the boxes would be filled with operable product, dysfunctional product, second hand product and "junk."  CW6 also recalled seeing an entire palette of empty boxes marked ZeusIOPS being prepared to be shipped.

118.   CW6 was told by people he worked for that the purpose of "shipping bricks" was to "reach revenue levels each quarter" and that this was common knowledge.  CW6 said that there was always a "rush" to get these "brick" shipments out.  CW6 recalled a specific instance of being told by Director of Operations Shane Mortazavi to get the shipment out that afternoon.

119.   CW6 heard from Mr. Mortazavi and others that it was Mike or Mark Moshayedi who was "pushing" the shipments of "bricks."  CW6 further advised that the Moshayedis made all the decisions at STEC, because that was the culture at the Company.

120.   Likewise, CW10, who was a STEC Field Application and Sales Engineer from September 2007 until November 2009, confirmed that it was

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

STEC's practice to engage in "shipping bricks," which involved shipping empty boxes or the wrong product to customers.

       **5.**    **STEC's 2009 Second Quarter Revenue Is Inflated**

            **(a)**    **STEC's 2009 Reported Revenue Has The Character Of A Bubble Created For The Purpose Of Unloading The Individual Defendants' Stock**

    121.   The history of STEC's reported revenue during 2009 shows it to have been a bubble that (1) expanded with increasing rapidity right up to the end of the second quarter—just before the secondary stock offering, (2) expanded ever more slowly for two quarters thereafter, and then (3) completely collapsed at the end of the year.

    122.   After falling in the fourth quarter of 2008, STEC's reported revenues increased in every quarter of 2009 compared to the previous quarter, before collapsing again in the first quarter of 2010.  Reported revenues increased 12% in the first quarter of 2009, *a whopping 36% in the second quarter* (three times greater than the rate of growth in the first quarter), 14% in the third quarter, and 8% in the fourth quarter.  STEC's reported revenues then plummeted *63.4% in the first quarter of 2010.*

    123.   However, this period of revenue growth was as short as it was spectacular.  In its earnings release for the fourth quarter of 2009, the Exchange Act Defendants announced revenue guidance of only $33-35 million for the first quarter of 2010, a prediction that was borne out by STEC's Form 10-Q for the first quarter of 2010, which reported revenues of only $38.8 million.

    124.   The shape of this bubble, with the secondary offering occurring right after STEC reported its most impressive spurt of revenue growth (and with the stock price having reached a level nine times higher than its level at the end of 2008), creates an inference that the entire bubble was created as a result of revenues being managed so that the Individual Defendants' stock could be

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1  unloaded at an inflated price, and that the entire bubble ultimately collapsed for the

2  simple reason that such management techniques as, *e.g.*, shipping defective or

3  unrequested product  had diminishing returns and, eventually, counterproductive

4  results.

### (b)  **STEC's Class Period Achievement Of Repeatedly Beating Guidance By The Same Small Amount Supports An Inference That Revenues Were Being Managed**

9  125.  In every quarter of 2009, STEC's reported revenues also exceeded the

10  Company's previous "guidance" for the quarter.  As shown by the following chart,

11  the excess of reported revenues over guidance was very similar in each quarter.

|  | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| STEC's Guidance | $58-60 million | $68-70 million; $82-84 million | $95-97 million | $101-103 million |
| Reported Results | $63.5 million | $86.4 million | $98.3 million | $106 million |

17  126.  In the context of the overall revenue bubble, the secondary offering at

18  the height of the bubble, and the evidence that STEC practiced conduct usually

19  used for inflating revenues, the fact that STEC was perpetually able to beat its own

20  guidance, and did so, in each instance, by the same small amount, suggests that the

21  revenues were being managed by the Exchange Act Defendants so that STEC

22  could impress growth oriented investors by reporting that it was exceeding its own

23  guidance.  This is especially true given that STEC managed to beat its guidance in

24  the second quarter even after increasing its guidance.

1
2
3
4

    (c)    **The First Quarter 2010 Collapse Of STEC's Reported Revenues Was Too Large To Be Explainable By STEC's Only Proffered Explanation, Namely, The Cessation Of Purchases By EMC**

5       127.  With the guidance announced by the Exchange Act Defendants in

6  STEC's earnings release for the fourth quarter of 2009, not only had the

7  Company's revenues stopped growing at an accelerating rate, and not only had

8  they had stopped growing at any rate, and they had also gone into decline.

9  Moreover, the decline was so great that, not only were the revenues for the first

10  quarter of 2010 lower than the revenues for the fourth quarter of 2009, but also, *the*

11  *revenues for the first quarter of 2010 were lower than the revenues had been for*

12  *the fourth quarter of 2008*—which, according to STEC's earnings release for the

13  fourth quarter of 2008, were $56.9 million.  Still further, this was true despite the

14  fact that the fourth quarter of 2008 had been a particularly bad quarter, with

15  revenues below those of the third quarter of 2008, and below STEC's guidance for

16  the fourth quarter of 2008.

