Christopher Kim (Bar No. 082080)
christopher.kim@limruger.com
Lisa J. Yang (Bar No. 208971)
lisa.yang@limruger.com
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017-2554
Telephone: (213) 955-9500
Facsimile: (213) 955-9511

Thomas A. Dubbs (*Pro Hac Vice*)
tdubbs@labaton.com
Martis Alex (Bar No. 77903)
malex@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Allyn Z. Lite (*Pro Hac Vice*)
alite@litedepalma.com
Bruce D. Greenberg (*Pro Hac Vice*)
bgreenberg@litedepalma.com
LITE DePALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Attorneys for Plaintiffs and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION | No.  SACV 09-01304-JVS (MLGx) |
| This Document Relates to **ALL ACTIONS.** | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**<br><br>Hearing Date: January 10, 2011<br>Time: 1:30 p.m.<br>Courtroom: 10C |

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

# **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .................................................................................iv

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................1

I.      CLAIMS UNDER SECTIONS 11 & 12 OF THE SECURITIES ACT .........1

    A.    PLEADING STANDARDS .............................................................1

    B.    FALSITY IS ADEQUATELY PLED ...............................................3

        1.    EMC and the EMC Supply Agreement .............................3

            (a)    Omission to File the EMC Supply Agreement ........4

            (b)    Sales to EMC Expected to Be Significant Percentage of Revenues for Foreseeable Future ........5

        2.    Increased Sales to Other OEMs Expected Through 2009 ...............5

    C.    THE ALLEGATIONS DO NOT SOUND IN FRAUD .......................6

II.    CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT ...............7

    A.    FALSITY IS ADEQUATELY PLED ...............................................7

        1.    EMC and the EMC Supply Agreement .............................7

            (a)    Announcement of Agreement ...............................7

            (b)    Sales to EMC Expected to Be Significant Percentage of Revenues for Foreseeable Future ........8

        2.    Sales to the Other OEMs .................................................9

            (a)    Increased Sales to the Other OEMs Expected Through 2009 ...............9

            (b)    Replacement Customer Could Be Found If a Customer Defaults Under Any Sales Agreement .......9

            (c)    "Full Production" by the Other OEMs is "A Quarter or Two Away" .......9

        3.    Inflated Revenues and Revenue Projection ...................10

            (a)    Inflated Revenues for Second Quarter 2009 ........10

                (i)    Shipping Defective or Unordered Product and Empty Boxes .......11

                (ii)    Channel Stuffing .........................................11

                (iii)    Reporting Inflated Revenues .......................12

LIM, RUGER & KIM, LLP

(b)   Inflated Revenue Projection for Second Quarter 2009 ...................................................... 13

    4.   Denial of Competition for ZeusIOPS ............... 13

B.   SCIENTER IS ADEQUATELY PLED ...................... 14

   1.   Standards for Pleading Scienter ....................... 14

   2.   The Moshayedis' Insider Sales ........................ 15

   3.   The SEC's Investigation of the Moshayedis ..... 16

   4.   Scienter of Specific Individual Defendants for Specific Misstatements ....................................... 17

    (a)   Bases of Scienter for Specific Misstatements ........ 17

     (i)   EMC and the Other OEMs .................. 17

      &bull;  All Misstatements Regarding EMC .................. 17

      &bull;  All Misstatements Regarding the Other OEMs ....... 17

      &bull;  STEC's Inventory Decline Shows Scienter Regarding *Both* EMC and the Other OEMs ........... 18

     (ii)   Inflated Revenues and Revenue Projection ........ 20

     (iii)   Competition for ZeusIOPS ............... 21

    (b)   Bases of Scienter of Specific Individual Defendants ............. 21

     (i)   Admissions of Scienter ...................... 21

     (ii)   Officers' Knowledge of Core Operations ............... 21

     (iii)   Involvement of Specific Defendants in Details Relating to the Misstatements ...................... 23

   5.   Holistic Analysis of Scienter ............................ 24

C.   CAUSATION IS ADEQUATELY PLED ................ 24

III.   THE SAFE HARBOR DOES NOT APPLY UNDER EITHER ACT ......... 25

A.   EMC AND THE EMC SUPPLY AGREEMENT .............. 26

B.   SALES TO THE OTHER OEMS ........................... 27

C.   STEC'S INFLATED SECOND QUARTER 2009 REVENUES AND REVENUE PROJECTION ...................... 28

D.   DENIAL OF COMPETITION FOR ZEUSIOPS ............... 28

IV.   CLAIMS UNDER SECTION 20A .......................... 28

1

V.      ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE.......................29

CONCLUSION.....................................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIM, RUGER & KIM, LLP

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ................................................................ 12

*In re Amylin Pharms., Inc. Sec. Litig.*,
  No. 01CV1455 BTM (NLS), 2003 WL 21500525
  (S.D. Cal. May 1, 2003) ...................................................................... 27

*Angelov v. Wilshire Bancorp, Inc.*,
  331 Fed. App'x 471 (9th Cir. 2009) .................................................... 29

*In re Apollo Group Inc. Sec. Litig.*,
  509 F. Supp. 2d 837 (D. Ariz. 2007) .................................................... 2

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) .............................................................. 2

*Backe v. Novatel Wireless, Inc.*,
  642 F. Supp. 2d 1169 (S.D. Cal. 2009) ......................................... 15, 21

*Belodoff v. Netlist, Inc.*,
  No. SA CV 07-00677 DOC (MLGx), 2008 WL 2356699
  (C.D. Cal. May 30, 2008) ...................................................................... 7

*Berson v. Applied Signal Tech.*,
  527 F.3d 982 (9th Cir. 2007) ................................................................ 2

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
  No. C06-1505 MJP, 2007 WL 3171435
  (W.D. Wash. Oct. 26, 2007) ........................................................... 27, 28

*Broudo v. Dura Pharms., Inc.*,
  339 F.3d 933 (9th Cir. 2003)
  *rev'd on other grounds*, 544 U.S. 336, 125 S. Ct. 1627 ..................... 20

*In re Century Aluminum Co. Sec. Litig.*,
  No. C 09-1001 SI2010, WL 1729426 (N.D. Cal. Apr. 27, 2010) ....... 25

*CWA Plan for Emps.' Pensions and Death Benefits v. CSK Auto Corp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) ............................................... 15

LIM, RUGER & KIM, LLP

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) ........................................................25

*City of Westland Police and Fire Ret. Sys. v. Sonic Solutions*,
   No. C 07-05111 CW, 2009 WL 942182 (N.D. Cal. Apr. 6, 2009) ...................29

*In re Commtouch Software LTD. Sec. Litig.*,
   No. C 01-00719 WHA, 2002 WL 31417998
   (N.D. Cal. July 24, 2002) ........................................................22

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008)................................14, 15, 23

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005)........................................................21

*In re Dynex Capital, Inc. Sec. Litig.*,
   No. 05 Civ. 1897(HB), 2009 WL 3380621
   (S.D.N.Y. Oct. 19, 2009) ........................................................11

*Epstein v. Itron, Inc.*,
   993 F. Supp. 1314 (E.D. Wash. 1998) ........................................21, 22

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ........................................................3, 25

*Frazer ex rel. U.S. v. Iasis Healthcare Corp.*,
   No. 08-16243, 2010 WL 3190641 (9th Cir. Aug. 12, 2010)..........................30

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003)........................................................11

*FSP 1 Stallion v. Luce*,
   No. 2:08-CV-01155-PMP-PAL, 2009 WL 1219683
   (D. Nev. May 1, 2009)........................................................27

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008),
   *cert. denied*, 129 S. Ct. 1993 (2008) ........................................................24

*In re Hienergy Techs., Inc.*,
   No. SACV04-1226DOC(JTLX), 2005 WL 3071250
   (C.D. Cal. Oct. 25, 2005)........................................................15, 30

LIM, RUGER & KIM, LLP

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ....................................................25

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ...............................................................28

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994) ..................................................................7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...............................................................26

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...............................................29

*Middlesex Ret. Syst. v. Quest Software Inc.*,
    No. CV 06-6863 DOC (RNBx), 2008 WL 7084629
    (C.D. Cal. July 10, 2008) .....................................................................29

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .............................................................2, 7

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..........................................15, 25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...............................................................12

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .....................................................15, 16, 23

*Orbital Scis. Corp. Sec. Litig.*,
    58 F. Supp. 2d 682 (E.D. Va. 1999) ...................................................20

*In re Peoplesoft, Inc. Sec. Litig.*,
    No. C 99-00472 WHA, 2000 WL 1737936
    (N.D. Cal., May 25, 2000) ...................................................................21

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) .............................................25

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*,
    No. CV-09-00214-JLQ, 2010 WL 2264962
    (E.D. Wash. June 2, 2010).............................................................17, 24

LIM, RUGER & KIM, LLP

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ....................................................2, 10, 14

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................................16

