1  Christopher Kim (Bar No. 082080)
   christopher.kim@limruger.com
2  Lisa J. Yang (Bar No. 208971)
   lisa.yang@limruger.com
3  LIM, RUGER & KIM, LLP
4  1055 West Seventh Street, Suite 2800
   Los Angeles, California 90017-2554
5  Telephone: (213) 955-9500
   Facsimile: (213) 955-9511
6

7  Thomas A. Dubbs (*Pro Hac Vice*)          Allyn Z. Lite (*Pro Hac Vice*)
   tdubbs@labaton.com                         alite@litedepalma.com
8  Martis Alex (Bar No. 77903)                Bruce D. Greenberg (*Pro Hac Vice*)
   malex@labaton.com                          bgreenberg@litedepalma.com
9
10 LABATON SUCHAROW LLP                       LITE DePALMA GREENBERG, LLC
   140 Broadway                               Two Gateway Center, 12th Floor
11 New York, New York 10005                   Newark, New Jersey 07102
   Telephone: (212) 907-0700                  Telephone: (973) 623-3000
12 Facsimile: (212) 818-0477                  Facsimile: (973) 623-0858

13
14 *Attorneys for New Jersey and Lead Counsel for the Class*

15              **UNITED STATES DISTRICT COURT**

16             **CENTRAL DISTRICT OF CALIFORNIA**

17                    **SOUTHERN DIVISION**

18

| | |
|---|---|
| 19 IN RE STEC, INC. SECURITIES | ) No.  SACV 09-01304-JVS (MLGx) |
| 20 LITIGATION | ) **SECOND CONSOLIDATED** |
| 21 | ) **AMENDED COMPLAINT FOR** |
| | ) **VIOLATION OF THE FEDERAL** |
| 22 This Document Relates To: | ) **SECURITIES LAWS** |
| 23 | ) |
| | ) **CLASS ACTION** |
| 24 | ) |
| 25 ALL ACTIONS | ) **DEMAND FOR JURY TRIAL** |
| | ) Judge: Hon. James V. Selna |
| 26 | ) |
| 27 | ) |

28

# TABLE OF CONTENTS

Page

I.   NATURE AND SUMMARY OF THE ACTION ...........................................1

II.  JURISDICTION AND VENUE ......................................................................7

III. THE PARTIES .................................................................................................7

     A.   The Plaintiffs ........................................................................................7

     B.   The Issuer Defendant ...........................................................................8

     C.   The Officer Defendants ........................................................................9

     D.   The Director Defendant.......................................................................11

     E.   The Underwriter Defendants...............................................................12

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE
     ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS .....13

     A.   During the 2009 Third Quarter, the Exchange Act Defendants
          Misrepresented the Nature of a New Agreement With EMC,
          STEC's Largest Customer......................................................................13

          1.   The Exchange Act Defendants had Consistently Described
               Their ZeusIOPS Business as One That Eventually Would
               Produce, *in the Ordinary Course*, Surging Sales to Each
               ZeusIOPS OEM Customer...........................................................13

          2.   The Exchange Act Defendants Falsely Communicated that
               the EMC Agreement was an Ordinary Course Contract
               Whose Large Size had Resulted from an Increase in
               EMC's Recurring Requirements...................................................19

               (a)   The July 16, 2009, Press Release.......................................19

               (b)   The August 3, 2009, Statements in the Prospectus,
                     and Second Quarter Earnings Release ...............................21

          3.   The Exchange Act Defendants Knew That Their
               Representations About the EMC Agreement Were False..........25

(a) Manouch Subsequently Admitted That the Exchange Act Defendants Always had Known That the EMC Agreement Was a One-Off Contract ................................. 25

(b) Manouch's Admission Also Means the Exchange Act Defendants Knew That EMC Would Not Continue Purchasing at the Same Volume ........................................ 25

(c) STEC's Intimate Relationship With Its OEM Customers Also Supports the Exchange Act Defendants' Scienter ......................................................... 26

4. The Exchange Act Defendants' Failure to File the EMC Agreement With the SEC, After Promising the SEC That Any Material One-Off Contracts With EMC Would Be Filed, is Additional Evidence of Their Scienter for Their Misleading Statements About the EMC Agreement ................. 29

B. During the 2009 Third Quarter, the Exchange Act Defendants Made Multiple Misleading Statements and Material Omissions Regarding Sales of ZeusIOPS to STEC's Other OEM Customers ..... 32

1. The Exchange Act Defendants Falsely Represented That They Expected the Other OEMs to Increase Their ZeusIOPS Purchases During the Second Half of 2009 ............. 32

(a) This Statement Was Made in the Prospectus for the Offering of the Moshayedis' Stock ................................... 32

(b) Subsequent Analyst Reports Reflected This Statement ......................................................................... 33

