1  year 2008 earnings conference call, Manouch stated that "[o]ur ZeusIOPS business
2  is growing through the roof."

3      63.    Also during the year 2008 earnings conference call, Manouch
4  predicted that STEC's ZeusIOPS revenues for just the *first half* of 2009 would
5  match STEC's ZeusIOPS revenues for the entire year 2008.  An analyst for
6  Capstone Investments commented that "STEC's guidance [for the first half of
7  2009] should be viewed as nothing short of spectacular."

8      64.    Halfway through 2009, STEC reported ZeusIOPS revenues of $57.7
9  million for just the second quarter alone—exceeding in that one quarter the total
10  ZeusIOPS revenues reported for the entire previous year—and reported even larger
11  ZeusIOPS revenues—$83.4 million—for the first *half* of 2009.

12      65.    These spectacular reported increases in ZeusIOPS revenues were
13  driven by spectacular reported increases in ZeusIOPS sales to EMC.  Thus, during
14  the first quarter of 2009—the last quarter prior to the Class Period—reported
15  ZeusIOPS sales to EMC totaled $7.55 million; while during the second quarter of
16  2009, reported ZeusIOPS sales to EMC totaled $33.6 million—an increase of more
17  than 300%.[4]

18

19     [4] The amounts of EMC's ZeusIOPS purchases here alleged are derived from the
20  following facts:  During the 2009 third quarter earnings conference call, Manouch
    affirmed an analyst's suggestion that EMC had purchased "$35 million" of
21  ZeusIOPS during the 2009 *second* quarter.  However, that number can be made
    more precise:  According to STEC's Form 424B3 filed on August 3, 2009, EMC's
22  *total* purchases from STEC during the 2009 second quarter accounted for 38.9% of
23  STEC's *total* revenues for that quarter.  Because STEC's 2009 second quarter
    reported revenue was $86.4 million, the precise amount of EMC's 2009 second
24  quarter purchases of ZeusIOPS cannot have been more than $33.7 million.
25  Manouch's statement demonstrates that, during this period, essentially *all* of
    EMC's purchases from STEC were for ZeusIOPS.  The amount of EMC's
26  purchases of ZeusIOPS during the 2009 *first* quarter can be derived by subtracting
27  the amount of EMC's purchases from STEC during the 2009 second quarter from
    the amount of EMC's purchases from STEC during the entire first half of 2009.
28                                     *(continued)*

2.   **The Exchange Act Defendants Falsely Communicated that the EMC Agreement was an Ordinary Course Contract Whose Large Size had Resulted from an Increase in EMC's Recurring Requirements**

(a)   **The July 16, 2009, Press Release**

66.   On July 16, 2009, early in the third quarter, STEC issued a press release announcing an agreement with "one of its largest enterprise storage customers"—later revealed to be EMC—to purchase $120 million worth of ZeusIOPS SSDs *in the second half of 2009*."

67.   The EMC Agreement provided for average quarterly purchases of $60 million of ZeusIOPS by EMC during each of the quarters in the second half of 2009. Compared to EMC's ZeusIOPS purchases during the 2009 second quarter—approximately $33.7 million—the EMC Agreement provided for an increase in average quarterly purchases of 78%. Although this represented a significant quarterly increase over the already high level of EMC's purchases during the 2009 second quarter, it was consistent with the scenario of increasing ZeusIOPS sales to a customer in full production as consistently communicated by the Exchange Act Defendants, and was actually a much smaller percentage increase than already had happened in the 2009 second quarter, when EMC's ZeusIOPS purchases had increased by 300%.

68.   Significantly, STEC's July 16 press release communicated that the increased size of the average quarterly purchases promised by EMC under the Agreement resulted not from any extraordinary circumstances or terms of the

*(continued)*
EMC's purchases from STEC during the entire first half of 2009, can, in turn, be derived from the fact that, according to STEC's 2009 second quarter 10-Q, EMC accounted for 27.5% of STEC's total revenues during the first half of 2009. STEC's reported revenues during the first half of 2009 totaled $149.9 million.

1   contract, but, rather, from the asserted fact that "sales of [EMC's] enterprise

2   storage systems utilizing our ZeusIOPS drives *have grown significantly.*"

3       69.    Investors reasonably understood STEC's announcement as meaning

4   that the EMC Agreement was a contract signed in the ordinary course of STEC's

5   business, that the size of the contract had been determined solely by a rise in the

6   volume of EMC's recurring demand for ZeusIOPS, and that, going forward, EMC

7   would be purchasing roughly $60 million of ZeusIOPS every quarter. Thus, on the

8   day of STEC's press release, an Oppenheimer analyst report stated:

9           STEC brought out the big gun today (checks suggest

10          EMC), and announced a $120M ZeusIOPS contract for

11          2H. Relative to our prior model [for 2H] that included

12          [a] $60-$70M contribution from EMC, this news raises

13          our model by $50M. *Looking ahead to '10, we now*

14          *expect rev from EMC alone of >$250M*

15      70.    In other words, based on STEC's press release, Oppenheimer was

16  now predicting that, in the next year—2010—EMC would purchase a bit more

17  than $60 million of ZeusIOPS *in each of the four quarters*.

18      71.    Not only did Oppenheimer understand STEC to be saying that the

19  level of EMC's purchases would continue at $60 million per quarter, but also,

20  Oppenheimer believed that such purchases would be made under subsequent

21  contracts similar to the EMC Agreement. Thus, the Oppenheimer report stated that

22  "[we] believe/suspect that a similar supply contract with EMC for all of '10 must

23  be in the works."

