August 3, 2009, that, as Manouch admitted three months later, the Other OEMs had not yet started to build ZeusIOPS into their systems.[9] Nevertheless, on August 3, 2009, not only did the Exchange Act Defendants falsely state that sales of ZeusIOPS to the Other OEMs were expected to increase during the second half of 2009, but also, they even failed to warn investors that the Other OEMs had not yet begun to build ZeusIOPS into their systems.

### iii.   IBM Was Only Offering ZeusIOPS as an Option, Not as a Standard Feature

146.   Asked by another analyst why IBM's ZeusIOPS "ramp is slow," Manouch disclosed for the first time that IBM was only "selling SSDs as an option" rather than as a standard part of the IBM system.  Manouch stated: "Selling SSDs as an option versus as part of the product is quite difficult. . . . If you're going out there and SSD is the first thing that you are offering your customer in terms of an upgrade for your system, that might change their mind."

### iv.   Analysts Expressed Surprise

147.   The November 3, 2009, disclosures that the Other OEMs were not going to increase their ZeusIOPS purchases during the second half of 2009 caught investors by surprise.

148.   Thus, an analyst report about STEC issued by Oppenheimer on November 3, 2009, stated that STEC's "results/outlook" for the third/fourth quarters were "worrisome," and that the "Q4(Dec.) outlook for $101-$103 in rev [was] even more troubling."  The analyst went on to say "[t]he trouble is twofold: 1) sell-through at primary customer EMC, 2) longer inception in new business at

---

[9] On November 10, 2008, when a STEC spokesperson described having had "over a year of daily and weekly meetings . . . to optimize the performance of our [ZeusIOPS] products within [our customer's] system," he was describing what he considered to be standard procedure for sales of ZeusIOPS.  His point was that the need for such a lengthy and intimate cooperation between the SSD seller and its customer was a "big barrier to entry," and, as Manouch added, "one of the reasons why you don't see too many competitors come into this market."

1   HPQ/IBM. *Both were linchpins of our Outperform thesis; now they go out the*

2   *window*."

3       149.   Another analyst report about STEC issued on November 4, 2009—

4   this one by Wedbush—was titled "Down for the Count After Last Night's

5   Blindsided Knock out Punch; Downgrade to Neutral and Reducing PT to $18." In

6   addition to noting the fact that EMC "had likely built inventory of [STEC's]

7   flagship ZeusIOPS," the report described "Q4 guidance" as "disappointing," and

8   stated "we were *completely caught off guard* by the stall in the adoption rates of

9   SSDs and its negative impact to near-term earnings and revenue."

10       150.   Still another analyst report about STEC issued on November 4,

11   2009—this one by B. Riley—focused on both the disclosure about EMC and

12   "sputtering demand from STEC's other enterprise storage customers." The report

13   noted that "another stumbling block in the period is IBM, which still is expected to

14   be the next storage customer to embrace SSDs in volume. IBM . . . is not

15   generating meaningful revenues yet—in part, STEC stated, due to the fact that *Big*

16   *Blue is marketing the drives as an option vs. coming out and leading upgrade*

17   *sales efforts with SSDs*."

18       151.   Finally, an analyst report about STEC by J.P. Morgan issued on

19   November 18, 2009, noted that, during the November 3, 2009, earnings conference

20   call, "STEC attempted to convey [the] message . . . . that enterprise SSD adoption

21   is still in the *early days* of the adoption phase," and that "[a]s a result, we think

22   investors are *better prepared for more bumps* along the way *until multiple OEMs*

23   *beyond EMC take product*." The report added that "STEC's stock stands to

24   languish pending greater clarity on the EMC and IBM ramps."

25

26

27

28

      **(f)**     **Investors Were Surprised Again, When the
Truth Was More Completely Disclosed on
February 23, 2010**

152.   On February 23, 2010, during its 2009 fourth quarter and year-end earnings conference call, STEC reported its 2009 fourth quarter ZeusIOPS revenues—$74 million—which confirmed that sales of ZeusIOPS to the Other OEMs during the second half of 2009 had sharply declined from what such sales had been during the first half of 2009; and that ZeusIOPS sales to the Other OEMs in the 2009 fourth quarter were no more than 33% of what such sales had been in the 2009 second quarter.

153.   Also on February 23, 2010, in STEC's fourth quarter/end of year earnings release, and during the 2009 fourth quarter/end of year earnings conference call, STEC issued its revenue guidance for the first quarter of 2010— $33 to $35 million.  That guidance disclosed that ZeusIOPS sales to the Other OEMs would not recover even during the 2010 first quarter, and that the Exchange Act Defendants' misstatement regarding expected growth of such sales during the second half of 2009 was a highly material misstatement, and not just an estimate that had been off by a month or two.  Because, on February 23, 2010, STEC also announced that no revenue from EMC was expected in the 2010 first quarter, this meant that the estimate of $33 to $35 million was an estimate of the total amount of 2010 first quarter revenue that STEC was expecting to receive from its non-EMC customers for all of STEC's products.  This was at least $17.8 million less than the amount of non-EMC related revenue that STEC had received during the second quarter of 2009.

