LATHAM & WATKINS LLP
   Patrick E. Gibbs, Bar No. 183174
   *patrick.gibbs@lw.com*
   Chris W. Johnstone, Bar No. 242152
   *chris.johnstone@lw.com*
140 Scott Drive
Menlo Park, California 94025
Telephone: +1.650.328.4600
Facsimile: +1.650.463.2600

LATHAM & WATKINS LLP
   Michele D. Johnson, Bar No. 198298
   *michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235
Facsimile: +1.714.755.8290

Attorneys for Defendants STEC, Inc.,
Manouch Moshayedi, Mark Moshayedi,
Raymond D. Cook, and Rajat Bahri

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 8:09-cv-01304-JVS (MLG)<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:   Hon. James V. Selna<br>Court:   10C<br>Date:    June 13, 2011<br>Time:    1:30 p.m. |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
SECOND AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................. 2

    A.    STEC's Business .......................................................................... 2

    B.    Increasing Demand For STEC's Products In Early 2009 ................... 5

    C.    The $120 Million EMC Agreement ....................................................... 5

    D.    The Secondary Offering ........................................................................ 6

    E.    The EMC Inventory Holdover ............................................................... 7

    F.    The SEC's Comment Letter ................................................................... 8

III.  ARGUMENT ......................................................................................... 9

    A.    Plaintiff's Exchange Act Claims Fail .................................................. 9

        1.    The $120 Million EMC Agreement ....................................... 10

        2.    STEC's Revenue & Revised Guidance For 2Q09 .................. 14

        3.    Sales To Other OEM Customers ........................................... 16

            a.    The August 3, 2009 Prospectus .................................... 17

            b.    The Comment Letter Response To The SEC ................ 21

        4.    Plaintiff's Additional Scienter Allegations Are Inadequate .................................................................................. 24

    B.    Plaintiff's Securities Act Claims Fail .................................................. 27

IV.   CONCLUSION ..................................................................................... 28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

i

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
SECOND AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page**

## CASES

*Backhaus v. Streamedia Commc'ns, Inc.*,
  No. 01 CIV 4889, 2002 WL 1870272 (S.D.N.Y. Aug. 14, 2002) .................. 26

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ....................................................... 21

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) .......................................................... 15

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .................................................................. 19, 20

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) .......................................................................... 21

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2006) .................................................................................. 9, 10

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v.
  Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004) ................................................................. 11, 20

*In re AirGate PCS, Inc. Sec. Litig.*,
  389 F. Supp. 2d 1360 (N.D. Ga. 2005) ........................................................... 26

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ................................................................... 12, 18

*In re CellCyte Genetics Sec. Litig.*,
  No. C08-0047, 2009 WL 3103892 (W.D. Wash. Sept. 24, 2009) .................. 13

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................ 12

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ................................................................... 10, 13

*In re Dot Hill Sys. Corp. Sec. Litig.*,
  No. 06-CV-228, 2009 WL 734296 (N.D. Cal. Mar. 18, 2009) ....................... 12

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) .......................................................... 24

*In re iPass, Inc. Sec. Litig.*,
  No. C 05-00228, 2006 WL 496046 (N.D. Cal. Feb. 28, 2006) ......................... 9

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

ii

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
SECOND AMENDED COMPLAINT

*In re PXRE Group, Ltd. Sec. Litig.*,
 600 F. Supp. 2d 510 (S.D.N.Y. 2009) .............................................................. 24

*In re Rackable Sys., Inc. Sec. Litig.*,
 No. C09-0222, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010) .......................... 25

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) ..................................................................... 9, 23

*In re Sketchers U.S.A., Inc. Sec. Litig.*,
 No. CV 03-02094, 2004 WL 108174 (C.D. Cal. May 10, 2004) .................... 12

*In re U.S. Aggregates*, *Inc. Sec. Litig.*,
 235 F. Supp. 2d 1063 (N.D. Cal. 2002) .......................................................... 15

*In re Vantive Corp. Sec. Litig.*,
 283 F.3d 1079 (9th Cir. 2002) .................................................................. 23, 27

*Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*,
 701 F.2d 1276 (9th Cir. 1983) ........................................................................ 27

*Lipton v. Pathogenesis Corp.*,
 284 F.3d 1027 n.15 (9th Cir. 2002) ................................................................ 10

*Metzler Inv. GMBH v. Corinthian Coll.*, *Inc.*,
 540 F.3d 1049 (9th Cir. 2008) .................................................................. passim

*Pittleman v. Impac Mortgage Holdings*, *Inc.*,
 No. 07-0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) .............................. 25

*Provenz v. Miller*,
 102 F.3d 1478 (9th Cir. 1996) .................................................................. 12, 18

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) ........................................................................... 26

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001) .................................................................... 23, 24

*Rubke v. Capitol Bancorp, Ltd.*,
 551 F.3d 1156 (9th Cir. 2009) ........................................................................ 19

*South Ferry LP v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) .......................................................................... 25

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008) ......................................................................... 10, 20, 21

*Zucco Partners, LLC v. Digimarc Corp*,
 552 F.3d 981 (9th Cir. 2009) ................................................................ 15, 16, 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATUTES**

15 U.S.C § 78u-5(c)(1)(B)...................................................................................9, 13

15 U.S.C. § 78u-4(b)(1) ...........................................................................................9

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................................9

**RULES**

SEC Rule 10b-5 ........................................................................................................ v

Fed. R. Civ.  P. 12(b)(6) .......................................................................................... v

Fed. R. Civ. P. 8(a) ................................................................................................. v

Fed. R. Civ. P. 9(b)........................................................................................v, 1, 26

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
SECOND AMENDED COMPLAINT

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on June 13, 2011, at 1:30 p.m. before the Honorable James V. Selna, United States District Judge, located at the Ronald Reagan Federal Building and U.S. Courthouse, 411 West Fourth Street, Courtroom 10C, Santa Ana, California 92701, Defendants STEC, Inc. ("STEC" or "the Company"), Manouch Moshayedi, Mark Moshayedi, Raymond D. Cook, and Rajat Bahri (collectively, "Defendants") will and hereby do move for an Order dismissing the Second Consolidated Amended Complaint For Violation Of The Federal Securities Laws ("SAC") filed by lead plaintiff, The State of New Jersey, Department of Treasury, Division of Investment ("Plaintiff"). This Motion is made pursuant to: (1) Federal Rules of Civil Procedure 12(b)(6), 9(b), and 8(a); and (2) the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that the SAC fails to state a claim for violations of Sections 10(b), 20(a), or 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder and violations of Sections 11, 12(a) or 15 of the Securities Act of 1933 (the "Securities Act"). Defendants hereby join the Motion to Dismiss filed by the Defendants Barclays Capital Inc., Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., and Oppenheimer & Co., Inc. (the "Underwriter Defendants") and incorporate the papers filed and arguments made by the Underwriter Defendants.

The Motion is based on this Notice, the Memorandum of Points and Authorities, the Defendants' Request for Judicial Notice, the Declaration of Christopher W. Johnstone and the exhibits attached thereto, the SAC, the Court's record in this matter as may be considered by the Court, and the arguments of counsel. This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 10, 2011.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

v

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
SECOND AMENDED COMPLAINT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Plaintiff's Second Amended Complaint ("SAC") should be dismissed. The SAC does not cure any of the defects that led to this Court's January 10, 2011 Order dismissing Plaintiff's prior Amended Complaint. Simply put, Plaintiff's claims remain what they have always been: a baseless attempt to characterize a temporary and unforeseen slowdown in sales for STEC, Inc. as a fraud. But Plaintiff's SAC does not tell a coherent story of the alleged fraud, much less one that meets the demanding pleading standards of the Private Securities Litigation Reform Act ("PSLRA") or Federal Rule of Civil Procedure 9(b).

Plaintiff's core claim is that Defendants committed securities fraud by allegedly predicting that, after the expiration of a $120 million supply agreement for the second half of 2009, STEC's largest customer, EMC, would continue buying products at the same rate in 2010, when in fact it did not. But STEC never offered any predictions about sales to EMC after 2009. Plaintiff's core fraud claim, in other words, rests on a series of misrepresentations about what Defendants said. Plaintiffs have not alleged any facts, much less particularized facts, suggesting that Defendants made any false or misleading statements about the EMC Agreement.