17      128.  Moreover, although EMC did not make any purchases from STEC

18  during the first quarter of 2010, this fact cannot explain the extent of the collapse

19  of STEC's 2010 first quarter revenues.  STEC's entire reported revenue for the

20  first quarter of 2010, $38.8 million, was *$14 million less* than the amount of

21  revenue reported by STEC in the second quarter of 2009, *even after removing from*

22  *the 2009 second quarter revenue that part of the revenue that was attributable to*

23  *purchases by EMC*.  Thus, according to STEC's Form 424B3 filed on August 3,

24  2009, EMC accounted for *38.9% of STEC's revenues* in the second quarter of

25  2009.  Given that STEC reported $86.4 million of revenue in the second quarter of

26  2009, that means that STEC reported $52.8 million of revenue from sources **other**

27  than EMC during the second quarter of 2009.  Therefore, during the second quarter

28  of 2009, just prior to the secondary offering, STEC reported revenue from sources

1    other than EMC that was *$14 million more* than the revenue reported from sources

2    three quarters later, and despite the fact that STEC repeatedly claimed that

3    purchases of ZeusIOPS were increasing with the passage of time.

4          129.   Therefore, the extraordinary revenue numbers reported by the

5    Exchange Act Defendants for the second quarter of 2009 cannot have been

6    justified based on any temporary enlargement of the orders STEC received from

7    EMC.

8          130.   When this fact is *combined with* (a) the testimony of multiple

9    witnesses that STEC routinely shipped defective or unordered product and empty

10   boxes, and engaged in undisclosed channel stuffing, (b) the fact that the history of

11   STEC's reported revenue during 2009 has the shape of a bubble, with STEC's

12   CEO and COO having sold off over 50% of their stock at the height of the bubble,

13   just after STEC reported its fastest rate of quarterly revenue growth, and (c) the

14   fact that, after missing its guidance in the fourth quarter of 2008, STEC beat its

15   final guidance in five straight quarters, and did so in every one of the five quarters

16   by similarly small amounts, the result is a strong inference that, for the purpose of

17   creating a false impression of ongoing revenue growth, the Exchange Act

18   Defendants materially misstated STEC's revenues reported for 2009, and, in

19   particular, materially misstated STEC's revenues for the second quarter of 2009—

20   the quarter that immediately preceded the insider stock sales and that, among all of

21   the quarters of 2009, involved the largest amount of reported revenue not

22   attributable to orders from EMC.

23              **6.   By Inflating Its Revenues, STEC Violates**

24                     **GAAP And Regulation S-K**

25         131.   Public companies are required by the SEC to prepare their financial

26   statements in accordance with Generally Accepted Accounting Principles

27   ("GAAP"). Under SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial

28   statements filed with the [SEC] which are not prepared in accordance with

1  [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R.

2  § 210.4-01(a)(1).

3     132.   Each of STEC's Forms 10-Q filed during 2009 contained a statement

4  that "the accompanying interim condensed consolidated financial statements of

5  STEC . . . have been prepared in accordance with accounting principles generally

6  accepted in the United States of America ('GAAP') for interim financial

7  information."

8     133.   Under the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"),

9  which interprets FASB Concepts Statement No. 5 ("Con 5"), which, in turn,

10 summarizes GAAP rules regarding revenue recognition, "revenue should not be

11 recognized until it is realized or realizable and earned," and such a condition does

12 not exist unless "delivery has occurred or services have been rendered" *and*

13 "collectibility is reasonably assured."  By recognizing revenue based on the

14 shipping of (a) empty boxes, (b) defective product, and (c) product shipped despite

15 the absence of any order, STEC violated GAAP and thereby made false statements

16 in its financial statements contained in its Form 10-Qs for the second and third

17 quarters of 2009.

18    134.   As established by Item 303(b) of Reg. S-K, Item 303 sets forth the

19 requirements for "management's discussion and analysis of financial condition and

20 results of operations" in Forms 10-Q.

21    135.   Item 303(a)(3)(ii) of Reg. S-K requires the registrant to "describe any

22 known trends or uncertainties that have had or that the registrant reasonably

23 expects will have a material favorable or unfavorable impact on sales or revenues

24 or income from continuing operations."  Channel stuffing has the result of shifting

25 revenues into earlier quarters to the detriment of later quarters.  Therefore, STEC's

26 failure to disclose its channel stuffing in the MD&A section of its second quarter

27 and third quarter Forms 10-Q was a violation of Reg. S-K.