*SEC v. Fitzgerald*,
   135 F. Supp. 2d 992 (N.D. Cal. 2001) .......................................................7

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .......................................................................12

*In re Scientific-Atlanta, Inc. Sec. Litig*,
   239 F. Supp. 2d 1351 (N.D. Ga. 2002),
   *aff'd*, 374 F.3d 1015 (11th Cir. 2004) ..................................2, 8, 10, 11

*SEC v. Currency Trading Int'l*,
   No. CV 02-05143PA, 2004 WL 2753128 (C.D. Cal. Feb. 2, 2004) ...................2

*SEC v. Leslie*,
   No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010) .........................13

*In re Seebeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................26

*Sekuk Global Enters. v. KVH Indus., Inc.*,
   No. Civ.A. 04-306ML, 2005 WL 1924202 (D.R.I. Aug. 11, 2005) .................11

*Selbst v. McDonald's Corp.*,
   No. 04 C 2422, 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) .........................28

*In re Silicon Graphics, Inc. Sec. Litig.*,
   970 F. Supp. 746 (N.D. Cal. 1997) ..........................................................29

*In re Skechers U.S.A., Inc. Sec. Litig.*,
   No. CV 03-02094 PA, 2004 WL 1080174
   (C.D. Cal. May 10, 2004) ...........................................................................2

*Slayton v. AMEX*,
   604 F.3d 758 (2d Cir. 2010) .....................................................................26

*South Ferry LP #2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005),
   *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008) ...............26, 28

LIM, RUGER & KIM, LLP

vii
PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

*South Ferry LP, #2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................ 21

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ........................................................... 4

*In re Surebeam Corp. Sec. Litig.*,
   No. 03 CV 1721JM(POR), 2005 WL 5036360
   (S.D. Cal. Jan. 3, 2005) ................................................................... 4

*Tellabs, Inc. v. Makor Issues & Rights, LTD.*,
   551 U.S. 308, 127 S. Ct. 2499 (2007) ................................... 14, 15, 20

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006) ............................................................ 17

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ......................................................... 2, 7

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................... 2

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) .......................................................... 7

*In re Washington Mutual, Inc. Sec. Litig.*,
   694 F. Supp. 2d 1192 (W.D.Wash. 2009) ......................................... 24

*Yanek v. Staar Surgical Co.*,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ....................................... 27, 28

**STATUTES, REGULATIONS AND RULES**

15 U.S.C. § 78t-1 (Exchange Act § 20(A)) ......................................... 28

17 C.F.R § 229.601(b)(10)
   (Item 601(b)(10) of SEC Regulation S-K) ................................... 4, 26

Fed. R. Civ. P. 9(b) ....................................................................... 7, 30

LIM, RUGER & KIM, LLP

## INTRODUCTION

From mid-June 2009 through early August 2009, the Exchange Act Defendants (Manouch and Mark Moshayedi, STEC's CEO and COO, who owned 45% of STEC's stock; Raymond D. Cook, CFO; and STEC) knowingly made misleading statements and omissions that caused STEC's stock price to double.

Only days after the last of these misstatements, and with the price of STEC's stock nearing its all time high, Mark and Manouch sold 50% of their stock, for $267.8 million, in a secondary offering.  This was by far the largest sale of stock ever by STEC insiders.  Defendants admit the brothers had been privately planning to sell this stock since May 2009—shortly before the first misstatement.

Only five weeks after the offering, a series of disclosures began that revealed the falsity of Defendants' statements and omissions, and, in turn, drove down the price of STEC's stock to below its pre-Class Period level.  In February 2010, STEC also disclosed that the two Moshayedi brothers had been subpoenaed by the SEC as part of a formal investigation.[1]

The Exchange Act Defendants are liable for all of the alleged misstatements and omissions, some of which were made in the registration statement or prospectus for the secondary offering.  The Securities Act Defendants (Rajat Bahri, a Director; several underwriters; and each of the Exchange Act Defendants) are strictly liable for the misstatements and omissions in the registration statement and prospectus, regardless of these Defendants' mental state.

## ARGUMENT

## I.  CLAIMS UNDER SECTIONS 11 & 12 OF THE SECURITIES ACT

### A.  PLEADING STANDARDS

The securities laws prohibit "telling of material *half-truths*, where the speaker 'omit[s] to state a material fact necessary in order to make the statements

---

[1] The Class Period is from June 16, 2009, through February 23, 2010.  ¶ 1.

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

made, in the light of the circumstances under which they were made, not misleading.'"  *United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (emphasis added); *see Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (falsity adequately alleged where defendants "chose to tout the company's backlog" while omitting that "backlog included a significant amount of work that had been halted by the company's customers").

"[S]tatements literally true on their face may nonetheless be misleading when considered in context."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *Id.* (citation omitted).

An analyst's reaction may be evidence that a defendant's statement was misleading.  *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig*, 239 F. Supp. 2d 1351, 1366-67 (N.D. Ga. 2002) ("analysts' optimistic view of the Company's stock could demonstrate that Defendants' statements and non-disclosures disguised the Company's true financial condition"), *aff'd*, 374 F.3d 1015 (11th Cir. 2004).[2]

A "statement of belief" or a "projection" is false if (1) not "genuinely believed," (2) without "a reasonable basis," *or* (3) the speaker knows facts "tending to seriously undermine [its] accuracy."  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113, 1115 (9th Cir. 1989) (cited in Defs.' Br., at 10, for same rule); *accord Provenz v. Miller*, 102 F.3d 1478, 1487-88 (9th Cir. 1996).[3]

---

[2]  *In re Skechers U.S.A., Inc. Sec. Litig.*, 2004 WL 1080174, at *7 (C.D. Cal. May 7, 2004), relied on by Defendants, *see* Defs.' Br. at 10, is not to the contrary because it did not involve use of an analyst's reaction as evidence of falsity.

[3]  *Accord In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 (N.D. Cal. 2009); *In re Apollo Group Inc. Sec. Litig.*, 509 F. Supp. 2d 837 (D. Ariz. 2007) (issue of falsity for trial, despite "undisputed evidence of Defendants' good faith"); *SEC v. Currency Trading Int'l Inc.*, 2004 WL 2753128, at *7, 9-10 (C.D. Cal. Feb.

1   The adequacy of a disclosure and its materiality are issues "to be decided by

2   the trier of fact," and are not to be decided as a matter of law unless their

3   resolution is "so obvious that reasonable minds [could] not differ." *Fecht v. The*

4   *Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (*quoting Durning v. First Boston*

5   *Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).

6   **B.   FALSITY IS ADEQUATELY PLED**

7   **1.   EMC and the EMC Supply Agreement**

8   By the second quarter of 2009, EMC had become STEC's largest customer,

9   accounting for 38.9% of STEC's revenues.  ¶ 81[4]; Defs' Ex. D, at 70.

10  Early in the third quarter of 2009, STEC announced that EMC had agreed to

11  purchase an unprecedented $120 million worth of ZeusIOPS SSDs in the third and

12  fourth quarters of 2009.  ¶ 46 ("EMC Supply Agreement" or "Agreement").  This

13  enormous purchase commitment was twenty-three (23) times larger than EMC's

14  largest previous binding commitment to purchase anything from STEC.  ¶ 80.

15  This commitment to make purchases during six months was also three times as

16  large as EMC's total purchases from STEC during the prior year.  ¶ 47.

17  Two weeks later, on August 3, 2009, as described, *infra*, Defendants made

18  several misstatements/omissions regarding EMC and the EMC Supply Agreement

19  in the registration statement and prospectus.

20  Three months after that, on November 3, 2009, during STEC's third quarter

21  conference call, Manouch admitted that the EMC Supply Agreement was "a one-

22  off type of a deal."  ¶ 55.  Moreover, after the six month period covered by the

23  Agreement, EMC failed to resume buying from STEC even in the amounts

24

25  2, 2004) (defendants liable under 10b-5, because no reasonable basis for estimate).
    [4] The allegation in ¶ 81 appears only in the Exchange Act part of the Complaint,

26  not in the Securities Act part.  To the extent that certain allegations made in only
    one part of the Complaint are used in this brief to support claims made in both

27  parts, if deemed necessary by the Court, Plaintiffs request permission to amend, to

28  make these allegations in both parts. *See infra* at 30 n.16 (list of paragraphs).

LIM, RUGER & KIM, LLP

purchased by EMC during the second quarter of 2009:  on January 26, 2010, EMC stated that the Agreement had been "designed" all along to satisfy EMC's supply requirements for a period "going into first quarter [of 2010]," ¶ 243, and, on February 23, 2010, STEC announced that "we do not expect *any* meaningful production orders from [EMC] during the *first half* of 2010," ¶ 190 (emphasis added).  Primarily because EMC failed to make any purchases during the first quarter of 2010, STEC's revenues during that quarter collapsed.  ¶ 264.