(c) The Statement Was False ............................................... 36

(d) The Statement Was Knowingly False When Made .......... 36

i. STEC's Knowledge of the Amount of Future Sales Was Greater for ZeusIOPS Than for STEC's Other Products ............................................... 37

ii. STEC Ordered Inventory in Advance, in Order to Fill Expected ZeusIOPS Purchases ....................... 38

iii.     At the Time When the Prospectus Was Issued, STEC had Ordered the Amount of Inventory Actually Needed for the Sales Subsequently Made During the Second Half of 2009 .................... 39

(e)     Investors Were Surprised When the Truth Was Partially Disclosed on November 3, 2009 ...................... 41

i.     Sales to the Other OEMs Were *Down* and Would Not Recover During 2009 ........................... 41

ii.     The Other OEMs had Not Even Started Building Systems Incorporating ZeusIOPS ............. 42

iii.     IBM Was Only Offering ZeusIOPS as an Option, Not as a Standard Feature ........................... 43

iv.     Analysts Expressed Surprise ..................................... 43

(f)     Investors Were Surprised Again, When the Truth Was More Completely Disclosed on February 23, 2010 ........................................................... 45

(g)     Too Late to Benefit Class Members, the Exchange Act Defendants Added a Key Cautionary Statement to Their Quarterly SEC Filings ......................................... 47

2.     The Prospectus Omitted to Disclose That IBM Would Not Begin Purchasing for Volume Production During the Second Half of 2009, and Was Not Marketing ZeusIOPS as a Standard Feature in Its Systems ......................................... 47

3.     STEC's September 10, 2009, Letter to the SEC Falsely Represented That One or More of the Other OEMs Was Ready to Purchase ZeusIOPS in Quantities Equivalent to Those Being Purchased Under the EMC Agreement ............... 49

4.     The Exchange Act Defendants' False Statement About Sun Supports Their Scienter for Their Misrepresentations About the Other OEMs, and Their Omissions About IBM ....... 50

C.     The Exchange Act Defendants Artificially Inflated STEC's 2009 Second Quarter Revenue .......................................................... 52

1.  The Exchange Act Defendants Inflated STEC's 2009 Second Quarter Revenue With Unearned Income and Undisclosed Channel Stuffing Based on Shipments to Customers Other Than EMC.........................................54

2.  The Collapse of STEC's Revenue in the 2010 First Quarter Shows That STEC's 2009 Second Quarter Revenue Was Inflated by $14 Million Regarding Sales to Customers Other Than EMC........................................................57

D.  The Exchange Act Defendants Inflated STEC's Revised 2009 Second Quarter Revenue Guidance .....................................58

V.   ADDITIONAL ALLEGATIONS OF SCIENTER.......................................58

A.  After Inflating the Price of STEC's Stock, Defendants Manouch and Mark Moshayedi Engaged In Massive Insider Selling ...............58

B.  As STEC's Stock Price Began to Collapse, the SEC Launched a Formal Investigation of the Moshayedis' Stock Sales........................60

C.  Only Days After Disclosing the SEC Investigation, STEC Made Golden Parachutes Available to the Officer Defendants ...................60

D.  Each of the Exchange Act Defendants' False Statements and Omissions Involved One of STEC's Core Operations .......................61

E.  Each Officer Defendant Had a Motive and Opportunity to Commit Fraud .......................................................................62

VI.  THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS RELATING TO THE EXCHANGE ACT CLAIMS...........................................................................62

A.  June 16, 2009 Press Release.........................................62

B.  July 16, 2009 Press Release .........................................63

C.  August 3, 2009, SEC Filings .........................................63

1.  2009 Second Quarter Earnings Release .......................63

2.  Form 424B3 (Prospectus) .........................................63

3.  Second Quarter 10-Q................................................64

D.    September 10, 2009, Publicly Filed Letter to the SEC ........................64

VII.  LOSS CAUSATION ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS........................................................................64

    A.    The November 3, 2009, Partial Corrective Disclosures......................64

        1.    Disclosure That the EMC Agreement Was Not an Ordinary Course Contract Indicative of Purchases by EMC Expected to Recur ............................................................................65

        2.    Disclosure That Sales to the Other OEMs Were Not Expected to Increase During the Second Half of 2009 .............66

        3.    Disclosure That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009, and Was Not Offering ZeusIOPS as a Standard Feature in Its Systems ................................................................67

        4.    Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement ......................................................68

    B.    The February 23, 2010, Additional Corrective Disclosures ...............69

        1.    Additional Disclosure That the EMC Agreement Did Not Represent a New Recurring Level of EMC Purchases .............69

        2.    Additional Disclosure That the Other OEMs Would Not Be Increasing Their Purchases During the Second Half of 2009 ........................................................................70

        3.    Additional Disclosure That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009 ..........................................................................71

        4.    Additional Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement................................72

        5.    Disclosure That the Exchange Act Defendants Inflated STEC's 2009 Second Quarter Revenue and Revised Revenue Guidance........................................................................72

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE TO EXCHANGE ACT CLAIMS...........................................74