24      72.    Following STEC's July 16 assertions regarding the EMC Agreement,

25  the price of STEC stock rose another 15.2%, or $4.20 per share in a single day,

26  over the previous day's closing price, to close at $31.79 per share on July 16, 2009,

27  on extraordinarily high trading volume. STEC's stock price thus reached another

28  all-time high.

1

**(b)**     **The August 3, 2009, Statements in the Prospectus,**
**and Second Quarter Earnings Release**

2

3     73.     On August 3, 2009, in STEC's second quarter earnings release, the

4   Exchange Act Defendants repeated their July 16 announcement, stating,

5   essentially, that the EMC Agreement covered EMC's requirements for just the

6   second half of 2009.  Thus, the earnings release stated that, during the Second

7   Quarter, STEC had signed a "$120 million contract to supply ZeusIOPS SSDs to a

8   major Enterprise-Storage customer *for the second half of 2009*."

9     74.     Also on August 3, 2009, in the Prospectus, STEC stated:

10          We expect continued *growth* in the sales of our Flash-

11          based SSD ZeusIOPS products through 2009 based on

12          the *accelerated adoption* of our ZeusIOPS SSDs by most

13          of our major enterprise-storage and enterprise-server

14          OEM customers into their systems.  *As part of this*

15          *expected growth*, on July 16, 2009 we announced *an*

16          *agreement with one of our largest enterprise-storage*

17          *customers for sales of $120 million of ZeusIOPS SSDs* to

18          be delivered in the second half of 2009.

19   Like the Exchange Act Defendants' other statements about the Agreement, on

20   July 16, 2009, and August 3, 2009, not only did this statement omit the key fact

21   that the Agreement was *not* made in the ordinary course of STEC's business, but

22   also, this statement communicated a contrary impression by describing the

23   Agreement solely as the result of EMC's "adoption" of ZeusIOPS into its systems

24   and a resulting "growth" in EMC's purchases.

25     75.     On August 28, 2009, again reflecting investors' understanding that the

26   $120 million contract was made in the ordinary course of STEC's ZeusIOPS

27   business, and that going forward such contracts with EMC would be repeated

28   every six months, an analyst report published by Needham stated that "[l]ooking

1  forward, we see a high likelihood of a *follow-on contract order* with at least

2  STEC's top OEM customer in 1H10 getting signed within the next 3 months."

3      76.    Eight days after the August 3, 2009, statements about the Agreement,

4  the Moshayedis sold their stock in the Offering for $267.8 million.

5      77.    Three months after the Offering, on November 3, during STEC's 2009

6  third quarter earnings conference call, Manouch admitted that, contrary to the

7  impression created by STEC's statements on July 16, 2009, and August 3, 2009,

8  "when we did sign the [EMC Agreement], we did—*this was a one-off type of a*

9  *deal*," and added that "I don't think we are going to be asking our customer for

10  another commitment."

11      78.    Also during the 2009 third quarter earnings conference call, contrary

12  to the impression created by STEC's statements on July 16 and August 3 that the

13  volume of purchasing under the EMC Agreement would be repeated by EMC

14  going forward, Manouch admitted that "[EMC] might carry inventory of our

15  ZeusIOPS at the end of 2009 which they will use in 2010."

16      79.    STEC made the same disclosure in its 2009 third quarter earnings

17  release, also filed on November 3, 2009, which stated that "[w]e recently received

18  preliminary indications that our customer [who placed a $120 million supply

19  agreement with us for shipments covering the second half of 2009] might carry

20  inventory of our ZeusIOPS at the end of 2009 which they will use in 2010."

21      80.    As shown by the following exchange between Manouch and an

22  analyst during the November 3, 2009, earnings conference call, the November 3,

23  2009, disclosure contradicted investors' prior understanding that the EMC

24  Agreement represented a new level of purchasing by EMC, expected by STEC to

25  recur every six months.  Moreover, the exchange also shows that Manouch *knew*

26  that investors had been led to believe that the EMC Agreement covered only six

27  months worth of EMC's requirements.  Thus, the analyst asked,

28

1                         If indeed EMC does carry some inventory . . . if the sell

2                         through *isn't as great as $120 million*, that would imply

3                         *the first quarter would most likely be smaller than what*

4                         *analysts are modeling* at right now, is that correct?

5  Manouch then responded:

6                         That is true and ***that is why we have put that in our***

7                         ***release***.

8        81.   Subsequently, on February 23, 2010, in STEC's earnings release for

9  the 2009 fourth quarter and full year, the Exchange Act Defendants made another

10  disclosure contrary to the misleading impression created by their statements on

11  July 16 and August 3 that the EMC Agreement represented a new increased level

12  of purchasing by EMC that would be repeated going forward.  Thus, the February

13  23, 2010, earnings release stated, "[W]e now anticipate this inventory carryover to

14  continue to negatively impact our sales to this customer during the first *half* of

15  2010, as we do not expect any meaningful production orders from this customer

16  during that time."

17        82.   The fact that the information in the February 23, 2009, earnings

18  release contradicted the impression that had been created by the Exchange Act

19  Defendants' statements on July 16 and August 3 is shown by an analyst report

20  published by B. Riley on February 24, 2010, which stated "STEC's new guidance

21  indicates that it expects EMC to take at least a whole year to work through its

22  $120MM July 2009 order for ZeusIOPS SSDs; *this order was envisioned as*

23  *meeting six months of demand*."

24        83.   Similarly, an analyst report published by Oppenheimer on February

25  24, 2010, stated, "Now that ***EMC's supply contract with STEC for $120M is***

26  ***indicative of a full-year run rate vs. half year***, we are resetting our '10E EPS . . .

27  and dropping our PT . . . ."