154.   Also on February 23, 2010, during STEC's fourth quarter earnings conference call, Manouch made a disclosure showing that the statement in the Prospectus about expected growth in ZeusIOPS sales to the Other OEMs had been wrong by *at least* half a year.  Thus, an analyst noted that "it sounds like you're not

1   expecting any [2010 first quarter] revenue from EMC.  But do you expect some

2   revenue from some of your other Zeus customers?"  Without any apparent basis,

3   Manouch initially responded that "[o]n the rest of the customers, everyone is

4   growing very slowly."  Then, more revealingly, he added, "we put second half of

5   this year as the time to see growth again in this market."

6          155.   Investors were surprised by both the 2009 fourth quarter results and

7   the 2010 first quarter revenue guidance as both of these applied to the Other

8   OEMs.

9          156.   Thus, on February 24, 2010, a Needham report on STEC stated it was

10  "revising estimates lower once more" because, among other reasons, fourth quarter

11  ZeusIOPS revenue was "below our original estimate."  This meant revenue from

12  the Other OEMs—not from EMC—was below what Needham had expected,

13  because analysts had known since the third quarter what the amount of fourth

14  quarter revenues from EMC would be, because revenues from EMC for the second

15  half of 2009 had been fixed by the EMC Agreement.

16         157.   Thus also, on February 24, 2010, J.P. Morgan lowered its STEC stock

17  price target to $12.50 from $42, after noting that STEC's 2010 first quarter revenue

18  guidance was more than $60 million below J.P. Morgan's prior estimate.  Because,

19  after STEC's November 3, 2009, disclosures, investors already knew that EMC

20  would not be purchasing as much as $60 million in the 2010 first quarter, at least a

21  portion of J.P. Morgan's prior overestimate of STEC's 2010 first quarter revenues

22  had been an overestimate of revenues from the Other OEMs.  J.P. Morgan

23  commented that "the disappearance of sustainable revenue momentum up-ended

24  our prior view" and that "[t]he flow-through effects of this reset are staggering to

25  the overall model, which is why we are downgrading to Neutral."

26

27

28

1
2
3

      **(g)**    **Too Late to Benefit Class Members, the Exchange Act Defendants Added a Key Cautionary Statement to Their Quarterly SEC Filings**

158.   STEC's 2009 10-K was issued on the last day of the Class Period, February 23, 2010.  In this 10-K, for the very first time, the Exchange Act Defendants added the following cautionary statement:

> [O]ur SSDs are currently offered as options in our customers' systems.  Therefore, the demand for these SSDs is unpredictable and fully dependent on end user requirements.  Unless and until our SSDs are offered as a standard feature in our customers' systems, our demand visibility will continue to be limited.

159.   The same statement has appeared in every subsequent 10-Q filed by STEC.  Thus, as late as November 2, 2010—a full fifteen months after the Exchange Act Defendants issued their false statement in the Prospectus that they expected increased sales of ZeusIOPS to the Other OEMs during the second half of 2009, the Exchange Act Defendants are still warning investors that STEC's SSDs are being offered only as "options" rather than as "a standard feature" in the systems of STEC's customers.  Investors who purchased STEC's stock during the Class Period never had the benefit of this warning.

      **2.**    <u>**The Prospectus Omitted to Disclose That IBM Would Not Begin Purchasing for Volume Production During the Second Half of 2009, and Was Not Marketing ZeusIOPS as a Standard Feature in Its Systems**</u>

160.   Shortly before the start of the Class Period, on May 11, 2009, during the 2009 *first* quarter earnings conference call, while talking about IBM's purchases of ZeusIOPS, Manouch stated "we feel that come third quarter, they will go in full production in all of these products."

161.   Subsequently, on August 3, 2009, the message that IBM would soon be increasing its purchases of ZeusIOPS was reinforced by a statement in STEC's 2009 second quarter earnings release that a "highlight" of the 2009 *second* quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage and Enterprise Server OEM customers, including IBM" and several Other OEMs.

162.   Also on August 3, 2009, the Exchange Act Defendants issued the Prospectus, which stated that "[w]e expect *continued growth* in the sales of our Flash-based SSD ZeusIOPS products *though 2009* based on the accelerated adoption of our ZeusIOPS SSDs *by most of our major enterprise-storage and enterprise-server OEM customers* into their systems."

163.   The Prospectus was misleading because, in addition to the fact that, as explained, *supra*, the Exchange Act Defendants did *not* expect ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, the Prospectus also failed to disclose that IBM was not expected to reach full production of systems incorporating ZeusIOPS at any time during the second half of 2009, and that IBM was offering ZeusIOPS only as an option, and not as a standard feature in its systems.

164.   For the same reasons that, on August 3, 2009, the Exchange Act Defendants knew that ZeusIOPS sales to the Other OEMs were not going to increase during the second half of 2009—and, in fact, would decline during the second half of 2009—they also knew that IBM was not going to reach full production of systems incorporating ZeusIOPS at any time during the second half of 2009, and, in fact, would decrease its purchases during the 2009 third quarter.

165.   Although, during the 2009 second quarter earnings conference call, which also took place on August 3, 2009, Manouch stated that the Other OEMs "are taking a *little bit* longer than expected in terms of full production," he did not disclose that sales to IBM were actually expected to drop during the 2009 third

1  quarter, and that IBM was not expected to reach full production at any time within
2  the second half of 2009.

3      166.   Manouch also failed to disclose that IBM was offering ZeusIOPS only
4  as an "option," and not as a standard feature in its systems, the reason that
5  Manouch subsequently gave when asked during the November 3, 2009, third
6  quarter conference call "why [IBM's] ramp is slow."