Similarly, Plaintiff claims that Defendants committed securities fraud by predicting that sales to customers other than EMC would increase during the second half of 2009, when in fact they did not. But again, none of the challenged statements predicted increased sales to customers other than EMC during the second half of 2009. Defendants told the market that STEC expected to see an increase in total sales of its ZeusIOPS product during the second half of 2009, and it did. This claim, too, simply misrepresents what Defendants said about sales to customers other than EMC. Stripped of those misrepresentations, Plaintiff's claim regarding sales to customers other than EMC fails.

Finally, Plaintiff claims that Defendants committed securities fraud by

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

1

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    inflating STEC's reported revenues for the second quarter of 2009. But Plaintiff
2    does not allege any facts from which the Court could infer the amount of the
3    alleged inflation, and so Plaintiff has failed to plead that STEC's reported revenues
4    were false. Moreover, this claim is based entirely on statements attributed to two
5    "confidential witnesses," neither of whom is even alleged to have had personal
6    knowledge of how the practices they allegedly observed affected STEC's reported
7    revenues, and neither of whom is alleged to have had any personal interaction with
8    any individual Defendants. Nor does Plaintiff allege any facts from which the
9    Court could infer that the market ever learned the "truth" about STEC's second
10   quarter 2009 revenues. Accordingly, Plaintiff has failed to allege loss causation as
11   to this claim.

12       At bottom, Plaintiff's SAC contains very little in the way of new allegations,
13   and certainly nothing that cures the pleading defects that led to the dismissal of the
14   Amended Complaint. The SAC should likewise be dismissed for failure to state a
15   claim. Given that plaintiffs in this case have now filed a total of four different
16   complaints, moreover, the SAC should be dismissed with prejudice.

17   **II.    FACTUAL BACKGROUND**[1]

18       **A.    STEC's Business**

19       STEC is a leading provider of enterprise-class flash solid-state drives
20   ("SSDs"). (SAC ¶ 26.) Manouch Moshayedi is STEC's Chairman and Chief
21   Executive Officer. (*Id.* ¶ 6.) Mark Moshayedi is STEC's President, Chief
22   Operating Officer, Chief Technical Officer and Secretary. (*Id.*) Mike Moshayedi,
23   one of STEC's founders, no longer works at STEC, but he remains a significant
24   shareholder. (*Id.*) Raymond D. Cook is STEC's Chief Financial Officer. (*Id.* ¶ 30.)

25   _____

26   [1]  This factual background is based upon the allegations in the SAC and
     documents subject to judicial notice. *See* Request for Judicial Notice filed
27   concurrently herewith. The exhibits cited herein as "Ex." are exhibits to the
     Declaration of Christopher W. Johnstone, attached to the Request for Judicial
28   Notice.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   Rajat Bahri is a STEC director and chair of the STEC Board's Audit Committee.
2   (*Id.* ¶ 33.)

3        STEC's flagship product is the ZeusIOPS SSD, which is a solid-state
4   memory drive that is used in high-end, enterprise-scale computer systems. (*Id.* ¶ 5;
5   Ex. M at 42.) The introduction of STEC's ZeusIOPS SSD in 2007 represented a
6   major milestone in the new and evolving market for flash-based SSD products.
7   (Ex. M at 41.) STEC markets its ZeusIOPS drives as a faster and more reliable
8   alternative to traditional hard disk drives, delivering enhanced performance, better
9   reliability, and significant energy savings. (Ex. N at 47.)

10       Because STEC's ZeusIOPS SSD products are relatively new, STEC has
11  cautioned investors about the many risks and uncertainties associated with its
12  business. STEC has warned investors, for example, that potential customers must
13  pass through many stages before they actually incorporate STEC's SSD products
14  into their own products for sale to end user customers: "The typical production
15  cycle consists of a design stage followed by a prototype stage and ends with full
16  production of the final product." (Ex. N at 49.) In describing this process, STEC
17  has specifically cautioned that its "product development is inherently risky" and
18  that "it will take some time for these new standards and products to be adopted, for
19  customers to accept and transition to these new products and for significant sales to
20  be generated from them, if this happens at all." (Ex. N at 56; Ex. Y at 258.)
21  Further, STEC has warned the market about the potential for "delays in the
22  development and introduction of new products" and explained that customers may
23  take many months to "test, evaluate and adopt" STEC's products, and may take
24  many more months "to begin volume production of equipment that incorporates
25  our products." (*Id.*) Indeed, after STEC's largest customer, EMC, qualified STEC's
26  products, it took another fifteen months before STEC announced that EMC had
27  reached the full production phase. (Ex. M at 41; Ex. Q at 165.) And STEC has
28  warned investors that, even if a customer selects STEC's products for its system,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  STEC has "no assurance that the customer will ultimately bring its product to
2  market or that such effort by our customer will be successful." (Ex. N at 56; Ex. Y
3  at 258.)

4     STEC has also disclosed the risks associated with selling to a very small
5  number of customers who sell the high-end computer systems for which ZeusIOPS
6  is designed, which include EMC, Sun Microsystems, IBM, and Dell. (Ex. CC at
7  387, 410; Ex. N at 46, 59.) STEC has warned that "[t]he loss of, or a significant
8  reduction in purchases by, any of our major customers could materially harm our
9  business, financial condition and results of operations." (Ex. N at 55.) Likewise,
10 STEC has cautioned investors that it may experience "changes in the composition
11 of our major customer base from quarter to quarter as the market demand for our
12 customers' products have changed and [that] we expect this variability to continue
13 in the future." (Ex. N at 50; *see also* Ex. V at 190; Ex. Z at 308, 323.)

14    Finally, STEC has repeatedly emphasized that it has only a "limited" ability
15 to forecast its customers "fluctuating" demand in the SSD market. (Ex. CC at 403;
16 Ex. N at 54.) STEC has stated that "[t]he market for enterprise Flash-based SSD
17 products is relatively new and evolving, which makes it difficult to forecast end
18 user adoption rates, and customer demand for our products." (Ex. Y at 253.) As
19 such, "[i]t is difficult to accurately predict what or how many products our
20 customers will need in the future." (Ex. P at 153; Ex. V at 204; Ex. Z at 327; Ex. N
21 at 56.) STEC has specifically warned that its sales could be affected by "inventory
22 buildups by customers" (Ex. N at 54), that "excess inventory held by [its]
23 customers [may reduce] future demand for [STEC's] products…" (Ex. T at 185),
24 and that "[c]ustomers may change, cancel or delay orders with limited or no
25 penalties." (Ex. N at 56.) For these reasons, STEC does not provide the market
26 with long-term earnings guidance. Instead, STEC provides guidance only for one
27 quarter at a time, often when the quarter is already well underway. (*See* Exs. O, R,
28 T, X, BB.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

4

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

**B.    Increasing Demand For STEC's Products In Early 2009**

In early 2009, STEC saw a surge in demand for its products.  On March 12, 2009 – near the end of the first quarter of STEC's 2009 fiscal year – STEC announced that it expected to generate $58 million to $60 million in revenue for 1Q09. (Ex. O at 139.) On May 11, 2009, STEC announced that its results for the first quarter exceeded this guidance. (Ex. R at 175.) STEC also announced that, for 2Q09, it expected to generate $68 million to $70 million in revenue. (SAC ¶ 204; Ex. R at 176.) On June 16, 2009, STEC increased its 2Q09 guidance to a range of $82 million to $84 million. (SAC ¶¶ 204, 224.) On August 3, 2009, STEC announced that results for 2Q09, which had not yet benefited from the second half of 2009 EMC Agreement, had exceeded the revised guidance STEC had provided on June 16, 2009. (Ex. X at 238-39.) STEC also issued its guidance for the third quarter of 2009, projecting revenue of $95 million to $97 million. (Ex. X at 239.) STEC ultimately exceeded this guidance, too. (Ex. BB at 379.)