28

136.   The $120 million EMC Supply Agreement, along with STEC's public statements that the contract was indicative of expected future sales growth, created a misleading impression that STEC's revenues during the second half of 2010 indicated a new and higher trend in revenues.  Therefore, STEC's failure to disclose in the MD&A section of its 2009 second quarter Form 10-Q that the EMC Supply Agreement was not likely to be repeated in the foreseeable future, and was not likely to be replaced in future quarters by similar contracts with other customers, was a violation of Reg. S-K.

137.   Because STEC's revenues reported during 2009 had been misleadingly inflated, analysts were unprepared for the first quarter 2010 guidance issued by STEC in its February 23, 2010 earnings release.

138.   On February 24, 2010, J.P.Morgan published an analyst report stating that "the disappearance of sustainable revenue momentum *up-ended our prior view* that STEC was the high-growth story in SMid Cap. . . . *STEC expects 1Q10 revenues of $33-35M, versus our prior estimate of $96.7M*.  The flow-through effects of this are *staggering* to the overall model."

139.   Also on February 24, 2010, Thomas Weisel Partners issued an analyst report stating that STEC's "March quarter outlook came in well below even the most cautious Street estimates," and Wedbush published an analyst report stating that "STEC's Q1 outlook [is] far below the Street and our expectations."

**E.**   **The Exchange Act Defendants Misrepresent ZeusIOPS Competition**

140.   From the beginning of the Class Period, the Exchange Act Defendants maintained that STEC had a virtual monopoly in the SSD market with ZeusIOPS, and faced "no competition."  For example, on August 3, 2009, on a telephone conference with analysts and investors, Defendant Manouch Moshayedi stated, *"As you know, we have no competition at this stage."*  He further stated, *"I would*

1  | *give the probability of someone coming out with a Fibre Channel interface,*
2  | *ZeusIOPs-like SSD a zero."*

3  | 141.  CW1 stated that there was "huge" competition for the ZeusIOPS.
4  | According to CW1, companies competing with STEC's ZeusIOPS product were
5  | IBM, Samsung, Toshiba, SMART Modules, and Kingston.

6  | 142.  In truth, the Exchange Act Defendants knew and/or deliberately
7  | disregarded that competition had entered the market.  For example, STEC's
8  | competitor, Pliant Technology, had begun sampling an enterprise SSD with
9  | customers and expected an initial qualification in the fourth quarter of 2009.  They
10 | also knew and/or deliberately disregarded that other competitors, such as Hitachi,
11 | were on track to qualify its SSD in early 2010.  Indeed, Defendant Manouch
12 | Moshayedi later admitted in a September 21, 2009 interview (after the Moshayedis
13 | had unloaded their stock for hundreds of millions of dollars), STEC "never
14 | expected to be a single source in this market forever . . . [i]t's perfectly inevitable
15 | that people will have second or third qualified vendors in this market."

16 | 143.  On September 17, 2009, Wedbush published an analyst report on
17 | STEC that identified important new adverse information regarding competition for
18 | ZeusIOPS, which the Exchange Act Defendants had adamantly and repeatedly
19 | denied could exist.  The report, entitled, "Checks Indicate Q3 Beat Likely in Cards;
20 | but Expect Changing Competitive Landscape to Pressure Shares Downward,"
21 | disclosed for the first time that the "competitive landscape" was "intensifying,"
22 | and that STEC's "window of opportunity to maintain a market leadership position
23 | and secure design wins at Tier I OEMS in the SATA/SAS SSD enterprise market
24 | ahead of the competition may be closing."  It stated that industry checks indicated
25 | that one of the Company's Tier I enterprise customers was "in the final
26 | qualification stages" with Toshiba for SSDs, and that a leading hard drive company
27 | was likely to introduce single-level cell and/or multi-level cell SSDs in the fourth
28 | quarter of 2009.  It further stated that, whereas Wedbush had previously expected

1  competitors to gain design wins, the firm did not expect that to happen until the
2  first quarter of 2010.

3    144.  The touted lack of competition was an important metric for investors
4  in making their investment decision. Obviously it is less risky to invest in a
5  company whose flagship product enjoys a monopoly than one whose sales may be
6  eroded by competition. This is borne out by the market reaction to the September
7  17, 2009 news—the one day decline in the stock price was over 16%.

8    145.  As B. Riley & Co. recognized in a September 25, 2009 analyst report,
9  "investors have sheared nearly 32% off STEC's market cap, spurred by recognition
10 of encroaching competition from both established SSD players and new entrants to
11 the market."