### (a)   Omission to File the EMC Supply Agreement

Allegations that state a claim for violating Reg. S-K "also sufficiently state a claim under Sections 11 and 12(a)(2)." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (violation of Item 303(a) of Reg. S-K); *accord In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005).

Item 601(b)(10) of Reg. S-K requires filing "[e]very contract not made in the ordinary course of business which is material to the registrant," and, even if made in the ordinary course, "[a]ny contract upon which the registrant's business is substantially dependent." ¶ 245 (quoting 17 C.F.R. § 229.601(b)(10)). Plaintiffs allege that the Securities Act Defendants violated Item 601(b)(10), and thereby Sections 11 and 12(a)(2) of the Securities Act, by failing to file the EMC Supply Agreement with the second quarter 10-Q, which was incorporated into the registration statement.  ¶¶ 245-49.

Defendants do not try to justify this violation.  They argue only that the omission was not material.  Defs.' Br. at 27.  They are wrong for two reasons.

First, disclosures mandated by Reg. S-K are "presumably material." *Steckman*, 143 F.3d at 1296.

Second, Defendants' omission to file the Agreement communicated to investors that the Agreement was (a) made in the ordinary course, and (b) not one on which STEC's business was "substantially dependent," *compare* ¶ 245; these were material misstatements contradicted by Manouch's admission that the

LIM, RUGER & KIM, LLP

Agreement was "a one-off type of a deal," ¶ 55—*i.e.*, *not* in the ordinary course—and by the collapse of STEC's revenues after the Agreement ended, ¶ 264.

### (b)   Sales to EMC Expected to Be Significant Percentage of Revenues for Foreseeable Future

The prospectus stated that "we expect sales to EMC will represent a significant percentage of our total revenues for the foreseeable future." ¶ 240. When this statement was made, the foreseeable future regarding sales to EMC included at least the first quarter of 2010, because the Agreement, which preceded this statement, was "designed" to satisfy EMC's supply needs during the first quarter of 2010. ¶ 143. In addition, this statement was made in the context of Defendants consistently stressing, and analysts consistently noting, the importance of STEC's quarterly revenues. ¶ 158. Indeed, the sentence in the prospectus that precedes this sentence states, "[s]ales to EMC as a percentage of our total revenues increased to 38.9% in the second quarter of 2009." Defs.' Ex. BB at 361. Thus, in context, this statement meant STEC believed EMC would represent a significant percentage of STEC's quarterly revenues through at least the first quarter of 2010.

Contrary to this statement, EMC made no purchases during the first quarter of 2010. ¶ 190. Moreover, Defendants had no reasonable basis for making this statement, given the design of the Agreement. ¶ 143. Therefore, the statement was false when made. ¶ 244.

Defendants argue this statement did not imply "that EMC would buy $120 million worth of product very six months" (Defs.' Br. at 26), but do not, and cannot, explain how this statement can be squared with "no production orders from [EMC] during [the first quarter of 2010]." ¶ 190.

### 2.   Increased Sales to Other OEMs Expected Through 2009

The registration statement and prospectus state:

*We expect continued growth in the sales* of our Flash-based SSD ZeusIOPS products through 2009 *based on the accelerated adoption* of our ZeusIOPS SSDs *by most of our* major [enterprise] *OEM customers* into their systems. *As part of this expected growth*, on July 16, 2009 *we announced an agreement* with one of our largest enterprise-storage customers *for sales of $120 million* of ZeusIOPS SSDs to be delivered in the second half of 2009.

¶ 278 (emphasis added).  As shown by the italicized portions of this paragraph, Defendants asserted that STEC expected its OEM customers other than EMC to increase their purchases during 2009 in a manner like EMC had done, based on their already having "adopted" ZeusIOPS into their systems.

The message communicated, and the impression created, by this statement is demonstrated by one analyst's report, which stated, while discussing the EMC Supply Agreement, that STEC "will likely secure *similar* supply agreements with the company's other Tier I OEMs . . . in the near term."  ¶ 89 (emphasis added).

However, contrary to Defendants' statement, the other OEMs did not increase their purchases during 2009.  At the end of 2009, Manouch conceded that even just "some revenue" from these other OEMs could not be expected before the second half of *2010*.  ¶ 94.

Moreover, three months after the registration statement and prospectus, during the November 3, 2009, third quarter earnings call, Manouch admitted that STEC's OEM customers other than EMC had not yet "*started*" to "build SSDs into their systems."  ¶ 255 (emphasis added).  Therefore, the assertion in the registration statement and prospectus that adoption of ZeusIOPS into these OEMs' systems had been "accelerated" was false when made, and Defendants lacked any reasonable basis for expecting "growth in the sales" "through 2009" based on such adoption by the other OEMs already having happened.  ¶ *Id.*

## C.   THE ALLEGATIONS DO NOT SOUND IN FRAUD

Scienter is not a required element for liability under Section 11 or 12(a)(2).

LIM, RUGER & KIM, LLP

1   *See Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994) (Section 11); *Miller*, 519

2   F.3d at 886 (Section 12(a)(2)).  Where allegations under a non-fraud claim neither

3   mention the word "fraud," nor "allege[ ] facts that would *necessarily* constitute

4   fraud," they are not subject to Rule 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

5   1097, 1105-06 (9th Cir. 2003) (emphasis added).

6       The Securities Act allegations here do not contain the word "fraud."  *See*

7   ¶ 282.  Even if the Court were to find that one or another of the Securities Act

8   allegations sounded in fraud, the others would not be subject to Rule 9(b).  *See*

9   *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *5-7 (C.D. Cal. May 30, 2008).  In

10  any event, all of the allegations satisfy Rule 9(b)—which requires nothing more

11  than pleading "who, what, when, where, and how" regarding "what is false and

12  misleading about a statement and why it is false." *Vess*, 317 F.3d at 1106.

13  **II.    CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT**

14      **A.    FALSITY IS ADEQUATELY PLED**

15          **1.    EMC and the EMC Supply Agreement**

16              **(a)    Announcement of Agreement**

17      The press release announcing the EMC Supply Agreement stated not only

18  that EMC had agreed to purchase an unprecedented $120 million of ZeusIOPS

19  during the second half of 2009, ¶ 46, but also, that "sales of [EMC's] enterprise

20  storage systems utilizing our ZeusIOPS drives have grown significantly," ¶ 48.

21      The press release was a misleading half-truth, because, by stating that

22  EMC's sales of ZeusIOPS had grown, it provided a reason for the huge size of the

23  Agreement, but *omitted* to provide the additional necessary information that (1)

24  the Agreement was designed to supply EMC's needs beyond the term of the

25  Agreement ¶ 59, and (2) it was a one-off type of a contract, not in the ordinary

26  course of STEC's business, ¶ 55.  *See Laurienti*, 611 F.3d at 539 ("telling of

27  material half-truths" prohibited); *see also SEC v. Fitzgerald*, 135 F. Supp. 2d 992,

28  1028 (N.D. Cal. 2001) (question is whether "defendant's statements . . . in the

LIM, RUGER & KIM, LLP

aggregate, created a misleading impression'") (citation omitted).

By concealing the true period of EMC's requirements that was covered by the Agreement, and the fact that the Agreement was a non-recurring transaction, the press release misled investors into believing that the size of the purchases under the Agreement was solely the result of an increase in EMC's ordinary course purchasing, so that, after the Agreement ended, EMC would continue making substantial purchases. Thus, on August 28, 2009, one analyst reported that "we see a high likelihood of a follow-on contract order with at least STEC's top OEM customer in 1H10 getting signed within the next 3 months." ¶ 53; *see*, *Scientific-Atlanta, Inc.*, 239 F. Supp. 2d at 1366 (analyst's interpretation demonstrates statement was misleading), *aff'd*, 374 F.3d 1015.

For the same reason, investors were surprised, on November 3, 2009, when Defendants announced EMC would still be using inventory from the Agreement in 2010, ¶ 54, and again, on February 23, 2010, when Defendants announced STEC did not expect "any meaningful production orders" from EMC "during the first half of 2010," ¶ 56. One analyst's reaction shows that he had to modify a previous belief that EMC would be purchasing $120 million of ZeusIOPS every six months. *See* ¶ 57 (stating "now," *i.e.*, based on the February 23, 2010, disclosure, EMC's $120 million purchase was "indicative of a full-year run rate *vs. half year*") (emphasis added).[5]

### (b) Sales to EMC Expected to Be Significant Percentage of Revenues for Foreseeable Future

Defendants' assertion quoted in ¶ 52 was false for the reasons given *supra* at 5, for the falsity of the same assertion quoted in ¶ 240, and is also actionable under Section 10(b) of the Exchange Act.

---

[5] This analyst's statement rebuts Defendants' argument, Defs.' Br. at 10, that "not even the analysts expected EMC to purchase $120 million every two quarters."