IX.    NO SAFE HARBOR......................................................................75

X.    CLASS ACTION ALLEGATIONS RELATING TO ALL CLAIMS........76

XI.    EXCHANGE ACT CLAIMS......................................................79

COUNT I
    For Violation of Section 10(b) of the Exchange Act
    and Rule 10b-5 Against STEC and The
    Officer Defendants ..................................................................79

COUNT II
    For Violation of Section 20(a) of the
    Exchange Act Against Manouch Moshayedi,
    Mark Moshayedi and Raymond D. Cook ....................................83

COUNT III
    For Violation of Section 20A of the
    Exchange Act Against Manouch Moshayedi and Mark Moshayedi ..........84

XII.    FALSE STATEMENTS AND MISLEADING MATERIAL
    OMISSIONS RELATING TO THE SECURITIES ACT CLAIMS,
    AND SUBSTANTIVE ALLEGATIONS REGARDING SAME ..............85

    A.    Misstatements/Omissions in the Prospectus ......................85

        1.    Sales to the Other OEMs..............................85

        2.    Sales to IBM..........................................86

        3.    The EMC Agreement ..................................86

    B.    Misstatements/Omissions in STEC's 2009 Second Quarter 10-Q,
        Incorporated by Reference into the Registration Statement and
        Prospectus..................................................86

        1.    Omission to File the EMC Agreement with the 10-Q ..............87

        2.    Omission to Explain in the MD&A Section That the EMC
            Contract Was a One-Off Contract..............................88

        3.    2009 Second Quarter Revenue..................................88

XIII.   SECURITIES ACT CLAIMS ......................................................88

COUNT IV
    For Violation Of Section 11 of the Securities
    Act Against the Officer Defendants, Bahri and STEC ................................89

COUNT V
    For Violation of Section 11 of the Securities Act Against the
    Underwriter Defendants ..............................................................................91

COUNT VI
    For Violation of Section 12(a)(2) of the Securities
    Act Against STEC, Manouch Moshayedi and Mark Moshayedi ...............93

COUNT VII
    For Violation of Section 12(a)(2) of the Securities Act Against the
    Underwriter Defendants ..............................................................................96

COUNT VIII
    For Violation of Section 15 of the Securities Act Against the Officer
    Defendants...................................................................................................98

XIV.  PRAYER FOR RELIEF .................................................................................99

XV.   JURY DEMAND .........................................................................................100

1        Court appointed Lead Plaintiff, the State of New Jersey, Department of

2 Treasury, Division of Investment ("Lead Plaintiff" or "New Jersey"), individually

3 and on behalf of a class of similarly situated persons and entities, by its

4 undersigned counsel, for its Second Consolidated Amended Class Action

5 Complaint for Violation of the Federal Securities Laws asserting claims against

6 STEC, Inc. ("STEC" or the "Company") and the other Defendants named herein,

7 alleges the following upon personal knowledge as to itself and its own acts, and

8 upon information and belief as to all other matters.

9        Lead Plaintiff's information and belief as to allegations concerning matters

10 other than itself and its own acts is based upon an investigation by its counsel

11 which included, among other things: (i) review of information about the other

12 Representative Plaintiffs obtained from them; (ii) review and analysis of

13 documents filed publicly by STEC with the Securities and Exchange Commission

14 (the "SEC"); (iii) review and analysis of press releases, news articles, earnings

15 conference call transcripts and other public statements issued by or concerning

16 STEC and other Defendants named herein; (iv) review and analysis of research

17 reports issued by financial analysts concerning STEC's securities and business; (v)

18 interviews of former STEC employees; (vi) interviews of employees and former

19 employees of STEC's customers, such as computer manufacturing companies; and

20 (vii) review and analysis of news articles, media reports and other publications

21 concerning the computer industry.  Lead Plaintiff believes that substantial

22 additional evidentiary support for the allegations herein exists and will continue to

23 be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

24 **I.**     **NATURE AND SUMMARY OF THE ACTION**

25       1.     As detailed below, this case involves two brothers who, as founders

26 and key officers of a high tech company, sold half of their stock in the Company

27 for $267.8 million after they and one of the other officers had made a series of

28 knowing misstatements and misleading omissions that artificially doubled the price

1    of the stock.  Shortly after the brothers sold their stock in a single secondary

2    offering, the falsity of their statements and omissions was disclosed, the price of

3    the company's stock collapsed back to its prior level, and the SEC commenced a

4    formal investigation that still is ongoing.

5        2.      This is a class action on behalf of all persons who purchased or

6    otherwise acquired STEC common stock between June 16, 2009, and February 23,

7    2010, inclusive (the "Class Period"), seeking to pursue remedies under the

8    Securities Exchange Act of 1934 (the "Exchange Act"), and the Securities Act of

9    1933 (the "Securities Act").

10       3.      STEC is a manufacturer of data storage devices for computer systems.

11   STEC's customers include original equipment manufacturers ("OEMs") such as

12   EMC, IBM, Hitachi, Hewlett-Packard ("HP") and Sun Microsystems ("Sun"),

13   who, in turn, manufacture high performance storage and server systems for large

14   enterprises.