28

84.    Still another analyst report—this one published by Deutsche Bank on February 23, 2010—suggested that the analyst had been misled regarding the ongoing level of EMC's requirements, stating "we had assumed EMC's demand for SSDs was higher than it now appears. . . . We now see EMC revenue of roughly *$35M/Q* in F2H-10, which *we believe has been EMC's true demand over the past few Qs*."  Significantly, a purchase volume of $35 million per quarter—the volume proposed by the Deutsche Bank analyst as EMC's "true demand"—is only about *half* of the quarterly volume of purchases under the EMC Agreement, which is just another way of saying that the true period covered by the EMC Agreement was twice as long as investors had been led to believe.  Also significantly, an EMC purchase volume of $35 million per quarter is only about the same as the volume that EMC had reportedly purchased during the 2009 *second* quarter ($33.6 million), the quarter that ended *just prior* to the announcement of the EMC Agreement—which, in turn, was quickly followed by the Moshayedis' sale of their stock.

85.    Like the Deutsche Bank report, a Thomas Weisel Partners report published on February 24, 2010, expressed a belief that investors had been misled. The report lowered the analyst's price target for STEC stock based on "our loss of confidence in STEC management."

86.    Ultimately, Manouch himself admitted that, although EMC had a certain recurring volume of demand for ZeusIOPS, in the words of the Deutsche Bank analyst, EMC's "*true* [quarterly] demand" was only about *half* of the quarterly volume of EMC's purchases under the EMC Agreement.  Thus, during the 2010 first quarter earnings conference call, an analyst asked Manouch "So maybe your normalized quarterly revenue run rate for ZeusIOPS is somewhere between $30 million and $40 million.  Is that a fair statement?"  Manouch answered: "I can't speculate, but *those numbers seem to be logical*."  Since quarterly purchases by the Other OEMs during each of the three quarters from the

1  2009 third quarter through the 2010 first quarter ranged from $6.7 million to $10.4

2  million,[5] that means the "normalized quarterly" requirements of EMC were [$30

3  million - $40 million] minus [$6.7 – 10.4 million], or, *at most*, about $33.3 million.

### 3.    The Exchange Act Defendants Knew That Their Representations About the EMC Agreement Were False

#### (a)    Manouch Subsequently Admitted That the Exchange Act Defendants Always had Known That the EMC Agreement Was a One-Off Contract

9  87.    On July 16, 2009, when STEC announced the EMC Agreement, and

10  on August 3, 2009, when STEC again touted the EMC Agreement, the Exchange

11  Act Defendants already knew that the $120 million contract was an exceptional,

12  one-time purchase agreement, *not* indicative of a new ongoing level of demand for

13  STEC's ZeusIOPS product by EMC, and that, going forward, EMC would *not* be

14  purchasing similar volumes every six months.  Thus, on November 3, 2009, during

15  STEC's third quarter earnings conference call, when Manouch admitted that the

16  EMC Agreement was "a one-off type of a deal," he did not describe this fact as a

17  new discovery.  To the contrary, he stated "So *when we did sign* the [EMC

18  Agreement], we did—*this was* a one-off type of a deal."

#### (b)    Manouch's Admission Also Means the Exchange Act Defendants Knew That EMC Would Not Continue Purchasing at the Same Volume

22  88.    The Exchange Act Defendants' knowledge on July 16, 2009, and

23  August 3, 2009, that the EMC Agreement was "a one-off type of a deal," also was

---

[5] The calculation of ZeusIOPS purchases by the Other OEMs during each quarter of 2009 is explained below.  The amount of their purchases during the first quarter of 2010 is derived from the fact that EMC made no ZeusIOPS purchases during that quarter and, according to Manouch's statement during the 2009 first quarter earnings conference call, STEC's ZeusIOPS revenues during that quarter were $10.4 million.

1  knowledge that, after the end of the period covered by the Agreement, EMC would
2  *not* continue buying at the same volume as under the Agreement, because, as
3  Manouch admitted, purchases from STEC at such a volume could not be made by
4  any of STEC's customers unless they entered into an agreement—such as the EMC
5  Agreement—in advance of the purchases.  Thus, during the August 3, 2009,
6  earnings conference call, when asked by an analyst whether STEC would sign
7  other agreements similar to the EMC Agreement, Manouch responded, "when you
8  get to a point where the amount of components that you need are extremely large,
9  we can't, or we won't, at least, go make those commitments to our suppliers and
10  bring the parts in on a whim.  We need to have [a] very solid forecast and *solid*
11  *commitments* in order to do that."  Because the Exchange Act Defendants always
12  had known that EMC would not be making any more such agreements—because
13  the Agreement was a "one off" contract—they also always had known that EMC
14  would not continue purchasing ZeusIOPS at volumes similar to its purchases under
15  the Agreement.

(c)      **STEC's Intimate Relationship With Its OEM**

**Customers Also Supports the Exchange Act**

**Defendants' Scienter**

19      89.    The knowledge of the Exchange Act Defendants on July 16, 2009,
20  and August 3, 2009, that, after the term of the Agreement, EMC would *not* be
21  making recurring purchases of a volume similar to its purchases under the
22  Agreement is also supported by EMC's subsequent statement, made during its own
23  January 6, 2010, earnings conference call, that the EMC Agreement was not
24  intended to cover EMC's requirements only for the second half of 2009, but,
25  rather, "was *designed* to protect ourselves going into first quarter [2010] against
26  what we knew would be a tight supply environment."

27      90.    EMC's statement on January 6, 2010, is indicative not only of EMC's
28  knowledge, but also, of the Exchange Act Defendants' knowledge, given

1   Manouch's statement about STEC's need for advance warning regarding an
2   OEM's large supply requirements, and given STEC's prior statements, described
3   below, that STEC and EMC had a long-running, still ongoing, ***intensely intimate***
4   working relationship.