7      167.   Because of STEC's intimate relationship with its OEM customers—
8  especially as regards the design of the OEMs' systems—the Exchange Act
9  Defendants already knew, at the time of the issuance of the Prospectus, that IBM
10  was offering ZeusIOPS only as an "option" and not as a standard feature in their
11  systems.

12      168.   The failure of the Exchange Act Defendants to qualify the statement
13  in the Prospectus about increased sales to the Other OEMs during the second half
14  of 2009 as it regarded IBM was a materially misleading omission, as shown by the
15  fact that, subsequent to STEC's issuance of the Prospectus, on September 9, 2009,
16  a J.P. Morgan analyst report discussing STEC's ZeusIOPS customers stated that
17  "we look for IBM to ramp to volume in 2H 2009."

18      **3.   STEC's September 10, 2009, Letter to the SEC Falsely**
19          **Represented That One or More of the Other OEMs Was**
20          **Ready to Purchase ZeusIOPS in Quantities Equivalent to**
21          **Those Being Purchased Under the EMC Agreement**

22      169.   On September 10, 2009, in its publicly filed response to the SEC's
23  inquiries concerning STEC's contracts with EMC, STEC stated that "in the
24  unlikely event a customer should default under a purchase order or other sales
25  agreement, STEC generally believes it could find a replacement customer for the
26  relevant product." This statement was intended to address STEC's then-current
27  sales agreements, as well as STEC's past sales agreements, as shown by the fact
28  that the statement was made in the present tense.

170.   This statement was knowingly false when made because, as subsequently disclosed, during STEC's November 3, 2009, third quarter earnings conference call, the Exchange Act Defendants knew that none of STEC's other customers could have replaced EMC under the EMC Agreement.  Thus, during the November 3, 2009, conference call, Manouch confirmed an analyst's statement that STEC's other large customers besides EMC "aren't selling to any degree yet" and added that they were all "*a year behind*" EMC.

171.   Moreover, during the November 3, 2009, earnings conference call, when an analyst asked "are you expecting any other supply agreements from any of your other qualified customers," Manouch responded "I would say that IBM would be the next guy that comes along," while also admitting that IBM's purchases of ZeusIOPS—which had never been described by STEC as rising to the level of volume production—had "*dropped off significantly* in the third quarter," and that, at present, IBM could not even be considered a "customer."[10]

### 4.   The Exchange Act Defendants' False Statement About Sun Supports Their Scienter for Their Misrepresentations About the Other OEMs, and Their Omissions About IBM

172.   Shortly before the start of the Class Period, on May 11, 2009, during STEC's first quarter earnings conference call, in a series of statements, Manouch falsely represented that Sun already was in "full production" of systems incorporating ZeusIOPS.

173.   First, Manouch stated that all of the five biggest enterprise storage OEMs had qualified ZeusIOPS, including EMC, Sun, IBM, HP and Hitachi.

174.   Second, Manouch stated that "for now we only have *two* customers in full production."

---

[10] Manouch stated "you can't have very good visibility with having one single customer. . . . we'll get to extremely good visibility once the IBMs [and other OEMs besides EMC] come along and start building in SSDs into their systems."

175.   Third, and finally, Manouch stated that IBM, Hitachi and HP "are not in full production."

176.   As a result of these statements, investors could only conclude that EMC and Sun were *both* in "full production" of systems incorporating ZeusIOPS. For example, on May 12, 2009, an analyst report about STEC published by Oppenheimer stated that "EMC and Sun has [sic] started volume production of ZeusIOPS-based storage servers."  Also on May 12, 2009, another analyst report about STEC, published by Capstone Investments, stated that "[c]urrent momentum is being driven primarily by two current customers (SUN/EMC)."

177.   Information provided by a knowledgeable confidential witness establishes that Manouch's statements on May 11, 2009, about Sun already having started "full production" of systems incorporating ZeusIOPS were knowingly false when made.

178.   Confidential Witness 2 ("CW2") was an employee at Sun from January 1999 through June 2009.  From January 2005 through June 2009, he was Sun's Chief Technologist for Storage and Data Management.  According to CW2, in the Spring of 2009, Sun purchased less than 100 Zeus SSDs from STEC, at approximately $1,000 per unit—a total purchase of only $100,000—for use solely for testing and development in Sun's series 7000 Unified Storage System. According to CW2, up until his departure from Sun, at the end of June 2009, Sun had never ordered ZeusIOPS for volume production.

179.   Given the importance of ZeusIOPS to STEC, Manouch's key role at STEC, and his comprehensive knowledge of STEC's ZeusIOPS business—as demonstrated during STEC's earnings conference calls—Manouch cannot have been unaware that his statement about Sun was false.

180.   Manouch's subsequent efforts to disguise the falsity of his statements during the 2009 first quarter earnings conference call further supports his scienter for these false statements.

181.   Thus, during STEC's 2009 second quarter earnings conference call, while investors were distracted by the news regarding the EMC Agreement, Manouch dropped his assertion that *two* of STEC's customers were in full production—without acknowledging that he was saying anything new—and stated that "*one* customer [is] in production, four customers are *still in pre production*."