**C.    The $120 Million EMC Agreement**

On July 16, 2009, STEC issued a press release announcing that one of its largest enterprise storage customers (later revealed to be EMC) had agreed to purchase "$120 million of ZeusIOPS SSDs in the second half of 2009." (Ex. U at 186.) It also stated that "sales of [EMC's] enterprise storage system utilizing our ZeusIOPS drives have grown significantly over the past few years." (*Id.*)[2] The press release described the key terms of the EMC Agreement, namely, the total dollar amount of the commitment ($120 million), the product category (ZeusIOPS SSDs), and the timing (second half of 2009). (*Id.*) STEC's August 3, 2009 earnings release also referred to the EMC Agreement, stating STEC had signed a "$120

---

[2]    The press release states that sales of EMC's systems "have grown significantly *over the past few years.*" Yet the SAC repeatedly cuts the italicized language from that sentence without indicating it has done so. (*Compare* Ex. U at 186 *with* SAC ¶¶ 68, 225.) Thus, the release did not describe EMC's future sales, as Plaintiff tries to suggest; it alluded to EMC's past growth in sales.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

5

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  million dollar contract to supply ZeusIOPS to a major Enterprise-Storage customer

2  for the second half of 2009." (Ex. X at 238; SAC ¶¶ 73, 226.) In announcing the

3  EMC Agreement, STEC did not say how much product EMC would actually use

4  during the second half of 2009, nor did it say anything about the level of EMC's

5  purchases after the second half of 2009. (*Id.*)

6  　　　　**D.　　The Secondary Offering**

7  　　　　On August 3, 2009, STEC announced that it would issue a secondary

8  offering of stock owned by Manouch and Mark Moshayedi, underwritten by four

9  major investment banks (the "Secondary Offering"). Since founding STEC,

10 Manouch and Mark Moshayedi had retained a substantial ownership interest in the

11 Company. (Ex. G at 30; Ex. H at 32.) They began to diversify their holdings in

12 2003, when they reduced their aggregated total ownership from about 55.9% to

13 about 41.2%. (Ex. I at 34; Ex. J at 36; Ex. K at 38; Ex. L at 40.) Long before the

14 Secondary Offering, as part of their long-term strategy for asset diversification,

15 estate planning and liquidity, Manouch and Mark Moshayedi had entered into

16 10b5-1 trading plans to sell a large portion of their STEC stock over eighteen

17 months, starting on or after August 15, 2009, as certain staggered, pre-determined

18 price thresholds were met. (Ex. S at 178.) But before any shares could be sold

19 under these plans, STEC's stock price rose above all of the pre-determined price

20 thresholds (Ex. EE), which would have triggered a very large sale on August 15,

21 2009, rather than the orderly, staggered sales that had been contemplated prior to

22 entering into the 10b5-1 trading plans when the expectation was that STEC's stock

23 price would gradually increase over time. It was to prevent such a sale that

24 Manouch and Mark Moshayedi cancelled their plans and instead sold their stock

25 through the orderly bank-underwritten Secondary Offering. (Ex. Y.)

26 　　　　The Secondary Offering was accompanied by a Registration Statement and

27 Prospectus containing 54 pages of public disclosures. (Ex. Y; SAC ¶ 304-05.) In

28 discussing the EMC Agreement, the August 3, 2009 Prospectus stated: "We expect

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    continued growth in the sales of our Flash-based SSD ZeusIOPS products through

2    2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our

3    major enterprise-storage and enterprise-server OEM customers into their systems.

4    As part of this expected growth, on July 16, 2009 we announced an agreement with

5    one of our largest enterprise-storage customers for sales of $120 million of

6    ZeusIOPS SSDs to be delivered in the second half of 2009." (SAC ¶¶ 74, 229; Ex.

7    Y at 284.) As in the July 16, 2009 announcement of the EMC Agreement, STEC

8    did not provide any estimate as to how much product EMC would use in the

9    second half of 2009, nor did STEC say anything about its expectations for

10   purchases by EMC after the second half of 2009. (*Id.*) The Prospectus did,

11   however, include lengthy and detailed cautionary language about the risks and

12   uncertainties of STEC's business. (Ex. Y at 252-67.)

13          After the offering, Manouch and Mark Moshayedi retained about 17.4%

14   ownership of STEC (Ex. Y at 269), and they remain two of its largest shareholders.

15   (Ex. DD at 508.) In the five weeks following the Secondary Offering, STEC's

16   stock price rose to $42.50 per share. (Ex. EE at 510.)

17          **E.     The EMC Inventory Holdover**

18          On November 3, 2009, STEC announced that it had recently received

19   preliminary indications that EMC might carry inventory of ZeusIOPS into the first

20   quarter of 2010. (SAC ¶ 79.) On an analyst call that day, a key topic was how long

21   the EMC inventory holdover was expected to last. One analyst asked, "you have

22   engineers co-located with EMC, [so you] *probably* have a pretty good insight

23   [into] what was actually pulled off the shelf in the third quarter." (Ex. AA at 353.)

24   (emphasis added). Manouch Moshayedi answered, ". . . We *don't know* exactly

25   how many they shipped across each system in Q3." (*Id.*) (emphasis added).

26   Manouch Moshayedi emphasized that STEC did not know the extent of EMC's

27   holdover: "Unfortunately, we don't have exact numbers from our customer," "We

28   really don't have a good estimate of what EMC has done in Q3 and to this date in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  Q4," "[EMC doesn't] tell us how much inventory they've got," "We really *don't*
2  *know* . . . It's very difficult for us still to tell at this point in time the amount of
3  inventory that [EMC will] have at the end of the year." (Ex. AA at 344, 362, 369.)
4  On February 23, 2010, STEC reported that it expected EMC's inventory carryover
5  to continue through the first half of 2010. (SAC ¶ 81.)

6        **F.      The SEC's Comment Letter**

7              On August 28, 2009, in a routine periodic review and comment on STEC's
8  Form 10-K for 2008, the Securities and Exchange Commission's ("SEC") Division
9  of Corporate Finance requested an explanation of STEC's dependence on sales to
10 EMC during 2008. Specifically, the SEC asked STEC why it had not attached
11 contracts made with EMC in 2008 to its Form 10-K for that year. (Ex. A at 9.) On
12 September 10, 2009, STEC explained, in its SEC comment letter response, that
13 sales to EMC during that time period (fiscal year 2008) were made through
14 individual purchase orders, not an overarching agreement. (Ex. B at 18.) The SEC
15 responded on September 30, 2009, asking STEC to describe the size of EMC's
16 purchase orders in 2008. (Ex. C at 20-21.) STEC responded that the amounts of the
17 2008 purchase orders ranged from $450 to $5.2 million dollars. (Ex. D at 24.) On
18 October 20, 2009, the SEC sent STEC a letter closing its review without further
19 comment. (Ex. E at 26.) The SEC correspondence regarding sales to EMC focused
20 entirely on purchase orders made by EMC in 2008. (Ex. A at 7; Ex. B at 12; Ex. C
21 at 20; Ex. D at 22.) It never referred to the $120 million EMC Agreement for sales
22 in the second half of 2009. (*Id*.)

23             Moreover, STEC's correspondence with the SEC was not released to the
24 public until well after the SEC closed its review of the matter. Pursuant to SEC
25 policy, "[c]orrespondence will be released not less than 45 days after the staff has
26 completed a filing review." (Ex. FF at 511.) Because the SEC closed its review on
27 October 20, 2009 (Ex. E at 26), its correspondence with STEC was not available to
28 the public until, at the earliest, December 4, 2009. Consequently, the SEC

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  correspondence was available to the public only *after* Manouch Moshayedi let
2  investors know on November 3, 2009 that other original equipment manufacturer
3  ("OEM") customers had not started selling systems using ZeusIOPS. (SAC ¶¶ 170-
4  71.)