12  **F.**   **After The Exchange Act Defendants Artificially Inflate The Price**
13       **Of STEC Stock, Defendants Manouch And Mark Moshayedi**
14       **Engage In Massive Insider Selling**

15   146.  After falsely fueling an extraordinary rise in the price of STEC stock
16  from $4 per share in December 2008 to $35.50 per share on August 3, 2009 – an
17  increase of nearly 900% – Defendants Manouch and Mark Moshayedi timely
18  unloaded nine million shares of STEC common stock.

19   147.  This sale reaped a windfall for the Company's top executives of
20  *$267.8 million in a single day*.  Manouch and Mark Moshayedi's collective
21  ownership of the Company decreased from 35.5% to 17.4%.  Their brother, Mike
22  Moshayedi sold $25 million of his stock in June and July 2009, beginning the day
23  after STEC's June 16, 2009 announcement of increased sales of ZeusIOPS.
24  Within one week after the announcement, STEC's former President unloaded over
25  one million shares.

26   148.  The Moshayedis' Class Period stock sell-off was the biggest insider
27  stock liquidation in the history of STEC.  Defendant Manouch Moshayedi sold no
28  stock in 2008 and sold only 400,000 shares in March 2009 for proceeds of $3

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1 | million.  Mark Moshayedi sold only 466,292 shares in June 2008 and another
2 | 400,000 shares in March 2009, for proceeds of $6.5 million and $3 million,
3 | respectively.  The number of shares sold by the Moshayedis in the Offering was
4 | collectively more than 11 times the number of shares they sold in the six months
5 | before the Class Period and nearly 20 times the number of shares they sold in all of
6 | 2008.

7 |      149.   After the market eventually learned that the EMC Supply Agreement
8 | was in fact a one time deal, one analyst aptly observed, ***"Whether management***
9 | ***knew about the demand/inventory issue in advance or not, the market found it***
10 | ***too coincidental that top management made such a substantial sale of stock in***
11 | ***the very quarter they blew up."***

12 |      150.   Following STEC's November 3, 2009 announcement that the EMC
13 | Supply Agreement would not order additional product in the first quarter of 2010,
14 | the SEC instituted a formal investigation into insider trading at STEC.  The
15 | Company's 2009 Form 10-K revealed for the first time: "The [SEC] is conducting
16 | a formal investigation involving trading in our securities.  Certain of our officers
17 | and employees, including our CEO and President, have received subpoenas in
18 | connection with the SEC's investigation."

19 | **VI.**   **ADDITIONAL ALLEGATIONS OF SCIENTER**

20 |     **A.**   **Each Of Defendants' False Statements And Omissions**
21 |            **Involved A Core Operation Of STEC**

22 |      151.   Each of the false statements alleged herein involved a core operation
23 | of STEC.

24 |      152.   Each of the Individual Defendants was a top executive involved in
25 | STEC's daily operations and with access to all material information regarding the
26 | Company's core operations.

27 |      153.   Therefore, each of the Individual Defendants is presumed to have had
28 | knowledge of all material facts regarding such core operations.

43

CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

154.   STEC referred to ZeusIOPS as its "signature" product including when Raymond Cook referred to ZeusIOPS during the August 3, 2009, conference call.

155.   During the August 3, 2009, conference call, Defendant Manouch Moshayedi stated that STEC was forecasting total third quarter revenue "between $95 million and $97 million," and ZeusIOPS revenue between "$67 million to $68 million." Therefore, STEC was forecasting ZeusIOPS revenue for the 2009 third quarter to comprise between 69% and 72% of all of STEC's revenue.

156.   EMC was STEC's principal customer. During the November 3, 2009, conference call, Defendant Manouch Moshayedi stated "EMC still remains our top customer" and that EMC accounted for 90% of ZeusIOPS sales." According to STEC's Form 424B3 filed on August 3, 2009, during the second quarter of 2009, EMC accounted for 38.9% of all STEC's revenues.

157.   STEC considered its four OEM customers other than EMC to be potentially as important to STEC as EMC. Thus, during the August 3, 2009, conference call, Manouch Moshayedi referred to the five OEM customers, including EMC, as "low hanging fruit," and stated that "[w]e've only picked one fruit at this point, and there are four more fruits left."

158.   STEC marketed itself to investors as, first and foremost, a "growth" company—*i.e.*, a company producing steady revenue growth. Thus, in each of its 10-Q's filed during the Class Period, STEC states at an early point in "Management's discussion and analysis of financial condition and results of operations" that STEC is "focusing on certain revenue growth initiatives." Thus, in its earnings releases for each of the first three quarters in 2009, in order to stress the continuing growth of its revenues, STEC compare its quarterly revenues, not only to its revenues from the previous year's same quarter, but also to its revenues from the most recent previous quarter. STEC posted on its website an article by Paul Shread, published on August 4, 2009, stating that "[t]he most interesting detail to come out of STEC's quarterly earnings report last night [*i.e.*, on August 3,