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

### 2.   Sales to the Other OEMs

#### (a)   Increased Sales to the Other OEMs Expected Through 2009

Defendants' assertion quoted in ¶ 278 was misleading for the reasons given *supra* at 5-6, and is also actionable under the Exchange Act.

#### (b)   Replacement Customer Could Be Found If a Customer Defaults Under Any Sales Agreement

On September 10, 2009, after the secondary offering but prior to the first corrective disclosure, in a public response to SEC inquiries, Defendants essentially asserted that another one of their customers was ready to make purchases equivalent to those being made under the Agreement.  Defendants stated, "in the unlikely event a customer should default under a purchase order or other sales agreement, STEC generally believes it could find a replacement customer for the relevant product."  ¶ 91.

This statement was false, *see supra* at 5-6 and *infra* at 17-20, and Defendants do not even try to defend it, *see* Defs.' Br. at 11-13.

#### (c)   "Full Production" by the Other OEMs is "A Quarter or Two Away"

During the August 3, 2009, earnings conference call, Manouch asserted a "huge ramp in sales of ZeusIOPS" results when an OEM transitions from a "pre-production type of stage"—*i.e.*, a stage in which it merely assembles and distributes samples of the system it intends to sell, *see* Defs.' Ex. O, at 240—to a "production" stage.  ¶ 51.  He also contrasted EMC, described as "in production" of a system incorporating ZeusIOPS, with STEC's four *other* OEM customers, described as "still in pre-production" regarding such systems.  ¶ 51.  When asked when the other OEMs would reach "full production," he said they were "maybe a quarter or two away from full ramping production" (*i.e.*, by end of 2009).  ¶ 51.

Consistent with Manouch's statements, a Needham analyst report following the August 3, 2009, conference call stated that STEC's second quarter growth

would "*repeat*" "*as STEC's customers ramp*." ¶ 95 (emphasis added).

However, contrary to his statements on August 3, 2009, Manouch conceded on February 23, 2010, that the other OEMs had made no such transition, and that "we put second half [of *2010*] as the time to see growth again in this market." ¶ 94. Following this admission, the Needham analyst reported that compared to EMC, "the remaining customers [are] far behind in their own ramps." ¶ 95.

Defendants argue that, during the August 3 conference call, Manouch said the other OEMs "[would] have to come up and do the marketing and sales that [EMC] is doing to get up to those sort of volumes" being purchased by EMC. Defs.' Br. at 12. But this statement did not negate the assertion that the other OEMs would begin full production within the next quarter or two. It merely qualified the size of the increase in purchases that would result from such full production. Manouch did *not* say STEC did not expect even "some revenue" from these other OEMs in the next two quarters—the result he was forced to admit, at the end of 2009. ¶ 94.

As demonstrated, *supra* at 5-6, and *infra* at 17-20, Manouch had no reasonable basis for making this statement, and, in fact, did not believe it.

### 3.    Inflated Revenues and Revenue Projection

#### (a)    Inflated Revenues for Second Quarter 2009

Defendants overstated STEC's second quarter 2009 revenues by including revenues that had not been earned, and failed to disclose that the reported total had been increased by channel stuffing. *See* ¶¶ 101-39; *Provenz*, 102 F.3d at 1484 ("under GAAP revenue must be earned before it can be recognized"); *Scientific-Atlanta*, 239 F. Supp. 2d at 1363 ("a company is obligated to reveal channel stuffing once sales, earnings, and growth projections were disclosed"). The combined effect of the overstatement and channel stuffing was $14 million, or 20% of the uninflated revenues. ¶¶ 127-30.

LIM, RUGER & KIM, LLP

### (i)   Shipping Defective or Unordered Product and Empty Boxes

Confidential witnesses report Defendants engaged in conduct for the purpose of reporting revenues that had not been earned, in order to inflate STEC's quarterly results, including shipping defective product that was later returned, ¶¶ 102-08, shipping product that had not been ordered, ¶ 109, and shipping boxes that were "empty" or filled with "junk," ¶¶ 116-20.  *See Sekuk Global Enters. v. KVH Indus., Inc.*, 2005 WL 1924202, at *10 (D.R.I. Aug. 11, 2005) (allegations of "fictitious sales" and "shipments of damaged or reconfigured [units]" made for the purpose of inflating earnings held actionable under Section 10(b)).

Defendants cannot relabel the deliberate shipping of defective products as "a post-shipment product failure."  *Compare*, Defs.' Br. at 14, *with* ¶¶ 12, 105-07. Moreover, regardless of when the product failures were first detected, STEC admits "product returns would . . . reduce our revenues."  Defs.' Ex. A, at 17.

Similarly, Defendants attack on CW1 (Defs.' Br. at 15) who stated that STEC shipped unordered product, is misguided.  The Class Period begins on June 16, 2009, ¶ 1, and CW1 was employed at STEC through July 2009, ¶ 42(a).  Even more important, she was at STEC through the entire 2009 second quarter whose revenues Defendants misrepresented.  *Id.*; *see In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *7 n.6 (S.D.N.Y. Oct. 19, 2009).

### (ii)   Channel Stuffing

Confidential witnesses also have stated STEC engaged in channel stuffing for the purpose of enhancing reported results for earlier quarters.  ¶¶ 110-15. Revenues from channel stuffing can create a misleading impression of increased *recurring* revenues.  For this reason failure to disclose channel stuffing is a violation of Section 10(b).  *Scientific-Atlanta*, 239 F. Supp. 2d at 1363 (Section 10(b) claim stated based on undisclosed channel stuffing); *Sekuk Global Enters.*, 2005 WL 1924202, at *10 (same); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d

LIM, RUGER & KIM, LLP

957, 988 (W.D. Wis. 2003) (omission to disclose channel stuffing not immaterial).

### (iii)   Reporting Inflated Revenues

Even apart from the confidential witnesses, Plaintiffs' other allegations support the conclusion that STEC's 2009 second quarter revenues were inflated by the unearned revenues and channel stuffing:

First, the increase in STEC's revenues during the second quarter of 2009—the quarter right before the secondary offering—was roughly three times greater than the increase during any other quarter of 2009, ¶ 122; and, thereafter, on the last day of the Class Period, STEC announced that its revenues would collapse in the following quarter, ¶ 127. Although STEC explained the collapse as a result of the cessation of purchasing by EMC, the collapse was so steep that reported first quarter 2010 revenues were $14 million less than the revenues reported for the second quarter of 2009 *even after excluding from the second quarter number any revenues resulting from purchases by EMC.* ¶¶ 128-29.

The sudden deterioration of a company's financial results at the end of a class period may support an allegation that the previously reported financial results were false—even if the previous results have not been restated. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) ("significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made").[6]

Second, shortly before the offering, Defendants increased the upper and lower bounds of their prior revenue estimate for STEC's 2009 second quarter by $14 million each (*see* ¶ 125)—the exact number by which non-EMC revenues *fell*

---

[6] *Accord, In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data" supports falsity "during the class period"); *see Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (absence of restatement "does not end [plaintiff's] case when he has otherwise met the pleading requirements").

LIM, RUGER & KIM, LLP

1  after the offering.   The announced increase in the estimate was followed by a

2  *27% rise* in STEC's stock price (¶ 44), which, in turn, was followed only days

3  later by the Moshayedi brothers selling their stock.   ¶¶ 146-48.  Moreover, as

4  Defendants admitted in their motion to dismiss the prior complaint, Manouch and

5  Mark began planning their sale of STEC stock in May 2009, *see* ECF No. 89, at 7,

6  only weeks before they increased STEC's revenue estimate by the $14 million.

7        The match between the $14 million increase in STEC's estimate for its

8  2009 second quarter, and the $14 million drop in post-offering non-EMC revenues

9  is too perfect to be explained by coincidence.  It is powerful proof that

10  Defendants inflated STEC's results in the quarter prior to the Moshayedis' stock

11  sale, using the unearned revenues and channel stuffing that the confidential

12  witnesses say was generated for that very purpose.  *See also* ¶¶ 124; 137-39.

13        The $14 million overstatement equals 20% of the uninflated second quarter

14  2009 reported revenues.  *See* ¶¶ 128, 170.  Therefore, it was a material

15  misstatement.  *See SEC v. Leslie*, 2010 WL 2991038, at *29-30 (N.D. Cal. July

16  29, 2010) (5% overstatement of revenues not immaterial as matter of law).

17              **(b)   Inflated Revenue Projection for
                        Second Quarter 2009**

18

19        For the same reasons that STEC's reported second quarter revenues were

20  misleading, STEC's June 16, 2009, revenue estimate was misleading.  ¶ 45.