15       4.      STEC claims to manufacture the industry's most comprehensive line

16   of solid-state drives ("SSDs," also known as "flash drives").  A solid state drive is

17   used for storing information in a computer system.  Whereas older hard disk drive

18   ("HDD") technologies stored information on electromechanical spinning disks, an

19   SSD has no moving parts, but instead retains information on static computer chips.

20   Because SSDs have no moving parts, they have certain performance advantages

21   over HDDs:  they are faster, more energy efficient and have longer service lives.

22   However, SSDs are significantly more expensive than HDDs.

23       5.      STEC's flagship product, the ZeusIOPS, is a high-performance SSD

24   advertised by the Company as being able to access stored data at much faster

25   speeds than both HDDs and other SSDs, due to the Company's proprietary

26   architecture.

27       6.      The Company was founded by the three Moshayedi brothers –

28   Manouch, Mehrdad ("Mark") and Masoud ("Mike")—in 1990.  Thereafter, the

1   Moshayedi brothers continued as STEC officers and directors.  At all relevant

2   times, Manouch was STEC's Chief Executive Officer ("CEO") and Chairman of

3   the Company's Board of Directors.  At all relevant times, Mark was the

4   Company's Chief Operating Officer ("COO"), Chief Technical Officer ("CTO"),

5   President and Secretary, as well as a member of STEC's Board of Directors and

6   Equity Awards Committee.  Mike, formerly the Company's President, retired in

7   2007, but retained at that time an 8.99% ownership interest in the Company.  Mike

8   Moshayedi is not a Defendant.

9        7.    The Moshayedi brothers are also major shareholders of the Company.

10   At the beginning of the Class Period they collectively held 45% of the Company's

11   stock.

12        8.    As detailed herein, during the Class Period, Defendants issued or

13   caused to be issued materially untrue statements and omissions that, among other

14   things, created an inflated impression of STEC's revenue growth, and of conditions

15   that supposedly ensured a near and long term continuation and even acceleration of

16   that growth.

17        9.    In summary form, these materially untrue statements and omissions

18   included:

19          (a)  that an agreement signed by STEC with its largest customer,

20              EMC, in the middle of 2009 for a huge volume of purchases to be

21              made in the second half of 2009 (the "EMC Agreement" or

22              "Agreement") was an ordinary course contract whose size was

23              determined solely by an increase in the customer's supply

24              requirements such that a similar volume of purchases by the same

25              customer could be expected on a regular recurring basis;

26          (b)  that, as of August 2009, STEC was expecting the volume of

27              purchases by its other large customers (the "Other OEMs") to

28              increase during the second half of 2009;

(c) that, as part of the expected increase in purchases by the Other OEMs during the second half of 2009, STEC was expecting IBM to transition to a much larger volume of purchases during that period;

(d) that, as of September 2009, one or more of the Other OEMs would have been willing and able to replace EMC as the purchaser under the EMC Agreement, or to purchase a similar amount of ZeusIOPS under a similar agreement; and

(e) that during the 2009 second quarter, STEC's reported revenue would grow, and then did grow, by an amount that—unknown to investors—had been artificially inflated.

10.   As indicated by the chart below, the effect of these false statements and omissions was to dramatically inflate the price of STEC's stock during the second and third quarters of 2009. On June 15, 2009, the day before the first alleged Class Period misstatement, the price of STEC stock closed at $18.02. By August 3, 2009, the price had roughly doubled, to $35.50. However, during the subsequent seven months, when the falsity of these statements and omissions was disclosed by successive partial corrective disclosures, STEC's stock price lost everything it had gained during the Class Period.



**COMPARISON OF STEC STOCK PRICE TO INDICES OF COMPARABLE COMPANIES**
from June 30, 2008 to July 30, 2010

*The Offering price was $31.00 per share.

11. On August 3, 2009, when the false impression created by Defendants' misstatements and omissions had resulted in a doubling of STEC's stock price, STEC announced that it would issue a secondary offering of stock, comprised entirely of stock held personally by Manouch and Mark Moshayedi (the "Offering"). Also on August 3, 2009, Defendants made most of the false statements and omissions alleged herein.

12. Eight days later, on August 11, 2009, these two defendants ("the Moshayedis") sold more than 50% of their STEC stock in the Offering, and received thereby a total of $267.8 million.

13. This was the biggest insider stock liquidation in the history of STEC, and a departure from the pattern of the Moshayedis' other recent sales of STEC stock. The number of shares sold by the Moshayedis in the Offering was collectively more than eleven times the number of shares they sold in the six

1  months before the Class Period and nearly twenty times the number of shares they
2  sold in all of 2008.

3      14.    Seven months later, as the price of STEC's stock was hitting a new
4  low, STEC announced that the SEC was conducting a formal investigation
5  involving trading in the Company's securities, and that the SEC had issued
6  subpoenas to certain of its employees in connection with that investigation,
7  including two of the Company's top officers:  Manouch, the Company's CEO, and
8  Mark, the Company's President and COO.  According to STEC's most recent
9  10-Q, filed on November 2, 2010, that investigation still is ongoing.