5       91.    Thus, on November 10, 2008, during STEC's 2008 third quarter
6   earnings conference call, a STEC spokesperson stated, "the largest Enterprise
7   Storage customer we are in production with, it took us ***over a year of daily and***
8   ***weekly meetings*** with our engineering team and their engineering teams, and we
9   went through more than 30 firmware revisions to optimize the performance of our
10  products with their system."

11      92.    Indeed, as far back as January 14, 2008, STEC announced that "EMC
12  and STEC [had] collaborated . . . . [o]ver the past year"—*i.e.*, starting a full two
13  and a half years before the EMC Agreement was signed,—declared that STEC was
14  "delighted to ***partner*** with EMC," and described EMC's selection of ZeusIOPS as
15  a "***union***" of STEC and EMC.

16      93.    Moreover, STEC's own statements show that its intimate relationship
17  with its OEM customers continues straight through such customers' production
18  phase.  STEC's 2008 10-K, filed on March 12, 2009, states that "[d]uring our
19  customers' production phase, we provide extensive support which includes
20  training, system-level design, implementation and integration support."  Indeed, as
21  an analyst observed during STEC's 2009 third quarter earnings conference call
22  without being contradicted by any Defendant, at that late date, a full quarter ***after***
23  the EMC Agreement had been signed, STEC *still* had its own engineers
24  "co-located with EMC."

25      94.    Still further support for the scienter of Manouch and the other
26  Exchange Act Defendants is provided by the timing of Manouch's admission that
27  "***when we did sign*** the [EMC Agreement], we did—***this was*** a one-off type of a
28  deal."  This admission followed rather than preceded, not only the initial,

misleading explanation of the EMC Agreement, but also, the Moshayedi brothers' sale of nine million of their own personal shares of STEC, for $267.8 million. Moreover, the admission followed the misstatements about the Agreement and the sale of the Moshayedis' stock so quickly that it came at the end of the same quarter in which the misstatements were made and the stock was sold, and did so despite the fact that, at the time of the admission, the EMC Agreement still had another full quarter to run.

95.   Indeed, after Manouch's admissions during the November 3, 2009, conference call, an analyst from Thrivent Asset Management indignantly pointed out to Manouch that "in August, you guys are [sic] sold a majority position of your stock," and then asked "are you considering buying any back?"

96.   Also significant is the fact that Manouch uses the term "we" in his admission. From the beginning, Mark Moshayedi knew as much about the Agreement as Manouch did, because, as stated by a confidential witness who was one of STEC's regional sales managers at the time when the Agreement was executed and announced (Confidential Witness 1, or "CW1"), both Manouch and Mark were heavily involved in the Company's large deals: "nothing happened at that place without those two."[6]

---

[6] CW1 worked for STEC from February 2006 through July 2009. He was the Company's Regional Sales Manager for the San Francisco Bay Areas and Pacific Northwest. He reported to Mike Nilsson, STEC's Worldwide Vice President of Sales.

4. **The Exchange Act Defendants' Failure to File the EMC Agreement With the SEC, After Promising the SEC That Any Material One-Off Contracts With EMC Would Be Filed, is Additional Evidence of Their Scienter for Their Misleading Statements About the EMC Agreement**

97.     Pursuant to Item 601(b)(10) of Reg. S-K and its instructions, "[e]very contract not made in the ordinary course of business which is material to the registrant," and, even if made in the ordinary course of business, "[a]ny contract upon which the registrant's business is substantially dependent" must be filed with the Form 10-Q or 10-K for the period during which the contract was executed. Among other justifications for this requirement, disclosing to investors the terms of the contract protects them from being misled into believing that a significant one-time contract obtained, for example, by the registrant having made extraordinary promises, is indicative of an ongoing trend in the issuer's results of operations.

98.     To this day, STEC has never filed the $120 million EMC Agreement with the SEC.

99.     Moreover, no later than at the end of August 2009, STEC was on notice that failure to file a "one-off" contract of such central importance to its business as the EMC Agreement would be viewed as highly questionable by the SEC. By letter dated August 28, 2009, the SEC wrote to STEC questioning, among other things, STEC's failure to file other, much smaller agreements with EMC that had been made during the previous year—when EMC accounted for a much smaller proportion of STEC's business than it accounted for in 2009.

100.    Thus, by letter dated August 28, 2009, the SEC asked why no "master agreement" with EMC, such as was referred to in STEC's 2008 10-K, had been filed with that Form 10-K, given that, even at that early date, EMC already accounted for 15.2% of STEC's total revenues.

1        101.   STEC's only proffered defense for this earlier failure was an argument

2    that STEC knew could not excuse its failure to file the EMC Agreement.  Thus, by

3    publicly filed letter, dated September 10, 2009, signed by Defendant Raymond

4    Cook, the Exchange Act Defendants responded to the SEC that, "STEC's master

5    agreements typically are non-exclusive and *do not contain any binding long-term*

6    *volume commitments* . . . actual sales of STEC products are made through more

7    specific sales agreements such as individual purchase orders."

8        102.   The SEC was not satisfied with STEC's answer.  Thus, by letter dated

9    September 30, 2009, the SEC again wrote to STEC, stating

10                   *[I]t remains unclear to us how you have concluded that*

11                   *you are not substantially dependent upon any of your*

12                   *agreements with . . . EMC Corporation*, such that they

13                   are not required to be filed pursuant to Item

14                   601(b)(10(ii)(B) of Regulation S-K.  We note your

15                   statements that STEC's master agreements typically are

16                   non-exclusive and that they do not contain any binding

17                   long-term volume commitments, and that actual sales are

18                   made through more specific sales agreements such as

19                   purchase orders. . . . *With respect to any individual*

20                   *purchase order that accounted for a significant amount*

21                   *of the company's revenues, please advise how you*

22                   *concluded that any such purchase order is not required*

23                   *to be filed as a material contract under Item 601(b)(10)*.