182.   Still later, during STEC's 2009 third quarter earnings conference call, when he was forced to admit that ZeusIOPS sales to the OEMs other than EMC had declined, Manouch gave an explanation about the lack of ZeusIOPS sales to Sun that essentially reiterated his previous false statement that Sun had been ordering ZeusIOPS for full production:

> In terms of **Sun, obviously Sun has been a very large customer for us over the past few quarters**. We've hit a snag with a deal [*i.e.*, a merger] that they are involved in at this point. And once that gets through—solved, we feel that we'll be back to the normal volumes that we have been doing.

183.   Manouch's willingness to knowingly make false statements about Sun, both before and during the Class Period, provides additional support for his scienter regarding STEC's false statement in the Prospectus that STEC expected increased sales to the OEMs other than EMC during the second half of 2009, and for STEC's omission to qualify the statement in the Prospectus specifically as it regarded IBM.

### C.   The Exchange Act Defendants Artificially Inflated STEC's 2009 Second Quarter Revenue

184.   STEC marketed itself to investors as, first and foremost, a "growth" company—*i.e.*, a company producing steady revenue growth. Thus, in each of its 10-Q's filed during the Class Period, STEC stated at an early point in "Management's discussion and analysis of financial condition and results of

operations" that STEC is "focusing on certain revenue growth initiatives." Thus too, in its earnings releases for each of the first three quarters in 2009, in order to stress the continuing growth of its revenues, STEC compared its quarterly revenues, not only to its revenues from the previous year's same quarter, but also to its revenues from the immediately preceding quarter.

185.   After falling in the fourth quarter of 2008, STEC's reported revenues increased in the 2009 first quarter by 11.6%. On May 11, 2009, at the same time that STEC reported its first quarter results, STEC also predicted that 2009 second quarter revenues would increase again, this time by 7%-10%. Investors responded by bidding up STEC's stock price by 31%.

186.   When investors are expecting a company to continuously report revenue growth, a decline in the rate of growth or even a continuation of the same rate of growth may not be enough to keep the company's stock price rising, or even enough to prevent it from falling. Thus, despite the 2009 first quarter revenue growth reported by STEC on May 11, 2009, one month later, on June 10, 2009, an analyst report about STEC by B. Riley *downgraded* STEC to "neutral," stating, "we believe the easy money has been had, and now is a good time to take some STEC off the table."

187.   Less than a week after the B. Riley downgrade, on June 16, 2009, STEC issued a press release announcing that it was increasing its 2009 second quarter revenue guidance by an additional $14 million—so that second quarter revenue was now predicted to exceed first quarter revenue by 29%-32%. Later in the year, on November 2, 2009, looking back, a Capstone Investments analyst report would note that "[p]reviously during '09, when investor expectations turned more bearish STEC management delivered increased estimate expectations (June '09)."

188.   As was also true for every other quarter in 2009, the amount of revenue that STEC ultimately reported for the 2009 second quarter slightly

exceeded STEC's final "guidance" for the quarter. As a result of meeting and slightly exceeding the guidance that STEC issued on June 16, 2009, STEC was able to report record revenue growth in the quarter that ended just prior to the Offering. In fact, STEC's 2009 second quarter revenue was reported on the same day that the Offering was announced.

189.   As explained further, *infra*, the Exchange Act Defendants were able to increase STEC's 2009 second quarter revenue guidance by $14 million because, at the time when STEC issued its increased guidance for the 2009 second quarter, the Exchange Act Defendants were taking steps to generate $14 million worth of unearned income and undisclosed channel stuffing by manipulating STEC's second quarter deliveries to the Other OEMs, and then manipulating the accounting for those deliveries. The manipulation of STEC's second quarter deliveries to the Other OEMs is shown by the statements of confidential witnesses who were employed at STEC during the 2009 second quarter. The fact that these manipulated deliveries were used to increase STEC's 2009 second quarter reported revenue with $14 million of unearned income and undisclosed channel stuffing is shown by the fact that, subsequent to the 2009 second quarter, revenue from the Other OEMs plunged, and it plunged by exactly $14 million—the same amount by which the Exchange Act Defendants had increased STEC's 2009 second quarter guidance.

1.   **The Exchange Act Defendants Inflated STEC's 2009 Second Quarter Revenue With Unearned Income and Undisclosed Channel Stuffing Based on Shipments to Customers Other Than EMC**

190.   Information provided by confidential witnesses who worked at STEC during the 2009 Second Quarter shows that, during the 2009 second quarter, STEC's shipments to its customers other than EMC involved practices generally

used to facilitate inflating reported revenues, including the methodical generation of unearned income,[11] and undisclosed channel stuffing.

191.   Confidential Witness 3 ("CW3") worked at STEC from June 2004 until July 2009, including through the entire 2009 second quarter.  She was coordinator of sales to Hewlett-Packard and in 2009 reported to Lorenzo Salhi, who reported directly to Manouch Moshayedi.  CW3 said she saw Manouch Moshayedi on a daily basis.

192.   CW3 has stated that STEC sent HP defective products and falsified the failure rate in order to make STEC's sales numbers for the second quarter of 2009.  When STEC tested the modules, 35 (or about 10%) failed.  Mr. Salhi replaced the failed modules and returned them to HP in May or June of 2009, with a report that falsely stated only two of the units had failed.  HP shipped these modules to its customers, where they again failed.  CW3 said the modules were shipped back to HP because STEC needed to make its numbers for that month or quarter.  CW3 said that Manouch Moshayedi told Mr. Salhi, "I don't care what you have to do, get those modules back to HP."