5  **III.   ARGUMENT**

6      Plaintiff claims that, between June 16, 2009 and February 23, 2010 (the
7  "Class Period"), Defendants made a series of misleading statements relating to: (1)
8  the EMC Agreement; (2) STEC's revenues and revised guidance for 2Q09; and (3)
9  STEC's sales to other OEM customers. (SAC ¶¶ 224-31.) On that basis, Plaintiff
10 asserts claims under Sections 10(b), 20(a), and 20A of the Exchange Act. Plaintiff
11 also alleges that the Registration Statement and Prospectus for the Secondary
12 Offering contained misleading statements relating to the same three subjects. (*Id.*
13 ¶¶ 304-24.) On that basis, Plaintiff asserts claims under Sections 11, 12(a)(2), and
14 15 of the Securities Act.

15     **A.     Plaintiff's Exchange Act Claims Fail**

16     To state a claim under Section 10(b) of the Exchange Act, Plaintiff must
17 allege: (1) a material misrepresentation; (2) scienter; (3) a connection with the
18 purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss
19 causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

20     Under the PSLRA, the first element – falsity – requires Plaintiff to specify
21 "each statement alleged to have been misleading" and "the reason or reasons why
22 the statement is misleading…." 15 U.S.C. § 78u-4(b)(1). Under the PSLRA's Safe
23 Harbor, "forward-looking" statements are not actionable if they are accompanied
24 by "meaningful cautionary statements identifying important factors that could
25 cause actual results to differ materially from those in the forward-looking
26 statements." *In re iPass, Inc. Sec. Litig.*, No. C 05-00228, 2006 WL 496046, at *5
27 (N.D. Cal. Feb. 28, 2006).

28     To plead scienter, Plaintiff must "state with particularity facts giving rise to a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

9

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    strong inference that [Defendants] acted with the required state of mind." 15

2    U.S.C. § 78u-4(b)(2)(A). For statements of current fact, this requires Plaintiff to

3    plead "in great detail" "specific facts" that demonstrate Defendants made the

4    allegedly false statements either intentionally or with deliberate recklessness. *In re*

5    *Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). For forward-

6    looking statements, Plaintiff must allege that Defendants had "actual knowledge"

7    that the statements were false when made. 15 U.S.C § 78u-5(c)(1)(B); *In re Cutera*

8    *Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). The SAC fails to meet these

9    "formidable pleadings requirements." *Metzler Inv. GMBH v. Corinthian Colls.,*

10   *Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).

11        To plead loss causation, Plaintiff must allege that STEC's stock price

12   dropped when the "relevant truth" – *i.e.*, a "truth" that the alleged fraud had

13   previously concealed – became "generally known." *Dura*, 544 U.S. at 342-45;

14   *Metzler*, 540 F.3d at 1054-55.

15        Finally, to plead reliance under the "fraud on the market theory" (as Plaintiff

16   purports to do here), Plaintiff must allege that the challenged statements became

17   public before the "relevant truth" otherwise became "generally known" to the

18   market. *See*, *e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552

19   U.S. 148, 159 (2008).

20        As discussed in more detail below, the SAC fails to allege one or more of

21   these required elements. As a result, all of Plaintiff's Exchange Act claims fail. *See*

22   *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o

23   prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first

24   allege a violation of § 10(b) or Rule 10b-5.")

25               **1.    The $120 Million EMC Agreement**

26        Plaintiff claims Defendants misled the market about the EMC Agreement

27   and what it meant in terms of future sales to EMC. Specifically, Plaintiff claims

28   Defendants led the market to believe, falsely, that the EMC Agreement would meet

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

10

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   EMC's needs only for the second half of 2009 and that, going forward, EMC

2   would purchase roughly $60 million of ZeusIOPS every quarter. (SAC ¶¶ 69, 74-

3   75.) Plaintiff claims the market learned the "truth" on November 3, 2009, when

4   STEC announced that EMC might carry inventory into the first quarter of 2010,

5   and on February 23, 2010, when STEC announced that it did not expect orders

6   from EMC during the first half of 2010. (*Id.* ¶¶ 233, 252.)

7       In its January 10, 2011 Order, however, this Court held that Plaintiff had

8   failed to allege any false or misleading statements about the EMC Agreement

9   because the statements on which Plaintiff relied

10      do not create the impression that the Agreement would meet
        EMC's requirements <u>only</u> for the second half of 2009 or that
11      EMC would submit another order of similar volume in the first
        quarter of 2010, particularly in light of STEC's accompanying
12      cautionary statements, including its statement that '[i]t is
        difficult to accurately predict what or how many products our
13      customers will need in the future.'

14  (Order at 7) (emphasis original). The Court also ruled that Manouch Moshayedi's

15  November 3, 2009 reference to the EMC Agreement as a "one-off type of deal" did

16  not suggest that Defendants' prior statements about the EMC Agreement were

17  false. (*Id.* at 7-8.) And the Court rejected Plaintiff's claim that STEC's failure to

18  file the full EMC Agreement with the SEC was a material omission.  (*Id.* at 8.)

19      Plaintiff's SAC continues to rely on many of the same allegations that this

20  Court rejected in the January 10, 2011 Order. (SAC ¶¶ 66-79.) For the reasons set

21  forth in the Order, Plaintiff has failed to allege that these statements were false.

22  Indeed, given that the statements were necessarily forward-looking, and were

23  accompanied by meaningful cautionary language (Ex. CC at 403; Ex. Y at 253; Ex.

24  P at 153; Ex. N at 54, 56; Ex. T at 185), these statements also are protected by the

25  Safe Harbor. *See Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund*

26  *v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).

27      In an apparent attempt to plead around the January 10, 2011 Order, the SAC

28  cites a handful of additional statements that Plaintiff claims created a false

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

11

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  impression about the EMC Agreement. However, Plaintiff has failed to allege any

2  facts suggesting that those statements were false.

3    First, Plaintiff claims that STEC created the impression that purchases of

4  ZeusIOPS by all OEMs could be expected to increase "by quantum leaps" as a

5  customer passed from one phase of production to the next (SAC ¶¶ 45, 56, 59), and

6  that, going forward, EMC would continue buying ZeusIOPS at a rate of $60

7  million every quarter. (*Id.* ¶ 69.) But nothing in STEC's actual statements

8  regarding its customers' phases of production or the EMC Agreement suggests that

9  EMC would continue buying at precisely the same level as it did under the EMC

10  Agreement. (*See id.* ¶¶ 45-55, 225-26, 228-29.)[3] The fact that EMC suspended

11  purchases in early 2010 does not render Defendants' statement regarding the EMC

12  Agreement false, much less false *when made*: Plaintiff alleges no facts suggesting

13  that Defendants did not believe their statements, or lacked a reasonable basis for

14  them, or were aware of facts "tending seriously to undermine" them. *See Provenz*

15  *v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996); *In re Apple Computer Sec. Litig.*,

16  886 F.2d 1109, 1113 (9th Cir. 1989). Indeed, because the alleged statement was

17  clearly forward-looking and accompanied by meaningful cautionary language (Ex.

18  CC at 403; Ex. Y at 253; Ex. P at 153; Ex. N at 54, 56; Ex. T at 185), it is protected

19  under the Safe Harbor. *See In re Dot Hill Sys. Corp. Sec. Litig.*, No. 06-CV-228,

20  2009 WL 734296, at *12 (N.D. Cal. Mar. 18, 2009); *In re Copper Mountain Sec.*

21  *Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004).