        **4.   Denial of Competition for ZeusIOPS**

21

22        During the August 3, 2009, conference call, Manouch stated that STEC had

23  "no competition at this stage" for ZeusIOPS.  ¶ 140.  Contrary to this assertion,

24  STEC Sales Coordinator, CW1, has stated that there was "huge" competition at

25  the time from several large, established tech companies.  ¶¶ 42(a), 141.  Indeed,

26  some competitors already were qualifying as suppliers for STEC's own

27  customers.  ¶ 142.[7]

28  _____

[7] When a product has been "qualified" by a customer, it has successfully passed

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

1

Defendants argue that Manouch "acknowledged" that other companies were developing competing products, but Defendants cite only to a statement that Manouch made on September 21, 2009. *See* Defs.' Br. at 4 (citing ¶ 142). That was four days *after* the truth about such competition was revealed to the market in an analyst's report. ¶¶ 176-79.

Defendants also advance a "truth-on-the-market" defense that "the market clearly understood" that competitors were "trying hard to enter the market," based on analyst reports issued prior to the alleged misstatements in 2009, but not mentioned in the Complaint. Defs.' Br. at 4. Even if these documents were to be judicially noticed, they would, at most, create a question of fact as to what the market "understood" and *when* it was understood—a question whose resolution is not appropriate on a Rule 12(b)(6) motion, or even on a motion for summary judgment. *See Provenz*, 102 F.3d at 1492-93 (truth-on-the-market defense based on analyst reports and articles rejected as insufficient at summary judgment); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1159-60 (C.D. Cal. 2008) ("the Court rejects a truth-on-the-market defense at the pleading stage").

Finally, Defendants argue Manouch meant only that no competitor had yet been "qualified" by STEC's OEM customers. Defs.' Br. at 13. However, he did not so limit his statement, *see* Ex. B at 33, and, after he made it, one analyst was surprised to discover that competition did exist, *see* Defs' Ex. CC at 413.

## B.   SCIENTER IS ADEQUATELY PLED

### 1.   Standards for Pleading Scienter

The test for alleging scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor*

---

that customer's testing process. *See* James Detar, *Solid-State Hard Drives Not a Flash in the Pan*, Investor's Business Daily, June 20, 2008, *available at* 2008 WLNR 11594714 (statement by Manouch).

1   *Issues & Rights, LTD.*, 551 U.S. 308, 322-23, 127 S. Ct. 2499, 2509 (2007)

2   (emphasis in original); *In re New Century*, 588 F. Supp. 2d 1206, 1228 (C.D. Cal.

3   2008) ("view [scienter] holistically with respect to each allegedly violative act").

4       The inference of scienter need only be "as compelling as any opposing

5   inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.

6   Ct. at 2510.  It "need not be . . . the 'most plausible of competing inferences.'"

7   *Id.*; *accord CWA Plan for Emps.' Pensions and Death Benefits v. CSK Auto Corp.*,

8   525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) ("a tie goes to the plaintiff").

9       Scienter is adequately alleged against a defendant corporation when it is

10  adequately alleged against one or more of the company's officers.  *In re Hienergy*

11  *Techs., Inc., Sec. Litig.*, 2005 WL 3071250, at *8-9 (C.D. Cal. Oct. 25, 2005).

### 2.      The Moshayedis' Insider Sales

13      Suspicious insider stock sales "support a strong inference of scienter,"

14  based on "(1) the amount and percentage of shares sold; (2) the timing of the

15  sales; and (3) consistency with prior trading history." *Nursing Home Pension*

16  *Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sales by

17  two insiders totaling $900 million, though representing only 2.1% and 7% of their

18  holdings, respectively); *accord Countrywide*, 588 F. Supp. 2d at 1186-88.

19      Here, only days after all but one of the alleged misstatements (*compare* ¶

20  231, *with* ¶¶ 163-73, 278), and after STEC's stock price had almost doubled as a

21  result of the misstatements (¶¶ 44, 146), Manouch and Mark Moshayedi sold 50%

22  of their collective stake for $267.8 million (¶ 147)—the largest insider stock

23  liquidation in STEC's history, and nearly 20 times what the Moshayedis sold,

24  collectively, in all of 2008 (¶ 148).

25      In order to make this liquidation, both Moshayedis cancelled 10b-5-1

26  trading plans that they had previously set up to govern their stock sales.  *See*

27  Defs.' Br. at 6.  Changing such plans is an additional indicium of scienter.  *See*

28  *Countrywide*, 588 F. Supp. 2d at 1188 n.70; *Backe v. Novatel Wireless, Inc.*, 642

LIM, RUGER & KIM, LLP

F. Supp. 2d 1169, 1185 (S.D. Cal. 2009).

Defendants do not, and cannot, deny that the size of the sale was out of line with the Moshayedis' prior trading history.  Defendants argue only from the supposed failure of *other* STEC insiders to sell their stock.  Defs.' Br. at 20.  However, the only other insider who is an Exchange Act Defendant is Cook, who did not own any STEC stock.  *See* Defs.' Ex. BB, at 377.[8]

Defendants also argue that the Moshayedis sold before STEC's stock price reached its apex.  However, no one can know until after-the-fact when a rising stock price has peaked.  Moreover, the Moshaeydis sold only five weeks before the first corrective disclosure.  ¶ 176; *see Nursing Home Pension Fund*, 380 F.3d at 1232 (strong inference of scienter where sales made only one month before corrective disclosure).  By contrast, in *Ronconi*, relied on by Defendants, the sales were three to six months before the first disclosure.  253 F.3d at 435; *see also* ¶ 149 (analyst stated market found timing of Moshaeydis' sales "too coincidental").

Finally, Defendants' "innocent" explanation for the timing of the sales is not credible.  Defendants assert the Moshayedis cancelled their 10b-5-1 plans because the plans "would have triggered a very large sale on August 15, 2009, rather than the orderly, staggered sales that had been planned . . . "  Defs.' Br. at 6.  But the secondary offering *also* did not involve "staggered sales"; rather, it involved a single offering of 50% of the Moshayedis' stock.  ¶¶ 231, 8 (chart).

### 3.   The SEC's Investigation of the Moshayedis

Following the corrective disclosures alleged herein, the Moshayedis were subpoenaed by the SEC as part of "a formal investigation involving trading in [STEC's] securities."  Defs.' Ex. A, at 25; *see* ¶ 10.[9]  This contributes to a strong

---

[8] In *Ronconi v. Larkin*, 253 F.3d 423, 434-36 (9th Cir. 2001), the court reviewed sales by eleven insider Exchange Act defendants at different prices.  Here, the possibility that an insider with a small amount of stock did not sell is irrelevant.
[9] "The SEC conducts two types of investigations—informal (or preliminary) and

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

LIM, RUGER & KIM, LLP

inference of their scienter.  *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*, 2010 WL 2264962, at *8 (E.D. Wash. June 2, 2010).

**4.  Scienter of Specific Individual Defendants for Specific Misstatements**

**(a)  Bases of Scienter for Specific Misstatements**

**(i)  EMC and the Other OEMs**

When they made their misstatements, Defendants already knew that the EMC Supply Agreement was "a one-off type of a deal," and that the other OEM customers would *not* be ordering for full production before the end of 2009.

- All Misstatements Regarding EMC

Defendants knew at all times that the EMC Supply Agreement was "a one-off type of a deal."  ¶ 55.  When Manouch finally made this admission, he did *not* describe this fact as a new discovery.  To the contrary, he stated "So *when we did sign* the [EMC Supply Agreement], we did—*this was* a one-off type of a deal." Defs.' Ex. O, at 239 (emphasis added).  Moreover, contrary to Defendants' refrain that EMC suffered an unexpected inventory "build up" (Defs.' Br. at 3, 11, 19), EMC stated that the Agreement had been "*designed*" to provide EMC with ZeusIOPS inventory going into 2010, ¶ 59 (emphasis added).  The admission of knowledge at the time of signing the Agreement, and the fact that the Agreement was "designed" to satisfy EMC's needs in the first quarter of 2010, is compelling evidence of scienter.

- All Misstatements Regarding the Other OEMs

Importantly, Defendants concede that they received customer indications of major purchases two quarters in advance, ¶ 97, STEC needed "months" of lead time to manufacture SSDs, ¶ 62, and STEC would not make commitments to their own suppliers to "bring the parts in" without "very solid forecast and solid

formal."  *U.S. v. Quattrone*, 441 F.3d 153, 163 n.8 (2d Cir. 2006).  In a formal investigation the SEC can issue process and take testimony.  *Id.*

LIM, RUGER & KIM, LLP

LIM, RUGER & KIM, LLP

1   commitments," ¶ 98.  Based on these practices, Defendants already knew in

2   August of 2009 that there would be no "huge ramps in sales" to their other OEM

3   customers during the remainder of that year.  ¶¶ 51, 84-85.  Moreover, they

4   already knew that, during the remainder of that year, STEC's sales would not

5   grow as a result of the other OEMs having transitioned to full "production" in the

6   way that EMC had done, ¶¶ 51, 278, because even *three months after making their*

7   *statements*, Defendants acknowledged that the other OEMs had not even started to

8   "build SSDs into their systems," much less commence full production of the

9   systems, ¶ 184.