10      15.    Under Counts I through III, which Lead Plaintiff brings under the
11  Exchange Act, and only under such counts, Lead Plaintiff alleges that each of the
12  Officer Defendants (defined in paragraph 31, *infra*) and STEC (together, "the
13  Exchange Act Defendants") committed fraud, by making one or more of the
14  alleged materially untrue statements and/or omissions and by doing so with
15  knowledge of the falsity of each such misstatement or omission, and that each of
16  the Officer Defendants is liable as a control person.

17      16.    Under Counts IV through VIII, which Lead Plaintiff brings under the
18  Securities Act, Lead Plaintiff alleges that each defendant—*i.e.*, each of the
19  Exchange Act Defendants plus Bahri (the Director Defendant) and each of the
20  Underwriter Defendants—is liable for each of the untrue statements and omissions
21  that were made or incorporated into the registration statement and/or prospectus for
22  the secondary offering, and that each of the Officer Defendants is also liable under
23  the Securities Act as a control person.  Lead Plaintiff *does not allege fraud* as to
24  any of its claims under the Securities Act.

25      17.    Because the only claims alleged against Bahri (the Director
26  Defendant) and the Underwriter Defendants are claims under the Securities Act,
27  Lead Plaintiff does not allege any claim based on fraud against any of these
28  defendants.

## II.   JURISDICTION AND VENUE

18.   The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), 77o, Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78-t1(a), Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 78r.

19.   This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1367.

20.   Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Defendant STEC maintains its principal place of business within this District, the Officer Defendants conduct business in this District, and many of the acts giving rise to the violations alleged herein, including the preparation and dissemination of materially false and misleading information and omissions, occurred in substantial part in this District.

21.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, without limitation, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III.   THE PARTIES

### A.   The Plaintiffs

22.   The State of New Jersey, Department of Treasury, Division of Investment is a large institutional investor, managing approximately $70.84 billion for the benefit of approximately 780,000 current and former public employees of the State of New Jersey.  As set forth in its certification previously filed herein, Lead Plaintiff purchased STEC common stock during the Class Period and suffered losses as a direct and proximate result of Defendants' wrongful conduct

1   alleged herein.  On July 14, 2010, the Court appointed New Jersey as Lead

2   Plaintiff.

3        23.    Representative Plaintiff the International Brotherhood of Electrical

4   Workers, Local 103 ("Local 103"), located in Dorchester, Massachusetts, oversees

5   the Electrical Workers Pension Fund, with assets of approximately $1.1 billion.

6   Local 103 alleges violations of Section 20A of the Exchange Act on behalf of itself

7   and all Class members who purchased STEC securities contemporaneously with

8   Defendants Manouch and Mark Moshayedi's sales of STEC stock during the Class

9   Period.  As set forth in its certification previously filed herein, Representative

10  Plaintiff Local 103 purchased STEC securities contemporaneously with the sales

11  of STEC securities by Manouch and Mark Moshayedi and suffered damage as a

12  result of the misconduct alleged herein.

13       24.    Representative Plaintiff the Norfolk County Retirement System

14  ("Norfolk County"), located in Massachusetts, provides retirement benefits to

15  8,200 active and retired employees from forty governmental units throughout the

16  County of Norfolk, Massachusetts, and manages more than $600 million in assets.

17  Norfolk County alleges violations of Sections 11, 12(a)(2) and 15 of the Securities

18  Act on behalf of itself and all Class members who acquired shares of STEC

19  common stock pursuant to or traceable to the registration statement (the

20  "Registration Statement") and/or the prospectuses (the "Prospectus") issued in

21  connection with the Offering.  As set forth in its certification previously filed

22  herein, Representative Plaintiff Norfolk County purchased STEC securities

23  pursuant to or traceable to the Registration Statement and/or Prospectus and

24  suffered damages as a result of the false statements contained therein.

25       **B.    The Issuer Defendant**

26       25.    Defendant STEC is a California corporation with its principal place of

27  business located at 3001 Daimler Street, Santa Ana, California.  STEC purports to

28  be a leading global provider of solid-state computer memory drive technologies

and solutions tailored to meet the high-performance, high-reliability needs of
OEMs such as EMC, IBM, HP, Hitachi and Sun.  During the Class Period, STEC's
core business was its enterprise scale SSDs, such as the ZeusIOPS.  STEC claims
to manufacture the "most comprehensive line" of SSDs in the storage industry.

26.     Defendants Manouch and Mark Moshayedi, and their brother, Mike
Moshayedi founded STEC, then named Simple Technology, Inc., in 1990.  The
Company grew rapidly through acquisitions and expansions both domestically and
abroad.  In September 2000, the Company went public.  In 2007, STEC divested
its Consumer Division, and introduced its high-end, flagship product, the
ZeusIOPS.

27.     Throughout the Class Period (June 16, 2009 through February 23,
2010), the Company's stock traded in an efficient market on NASDAQ under the
ticker symbol, "STEC."  As of November 2, 2010, the Company had nearly 51
million shares of common stock outstanding.