24       103.   By publicly filed letter dated October 13, 2009, and again signed by

25   Raymond Cook, STEC responded that "STEC received over 100 individual

26   purchase orders from EMC related to 2008 deliveries.  *The amounts of these*

27   *purchase orders ranged from $450 up to approximately $5.2 million for the*

28   *largest individual purchase order*. . . .  As a result, STEC believes that none of the

1 | individual EMC purchase orders received for 2008 shipments constitutes a material
2 | contract under Item 601(b)(10) of Regulation S-K."

3 |     104.   Thus, the only excuse that STEC even attempted for its failure to file
4 | any EMC agreement with the 2008 Form 10-K was that the largest actual purchase
5 | order by EMC during 2008 was for only $5.2 million.  Obviously, such an
6 | argument could not possibly excuse STEC's failure to file the EMC Agreement,
7 | since that agreement was for $120 million—an amount *23 times larger* than
8 | STEC's largest previous binding commitment from EMC.

9 |     105.   Moreover, while the SEC expressed concern about STEC's failure to
10 | file any agreement with EMC during a period in 2008 in which EMC accounted for
11 | as much as *15.2%* of STEC's revenues, EMC's importance to STEC subsequently
12 | increased, until, by the second quarter of 2009, EMC accounted for *38.9%* of
13 | STEC's revenues, as disclosed in STEC's Form 424B3 filed on August 3, 2009.

14 |     106.   Significantly, STEC's September 10, 2009, letter to the SEC ended
15 | with a statement that "[g]*oing forward*, the Company will continue to assess each
16 | quarter whether it is dependent upon any one agreement such that an exhibit filing
17 | is required under Item 601(b)(10)(ii)(B)."  Nevertheless, even after making this
18 | promise to the SEC, the Exchange Act Defendants still failed to file the EMC
19 | Agreement—as they ***immediately*** should have done, attaching it to a Form 8-K.

20 |     107.   By failing to file the EMC Agreement with STEC's 2009 second
21 | quarter 10-Q, or to file the Agreement with a Form 8-K immediately after
22 | receiving the SEC's August 28, 2009, letter, the Exchange Act Defendants sent a
23 | misleading message to investors that the EMC Agreement did not need to be filed
24 | with the SEC, because it was a contract made in the ordinary course of business.

25 |     108.   By failing to file the EMC Agreement, the Exchange Act Defendants
26 | also sent a misleading message that STEC's business was not "substantially
27 | dependent on" the EMC Agreement.  This second misleading message was
28 | reinforced by an explicit false statement made in STEC's September 10 letter to

1   the SEC, that "in the unlikely event a customer should default under a purchase
2   order or other sales agreement, STEC generally believes it could find a
3   replacement customer for the relevant product"—a statement that applied to all of
4   STEC's sales agreements, including the EMC Agreement.

5        109.   The Exchange Act Defendants' failure to file the EMC Agreement
6   with the SEC was a material violation of Reg. S-K.  Moreover, their failure to so
7   file it *after STEC's exchange of letters with the SEC* can only have been a *knowing*
8   violation.  The Exchange Act Defendants' failure to file the EMC Agreement with
9   the SEC therefore raises a strong inference that all of Defendants' false
10  statements/omissions regarding the EMC Agreement were made with an intention
11  to conceal the full truth about the Agreement from investors.

12  **B.      During the 2009 Third Quarter, the Exchange Act Defendants**
13  **Made Multiple Misleading Statements and Material Omissions**
14  **Regarding Sales of ZeusIOPS to STEC's Other OEM Customers**

15  **1.      The Exchange Act Defendants Falsely Represented That**
16  **They Expected the Other OEMs to Increase Their**
17  **ZeusIOPS Purchases During the Second Half of 2009**

18  **(a)      This Statement Was Made in the Prospectus for the**
19  **Offering of the Moshayedis' Stock**

20       110.   At the same time that the Exchange Act Defendants made
21  misstatements regarding the EMC Agreement, they also stated falsely that they
22  expected ZeusIOPS sales to increase to most of their other OEM customers during
23  the second half of 2009—which, at that time, had five months left to run.  Thus, in
24  the Prospectus, filed on August 3, 2009, STEC stated:

25           We expect *continued growth* in the sales of our Flash-
26           based SSD ZeusIOPS products *through 2009* based on
27           the accelerated adoption of our ZeusIOPS SSDs *by most*
28

32   SECOND CONSOLIDATED  AMENDED COMPLAINT
     Lead Case No. SACV 09-01304-JVS (MLGx)

1           *of our major enterprise-storage and enterprise-server*

2           *OEM customers* into their systems.

3      111.   Based on STEC's 2009 second quarter earnings release, also filed on

4 August 3, 2009, investors knew that the reference in the Prospectus to STEC's

5 "major enterprise-storage and enterprise-server OEM customers" included Fujitsu

6 and Compellent, as well as the five OEM customers previously referenced during

7 the 2009 first quarter conference call—EMC, IBM, HP, Hitachi and Sun.  The

8 second quarter earnings release stated that one of the "highlights" of STEC's 2009

9 second quarter had been "accelerated adoption of the ZeusIOPS SSDs into major

10 Enterprise-Storage and Enterprise-Server OEM customers including IBM, Fujitsu,

11 Compellent and HP."

12          **(b)    Subsequent Analyst Reports Reflected This Statement**

13      112.   Analysts' responses to STEC's assertion shows their understanding

14 that STEC was predicting continued revenue growth based on the Other OEMs

15 increasing their ZeusIOPS purchases during the second half of 2009.