193.   Another way in which the Exchange Act Defendants created unearned income was by sending customers unwanted product.  For example, CW3 reported that when Hewlett-Packard received from STEC a shipment in which 10% of the products failed, HP placed STEC on a "world wide stop shipment" hold.  Manouch

---

[11] Under the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"), which interprets FASB Concepts Statement No. 5 ("Con 5"), which, in turn, summarizes GAAP rules regarding revenue recognition, "revenue should not be recognized until it is realized or realizable and earned," and such a condition does not exist unless "delivery has occurred or services have been rendered" *and* "collectibility is reasonably assured."  Under SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with Generally Accepted Accounting Principles [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Each of STEC's Forms 10-Q filed during 2009 also contained a statement that "the accompanying interim condensed consolidated financial statements of STEC . . . have been prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') for interim financial information."

1  Moshayedi nonetheless ordered that replacement product be shipped to HP.

2  According to CW3, the modules were shipped to HP in May or June of 2009

3  because STEC needed the sales that month/quarter.  When HP received the

4  modules, HP's procurement engineer "hit the roof" and said that STEC should not

5  have shipped them.

6      194.   STEC's 2009 10-K admits that "product returns would increase our

7  inventory and reduce our revenues."

8      195.   Still another deceptive practice used by STEC to create unearned

9  revenues was to "ship bricks," or empty boxes, so that they could record revenue

10  from those phantom shipments to meet revenue goals.  Confidential Witness 4

11  ("CW4"), who was a STEC Field Application and Sales Engineer from September

12  2007 until November 2009, including during the entire 2009 second quarter,

13  confirmed that it was STEC's practice to engage in "shipping bricks" or wrong

14  product to customers.

15      196.   The Exchange Act Defendants also artificially inflated STEC's

16  revenue by pressuring customers to advance into the current quarter their purchases

17  of product that they would not need until a later quarter, and by failing to disclose

18  this "channel stuffing" to investors.  Thus, CW3 reported that Manouch Moshayedi

19  directed her boss, Lorenzo Salhi, to pull all sales of product to Cisco from a future

20  quarter in 2009 to an earlier quarter.

21      197.   CW3 stated that she was told by a Sales Director, who reported to

22  Manouch Moshayedi and who attended sales meetings with Manouch Moshayedi,

23  that at those sales meetings, Manouch would tell everyone to push sales from a

24  future quarter to the present quarter.  This was done to make the current quarter

25  look good.  CW3 stated that Manouch "had his hands on everything when it came

26  to sales."

27      198.   CW3 stated that she was told by a STEC salesperson, who worked in

28  Houston on the HP account and reported to Lorenzo Salhi (and who was in charge

of Cisco sales), that "Cisco must take everything this quarter" because he wanted "grand numbers" that quarter.

> **2.   The Collapse of STEC's Revenue in the 2010 First Quarter Shows That STEC's 2009 Second Quarter Revenue Was Inflated by $14 Million Regarding Sales to Customers Other Than EMC**

199.   After the 2009 second quarter, STEC's revenue growth slowed significantly, from 36% in the second quarter, to 14% in the third quarter, to 7% in the fourth quarter. Finally, in the first quarter of 2010, STEC's revenue collapsed, dropping 63.4%, to $38.8 million.

200.   STEC's 2009 fourth quarter earnings release conceded that STEC did not expect "any meaningful production orders" from EMC during the 2010 first quarter. Thus, STEC's 2010 first quarter revenue represents the amount of STEC revenue obtained from sources other than EMC, and in the absence of such revenue inflating activities as the confidential witnesses observed during the second quarter of 2009.

201.   Based on the statement in STEC's Form 424B3 filed on August 3, 2009, that EMC accounted for 38.9% of STEC's 2009 second quarter revenue, STEC's 2009 second quarter revenue derived from sources *other* than EMC was $52.8 million. This is precisely $14 million more than the revenue from non-EMC sources reported by STEC in the 2010 first quarter.

202.   The $14 million by which STEC's reported revenue for the 2009 second quarter exceeds STEC's reported revenue for the 2010 first quarter is exactly equal to the amount by which the Exchange Act Defendants had increased STEC's 2009 second quarter revenue guidance on June 16, 2009.

203.   This remarkable symmetry is strong evidence that STEC's 2009 second quarter revenue was knowingly inflated by $14 million using the techniques reported by the confidential witnesses herein.

**D.     The Exchange Act Defendants Inflated STEC's Revised 2009**
**Second Quarter Revenue Guidance**

204.    Before the market opened on June 16, 2009 (the beginning of the Class Period), the Exchange Act Defendants issued a press release announcing a $14 million increase in revenue guidance for the second quarter of 2009.  First quarter revenue had been $63.5 million, previous guidance for the second quarter was $68-70 million, and the increased second quarter guidance was for revenue of $82-84 million—an increase of $14 million.

205.    On STEC's June 16 announcement, the price of the Company's stock increased 27% in a single day to close at $22.88 per share, a $4.86 increase from the prior day's closing price of $18.02, on extraordinarily high trading volume of 10.4 million shares.  For the same reasons as explained, *supra*, showing that the revenue subsequently reported for the second quarter of 2009 was inflated by the Exchange Act Defendants by $14 million, so too this revenue guidance was inflated, and, therefore, knowingly false.