22    Second, Plaintiff claims that, by telling the market that sales of systems

23  using ZeusIOPS "have grown significantly over the past few years," Defendants

24  misled the market into thinking that the $120 million EMC Agreement was an

---

3   Unable to cite any statement by STEC to that effect, Plaintiff repeatedly points to the speculative comments of third-party equity research analysts. (*See*, *e.g.*, SAC ¶¶ 69-71, 75.) Plaintiff cannot rely on statements that Defendants neither endorsed nor adopted. *In re Sketchers U.S.A., Inc. Sec. Litig.*, No. CV 03-02094, 2004 WL 1080174, at *7 (C.D. Cal. May 10, 2004).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case No. 8:09-cv-01304-JVS (MLG)
12  NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

ordinary contract based "solely" on a rise in EMC's recurring demand for ZeusIOPS. (SAC ¶ 69.) As an initial matter, the statement does not actually say that the EMC Agreement was "ordinary" or that it was based "solely" on EMC's "recurring" demand for ZeusIOPS. It simply observes a historical fact – growth in the sales of systems using ZeusIOPS over the "past few years" – which Plaintiff does not claim is false. Moreover, even if Defendants had said what Plaintiff claims (*i.e.*, that the EMC Agreement was "ordinary" or based "solely" on EMC's "recurring" demand), such a statement cannot plausibly be read as a guarantee that sales to EMC would continue at the same rate indefinitely, without any slowdown or interruption. *See In re CellCyte Genetics Sec. Litig.*, No. C08-0047, 2009 WL 3103892, at *5 (W.D. Wash. Sept. 24, 2009) (rejecting plaintiffs' unreasonable characterization of a statement). In fact, as the Court has already noted, STEC made clear to investors that "it is difficult to accurately predict what or how many products [its] customers will need in the future." (Order at 7.) The Court also noted that "it is clear from the information disclosed by Defendants [regarding the size of the EMC Agreement] that [it] was one on which STEC's business was substantially dependent and <u>not</u> one made in the ordinary course of business." (*Id.* at 8) (emphasis added).

Third, Plaintiff alleges that STEC's August 3, 2009 Prospectus created the impression that EMC would purchase $60 million every quarter going forward because the $120 million contract "provided for average quarterly purchases of $60 million" in the second half of 2009. (*Id.* ¶¶ 67-69.) This is plainly absurd. The Court has already ruled that the Prospectus did not communicate that EMC would continue to make purchases of a similar volume, going forward, every six months. (Order at 7.) Indeed, the statement in the Prospectus does not even mention EMC's future demand and makes no predictions about similar deals in the future. (SAC ¶¶ 74, 228-29.) Taken together, Plaintiff's new allegations provide no additional support for its claim (which has already been rejected once by the Court), that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   Defendants misled investors about the EMC Agreement.

2          Nor does the SAC allege "with particularity" that any of the Defendants

3   acted with scienter. By definition, each of the statements Plaintiff challenges is

4   forward-looking, as Plaintiff claims these statements created a false impression

5   about the amount of ZeusIOPS that EMC would purchase after the second half of

6   2009. As such, Plaintiff must "state with particularity facts giving rise to a strong

7   inference" that Defendants actually knew the challenged statements were false

8   when made. 15 U.S.C. §78u-5(c)(1)(B); *Cutera*, 610 F.3d at 1112. The SAC does

9   not come close to meeting this standard. This Court has already ruled that

10  Manouch Moshayedi's November 3, 2009 reference to the EMC Agreement as a

11  "one-off type of deal" does not render any of Defendants' prior statements false

12  and does not show scienter. (Order at 7-8.)

13         The Court has also ruled that EMC's January 26, 2010 statement about the

14  purpose of the EMC Agreement "does not show that Defendants knew at the time

15  the Registration Statement and Prospectus were filed that the Agreement would

16  carry EMC's supply into the first quarter of 2010." (*Id.* at 7.) And the Court has

17  already rejected Plaintiff's claim that the failure to file the EMC Agreement with

18  the SEC was a material omission (*id.* at 8), so that fact cannot support a "strong

19  inference" that Defendants knowingly misled the market about the EMC

20  Agreement. Plaintiff's remaining allegations about the EMC Agreement – that

21  STEC and EMC had an "intimate" relationship; that STEC was a "partner" with

22  EMC; and that STEC had engineers "co-located" at EMC – do not come close to

23  showing that Defendants knew that any of their statements about the EMC

24  Agreement were false.

25                 **2.      STEC's Revenue & Revised Guidance For 2Q09**

26         Plaintiff claims that STEC "artificially inflated" its 2Q09 revenue by

27  engaging in channel stuffing and shipping defective products (SAC ¶¶ 190-98),

28  and that STEC issued false revenue guidance for 2Q09 for "the same reasons." (*Id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

14

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

¶¶ 204-05.) Though STEC's 2Q09 revenues have never been restated or even questioned, Plaintiff claims that the alleged "artificial inflation" was revealed when STEC announced its revenue guidance for the first quarter of 2010. (*Id.* ¶¶ 199-02, 265.)

Plaintiff's current allegations about STEC's 2Q09 revenue and guidance are no different than the allegations the Court found insufficient in dismissing the Amended Complaint. (*Compare* AC ¶¶ 101-20, 127-30 *with* SAC ¶¶ 184-205.) As before, the claim rests entirely on statements attributed to CWs – this time CWs 3 and 4 – who are "not alleged to have personal knowledge of the effects that the conduct they witnessed had on the reported revenues." (Order at 10); *see also Zucco Partners, LLC v. Digimarc Corp*, 552 F.3d 981, 995 (9th Cir. 2009); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009). And as before, Plaintiff has failed to "show that any deficiencies in the reported revenues rose to the level of *material* misrepresentations." (Order at 10.) Although Plaintiff continues to rely on the alleged "match" between the $14 million increase in STEC's 2Q09 guidance and the $14 million "drop" in post-offering non-EMC revenues, this Court has correctly ruled that Plaintiff has failed to "explain why the non-EMC revenues for the second quarter of 2009 and the first quarter of 2010 should have been identical." (*Id.* at 10-11.) Plaintiff still has no such explanation. Having failed to address any of these deficiencies, Plaintiff's claim should be dismissed for the reasons set forth in the January 10, 2011 Order.

Plaintiff also fails to plead loss causation as to this claim. Plaintiff again relies on the alleged "symmetry" between STEC's 1Q10 guidance and its 2Q09 revenue (SAC ¶¶ 203, 265), but that alleged "symmetry" fails to show loss causation for the same reason that it fails to show falsity: there is no reason why the non-EMC revenues for those periods should have been identical. And in any event, Plaintiff's attempt to show loss causation based on STEC's 1Q10 guidance is, at best, an attempt to plead loss causation by "euphemism." *Metzler*, 540 F.3d at

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

15

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1063. STEC's February 23 announcement of 1Q10 guidance did not say anything about its 2Q09 revenue or guidance, and Plaintiff does not allege any facts suggesting that the market understood STEC's 1Q10 guidance to reveal any previously undisclosed "facts" about STEC's 2Q09 revenue or guidance.

Finally, Plaintiff also fails to plead scienter. Plaintiff's scienter allegations again rely entirely on CW3 and CW4. For such allegations to support an inference of scienter, Plaintiff must plead particularized facts showing that each Defendant "had reason to know about the accounting improprieties identified by the [CWs]." *In re U.S. Aggregates*, *Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1075 (N.D. Cal. 2002). CW4 makes no claims about any Defendant whatsoever, thus negating any possibility that his claims may be indicative of scienter. CW3, on the other hand, never claims to have spoken to any Defendant, but instead relies on hearsay for her allegations that Manouch Moshayedi wanted to "get those modules back to HP" and that Manouch Moshayedi "would tell everyone to push sales from" some unspecified "future quarter to the present quarter." (SAC ¶¶ 192, 197.) Such hearsay is insufficient, *Zucco*, 552 F.3d at 996, but even more importantly, CW4's allegations do not come close to establishing that Manouch Moshayedi was aware of or was requesting that STEC engage in any *accounting improprieties*. Accordingly, this claim fails at every level.

### 3.    Sales To Other OEM Customers

As before, Plaintiff claims that STEC's August 3, 2009 Prospectus and its September 10, 2009 comment letter response to the SEC misled the market about expected sales to OEMs other than EMC during the second half of 2009. Plaintiff claims the market learned the "truth," in part, on November 3, 2009, when STEC announced its 3Q09 results and guidance for 4Q09, and disclosed that sales to OEMs other than EMC were down or below normal, and that other OEMs had not yet started building SSDs into their systems or were not yet offering SSDs as a standard feature. (SAC ¶¶ 139-41, 143-44, 146, 248.) Plaintiff claims the market

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

16

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   learned the rest of the "truth" on February 23, 2010, when STEC announced its

2   4Q09 results ($74 million in revenue) and 1Q10 guidance ($33-$35 million in

3   revenue), and said that it expected "to see growth again" in the second half of

4   2010. (SAC ¶¶ 152-54, 256, 259.) As discussed below, however, the SAC fails to

5   state a claim for relief on this basis.