   ● STEC's Inventory Decline Shows Scienter
10     Regarding *Both* EMC and the Other OEMs

11       Defendants' failure to maintain STEC's inventory level, even while

12   asserting that their four other OEM customers, ¶¶ 51, 84 n.2, would be increasing

13   their purchases during 2009, *see supra* at 9-10, and that the Agreement

14   represented increased purchasing by EMC continuing into 2010, *see supra* at 7-8,

15   shows Defendants did not believe their own statements.

16       If, in the third quarter of 2009, Defendants had believed their own

17   statements, they would have ordered more raw materials in order to increase

18   STEC's inventory during the remainder of 2009, so that STEC could

19   accommodate increased purchasing during 2009, and purchasing continuing at a

20   high level in the first quarter of 2010.  But they did no such thing.  By the end of

21   2009 (also the beginning of first quarter 2010), STEC's inventory had *declined* to

22   a level even lower than at the end of  2008—which was long before STEC ever

23   had the EMC Supply Agreement.  ¶¶ 62-65.  Moreover, this decline occurred

24   despite the fact that the other OEMs failed to increase their purchases.  ¶¶ 92-94.

25       Citing to a document not referenced in the complaint—STEC's 2010

26   second quarter 10-Q—Defendants argue that they *did* order new raw materials

27   during the 2009 third quarter. *See* Defs.' Br. at 18 (asserting that an inventory

28

1   increase from $43 million at end of 2009, to $66 million by June 30, 2010,

2   resulted from "non-cancelable inventory purchase commitments in the second half

3   of 2009").  However, even by *June 30, 2010*, STEC's inventory still was only as

4   high as at the *end of 2008—six months before* the EMC Supply Agreement was

5   even announced.  ¶ 63.  Moreover, the rebuilding of STEC's inventory *after* the

6   first quarter of 2010, fails to explain why it was so low at the *beginning* of

7   2010—when it was 33% lower than at either the end of 2008 or the middle of

8   2010.  The best explanation for this decline is that Defendants knew all along that

9   EMC would not make any purchases during the first quarter of 2010, and that the

10  other OEMs would *not* increase their purchases during the second half of 2009.

11      Defendants also try to explain away the inventory decline during the second

12  half of 2009 by asserting that it was merely declining from an unusually high level

13  supposedly accumulated at the end of 2008 "in anticipation of increased

14  production" in 2009.  Defs' Br. at 18.  This idea also fails, for three reasons.

15      First, even if Defendants did raise the inventory level at the end of 2008 to

16  prepare for sales growth in 2009, they should have raised it again, even more, in

17  the third quarter of 2009, after signing a purchase agreement with EMC far larger

18  than any previous purchase agreement, ¶¶ 47, 80, and after asserting that their four

19  other OEM customers would follow suit within the next two quarters, ¶¶ 85, 278.

20      Second, if Defendants are asserting that, at the end of 2008, they already

21  knew what STECs inventory needs would be for the entire year of 2009, then they

22  are conceding that they generally knew STEC's inventory needs an entire year in

23  advance.  This means that, when they made their misstatements in August 2009,

24  they already knew they were false.

25      Third, a review of STEC's non-cancelable inventory purchase commitments

26  made from the third quarter of 2008, through the second quarter of 2010, as

27  disclosed in STEC's 10-Qs and 10-K's, shows the size of STEC's non-cancelable

28  inventory purchase commitment in the third quarter of 2009—the time of the

LIM, RUGER & KIM, LLP

1  misstatements—was essentially equal to the *smallest* such commitment made in

2  any of these eight quarters.  *See* Lite Decl. Ex. I.

3      Moreover, the non-cancelable inventory purchase commitment of $103

4  million made in the *second* quarter of 2009, *see id.*, was *just large enough* to cover

5  STEC's actual sales during the second half of 2009, given that the *cost* of

6  revenues during the second half of 2009 was approximately 50% of the

7  revenues—which totaled $204 million, *id.*.  Thus, in the *third* quarter of 2009,

8  Defendants failed to make *any* substantial additional commitments, *id.*, despite the

9  fact that STEC's inventory would have been inadequate to satisfy any *increased*

10 purchasing by the other OEMs in 2009, or any *continued* purchasing by EMC in

11 the first quarter of 2010.

12     In short, the inference of Defendants' scienter from the facts regarding

13 STEC's own inventory levels is as strong as, if not much stronger than, any

14 opposing inference.  *See Tellabs*, 551 U.S. at 324, 127 S. Ct. at 2510.

15       **(ii)  Inflated Revenues and Revenue Projection**

16     The perfect symmetry between the $14 million by which Defendants

17 increased STEC's revenue estimate for the 2009 second quarter—just prior to the

18 secondary offering—and the amount by which reported non-EMC revenues for

19 that quarter *exceeded* STEC's post-secondary offering non-EMC revenues

20 supports a strong inference of scienter.  *Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp.

21 2d 682, 687 (E.D. Va. 1999) (holding "strong inference of scienter" where

22 opposing inference would be "too coincidental to be believed").

23     The inference of scienter is further supported by the confidential witness

24 statements that Defendants' inappropriate shipping conduct and channel stuffing

25 were done for the purpose of inflating "sales numbers" and "revenue levels."  ¶¶

26 106, 118; *see* ¶¶ 102, 109, 112; *Broudo v. Dura Pharms.*, *Inc.*, 339 F.3d 933, 940

27 (9th Cir. 2003) ("channel stuffing claims may have some probative value insofar

28 as the channel stuffing was done so as to artificially inflate income"), *rev'd on*

LIM, RUGER & KIM, LLP

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

*other grounds*, 544 U.S. 336, 125 S. Ct. 1627 (2005); *Backe*, 642 F. Supp. 2d at 1186-87 ("confidential witness attesting to the practice of shipping product early" supports scienter for overstated revenues, and despite absence of restatement).[10]

### (iii)    Competition for ZeusIOPS

Defendants admit they were aware of existing competition for ZeusIOPS, and argue only—erroneously—that Manouch meant no competition had yet been "qualified" by any tier one OEMs.  Defs.' Br. at 4; *compare supra* at 14.

### (b)    Bases of Scienter of Specific Individual Defendants

### (i)    Admissions of Scienter

Manouch admits he knew from the start that the Agreement was "a one-off type of a deal."  *See supra* at 17.  All Defendants admit having knowledge of the competition for ZeusIOPS.  *See supra* at 14.  Defendants do not deny knowledge of inflated revenues and estimated revenues for the second quarter of 2009.  *See* Defs.' Br. at 17-21; ¶ 130.

### (ii)    Officers' Knowledge of Core Operations

An inference that "key officers" must know "facts critical to a business's core operations" can contribute, along with other supporting allegations, to a strong inference of scienter.  *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 782, 784 (9th Cir. 2008); *see Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1325-26 (E.D. Wash. 1998) (same re "easily discoverable additional facts that directly affected [significant] source of income"); *In re Peoplesoft, Inc. Sec. Litig.*, 2000 WL 1737936, *3 (N.D. Cal. May 25, 2000) (same re "an important transaction").

The EMC Supply Agreement and any possibility of increased purchases by

LIM, RUGER & KIM, LLP

---

[10] The Complaint alleges the amount misstated, ¶ 128, dates of relevant transactions, ¶¶ 105-06, 109, 111, products involved, ¶¶ 42(a) & (h), 117, and customers involved, ¶¶ 42(a) & (h), 104-06, 109, 111, 113.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005) (providing list, but adding that "[p]laintiffs need not allege each of those particular details").

LIM, RUGER & KIM, LLP

the other OEMs were crucial to STEC's business.  ¶¶ 47, 55, 80, 157.

Additionally, STEC pursued a core "strategy of closely matching inventory levels with product demand."  Defs' Ex. A, at 17, para. 2.  Thus, it can be inferred that, at all times, each Defendant knew STEC was not ordering enough raw materials in order to maintain sufficient inventory in order to fill the increased and ongoing orders that would result *if* the other OEMs increased their purchases during 2009, or *if* EMC continued making purchases after the Agreement ended.  Moreover, because Defendants' scienter is shown by their knowledge of STEC's failure to maintain *STEC's own inventory level*, there is no need to show that Defendants had knowledge of *EMC's inventory level*.  *Compare* Defs.' Br. at 19.

An independent basis for inferring Defendants' individual knowledge that the other OEMs would not be substantially increasing their purchases in the second half of 2009 is the fact—critical to STEC's core operations—that STEC required "solid" advance "commitments" from customers making "extremely large" purchases.  ¶¶ 97-98.  Moreover, the fact that these OEMs had not "started" to build SSDs into their "systems" (¶ 255) was "easily discoverable" by Defendants, *Epstein*, 993 F. Supp. at 1325-26, as shown by the fact that, at some point, Manouch did discover it, and disclosed it after the secondary offering without claiming surprise, *see* Defs.' Ex. O, at 249.