**C.     The Officer Defendants**

28.     At all relevant times Defendant Manouch Moshayedi has been CEO,
Chairman of STEC's Board of Directors and a member of the Equity Awards
Committee.  During the Class Period, Manouch Moshayedi signed and certified
STEC's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act
of 2002, including, without limitation, the Company's quarterly report for the
second quarter of 2009 ("2009 second quarter Form 10-Q" or "2009 second quarter
10-Q") and the annual report for 2009 ("2009 Form 10-K" or "2009 10-K").  He
also signed the documents in connection with the Offering, including the
Registration Statement on Form S-3, and the Prospectus contained in the
Registration Statement.  Manouch Moshayedi sold 4.1 million shares of his STEC
common stock for $133,920,000 in the Offering.

29.     At all relevant times Defendant Mark Moshayedi has been STEC's
President, COO, CTO, and Secretary, as well as a member of the Company's

1   Board of Directors and a member of the Equity Awards Committee. During the

2   Class Period, Mark Moshayedi signed STEC's SEC filings, including, without

3   limitation, the Registration Statement, and the 2009 10-K. Mark Moshayedi sold

4   4.9 million shares of his STEC common stock for $133,920,000 in the Offering.

5        30.    Defendant Raymond D. Cook was first hired by STEC in November

6   2008. At all times during the Class Period he was STEC's Chief Financial Officer

7   ("CFO") and Principal Accounting Officer. Defendant Cook signed STEC's Class

8   Period SEC filings, including, without limitation, the Registration Statement, the

9   2009 second quarter 10-Q, the 2009 second quarter Earnings Release, the 2009

10  third quarter 10-Q, the 2009 third quarter Earnings Release, the 2009 10-K, the

11  2009 fourth quarter Earnings Release and STEC's September 10, 2009, letter to the

12  SEC.

13       31.    Because of their positions with the Company, Defendants Manouch

14  Moshayedi, Mark Moshayedi, and Raymond D. Cook (collectively, the "Officer

15  Defendants") each possessed the power and authority to control the contents of

16  STEC's quarterly reports, press releases, and presentations to securities analysts,

17  money and portfolio managers, and institutional investors. They were provided

18  with copies of the Company's reports and press releases alleged to be misleading

19  prior to or shortly after their issuance, and had the ability and opportunity to

20  prevent their issuance or cause them to be corrected. Because of their positions

21  with the Company, and their access to material non-public information, the Officer

22  Defendants knew that the adverse facts specified herein were being concealed from

23  the public, and that the positive representations being made were then materially

24  false and misleading.

25       32.    As officers and controlling persons of a publicly-held company whose

26  common stock was, and is, registered with the SEC pursuant to the Exchange Act,

27  traded on NASDAQ, and governed by the provisions of the federal securities laws,

28  the Officer Defendants each had a duty promptly to disseminate accurate and

1  truthful information with respect to the Company's financial condition and
2  performance, growth, operations, financial statements, business, products, markets,
3  management, earnings, and present and future business prospects, and to correct
4  any previously-issued statements that had become materially misleading or untrue,
5  so that the market price of the Company's publicly traded common stock would be
6  based on truthful and accurate information.  The Officer Defendants'
7  misrepresentations and omissions during the Class Period violated these specific
8  requirements and obligations.  The Officer Defendants are therefore liable for the
9  false and misleading statements pleaded herein.

10      **D.    The Director Defendant**

11      33.    Rajat Bahri was, at all relevant times, a member of STEC's Board of
12  Directors, and Chair of the Board's Audit Committee.  During the Class Period,
13  Defendant Bahri signed the Company's SEC filings, including, without limitation,
14  the Registration Statement and the 2009 Form 10-K.

15      34.    STEC's Board of Directors has determined that Mr. Bahri is an "audit
16  committee financial expert," as that term is defined in Item 407(d)(5) of Regulation
17  S-K, which means that the Company's Board determined that Defendant Bahri has
18  the following attributes:

19          (a)    An understanding of generally accepted accounting principles
20  and financial statements;

21          (b)    The ability to assess the general application of such principles
22  in connection with the accounting for estimates, accruals and reserves;

23          (c)    Experience preparing, auditing, analyzing or evaluating
24  financial statements that present a breadth and level of complexity of accounting
25  issues that are generally comparable to the breadth and complexity of issues that
26  can reasonably be expected to be raised by the registrant's financial statements, or
27  experience actively supervising one or more persons engaged in such activities;

28

11    SECOND CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1          (d)     An understanding of internal control over financial reporting;

2  and

3          (e)     An understanding of audit committee functions.

4      35.    No allegation based on fraud is made against Defendant Bahri.

5  **E.    The Underwriter Defendants**

6      36.    Defendant Barclays Capital Inc. ("Barclays Capital") is an investment

7  bank that acted as an underwriter with respect to STEC common stock sold in the

8  Offering.  Barclays Capital's headquarters are located at 745 Seventh Avenue,

9  New York, New York 10019.

10      37.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank

11  Securities") is an investment bank that acted as an underwriter with respect to

12  STEC common stock sold in the Offering.  Deutsche Bank Securities' headquarters

13  are located at 60 Wall Street, New York, New York 10005.