16      113.   On August 3, 2009, an analyst report by Thomas Weisel Partners—

17 which billed Thomas Weisel as "Experts in Growth"—noted that STEC had given

18 an "upbeat outlook as the growth acceleration driven·by the enterprise-SSD

19 ZeusIOPS segment continues to ramp," and that "[t]he company expects . . .

20 enterprise storage OEMs [to] continue ramping."

21      114.   On August 4, 2009, an analyst report issued by ThinkEquity LLC

22 noted that STEC's product mix had shifted toward ZeusIOPS and that "[w]e

23 believe *2H09 should see* continuing upside to the consensus, with *ramps outside*

24 *EMC.*"

25      115.   Also on August 4, 2009, an analyst report issued by Capstone

26 Investments stated that "STEC's SSD revenue acceleration over the last 12-months

27 has been nothing short of phenomenal," ZeusIOPS revenues grew during the

28 second quarter "as largest customer EMC continues its appetite for adoption during

1    FY09," and "[f]urther customer acceleration is likely *during 2H09* as IBM, HPQ,

2    [Compellent] and Fujitsu all begin to ramp from sampling orders towards full

3    production."

4        116.   Also on August 4, 2009, an analyst report issued by Needham stated

5    "STEC's string of successes continued in the June quarter, with strong growth in

6    ZeusIOPS and impressive margins. We expect this trend to repeat as STEC's

7    customers ramp and deploy SSDs into the marketplace."

8        117.   On August 10, 2009, Wedbush Morgan ("Wedbush") initiated

9    coverage of STEC, with the analyst noting that STEC had "captur[ed] design wins

10    at leading OEMs" and had "secured a $120MM supply agreement with one of its

11    leading customers who we believe to be EMC." The analyst then added that "[w]e

12    expect due to STEC's monopoly of the fibre channel SSD market [*i.e.*, with

13    ZeusIOPS] that it will likely secure similar supply agreements with the company's

14    other Tier I OEMs. We expect these announcements to be positive catalysts *in the*

15    *near term* driving shares higher." Although ZeusIOPS' monopoly of the fibre

16    channel SSD market was a reason why any customer deciding to purchase a fibre

17    channel SSD would buy it from STEC, the *timing* of the expected supply

18    agreements reported by this analyst—"in the near term"—clearly reflected STEC's

19    prediction in the Prospectus of "continued growth in the sales of our Flash-based

20    SSD ZeusIOPS products *through 2009* based on the *accelerated adoption* of our

21    ZeusIOPS SSD *by most of our major enterprise-storage and enterprise-server*

22    *OEM customers* into their systems."

23        118.   On August 16, 2009, an analyst report issued by Deutsche Bank,

24    titled, "In the lead in a rapidly growing market," reported that, in addition to the

25    purchases of ZeusIOPS by EMC, "STEC is also *ramping* new business with IBM,

26    HP, Hitachi and Sun, and *we expect these customers' volumes to grow over the*

27    *next few quarters.*"

28

119.   On September 9, 2009, an analyst report issued by J.P. Morgan initiated coverage of STEC, describing it as "the high-growth story in our coverage universe and technology in general," and reporting as fact "the pending cascade of revenues as multiple OEM customers [of STEC's SSDs] prepare to ramp."

120.   Although, during the August 3, 2009, second quarter earnings conference call, Manouch did say that STEC's customers other than EMC were "maybe a quarter or two away from full ramping production," this statement did not contradict the statement in STEC's Prospectus that *increased sales were expected* from the OEMs other than EMC *during the second half of 2009*.  For one thing, the Exchange Act Defendants had never said that ZeusIOPS sales would only increase when customers were in full production.  On the contrary, the Exchange Act Defendants had consistently represented that increases in sales of ZeusIOPS could be expected quarter after quarter even in the absence of any OEM being in full production.  As early as during the 2008 second quarter earnings conference call, before STEC had announced that any of its five large OEM customers was in full production or that any of the large OEMs had even "qualified" ZeusIOPS for any system, Manouch had asserted that "we have shown *quarter after quarter* that Zeus growth is [an] absolute possibility and it is happening."  For another thing, on August 3, 2009, there were still five months— or almost two full quarters—left in 2009.  Therefore, it would be consistent with the Other OEMs being "a quarter or two away from full production" if they began transitioning to full production before the end of the year.  This is precisely the message received by the analyst from Capstone Investments, who reported on August 4, 2009, that "[f]urther customer acceleration is likely *during 2H09* as IBM, HPQ, CML and Fujitsu all begin to ramp from sampling orders *towards* full production."

1      **(c)      The Statement Was False**

2          121.   Contrary to the Exchange Act Defendants' statement that the Other

3  OEMs would increase their ZeusIOPS purchases during the second half of 2009,

4  ZeusIOPS purchases by the Other OEMs during the second half of 2009

5  *dramatically shrank*, from $42.2 million in the first half of 2009, to only $14.7

6  million in the second half of 2009.[7]

7          122.   The following table (with numbers representing millions) shows, for

8  each quarter of 2009, (1) total sales of ZeusIOPS, (2) sales of ZeusIOPS to EMC,

9  and (3) sales of ZeusIOPS to the Other OEMs:

|  | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 |
|---|---|---|---|---|
| Total ZeusIOPS Revenues | $25.7 | $57.7 | $60.7 | $74.0 |
| EMC's ZeusIOPS Purchases | $7.6 | $33.6 | $54.0 | $66.0 |
| **The Other OEMs' ZeusIOPS Purchases** | **$18.1** | **$24.1** | **$6.7** | **$8.0** |

16          123.   Moreover, as further explained, *infra*, at the time when the Exchange

17  Act Defendants stated that they expected sales of ZeusIOPS to the Other OEMs to

18  grow during the second half of 2009, the Exchange Act Defendants knew that their

19  statement was false, and knew that, contrary to their statement, such sales would

20  drop—and drop dramatically.