**V.    ADDITIONAL ALLEGATIONS OF SCIENTER**

**A.     After Inflating the Price of STEC's Stock, Defendants Manouch**
**and Mark Moshayedi Engaged In Massive Insider Selling**

206.    After falsely fueling a doubling of the price of STEC stock from $18.02 per share on June 16, 2009, to $35.50 per share on August 11, 2009, Defendants Manouch and Mark Moshayedi timely unloaded nine million shares of STEC common stock.[12]  This sale reaped a windfall for the Company's top two executives of $267.8 million in a single day, while their collective ownership of the Company decreased from 35.5% to 17.4%.

---

[12] Forms 4 filed by Mark and Manouch on August 13, 2009, list August 11 as the "Transaction Date" for the sale of all nine million shares.  The Offering was announced on August 3, 2009, priced on August 6, 2009, and closed on August 11, 2009.

207.   The Moshayedis' Class Period stock sell-off was the biggest insider stock liquidation in the history of STEC, and a departure from the pattern of their other recent sales of STEC stock.  Defendant Manouch Moshayedi sold no stock in 2008 and sold only 400,000 shares in March 2009 for proceeds of $3 million. Mark Moshayedi sold only 466,292 shares in June 2008 and another 400,000 shares in March 2009, for proceeds of $6.5 million and $3 million, respectively. The number of shares sold by the Moshayedis in the Offering was collectively more than eleven times the number of shares they sold in the six months before the Class Period and nearly twenty times the number of shares they sold in all of 2008.

208.   The Moshayedis had been planning to sell STEC stock since shortly before making the first of their alleged misstatements and omissions.  Thus, on May 29, 2009, without mentioning anything about the number of shares involved, a STEC press release stated that Manouch and Mark had adopted "pre-arranged stock trading plans" under Rule 10b5-1 to sell a portion of their stock "over a period of 18 months."  Approximately two weeks later, the Exchange Act Defendants made their first Class Period misstatement, when STEC issued its revised 2009 second quarter revenue guidance.[13]

209.   After the Exchange Act Defendants had issued their string of misstatements and the price of STEC's stock had doubled, on August 3, 2009, during STEC's second quarter earnings conference call, Defendant Cook announced that the Moshayedis had cancelled their 10b5-1 plans, and would sell their stock in a single secondary offering—which closed eight days later.

210.   Subsequently, after the November 3, 2009, disclosures, a commentator on the much followed Seeking Alpha website observed that "the

---

[13] The Moshayedis' retired brother, Mike, STEC's former President, sold $25 million of his stock in June and July 2009, beginning the day after STEC issued its increased second quarter revenue guidance.  Within one week after the announcement, Mike unloaded over one million shares.

1   market found it too coincidental that top management made such a substantial sale

2   of stock in the very quarter they blew up."

3        211.   During the November 3, 2009, conference call, another analyst asked

4   Manouch "are you considering buying any [of the stock] back?"

5        212.   Still later, after the February 23, 2010, disclosures and the collapse of

6   STEC's stock price to $10.27, a *Barron's* article sarcastically observed that the

7   Moshayedis now "look[ ] prescient" for having "sold 9 million shares—at $31

8   a piece."

9    **B.**    **As STEC's Stock Price Began to Collapse, the SEC Launched a**

10            **Formal Investigation of the Moshayedis' Stock Sales**

11       213.   Following STEC's November 3, 2009, disclosures the SEC instituted

12   a formal investigation into insider trading at STEC.  The Company's 2009 Form

13   10-K, filed on February 23, 2009, disclosed for the first time:  "The [SEC] is

14   conducting a formal investigation involving trading in our securities.  Certain of

15   our officers and employees, including our CEO [Manouch] and President [Mark],

16   have received subpoenas in connection with the SEC's investigation."  According

17   to STEC's most recent 10-Q, filed on November 2, 2010, the SEC investigation is

18   still on-going.

19   **C.**    **Only Days After Disclosing the SEC Investigation, STEC Made**

20            **Golden Parachutes Available to the Officer Defendants**

21       214.   On February 26, 2010, just a few days after STEC advised the market

22   that certain of its officers were under investigation by the SEC, the Company

23   announced that it had terminated its existing Severance and Change in Control

24   Agreements and entered into new Severance and Change in Control Agreements

25   that provided additional benefits for the Officer Defendants should they be

26   terminated without cause or should they terminate their own employment after a

27   change in control at the Company.  These benefits include so-called "golden

28

1  parachutes"—a prorated annual bonus and accelerated vesting of stock options—if

2  they leave the Company within twelve months of a change of control.

3      **D.**    **Each of the Exchange Act Defendants' False Statements and**

4          **Omissions Involved One of STEC's Core Operations**

5      215.   Each of the Officer Defendants was a top executive involved in

6  STEC's daily operations and with access to all material information regarding the

7  Company's core operations.  Therefore, each of the Officer Defendants is

8  presumed to have had knowledge of all material facts regarding STEC's core

9  operations.

10      216.   Each of the false statements alleged herein involved a core operation

11  of STEC.

12      217.   During the August 3, 2009, earnings conference call, Cook referred to

13  ZeusIOPS as STEC's "signature" product.  During the same conference call,

14  Manouch made statements showing that STEC was forecasting ZeusIOPS revenue

15  for the 2009 third quarter to comprise between 69% and 72% of STEC's total

16  revenue.