6                    **a.      The August 3, 2009 Prospectus**

7          Plaintiff has not alleged that Defendants made any false or misleading

8   statements in the Prospectus regarding expected sales to other OEMs. The

9   Prospectus stated that STEC "expect[ed] continued growth in the sales of our

10  Flash-based SSD ZeusIOPS through 2009[,]" and in fact, the total sales of

11  ZeusIOPS *did* grow throughout that year. (SAC ¶¶ 122, 74, 229.) The fact that

12  sales to OEM customers other than EMC were down as of November 3, 2009 does

13  not make this statement false or misleading, as the statement describes STEC's

14  expectations for total sales of ZeusIOPS, not for sales to any particular customers.

15  Indeed, the Prospectus attributed the expected growth in sales of ZeusIOPS to both

16  the $120 million of sales under the EMC Agreement and the "accelerated

17  adoption" of ZeusIOPS by "most of" STEC's OEM customers. (*Id.* ¶¶ 74, 229.)

18         Although Plaintiff claims the reference to "accelerated" adoption was itself

19  false because other OEMs had not yet built STEC's SSDs into their products by

20  November 3, 2009 (*Id.* ¶¶ 142-45), this Court has already recognized that the

21  reference to "accelerated" adoption did not suggest that other OEMs had built

22  STEC's SSDs into their products. (Order at 9.) Indeed, as the Court noted, on the

23  same day that the Prospectus was filed, Manouch Moshayedi told the market that

24  other OEMs were "going through the same trials and tribulations that our first

25  customer [EMC] went through in terms of sales and marketing," and that other

26  OEMs were "maybe a quarter or two away from full ramping production." (Ex. W

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

at 226.)[4] Simply put, Plaintiff has not identified any statement by Defendants that sales to other OEMs would increase during the second half of 2009. Thus, the alleged fact that sales to those customers decreased (SAC ¶ 122) does not suggest that Defendants made any false or misleading statement about sales to other OEMs.

In any event, even if STEC had predicted increased sales to other OEMs for the second half of 2009, Plaintiff does not allege any facts suggesting that STEC did not believe the prediction, or lacked a reasonable basis for it, or was aware of facts tending seriously to undermine it. *See Provenz,* 102 F.3d at 1487; *Apple Computer*, 886 F.2d at 1113. In a convoluted series of allegations, the SAC asserts that STEC's inventory "through 2009" demonstrates that the statement regarding "accelerated adoption" of ZeusIOPS "by most of [STEC's] major-enterprise-storage and enterprise-server OEM customers" was knowingly false when made. (SAC ¶¶ 124-38.) According to Plaintiff, in other words, STEC's inventory levels "through 2009" show that STEC did not expect, and could not have fulfilled, a significant increase in sales to OEMs other than EMC during the second half of 2009. (*Id.*) To reach this wildly speculative conclusion about the sufficiency of STEC's inventory, however, Plaintiff has simply misrepresented certain items in STEC's financial statements. Specifically, Plaintiff claims that: (1) the "cost of revenues" reported by STEC in any given quarter is essentially equal to the "inventory actually used in a given quarter" to support STEC's sales for that quarter; and (2) the "inventory" reported by STEC in any given quarter (which Plaintiff calls the "inventory ordered for future use") is essentially equal to the amount of "non-cancellable inventory purchase commitments" entered into by

---

[4]   The market was certainly aware that the transition from adoption to full production could take additional time given that fifteen months elapsed between EMC's qualification of ZeusIOPS and STEC's announcement that EMC had reached full production. (Ex. M at 41; Ex. Q at 165.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

18

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    STEC during that period. (*Id.* ¶ 134.) Plaintiff claims that STEC's "non-cancellable
2    inventory purchase commitments" in 2Q09 were equal to $103 million, just
3    slightly higher than the $101.5 million reported by STEC as "cost of revenues" for
4    the second half of 2009. (*Id.*) According to Plaintiff, this shows that STEC's
5    inventory as of 2Q09 was enough to fulfill the EMC Agreement, but not to fulfill a
6    significant amount of sales to any other customers.

7         But Plaintiff alleges no facts supporting its conclusory assertions that (1)
8    "cost of revenues" is equal to the "inventory actually used in a given quarter"; and
9    (2) "inventory" is equal to "non-cancellable inventory purchase commitments." As
10   to the first comparison, STEC's public filings make clear that "cost of revenues"
11   includes not just "component costs" but also "personnel costs related to
12   manufacturing, testing, quality control and material management employees, and
13   depreciation costs on production, testing and quality control equipment." (Ex. F at
14   28.) Thus, "cost of revenues" does not simply represent the "inventory actually
15   used in a given quarter."  As to the second comparison, STEC's public filings also
16   make clear that "inventory" at any given time does not just reflect the amount of
17   "non-cancellable inventory purchase commitments," but instead includes all "raw
18   materials, work-in-progress, and finished goods." (Ex. CC at 468.) Because
19   Plaintiff's conclusory claims about the meaning of "cost of revenues" and
20   "inventory" are demonstrably incorrect, Plaintiff's comparison of those two
21   numbers does not support any reasonable inference as to whether STEC had
22   sufficient materials and components available to it to fulfill any increase in demand
23   from customers other than EMC.

24        Plaintiff's analysis of STEC's inventory levels is also baseless because it
25   simply assumes that the "non-cancellable inventory purchase commitments"
26   reflected in STEC's inventory were STEC's only source of materials to fill
27   customer orders. But the fact that STEC sometimes enters into non-cancellable
28   inventory purchase commitments when it has firm forecasts from its customers

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

19

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   does not mean that this is the only way for STEC to secure materials. STEC may

2   very well have been able to obtain raw materials through some method other than

3   non-cancellable purchase commitments, which did not show up as "inventory" on

4   STEC's books. Accordingly, Plaintiff's claims regarding STEC's inventory levels

5   rely on a series of baseless assumptions and do not withstand basic scrutiny.[5]

6          Recognizing that this Court has rejected its prior claims about statements in

7   the Prospectus regarding sales to other OEMs, Plaintiff now claims that the

8   Prospectus was misleading because it failed to disclose that one such customer,

9   IBM, would not make large purchases in the second half of 2009, and was not

10  marketing ZeusIOPS as a standard feature in its systems. (SAC ¶¶ 160-68.) But to

11  plead falsity on this basis, Plaintiff must allege facts showing that the omission

12  made the Prospectus materially misleading. *Brody v. Transitional Hosp. Corp.*, 280

13  F.3d 997, 1006 (9th Cir. 2002) ("plaintiffs' complaint must specify the reason or

14  reasons why the statements made by [the defendant] were misleading or untrue, not

15  simply why the statements were incomplete"); *Rubke v. Capitol Bancorp, Ltd.*, 551

16  F.3d 1156, 1162 (9th Cir. 2009) ("There is no indication that the omitted

17  information … made any statement … false or misleading.").

18         Here, the SAC does not allege any facts showing that the allegedly omitted

19  information about IBM rendered the Prospectus materially misleading. Nothing in

20  the Prospectus suggested that IBM (or any customer other than EMC) would make

21  large purchases in the second half of 2009, and nothing in the Prospectus suggested

22  that IBM would be selling systems with STEC's SSDs as a standard feature. In

23  fact, as noted above, the SAC concedes that on the day the Prospectus was filed,

24  Manouch Moshayedi informed the market that other OEMs were "going through

25

---

26  [5]  In addition to showing that this statement was not false, this undermines
      Plaintiff's scienter allegations relating to sales to other OEMs. Plaintiff's related
27    claim of scienter based on statements that Manouch Moshayedi made about Sun
      (SAC ¶¶ 172-83) also fails, both because it is legally irrelevant, and because it
28    badly mischaracterizes what was said. *Metzler*, 540 F.3d at 1069.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   the same trials and tribulations…" and that they were "maybe a quarter or two

2   away [(from August 3, 2009)] from full ramping production." (Ex. W at 226.)