It can also be inferred that STEC's officers had knowledge of the revenues misstatement.  STEC's 10-Ks describe "revenue recognition" as one of STEC's "critical accounting policies."  Defs' Ex. G, at 130.  Moreover, the alleged misstatement was the basis for an unusual last minute increase in STEC's quarterly estimate equaling 20% of the uninflated portion of the estimate.  *See* ¶ 125; *In re Commtouch Software LTD. Sec. Litig.*, 2002 WL 31417998, at *9 (N.D. Cal. July 24, 2002) ("unlikely that transactions [totaling 20% of "actual revenue"] would fly below the radar of top management, particularly the CEO and CFO").

### (iii) Involvement of Specific Defendants in Details Relating to the Misstatements

The inference of the Moshayedis' scienter is strengthened by the fact that, according to one CW, they "made all the decisions at STEC." ¶ 119. *See Nursing Home Pension Fund*, 380 F.3d at 1234 ("reasonable to infer that [the] executives' detail-oriented management style led them to become aware of the allegedly improper revenue recognition of such significant magnitude that the company would have missed its quarterly earnings projection but for the adjustments").

Manouch's detail oriented management of the relevant operations is shown by the fact that during conference calls he gave detailed descriptions of purchasing by EMC and the other OEMs, ¶¶ 51, 55, 85-86, 92-94, 98; he signed the misleading registration statement, 10-Qs and 10-Ks, ¶¶ 26, 278; during the August 3 conference call he assured investors that STEC would have enough inventory, ¶ 65; he ultimately conceded having known from the start that the Agreement was "a one-off type of a deal," *see supra* at 17; confidential witnesses have stated that he "had his hands on everything when it came to sales," ¶ 112, he ordered product shipped to HP despite HP having placed STEC on a "world wide stop shipment" hold, and, to make current quarters "look good," he told "everyone" to pull sales from future quarters, ¶¶ 109, 111-12.

The inference of Mark Moshayedi's scienter is strengthened because he was STEC's COO. *See Countrywide*, 588 F. Supp. 2d at 1195 ("primary job as COO was to oversee [the company's] operations"). He also was President, Chief Technical Officer, Secretary, a Director and a member of the Equity Awards Committee, ¶ 3, and he signed the 10-K's and registration statement. *Id.*

The inference of Cook's scienter is enhanced by his being STEC's Principal Accounting Officer, as well as its CFO, ¶ 28, and by his describing revenues and shipping numbers in great detail during conference calls, *see* Defs.' Ex. B, at 31-33. He also signed the letters to the SEC regarding STEC's failure to file any

LIM, RUGER & KIM, LLP

1  agreements with EMC, the misleading registration statement, and the 10-Qs and

2  10-Ks. ¶¶ 28, 76, 78, 278.

3          **5.      Holistic Analysis of Scienter**

4          Under a holistic analysis, the scienter of each Defendant and STEC has

5  been adequately alleged.  *See Plumbers Union*, 2010 WL 2264962, at *8 (scienter

6  adequately alleged based on "core operations inference . . . . allegations of the

7  confidential witnesses, the SEC investigation, and the stock sales.").

8      **C.     CAUSATION IS ADEQUATELY PLED**

9          "So long as the complaint alleges facts that, if taken as true, plausibly

10 establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."  *In re Gilead*

11 *Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

12         The Complaint alleges a series of partial corrective disclosures on three

13 dates.  Contrary to Defendants' argument (Defs.' Br. at 21-24), on each of these

14 dates, material truths previously concealed by Defendants were disclosed.

15         On September 17, 2009, just weeks after Manouch misleadingly stated that

16 STEC had "no competition," Wedbush Morgan published an analyst report that

17 revealed previously undisclosed competition for the ZeusIOPS.  ¶¶ 168, 176-78.

18 STEC's stock price dropped 16%.  ¶ 179.

19         On November 3, 2009, Manouch revealed that the EMC Supply Agreement

20 was actually "a one-off type of a deal," EMC would still have inventory on hand

21 in 2010 that was delivered under the Agreement, and the other OEMs had not

22 even "started" to "build SSDs into their systems."  ¶¶ 55, 61, 180-84, 255.

23 STEC's stock price dropped 39%.  ¶ 185.[11]

24         On February 23, 2010, STEC announced a first quarter 2010 revenue

25

26 [11] The disclosures on November 3, 2009, are alleged to be only partial disclosures

27 of truths further disclosed on February 23, 2010.  *See In re Washington Mutual,*
   *Inc. Sec. Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) ("Revelation of

28 the fraud need not be complete for loss causation to be adequately pled.").

LIM, RUGER & KIM, LLP

1    estimate far below STEC's revenues in the 2009 second quarter, implicitly

2    disclosing that the estimated and reported revenues for that prior quarter had been

3    inflated, ¶¶ 123, 128, 194; revealed for the first time that Defendants did not

4    expect "any meaningful production orders" from EMC during the entire first half

5    of 2010, ¶¶ 56, 190; and admitted that Defendants did not expect even "some

6    revenue" from the other OEMs before the second half of 2010, ¶¶ 94, 192.

7    STEC's stock price dropped 23%.  ¶ 196.

8         Defendants argue the February 23, 2010, disclosure is not adequately linked

9    to the alleged misstatements regarding STEC's revenues.  Defs.' Br. at 24.

10   However, a corrective disclosure need not precisely mirror the misstatement that it

11   corrects.  *See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,

12   411 F. Supp. 2d 1172, 1177-78 (N.D. Cal. 2005) (declining revenues was among

13   corrective disclosures of prior misstatements regarding current and estimated

14   revenue); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547

15   (N.D. Cal. 2009) (causation is adequately pled where cause of loss suffered is that

16   risk concealed by defendant's misstatement materialized).

17        Finally, Defendants argue that the February 23, 2010, stock drop was

18   caused solely by a reaction to STEC's "poor financial health generally."  Defs.'

19   Br. at 24.  However, the disaggregation of fraud and non-fraud causes for a stock

20   drop is "a factual inquiry better suited for determination at summary judgment or

21   trial, rather than at the pleading stage."  *In re Century Aluminum Co. Sec. Litig.*,

22   2010 WL 1729426, at *9 (N.D. Cal. Apr. 27, 2010).

23   ## III.   THE SAFE HARBOR DOES NOT APPLY UNDER EITHER ACT

24        The PSLRA safe harbor cannot be applied as a matter of law, unless

25   "reasonable minds could not disagree that [because of cautionary language] the

26   challenged statements were not misleading."  *New Century*, 588 F. Supp. 2d at

27   1226; *see Fecht*, 70 F.3d at 1082; *In re Immune Response Sec. Litig.*, 375 F. Supp.

28   2d 983, 1033 (S.D. Cal. 2005) ("cautionary statement must discredit the alleged

*LIM, RUGER & KIM, LLP*

1   misrepresentations to such an extent that 'the risk of real deception drops to nil'").

2   ## A.    EMC AND THE EMC SUPPLY AGREEMENT

3       None of the alleged misstatements or omissions regarding EMC or the

4   Agreement is forward looking.  There is nothing forward looking about

5   Defendants' failure to file the EMC Supply Agreement in violation of Reg. S-K.

6   The statement that STEC believed sales to EMC would be a significant percentage

7   of revenues for the foreseeable future was a statement of current state of mind.

8   *See South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1134 (W.D. Wash.

9   2005) (statement regarding "current expectations" is "not forward looking"),

10  *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008).  STEC's press

11  release announcing the Agreement *admits* that "this press release is a statement of

12  STEC's present intention, belief or expectation."  Defs.' Ex. DD at 421.

13      Even if any of Defendants' statements regarding EMC had some forward

14  looking aspect, they would not be entitled to safe harbor protection for the aspect

15  that is not forward looking.  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d

16  702, 705 (7th Cir. 2008) ("a mixed present/future statement is not entitled to the

17  safe harbor with respect to the part of the statement that refers to the present");

18  *South Ferry LP #2*, 399 F. Supp. 2d at 1131 (same).

19      Moreover, Defendants have not cited any meaningful cautionary language.

20  STEC's general disclaimer regarding "inventory build ups" (Defs.' Br. at 10-11,

21  27) does not give warning of the specific reason why EMC failed to make any

22  purchases during the first quarter of 2010, namely, that the Agreement was

23  "*designed* to protect [EMC] going into first quarter [of 2010]." ¶ 59; *see Slayton v.*

24  *AMEX*, 604 F.3d 758, 772 (2d Cir. 2010) (no safe harbor where "pleaded facts do

25  not support the defendants' assertion that this is the exact risk that materialized");

26  *In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1167 (C.D. Cal.

27  2003) (caution not "meaningful," where it "does not sufficiently identify those

28  factors that the plaintiff alleges made the press release false or misleading").