14      38.    Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is an

15  investment bank that acted as an underwriter with respect to STEC common stock

16  sold in the Offering.  J.P. Morgan Securities' headquarters are located at 277 Park

17  Avenue, New York, New York 10172.

18      39.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") is an

19  investment bank that acted as an underwriter with respect to STEC common stock

20  sold in the Offering.  Oppenheimer's headquarters are located at 125 Broad Street,

21  New York, New York 10004.

22      40.    The Underwriter Defendants acted as underwriters of the Offering and

23  distributed at least nine million shares of STEC common stock to investors.  The

24  distribution of shares to the Underwriters (excluding the 1,350,000 share over-

25  subscription allotment) was:

26

27

28

| Name | Number of shares |
|------|------------------|
| J.P. Morgan Securities | 2,925,000 |
| Deutsche Bank Securities | 2,925,000 |
| Barclays Capital | 1,800,000 |
| Oppenheimer | 1,350,000 |

41.    In connection with the Offering, the Underwriter Defendants were granted an option for a period of thirty days to purchase up to an additional 1,350,000 shares to cover overallotments.

42.    The Underwriter Defendants received an underwriting discount of at least $11.16 million, indirectly paid by Lead Plaintiff and other Class members who purchased STEC common stock in the Offering.

43.    The Underwriter Defendants failed to conduct an adequate due diligence investigation, which was a substantial contributing factor leading to the harm complained of herein.

44.    No allegation based on fraud is made against any Underwriter Defendant.

IV.    **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS**

A.    **During the 2009 Third Quarter, the Exchange Act Defendants Misrepresented the Nature of a New Agreement With EMC, STEC's Largest Customer**

1.    **The Exchange Act Defendants had Consistently Described Their ZeusIOPS Business as One That Eventually Would Produce, *in the Ordinary Course*, Surging Sales to Each ZeusIOPS OEM Customer**

45.    Starting prior to the Class Period, and continuing through the time of the Exchange Act Defendants' misstatements and omissions, STEC consistently told investors that because, among other reasons, sales of ZeusIOPS are customized by STEC for each particular OEM customer, purchasing of ZeusIOPS

1   by any given OEM could be expected to pass through a series of phases, with the

2   volume of the OEM's purchases increasing by quantum leaps as the OEM passed

3   from one phase to the next.

4        46.    STEC's Form 10-K for the year 2008, filed on March 12, 2009, states,

5   "[p]roducts sold to our customers are typically customized by our design and

6   engineering teams to meet our customers' specific design requirements," and "[w]e

7   offer our [OEM] customers a comprehensive technology solution from concept to

8   design to the creation of prototypes through volume production and testing."

9        47.    According to STEC, the first stage for any ZeusIOPS customer

10  involves STEC selling the customer samples for the purpose of testing and

11  evaluation.  If the first phase is successful, it results in the OEM "qualifying"

12  ZeusIOPS for use in one or more "system platforms," and increasing its purchases

13  of ZeusIOPS.[1]

14       48.    In the second phase—referred to by Manouch during STEC's 2009

15  second quarter earnings conference call as "pre production"—the OEM markets a

16  system of its own that incorporates ZeusIOPS, by sending its own samples to

17  multiple end-users, while purchasing an increased volume of ZeusIOPS from

18  STEC in order to create these samples.

19       49.    In the third and final phase, the OEM receives a stream of orders for

20  its system large and steady enough to justify what STEC's 2008 10-K refers to as

21  "volume production" of the OEM's system—also referred to by Manouch during

22  the 2009 second quarter conference call as "production," "full production," and

23  "full ramping production" of the OEM's system.  In this third and final phase, the

24  OEM purchases a substantially increased volume of ZeusIOPS to support the

25

26  _____

27  [1] According to STEC, an OEM makes at least some purchases of ZeusIOPS
    even prior to ZeusIOPS having been qualified for the OEM's systems. Thus,
    during STEC's 2008 second quarter earnings conference call, Manouch stated that

28  STEC had sold a total $12.2 million of ZeusIOPS "mostly for qualifications."

1    OEM's substantially increased production of its system that incorporates
2    ZeusIOPS.

3        50.    In 2007, ZeusIOPS had not yet been qualified by any enterprise
4    storage OEM.  During STEC's earnings conference call on May 14, 2007,
5    Manouch stated that "we are still in the qualification stages [with ZeusIOPS]," and
6    "once this thing is qualified with customers, the volumes will be significant."

7        51.    On January 14, 2008, STEC announced that, after a year of
8    "collaborative effort" between STEC and EMC Corporation (described by *The*
9    *Wall Street Journal* as "the market-share leader in big computer storage systems")
10   EMC had "selected Zeus-IOPS" for "deployment" in certain "high-end networked
11   storage systems."  STEC stated "[t]his union signifies the first adoption of our
12   Zeus-IOPS SSDs in the enterprise storage and enterprise computing markets."