21      **(d)      The Statement Was Knowingly False When Made**

22          124.   As demonstrated, *infra*, the Exchange Act Defendants' knowledge, on

23  August 3, 2009, that sales to the Other OEMs would drop during the second half of

24  2009 is shown by the fact that, as of August 3, 2009, these Defendants already had

25

26  _____

27  [7] The amount of ZeusIOPS purchases by the Other OEMs has been calculated by subtracting the amount of ZeusIOPS purchases by EMC from the total amount of STEC's ZeusIOPS revenues.  The total amount of STEC's quarterly ZeusIOPS

28  revenues was disclosed during STEC's quarterly earnings conference calls.

1  ordered almost the exact amount of supplies—*i.e.*, inventory—that ultimately was

2  needed by STEC in order to sell the amount of ZeusIOPS to both EMC and the

3  Other OEMs that actually was sold during the second half of 2009, while leaving

4  STEC, at the end of 2009, with the amount of inventory on hand that, according to

5  the Exchange Act Defendants themselves, was optimal.

6             i.   **STEC's Knowledge of the Amount of Future**

7                  **Sales Was Greater for ZeusIOPS Than for**

8                  **STEC's Other Products**

9        125.  Starting prior to the Class Period, the Exchange Act Defendants made

10  clear to investors that their knowledge of the amount of future sales was greater for

11  ZeusIOPS than for their other products.

12       126.  On March 12, 2009, during the 2008 fourth quarter earnings

13  conference call an analyst asked Manouch, "[a]s your Zeus product line continues

14  to grow as a piece of your overall mix, is this enabling you with any level of

15  improved visibility within your business?" Manouch answered, "it does affect our

16  visibility positively." As an example of STEC's greater knowledge of future sales

17  when those sales are based on ZeusIOPS, Manouch then pointed out that, as of

18  March 12, "[w]e've already said that the first half this year, we think that we're

19  going to surpass what we did in last year."

20       127.  As an example of STEC's ability to accurately estimate future sales of

21  ZeusIOPS, during the 2008 third quarter earnings conference call, Manouch

22  pointed out that, as much as "6 quarters ago," STEC had estimated that sales of

23  ZeusIOPS for the year 2008 would total $50 million. Six quarters—one and a half

24  years—after making that estimate, during the 2008 fourth quarter earnings

25  conference call, the estimate apparently was verified, when STEC announced that

26  its ZeusIOPS sales for 2008 totaled $53 million.

27       128.  STEC's accurate knowledge of future demand for ZeusIOPS results

28  from the close collaboration between STEC and its ZeusIOPS customers, as

1   described by STEC in its January 14, 2008, press release regarding EMC, and by

2   Manouch during the 2008 third quarter earnings conference call—quoted, *supra*, in

3   paragraphs 51 and 91.[8]

4       129.   Without this close collaboration with its customers and the resulting

5   advance knowledge that STEC had of ZeusIOPS demand, STEC would not have

6   been able to implement what its 2008 10-K referred to as STEC's "strategy of

7   closely matching inventory levels with product demand."

8             **ii.   STEC Ordered Inventory in Advance, in Order**

9             **to Fill Expected ZeusIOPS Purchases**

10       130.   As disclosed in STEC's quarterly SEC filings, the majority of STEC's

11   inventory is comprised of the raw materials that STEC needs to build its products.

12   As also disclosed in STEC's quarterly SEC filings, in order to prepare for *expected*

13   *future sales* of ZeusIOPS, STEC makes "non-cancelable inventory purchase

14   *commitments*." Thus, as stated in STEC's 2009 10-K, filed on February 23, 2010,

15   STEC makes such "non-cancellable inventory purchase commitments as a result of

16   the actual and *anticipated* growth in *orders* for our ZeusIOPS products."

17       131.   Thus, during the 2008 second quarter conference call, on August 4,

18   2008, Manouch stated that, for STEC's SSDs, "[*w]e will see* good *purchase orders*

19   and forecasts from major OEMs that carry on up to first quarter of 2009 [*i.e.*,

20   through two full future quarters] and *as a result, we locked in all the material that*

21   *was needed for all of that purchase order*."

22       132.   In short, as soon as STEC knows the amount of its future ZeusIOPS

23   sales, STEC makes non-cancellable inventory purchase commitments sufficient to

24

25

26       _____

27   [8] As explained by CW2, the former Chief Technologist for Storage and Data Management at Sun, when an OEM requires supplies of SSDs, it is to the advantage of the OEM to give its supplier advance notice of its requirements, in

28   order to avoid any bottlenecks in the chain of supply.

1 provide for those sales; and STEC usually knows the amount of its future
2 ZeusIOPS sales at least two quarters in advance of completing the sales.

3     133. In addition to calibrating its non-cancelable inventory purchase
4 commitments to support its future ZeusIOPS sales, STEC also calibrates its non-
5 cancelable inventory purchase commitments so as to leave STEC with a certain
6 amount of inventory at the end of each quarter. On May 11, 2009, during the 2009
7 first quarter earnings conference call, Manouch was asked whether STEC was
8 planning on changing its inventory level. Manouch responded "I think our
9 inventory will remain in the $40 million range. I think that is our goal, to keep it in
10 the $40 million range."