17      218.   EMC was STEC's principal customer.  According to STEC's

18  Form 424B3 filed on August 3, 2009, during the second quarter of 2009, EMC

19  accounted for 38.9% of all STEC's revenues.  During the November 3, 2009,

20  conference call, Defendant Manouch stated "EMC still remains our top customer"

21  and that EMC accounted for 90% of ZeusIOPS sales.

22      219.   STEC considered the Other OEMs to be potentially as important to

23  STEC as EMC.  Thus, during the August 3, 2009, conference call, Manouch

24  referred to the five top OEM customers, including EMC, as "low hanging fruit,"

25  and stated that "[w]e've only picked one fruit at this point, and there are four more

26  fruits left."

27      220.   STEC marketed itself to investors as, first and foremost, a "growth"

28  company—*i.e.*, a company producing steady revenue growth.  STEC posted on its

website an article by Paul Shread, published on August 4, 2009, stating that "[t]he most interesting detail to come out of STEC's quarterly earnings report last night [*i.e.*, on August 3, 2009] is just how much growth may still lie ahead for the enterprise solid state (SSD) drive maker."

**E.    Each Officer Defendant Had a Motive and Opportunity to Commit Fraud**

221.   Each of the Moshayedis had a motive to commit fraud in order to reap his roughly half share of the $267.8 million obtained from the Offering.  Of the 9 million shares sold in the Offering, 4.9 million were Mark's, and roughly 4.1 million were Manouch's.

222.   Cook had a motive to commit fraud in order to please the Moshayedis. Cook had been hired by STEC only recently—just nine months before the Offering—and, unlike the Moshayedis, was neither a director nor a major shareholder.[14]  He therefore had a motive to curry favor with these two brothers who had founded the firm, and who, together, represented an unrivaled source of influence and control within the company.

223.   As the Company's most senior officers, and for the other reasons detailed herein, each of the Officer Defendants had a clear opportunity to commit fraud.

**VI.   THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS RELATING TO THE EXCHANGE ACT CLAIMS**

**A.    June 16, 2009 Press Release**

224.   On June 16, 2009, the first day of the Class Period, the Exchange Act Defendants issued a press release containing revenue guidance for the 2009 second quarter of "82-84 million."  This was an increase of $14 million over the previous guidance issued for the 2009 second quarter.

---

[14] At the time of the Offering, Cook did not own any STEC stock.

62    SECOND CONSOLIDATED  AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

**B.    July 16, 2009 Press Release**

225.   On July 16, 2009, the Exchange Act Defendants issued a press release stating that STEC had signed an agreement with "one of its largest enterprise storage customers for sales of $120 million of ZeusIOPS SSDs in the second half of 2009." The press release also quoted Defendant Manouch Moshayedi's statement that the agreement had been made possible by the fact that "sales of [the purchaser's] enterprise storage system utilizing our ZeusIOPS drives have grown significantly."

**C.    August 3, 2009, SEC Filings**

    **1.    2009 Second Quarter Earnings Release**

226.   On August 3, 2009, STEC issued its 2009 second quarter earnings release which stated that STEC had signed a "$120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer for the second half of 2009."

227.   STEC's 2009 second quarter earnings release also reported second quarter revenue of $86.4 million, and failed to disclose that $14 million of this total was comprised of unearned income and undisclosed channel stuffing.

    **2.    Form 424B3 (Prospectus)**

228.   Also on August 3, 2009, STEC filed a Form 424B3 (the Prospectus) stating, among other things:

> We expect continued growth in the sales of our Flash-based SSD ZeusIOPS products though 2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our major enterprise-storage and enterprise-server OEM customers into their systems.

The foregoing passage was a misstatement concerning the Other OEMs. The foregoing passage also contained misleading material omissions concerning IBM.

229.   The passage quoted in paragraph 228, *supra*, also was part of the following, longer passage, which was a misstatement/omission regarding the EMC Agreement:

> We expect continued growth in the sales of our Flash-
> based SSD ZeusIOPS products though 2009 based on the
> accelerated adoption of our ZeusIOPS SSDs by most of
> our major enterprise-storage and enterprise-server OEM
> customers into their systems.  As part of this expected
> growth, on July 16, 2009 we announced an agreement
> with one of our largest enterprise-storage customers for
> sales of $120 million of ZeusIOPS SSDs to be delivered
> in the second half of 2009.

### 3.   Second Quarter 10-Q

230.   Also on August 3, 2009, STEC filed its 2009 second quarter 10-Q, which reported revenue for the second quarter of $86.4 million, and failed to disclose that $14 million of this total was comprised of unearned income and undisclosed channel stuffing.

### D.   September 10, 2009, Publicly Filed Letter to the SEC

231.   On September 10, 2009, STEC publicly filed with the SEC a letter to the SEC, signed by Defendant Raymond Cook, stating that "in the unlikely event a customer [of STEC] should default under a purchase order or other sales agreement [with STEC], STEC generally believes it could find a replacement customer for the relevant product."

## VII.   LOSS CAUSATION ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS

### A.   The November 3, 2009, Partial Corrective Disclosures

232.   In reaction to multiple corrective disclosures made after the market closed on November 3, 2009, shares of STEC common stock plunged $9.01 per

1    share to close at $14.14 per share on November 4, 2009, a one-day decline of 39%

2    on extraordinary volume of 32 million shares.