3   Because the alleged omissions regarding IBM did not "affirmatively create an

4   impression of a state of affairs that differ[ed] in a material way from the one that

5   actually exist[ed]," Plaintiff has failed to plead a material omission regarding IBM.

6   *Brody*, 280 F.3d at 1006.

7        In any event, even if the omission of these "facts" created a false impression,

8   the omission was clearly forward-looking, and thus immune from liability because

9   the Prospectus included a stream of warnings that customers' transition from

10  adoption to full production was unpredictable. The Prospectus stated that STEC

11  may experience "delays in the development and introduction of new products" and

12  noted that "we have no assurance that the customer will ultimately bring its

13  product to market or that such effort by our customer will be successful." (Ex. Y at

14  258.) The Prospectus also cautioned investors that "[i]t will take time for these new

15  standards and products to be adopted, for customers to accept and transition to

16  these new products and for significant sales to be generated from them, if this

17  happens at all." (*Id.*) Taken together, these repeated warnings about future sales to

18  other OEM customers not only undercut Plaintiff's suggestion that the Prospectus

19  was misleading, they also preclude any liability under the Safe Harbor. *See Clorox*,

20  353 F.3d at 1132.

21              **b.    The Comment Letter Response To The SEC**

22       Plaintiff again claims that in STEC's letter response to the SEC dated

23  September 10, 2009, STEC told the SEC (and the market) that if EMC did not

24  complete the EMC Agreement, other OEMs were ready to purchase $120 million

25  of ZeusIOPS. (SAC ¶ 169.) But this claim fails because Plaintiff does not allege

26  reliance, which the Supreme Court has described as "an essential element of the §

27  10(b) private cause of action." *Stoneridge*, 552 U.S. at 159. In this case, Plaintiff

28

LATHAM&WATKINS^{LLP}
ATTORNEYS AT LAW
SILICON VALLEY

21

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    attempts to plead reliance under the "fraud-on-the-market" theory.[6] (SAC ¶ 271.)

2    This theory, however, requires that the alleged misrepresentation be public, *i.e.*,

3    that it be revealed to the market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247

4    (1988); *see also Stoneridge*, 552 U.S. at 159 (noting that the theory is predicated

5    on the notion that "public information is reflected in the market price of the

6    security.").

7        Here, Plaintiff has failed to plead, let alone plead with particularity, *when*

8    STEC's September 10, 2009 SEC comment letter response was made public.

9    Simply referencing the date of the letter does not suffice, because SEC comments

10   and responses *are not made public on the dates they are filed*. Rather, comment

11   letters and related correspondence are released "not less than 45 days after the staff

12   has completed a filing review." (Ex. FF at 511.) Here, the SEC did not close its

13   review of the matter until October 20, 2009, and so the earliest date on which any

14   of the correspondence was made public was December 4, 2009. (Ex. E at 26.) By

15   then, of course, the market already knew the facts that Plaintiff claims revealed the

16   "truth" – namely, that other OEM customers were not in production and "aren't

17   selling to any degree yet," and thus could not have replaced EMC under the EMC

18   Agreement. (SAC ¶ 170.) Since the letter itself could not have been made public

19   until after the market already knew the "relevant truth," Plaintiff has failed to

20   allege reliance. *Stoneridge*, 552 U.S. at 159. This also means, as the Court has

21   already held, that Plaintiff has failed to allege loss causation, since Plaintiff cannot

22   show that STEC's stock price dropped when the market learned some "relevant

23   truth" that the statement had previously concealed. (Order at 10.)

24       In any event, Plaintiff has failed to plead that the letter contained any false or

25   _____

26   [6]  Plaintiff's alternative argument that it is entitled to a presumption of reliance is
     baseless. (SAC ¶ 270.) "*Affiliated Ute* is limited to cases that can be

27   characterized as primarily alleging omissions." *Desai v. Deutsche Bank Sec.
     Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) (quotation and alterations omitted).

28   Here, Plaintiff is claiming that the letter to the SEC was affirmatively false.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

22

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    misleading statements, because the letter did not say – as Plaintiff claims – that
2    STEC would be able to replace EMC with another customer if the $120 million
3    Agreement fell through. This is clear from a review of the complete
4    correspondence with the SEC. On August 28, 2009, the SEC asked STEC why it
5    had not attached contracts made with EMC *in 2008* to its Annual Report on Form
6    10-K for 2008. (Ex. A. at 9.) This was in reference to sales to EMC in 2008, which
7    was long before the EMC Agreement. (*Id.* at 7.) On September 10, 2009, STEC
8    wrote a lengthy response, much of which Plaintiff leaves out of the SAC. (Ex. B at
9    18-19.)

10          First, STEC cited cautionary language in its 2008 Form 10-K that STEC had
11   "experienced changes in the composition of our major customer base from quarter
12   to quarter as the market demand for our customers' products have changed and we
13   expect this variability to continue in the future." (*Id.*) Next, STEC stated that "in
14   the unlikely event a customer should default under a purchase order or other sales
15   agreement, STEC generally believes it could find a replacement customer for the
16   relevant product." (*Id.* at 19) In so doing, STEC made crystal clear that it was
17   referring to the smaller individual contracts or purchase orders with EMC made in
18   2008 by noting that "STEC does not believe the ordinary course *business*
19   *contracts cited in the Staff's comment* were required to be filed as material
20   contracts." (*Id.*) (emphasis added).

21          On September 30, 2009, the SEC followed up, asking STEC "in quantitative
22   terms, whether sales to these customers *for fiscal year 2008* were based on a few
23   large purchase orders or multiple small ones." (Ex. C at 21) (emphasis added). On
24   October 13, 2009, STEC explained in response that it "received over 100
25   individual purchase orders from EMC related to 2008 deliveries" and that "[t]he
26   amounts of these purchase orders ranged from $450 up to approximately $5.2
27   million for the largest individual purchase order" or "less than 2.5% of the
28   Company's total revenues" for 2008. (Ex. D at 24.) The SEC then closed its review

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1    without further comment. (Ex. E at 26.)

2        The correspondence between STEC and the SEC makes clear that STEC's

3    statement about its ability to find replacement customers applied only to STEC's

4    purchase orders with EMC in 2008, and did not refer to the EMC Agreement.[7] As a

5    result, the statement does not support Plaintiff's claim that Defendants told the

6    market that other OEMs were "ready to purchase ZeusIOPS in quantities

7    equivalent to those being purchased under the EMC Agreement." (SAC ¶¶ 168-

8    69.)

9              **4.    Plaintiff's Additional Scienter Allegations Are Inadequate**

10        Plaintiff adds a number of additional allegations in attempting to adequately

11   plead scienter. (SAC ¶¶ 206-23.) These allegations fare no better.

12        First, Plaintiff relies on Manouch and Mark Moshayedi's stock trades. (*Id.* ¶¶

13   206-12.) But the Ninth Circuit has made clear that pleading a "motive and

14   opportunity to commit fraud" (*i.e.*, stock sales) does not satisfy a plaintiff's burden.

15   *Silicon Graphics*, 183 F.3d at 988. In fact, "by themselves, large numbers" of

16   insider sales "do not necessarily create a strong inference of fraud." *In re Vantive*

17   *Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002). Notably, Plaintiff does not

18   allege that Defendants Raymond D. Cook, Rajat Bahri, or any other STEC officer

19   or director sold STEC's stock during the Class Period. This fact alone undermines

20   any inference of scienter based on the stock sales, as "[o]ne insider's well timed

21   sales do not support the strong inference required by the statute where the rest of

22   the equally knowledgeable insiders act in a way inconsistent with the inference that

23   the favorable characterizations of the company's affairs were known to be false

24   when made." *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001); *see also*

25   *Metzler*, 540 F.3d at 1067.