LIM, RUGER & KIM, LLP

1    Moreover, the inventory disclaimer routinely appeared in STEC's SEC
2    filings even before the EMC Supply Agreement ever existed.  *Compare* Defs.' Ex.
3    G at 110, *with* Defs.' Ex. C at 49; *see FSP Stallion 1 v. Luce*, 2009 WL 1219683,
4    at *6 (D. Nev. May 1, 2009) ("cautionary statements must . . . 'directly address' . .
5    . [defendants'] future projections"); *In re Amylin Pharmaceuticals, Inc. Sec. Litig.*,
6    2003 WL 21500525, at *7-8 (S.D. Cal. 2003) ("vague or boilerplate disclaimers"
7    "not tailored to Defendants [misleading] statement" held "insufficient").

8    Defendants' purported warning that "[the] significant reduction of
9    purchases by any of our major customers could materially harm our business"
10   (Defs.' Br. at 11) regards only what the result would be *if* a major customer
11   reduced its purchases; it cannot immunize Defendants' misleading present tense
12   assertion that "we expect sales to EMC will represent a significant percentage of
13   our total revenues for the foreseeable future."  ¶ 52.

14   Finally, Defendants' warnings that "customers may change, cancel or delay
15   orders," Defs.' Br. at 11, are ineffective because "so broad that they apply to *any*
16   business."  *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal.
17   2005) (emphasis in original) (cautions inadequate); *accord In re BP Prudhoe Bay
18   Royalty Trust Sec. Litig.*, 2007 WL 3171435, at *5 (W.D. Wash. Oct. 26, 2007).

19   ## B.    SALES TO THE OTHER OEMS

20   The statements that increased sales to the other OEMs were expected
21   through 2009, and that Defendants believed a replacement customer could be
22   found if a customer defaulted under any sales agreement are statements of current
23   state of mind, and, therefore, not forward looking.  The reference to "accelerated
24   adoption," ¶ 278, is a reference to the past.

25   Defendants have not cited any cautionary language that could bring any of
26   the statements regarding the other OEMs—including those paraphrased in the
27   previous paragraph, or Manouch's statement that full production was just a quarter
28   or two away—within the safe harbor.  *See* Defs.' Br. at 12, 13, 28.  The references

LIM, RUGER & KIM, LLP

1  in Exhibits I and L to unspecified "risks and uncertainties" are meaningless boiler

2  plate. *In re Prudhoe Bay*, 2007 WL 3171435, at *5. The language in Exhibits D

3  and G also is not adequate; "risks associated with the 'acceptance of new

4  products' by consumers . . . are factors that are so broad that they apply to *any*

5  business." *Yanek*, 388 F. Supp. 2d at 1123 (emphasis in original).

6       Finally, no purported caution was even referenced in Defendants' letter to

7  the SEC implicitly stating STEC's belief that it could find a "replacement

8  customer" for the EMC Supply Agreement. ¶ 91.

### C.    STEC'S INFLATED SECOND QUARTER 2009 REVENUES AND REVENUE PROJECTION

9

10      The misstatement of STEC's second quarter 2009 revenues was not forward

11 looking, *see Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *10 (N.D. Ill.

12 Sept. 21, 2005) (statement of "financial results for a prior quarter" *not* forward

13 looking), nor was the part of the press release increasing the estimate for that

14 quarter that stated the increase was "primarily the result of increases in [STEC's]

15 ZeusIOPS sales," ¶ 43; *see South Ferry LP #2*, 399 F. Supp. 2d at 1131.

### D.    DENIAL OF COMPETITION FOR ZEUSIOPS

16

17      Manouch's denial of competition for ZeusIOPS was not forward looking.

18 He stated STEC had "no competition *at this stage*." ¶ 140 (emphasis added).

### IV.   CLAIMS UNDER SECTION 20A

19

20      Section 20A imposes liability on persons who engage in insider trading, for

21 damages suffered by individuals who traded "contemporaneously" with the

22 insider. 15 U.S.C. § 78t-1; *Johnson v. Aljian*, 490 F.3d 778, 779 (9th Cir. 2007).

23 Plaintiffs assert Section 20A claims against Mark and Manouch Moshayedi, based

24 on Representative Plaintiff Local 103 having purchased contemporaneously with

25 the Moshayedis' sales. ¶¶ 229-34. Defendants argue only that Local 103's

26 purchases were not "contemporaneous." Defs' Br. at 24-25.

27      Local 103 purchased on August 12, 2009. *See* Compl. at Ex. A; Defs.' Br.

28

LIM, RUGER & KIM, LLP

1   at 25.  Citing ¶ 231, Defendants argue that Mark and Manouch Moshayedi each

2   sold 4.5 million shares on August 6, 2009.  However, the Complaint also cites

3   August 11 as the date for the sale.  *See* ¶ 8 (chart).  In fact, although the offering

4   *began* on August 6, it *closed* on August 11.  *See* Form 10-Q filed November 3,

5   2009, at 9, penultimate para.[12]  Moreover, the Forms 4 filed by Mark and

6   Manouch on August 13, 2009, list August 11 as both the "Date of Earliest

7   Transaction" and the "Transaction Date" for the sale of all nine million shares.[13]

8        Based on the offering's closing date, Local 103's purchases were

9   "contemporaneous" even within the "one trading day after" standard cited by

10  Defendants.  Defs.' Br. at 25.  Moreover, other recent cases have applied a more

11  expansive definition of contemporaneity.  *See Middlesex Ret. Syst. v. Quest*

12  *Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (trades within eight

13  days are contemporaneous); *City of Westland Police and Fire Ret. Sys. v. Sonic*

14  *Solutions*, 2009 WL 942182, at *12 (N.D. Cal. Apr. 6, 2009) (nine days); *In re*

15  *Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 761 (N.D. Cal. 1997) (six

16  days).  Thus, even if August 6 were deemed the date of the sale, Local 103's

17  purchase—four business days (six calendar days) later—was contemporaneous.[14]

18  **V.    ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE**

19       "Dismissal without leave to amend is proper only in 'extraordinary' cases."

20  *Angelov v. Wilshire Bancorp, Inc.*, 331 Fed. App'x 471, 472 (9th Cir. 2009)

21  (where "complaint may be saved by the allegation of additional facts, [it] should

22

23  [12] *Available at* http://www.sec.gov/Archives/edgar/data/1102741/000119312509 222181/10q.htm.

24  [13] *Available at* http://www.sec.gov/Archives/edgar/data/1102741/000118143109 039398/0001181431-09-039398-index.htm *and* -039399-index.htm.

25  [14] The Complaint sufficiently pleads control liability under both acts.  *See* ¶¶ 26-

26  30, 225-28, 305-07.  Further, "Whether someone is a control person is an

27  'intensely factual question' . . . .  particularly difficult to resolve at the motion to

28  dismiss stage."  *Middlesex Ret. Sys. v. Quest Software Inc.*, 2008 WL 7084629, at *13 (C.D. Cal. July 10, 2008).

LIM, RUGER & KIM, LLP

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT

1  not be dismissed without leave to amend").  Therefore, any dismissal of any part

2  of the Complaint should be without prejudice.  Defendants' argument (Defs.' Br.

3  at 29) ignores that the Court has not previously evaluated the sufficiency of any

4  complaint herein.  *See Frazer ex rel. U.S. v. Iasis Healthcare Corp.*, 2010 WL

5  3190641, at *2 (9th Cir. Aug. 12, 2010) ("court did not give sufficient weight to

6  the fact that . . . the motion to dismiss the Second Amended Complaint was the

7  first time that [plaintiff's] claims were subject to a Rule 9(b) sufficiency

8  analysis.");  *In re Hienergy*, 2005 WL 3071250, at *7 (granting leave to amend

9  where complaint was "first complaint that has been assessed by the Court with

10  regard to its sufficiency under Rule 9 and the PSLRA scienter requirements").[15]

### CONCLUSION

11

12           For the foregoing reasons, Defendants' motion should be denied.

13  Dated: October 25, 2010                     Respectfully submitted,

14                                              LIM, RUGER & KIM, LLP

15

16  LABATON SUCHAROW LLP                        By /s/ Christopher Kim
    LITE DEPALMA GREENBERG, LLC                 Christopher Kim
17  *Attorneys for New Jersey and Co-Lead*      *Attorney for New Jersey and*
    *Counsel for the Class*                     *Liaison Counsel for Class*

18

19

20

21

22

23

24

25

26  [15] As explained, *supra* at 3 n.4, if deemed necessary by the Court, Plaintiffs request
27  leave to amend, in order to make the allegations in the following paragraphs appear
    in both the Exchange Act and Securities Act parts of the Complaint:  ¶¶ 46-47, 55,
28  70, 80-81, 89, 94, 143, 158, 190, 255, 278.

*LIM, RUGER & KIM, LLP*

PLAINTIFFS' OPPOSITION TO MOT. TO DISMISS CONSOL. AM. COMPLAINT