13       52.    Two months later, on March 5, 2008, during the year-end earnings
14   conference call for 2007, a STEC spokesperson stated that "[w]e expect production
15   levels to ramp for [EMC] in future quarters."

16       53.    Another two quarters later, in its 2008 third quarter 10-Q, STEC
17   reported that  ZeusIOPS had been "qualified" for use on the platforms of "one of
18   the largest Enterprise Storage and Server OEMs."  During STEC's 2008 third
19   quarter earnings conference call Manouch stated that sales of ZeusIOPS during the
20   first three quarters of 2008 had already grown substantially compared to sales
21   during 2007, "and this 2008 was just a sampling of what we can do in that type of
22   product [because] we haven't yet gone into *major production*[2] of this product line.
23   Once we do, I think the numbers will be *significantly* higher than what we are
24   doing today based on just eval[uations] and samples."

25       54.    Another two quarters later, during STEC's 2009 first quarter
26   conference call, Manouch stated that ZeusIOPS was now qualified at all five of the

27

28   [2] Unless otherwise noted, all emphasis is added.

1  largest enterprise storage OEMs, and indicated that EMC was now in "full

2  production" of systems incorporating ZeusIOPS.

3         55.    One quarter after that, during STEC's 2009 second quarter earnings

4  conference call, Manouch described EMC as being in "full ramping production,"

5  and added that once the other four OEMs—described by Manouch as being in "pre

6  production"—"start kicking in we will see *huge ramps* in sales of ZeusIOPS going

7  forward."

8         56.    According to STEC, although the volume of a given OEM's

9  purchases of ZeusIOPS would increase by quantum leaps as the customer passed

10  from pre qualification, to pre production, to volume production, an OEM's

11  purchases could increase—although more gradually—at other times as well,

12  because, as stated in STEC's 2008 10-K, "the SSD market will continue to expand

13  over the next few years, aided by the continuation of the decline in Flash

14  component pricing," and because the continuous development of new applications

15  for SSDs would increase the variety of possible OEM systems and interested end

16  users.[3]

17         57.    Thus, as early as during the May 14, 2007, earnings conference call,

18  Manouch noted that one ZeusIOPS customer that was still in the qualification stage

19

20

21         [3] During the May 14, 2007, earnings conference call, Manouch noted that
22  "everybody in every industry that we are seeing, small or large products that they
    build, they are now trying to integrate Flash into it." As explained by *The Wall*
23  *Street Journal* on January 14, 2008, EMC originally expected that its systems
    incorporating ZeusIOPS would only be purchased by financial institutions needing
24  to "handle hundreds of transactions a second," and, during STEC's 2008 first
25  quarter conference call, Manouch stated that systems incorporating ZeusIOPS had
    not yet been sent by the OEMs "to anybody else besides the financial institutions."
26  However, Manouch immediately added, "I think as we go forward during the
27  year[,] in the second half of the year, we will see more and more applications
    coming up."
28

1    "wants a much larger volume for qualification across their platforms," and that

2    "customers like that will pick up significantly."

3        58.    Thus too, according to STEC, the achievement of volume production

4    by a specific OEM did not mean the end of the growth in the volume of its

5    purchases from STEC, because the volume of its requirements was likely to

6    *continue* growing as ZeusIOPS was integrated into more and more of the OEM's

7    systems for sale to an increasing variety of end users—which is why, on August 3,

8    2009, during the second quarter earnings conference call, Manouch

9    interchangeably used the terms "full production" and "full *ramping* production."

10       59.    In sum, STEC made clear to investors that in the ordinary course of its

11   ZeusIOPS business, total sales of ZeusIOPS were likely to grow over time, and,

12   not only were sales of ZeusIOPS to any given customer likely to grow over time,

13   but also, they were likely to exhibit great spurts of growth as the customer

14   transitioned from one phase of purchasing to the next.

15       60.    As reported by STEC during its quarterly earnings conference calls,

16   from the time of STEC's first collaborative efforts with EMC during 2007 to create

17   EMC systems incorporating ZeusIOPS, through the second quarter of 2009 when

18   EMC achieved "full ramping production" of such systems, STEC's revenues from

19   ZeusIOPS sales increased from quarter to quarter, and year to year by dramatic

20   amounts.  These reported results appeared to confirm the scenario depicted by

21   STEC of steadily increasing total ZeusIOPS sales, driven by the transitioning of

22   purchasers—up to this point, especially EMC—from pre qualification, to pre

23   production, to volume production of systems incorporating ZeusIOPS.

24       61.    For the year 2007—the year when STEC reportedly began its

25   collaboration with EMC—STEC reported ZeusIOPS revenues of $11 million, with

26   just the last quarter of 2007 accounting for $7 million of that total.

27       62.    For the next year—2008—STEC reported ZeusIOPS revenues of

28   $52.7 million—making for a year-over-year increase of almost 400%.  During the