11              **iii.**    **At the Time When the Prospectus Was Issued,**
12                     **STEC had Ordered the Amount of Inventory**
13                     **Actually Needed for the Sales Subsequently**
14                     **Made During the Second Half of 2009**

15     134. Based on information from STEC's quarterly reports for the 2009
16 second, third and fourth quarters, the following chart shows both the amount of
17 inventory ordered in a given quarter for future use, and the amount of inventory
18 actually used in a given quarter to support the sales made in that quarter. The
19 amount of inventory ordered for future use is the amount of "non-cancellable
20 inventory purchase commitments." The amount of inventory actually used in a
21 given quarter to support the sales made in that quarter is, essentially, the "cost of
22 revenues" for that particular quarter.

| STEC Revenues and Inventory ($ 000's) | | | |
|---|---|---|---|
| **Reporting Period** | **2Q 2009** | **3Q 2009** | **4Q 2009** |
| **Net revenues** | 86,350 | 98,293 | 106,004 |
| **Cost of revenues** | 43,177 | **49,478** | **52,078** |
| **Non-cancelable inventory purchase commitments** | **103,222** | 6,859 | 14,177 |
| **Inventory** | 37,656 | 35,555 | **42,739** |

135.   As shown in the preceding chart, the cost of STEC's revenues—*i.e.*, the amount of inventory actually used by STEC in order to make its sales—in the third and fourth quarters of 2009 was, in turn, $49.5 million and $52 million. Therefore, for the entire second half of 2009, STEC's cost of revenues was ***$101.5 million***.

136.   As also shown in the preceding chart, the non-cancelable inventory purchase commitments made by STEC in *advance* of the second half of 2009, during the second quarter of 2009, was ***$103 million***, almost exactly equal to the cost of the total sales that STEC actually made during the second half of 2009.

137.   Moreover, during the 2009 third quarter when STEC was falsely announcing that it expected ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, STEC's non-cancelable inventory purchase commitments were a de minimis $6.9 million—which was just enough to bring STEC's total inventory on hand at the end of 2009 to $42.7, almost exactly equal to the $40 million goal announced by Manouch during the 2009 first quarter earnings conference call.

138.   If, in August, when they made their misstatements, the Exchange Act Defendants had really expected ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, they would have ordered inventory sufficient to

1   support such increased sales.  Instead, at the same time when the Exchange Act

2   Defendants were publicly stating an expectation that sales to the Other OEMs

3   would *increase*, they were ordering just enough inventory to provide for sales of

4   ZeusIOPS to the Other OEMs that would ***drop by more than $27 million*** during

5   the second half of 2009, as compared to the first half of 2009.

   (e)   **Investors Were Surprised When the Truth Was**
6
   **Partially Disclosed on November 3, 2009**
7
         i.   **Sales to the Other OEMs Were *Down* and**
8
              **Would Not Recover During 2009**
9

10         139.  On November 3, 2009, during STEC's 2009 third quarter earnings

11  conference call, Manouch not only admitted that the EMC Agreement was a "one-

12  off type of a deal," but also, that "the rest of the [ZeusIOPS] account did not come

13  along as fast as we had anticipated.  So, therefore, ***their numbers were down***."

14         140.  Manouch added that IBM's purchases of ZeusIOPS "dropped off

15  significantly in the third quarter" and that Sun's purchases of ZeusIOPS were

16  below "normal volumes."

17         141.  Also during the November 3, 2009, conference call, and in STEC's

18  2009 third quarter earnings release—filed on the same day—STEC issued its

19  fourth quarter revenue guidance.  The increase in fourth quarter revenues predicted

20  by this guidance—only $2.7 to $4.7 million—was substantially less than the

21  expected increase in fourth quarter sales to EMC under the EMC Agreement—$12

22  million.  Because any increased sales of ZeusIOPS during the fourth quarter

23  therefore would be attributable to the EMC Agreement, there would be no fourth

24  quarter recovery of ZeusIOPS sales to the Other OEMs.  Moreover, because there

25  would be no recovery of ZeusIOPS sales to the other OEMs during the fourth

26  quarter, ZeusIOPS sales to the Other OEMs during the entire second half of 2009

27  were not even going to *match* the level of such sales during the *first half* of 2009,

28

1  much less would there be any *increase* in such sales as compared to during the first
2  half of 2009.

3              ii.    **The Other OEMs had Not Even Started**
4                     **Building Systems Incorporating ZeusIOPS**

5      142.   One analyst noted that these results were contrary to the Exchange
6  Act Defendants' prior representations regarding their ability to forecast ZeusIOPS
7  sales. The analyst stated: ***"Your visibility seems to have changed. I don't want***
8  ***to, I guess, use any adjectives. Let's just say it's changed***, but when do you
9  believe the prior visibility returns. Is it really going to solely revolve around your
10 largest customer or have there been some other dynamics that have kind of
11 changed your near-term visibility here?"

12     143.   Responding to this question, Manouch disclosed for the first time that
13 *the Other OEMs had not even started "building in SSDs into their systems*," and
14 that, for practical purposes, *they could not even be considered customers.*
15 Manouch stated, "you really can't have very good visibility with having one single
16 customer. . . . we'll get to extremely good visibility once the IBMs, the Suns, the
17 Hitachi Data Systems and the HPs of the world come along and start building in
18 SSDs into their systems as well."

19     144.   When another analyst suggested that most of the Other OEMs "aren't
20 selling to any degree yet," Manouch responded, "exactly." Then Manouch added
21 that "five customers worldwide dominate the whole enterprise storage markets, and
22 that's EMC, IBM, Hitachi Data Systems, HP, and Sun," and that STEC would be
23 "back to the races" when these OEMs' "customers start seeing systems with SSDs
24 on board."

25     145.   Given Manouch's prior statement that STEC and one of its ZeusIOPS
26 customers had needed "over a year of daily and weekly meetings . . . to optimize
27 the performance of our [ZeusIOPS] products with [the customer's] system," the
28 Exchange Act Defendants already knew at the time of their misstatements on