3        **1.**    **Disclosure That the EMC Agreement Was Not an Ordinary**

4        **Course Contract Indicative of Purchases by EMC Expected**

5        **to Recur**

6        233.   One substantial cause of the November 4, 2009, stock price decline

7    was the disclosure that the $120 million EMC Agreement was a one off contract

8    that had satisfied EMC's requirements for more than just the second half of 2009,

9    and not an ordinary course contract indicative of a new, higher volume of recurring

10   purchases by EMC. *Compare* ¶¶ 66-80, *supra*.

11       234.   Thus, on November 4, 2009, in a report entitled, ***"Down for the***

12   ***Count After Last Night's Blindsided Knock Out Punch,"*** Wedbush slashed its

13   STEC stock price target to $18 from $39 per share "following STEC's surprising

14   revelation last night on its Q3 earnings call that its leading SSD customer (EMC)

15   had likely built inventory of its flagship ZeusIOPs," and cut its rating to "Neutral"

16   from "Outperform." Earlier that same day, but prior to STEC's startling

17   disclosure, Wedbush had reiterated an "Outperform" rating for STEC and assigned

18   a $39 price target, emphasizing STEC's "strong demand for ZeusIOPS at its

19   leading Tier 1 customer EMC."

20       235.   Also on November 3, 2009, Oppenheimer slashed its STEC stock

21   price target in half to $21 from $45, said "we would not be surprised if bears

22   pounce," downgraded STEC from "Outperform" to "Perform," and explained that

23   "[t]he trouble is twofold," with one of the two problems being "sell-through at

24   primary customer EMC."

25       236.   Also on November 4, 2009, a *Barron's* article titled "STEC crushed

26   by EMC issue; three bullish analysts give up," stated that "STEC shares are being

27   ravaged today after the company warned investors yesterday that excessive

28

1  inventory of ZeusIOPS solid-state drives sold to customer EMC could hurt demand

2  in the early part of 2010."

3      237.   On November 16, 2009, a commentator on the Seeking Alpha internet

4  site concluded that a "major reason" for the "market reaction" to the November 3

5  disclosure regarding EMC was the appearance that a fraud had been perpetrated by

6  STEC's management:

7          **Concern over management integrity and credibility:**

8          Whether management knew about the demand/inventory

9          issue in advance or not, ***the market found it too***

10          ***coincidental*** that top management made such a

11          substantial sale of stock in the very quarter they blew up.

12      **2.**    **Disclosure That Sales to the Other OEMs Were Not**

13            **Expected to Increase During the Second Half of 2009**

14      238.   A second substantial cause of the November 3, 2009, stock price

15  decline was the disclosure that ZeusIOPS sales to the Other OEMs were not

16  expected to increase during the second half of 2009. *Compare* ¶¶ 110-20, *supra*.

17      239.   Thus, a November 4, 2009, report by *ABC News/Money* led with the

18  statement that "Shares of Stec Inc. tumbled ahead of regular trading Wednesday

19  after the company gave a weak outlook for the rest of the year," noting that

20  revenue for the 2009 third quarter was "up," but "the company's revenue forecast

21  for the rest of the year fell short [of what] analysts polled by Thomson Reuters

22  were looking for."  Because the market had known since the 2009 third quarter

23  essentially what EMC's purchases would be in the 2009 fourth quarter (because

24  they had been determined by the EMC Agreement), it was the disclosure of the

25  falsity of STEC's stated expectation regarding fourth quarter sales to the Other

26  OEMs that had caused the drop in STEC's stock price, according to this report.

27      240.   Similarly, the Oppenheimer report issued late on November 3, 2009,

28  which slashed its STEC stock price target in half to $21 from $45, said "[t]he

1  trouble is twofold:  1) sell-through at primary customer EMC, 2) *longer inception*

2  *in new business at HP/IBM.  **Both*** were linchpins of our Outperform thesis; now

3  they go out the window."

4      241.  Also similarly, on November 4, 2009, J.P. Morgan cut its STEC stock

5  price target from $50 to $42, and stated that "STEC's stock stands to languish

6  pending greater clarity on the EMC and IBM ramps."

7      242.  Also similarly, the November 4, 2009, *Barron's* article, which led

8  with a statement about the EMC Agreement, stated in its second sentence, "Adding

9  to the pressure, the company warned on its post-earnings conference call that

10  business has been slow as well at both IBM and Sun Microsystems."

11      243.  The November 4, 2009, Wedbush report which slashed its STEC

12  stock price target from $39 to $18 also saw the EMC issue as part of a bigger

13  problem involving STEC's other customers as well.  The report focused on

14  "disappointing top line Q4 guidance," stated "we were completely caught off guard

15  by the stall in the adoption rates of SSDs and its negative impact to near-term

16  earnings and revenue," and advised that "investors move to the sidelines" until

17  there is greater visibility on, among other things, "customer production ramps"—

18  using the plural "ramps."

19      **3.  Disclosure That IBM Was Not Expected to Begin**

20      **Purchasing for Volume Production in the Second Half of**

21      **2009, and Was Not Offering ZeusIOPS as a Standard**

22      **Feature in Its Systems**

23      244.  A third substantial cause of the November 3, 2009, stock price decline

24  was the disclosure that STEC had no expectation that IBM would commence

25  volume production of a ZeusIOPS during the second half of 2009, and that IBM

26  was not selling ZeusIOPS as a standard feature in its systems.  *Compare* ¶¶ 160-68,

27  *supra*; *see also* ¶¶ 139-41, 146, 150.

28

67  SECOND CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)