26

27   [7]   Indeed, the heading for the relevant question in Item 15 of the SEC's comment letter is "Form 10-K for the Fiscal Year Ended December 31, 2008." (Ex. A at 7; Ex. B at 12; Ex. C at 20; Ex. D at 22.)

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

24

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1   In addition, the timing of Manouch and Mark Moshayedi's trades likewise
2   undercuts any inference of scienter. "Insider trading is suspicious only when it is
3   dramatically out of line with prior trading practices *at times calculated to maximize*
4   *the personal benefit from undisclosed inside information*." *Ronconi*, 253 F.3d at
5   435 (quotation omitted; emphasis in original). Plaintiff cannot make such a
6   showing here. The Secondary Offering was priced at $31 per share. (SAC ¶ 305.)
7   But STEC's stock price rose dramatically thereafter, eventually reaching $42.50 on
8   September 9, 2009. (Ex. EE at 510.) This peak price is over 27% higher than the
9   price at which the Moshayedis' shares were sold during the Secondary Offering.
10  Thus, by selling at $31 per share instead of $42.50, the Moshayedis left over $100
11  million on the table. The Ninth Circuit has made clear that "miss[ing] the boat this
12  dramatically" is not indicative of scienter. *Ronconi*, 253 F.3d at 435 (finding no
13  scienter where insiders sold 69% of their holdings for a price anywhere from
14  roughly 24%-28% lower than that to which the stock price rose during the class
15  period).[8]

16  Second, Plaintiff cites the existence of an SEC investigation (SAC ¶ 213)
17  and a revision to STEC's Severance and Change in Control Agreement that
18  occurred after STEC announced the investigation. (*Id.* ¶ 214.) But "the mere
19  existence of an investigation cannot support any inferences of wrongdoing or
20  fraudulent scienter on the part of a company or its senior management." *Hansen*,
21  527 F. Supp. 2d at 1162. Moreover, the fact that the Company revised its change in
22  control agreements with certain members of management at around the time the
23  Company disclosed the existence of the SEC investigation is irrelevant. Plaintiff
24  offers literally nothing to connect the revision to the alleged fraud. This will not

25

26  [8]  In addition to failing to establish suspicious timing, the trading allegations fail
27  because "Plaintiff has failed to link any Individual Defendant's sale of stock to
    any of the alleged misstatements by [STEC]." *In re Hansen Natural Corp. Sec.*
28  *Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal 2007).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

25

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  do. *See In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y.

2  2009) ("Without additional factual allegations [beyond timing] linking [the]

3  negotiation of a 'golden parachute' to the alleged fraud, the Court finds these

4  allegations insufficient to raise a strong inference of scienter.").

5      Third, Plaintiff argues that Defendants are "presumed" to have knowledge of

6  all material facts regarding STEC's "core operations." (SAC ¶ 215.) But this

7  doctrine applies only in an "exceedingly rare category of cases," *South Ferry LP v.*

8  *Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008), where "the falsity of the

9  information [is] obvious from the *operations of the company*," *Zucco*, 552 F.3d at

10  1001 (emphasis added), or where "[a]llegations regarding management's role in a

11  corporate structure and the importance of the corporate information" are "made in

12  conjunction with detailed and specific allegations about management's exposure to

13  factual information *within the company*." *South Ferry LP v. Killinger*, 542 F.3d at

14  785 (emphasis added). Here, Plaintiff's claims are focused on something that is not

15  part of STEC's "operations" at all, namely, the needs of STEC's customers. (SAC

16  ¶¶ 218-19.) No matter how important these customers are to STEC, their future

17  needs and the market's whims are not something Defendants can simply be

18  presumed to know. It is not part of STEC's operations; it is part of their *customers'*

19  operations. Thus, Plaintiff has not alleged that EMC's intent to carry inventory into

20  2010 would have been "obvious" from STEC's operations at the time the alleged

21  false statements were made, or that it would be "absurd" to suggest that STEC's

22  management was unaware of the exact purchases other OEMs would make. *In re*

23  *Rackable Sys., Inc. Sec. Litig.*, No. C09-0222, 2010 WL 199703, at *9-10 (N.D.

24  Cal. Jan. 13, 2010); *Pittleman v. Impac Mortgage Holdings, Inc.*, No. 07-0970,

25  2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) .[9]

26

27  [9] Because Plaintiff fails to plead an independent violation of the Exchange Act, its claims under Section 20A and Section 20(a) should also be dismissed.

28  (Order at 13.)

LATHAM&WATKINS
ATTORNEYS AT LAW
SILICON VALLEY

26

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

**B.      Plaintiff's Securities Act Claims Fail**

To state a claim under Section 11, a plaintiff must allege that a registration statement contained a material false statement or omission. *Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1133 (N.D. Cal. 2006). Under Section 12(a)(2), a plaintiff must allege: (1) an offer or sale of a security; (2) by the use of any means of interstate commerce; (3) through a prospectus or oral communication; (4) which includes an untrue statement of material fact. *Id.* The Safe Harbor applies to claims under Section 11 and Section 12, so forward-looking statements accompanied by meaningful cautionary language are not actionable. *See Backhaus v. Streamedia Commc'n, Inc.*, No. 01 CIV 4889, 2002 WL 1870272, at *4 (S.D.N.Y. Aug. 14, 2002); *In re AirGate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1373 (N.D. Ga. 2005). Although neither Section 11 nor Section 12 requires a plaintiff to plead fraud, a plaintiff who asserts a Section 11 or Section 12 claim that "sounds in fraud" must satisfy the pleading requirements of Rule 9(b). *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). This Court previously concluded that the Securities Act claims sound in fraud because Plaintiff alleges a "unified course of fraudulent conduct[,]" (Order at 14), and the same is true of the SAC. The Securities Act claims in the SAC rely almost entirely on alleged misstatements that also form a basis for Plaintiff's claims under the Exchange Act. (SAC ¶¶ 304-11, 324.) As detailed above, Plaintiff is unable to identify a misrepresentation, and most of the statements in question are protected by the Safe Harbor. The only separate allegation in support of Plaintiff's Securities Act claims is the allegation that STEC misled investors by not filing the EMC Agreement with its Form 10-Q for 2Q09. (*Id.* ¶¶ 312-23.) But the Court has already found that this alleged failure was not misleading: "Plaintiffs have not alleged that specific information in the [EMC] Agreement itself would have altered investors' impressions, and it is clear from the information disclosed by Defendants [*supra* at 5-6] that the [EMC] Agreement was one on which STEC's business was

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

27

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

1  substantially dependent and not made in the ordinary course of business." (Order at

2  8.) Because Plaintiff fails to plead a material misrepresentation, its claims under

3  Sections 11, 12(a)(2), and 15 must be dismissed.[10]

4  **IV.  CONCLUSION**

5       For the foregoing reasons, the SAC should be dismissed. That dismissal,

6  moreover, should be with prejudice. Collectively, plaintiffs in this case have had

7  four chances to file a viable complaint: (1) the original complaints filed in

8  November 2009; (2) the amended complaint filed by the prior lead plaintiffs on

9  April 9, 2010; (3) the Amended Complaint filed by Plaintiff on August 13, 2010;

10  and (4) the SAC now at issue. Having failed to state a claim despite the benefit of

11  three prior rounds of pleading, Plaintiff should not be given yet another chance to

12  amend. *See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d

13  1276, 1293 (9th Cir. 1983); *Metzler*, 540 F.3d at 1072; *Vantive*, 283 F.3d at 1098.

14

15  Dated:  March 24, 2011                          Respectfully submitted,

16                                                  LATHAM & WATKINS LLP

17

18                                                  By _____/s/_____

19                                                  Patrick E. Gibbs
                                                    Attorneys for Defendants STEC, Inc.,
20                                                  Manouch Moshayedi, Mark
                                                    Moshayedi, Raymond D. Cook, and
21                                                  Rajat Bahri

22

23

24

25

26

---

[10]  Finally, Defendants join each of the arguments made by the Underwriter
27  Defendants regarding Plaintiff's lack of standing to pursue claims under the
    Securities Act.
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

28

Case No. 8:09-cv-01304-JVS (MLG)
NOTICE OF MOTION AND MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT