Christopher Kim (Bar No. 082080)
christopher.kim@limruger.com
Lisa J. Yang (Bar No. 208971)
lisa.yang@limruger.com
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017-2554
Telephone: (213) 955-9500
Facsimile: (213) 955-9511

Thomas A. Dubbs (*Pro Hac Vice*)
tdubbs@labaton.com
Richard T. Joffe (*Pro Hac Vice*)
rjoffe@labaton.com
Thomas G. Hoffman, Jr. (*Pro Hac Vice*)
thoffman@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Allyn Z. Lite (*Pro Hac Vice*)
alite@litedepalma.com
Bruce D. Greenberg (*Pro Hac Vice*)
bgreenberg@litedepalma.com
LITE DePALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Attorneys for New Jersey and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS<br>_____ | No. SACV 09-01304-JVS (MLGx)<br><br>**DECLARATION OF JOHN D. FINNERTY, Ph.D. IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

1

## Table of Contents

2  I.  Qualifications ................................................................................ 1
3  II.  Assignment .................................................................................... 2
   III.  Summary of Opinions ................................................................... 3
4  IV.  Efficiency of the Market for STEC's Common Stock ................... 3
5       A.  Application of the Cammer Factors to the Market for STEC's
            Common Stock ..................................................................... 6
6            1.  Cammer Factor One: Weekly Trading Volume ............... 6
7            2.  Cammer Factor Two: Stock Analyst Coverage ............... 8
8            3.  Cammer Factor Three: Existence of Market Makers,
                 Institutional Investors, and Arbitrageurs ....................... 9
9            4.  Cammer Factor Four: STEC's Eligibility to File SEC Form
10                S-3 .............................................................................. 10
             5.  Cammer Factor Five: The Relationship between News
11                Events and Security Price Changes .............................. 11
12                i.    June 16, 2009 ...................................................... 16
                  ii.   July 13, 2009 ...................................................... 17
13                iii.  July 16, 2009 ...................................................... 18
14                iv.   August 3-4, 2009 ................................................ 19
                  v.    September 17, 2009 ............................................ 22
15                vi.   November 3-4, 2009 ............................................ 23
16                vii.  February 23-24, 2010 .......................................... 25
             6.  The Relationship between News Events and Security Price
17                Changes During the Control Period ............................. 27
18                i.    November 17-18, 2008 ........................................ 27
                  ii.   December 15-16, 2008 ......................................... 28
19                iii.  March 12-13, 2009 .............................................. 30
20                iv.   May 11-12, 2009 ................................................. 32
21       B.  Application of the Elmer Krogman Factors to the Market for
             STEC's Common Stock ....................................................... 33
22            1.  Market Capitalization .................................................. 33
23            2.  Bid-Ask Spread ........................................................... 35
             3.  Public Float ................................................................. 35
24       C.  Additional Factors Considered ............................................ 36
25            1.  Put-Call Parity Tests ................................................... 37
26            2.  Random Walk Tests ...................................................... 42
27  V.  Conclusions .................................................................................. 47

28

1    I, John D. Finnerty, declare pursuant to 28 U.S.C. § 1746, as follows:

2    **I.    Qualifications**

3    1.    My name is John D. Finnerty.  I am a Professor of Finance and the

4    founding Director of the Master of Science in Quantitative Finance Program in the

5    Graduate School of Business Administration at Fordham University.  I was

6    awarded early tenure in 1991, and received the Gladys and Henry Crown Award

7    for Faculty Excellence in 1997.  I have published fourteen books, including

8    *Corporate Financial Management*, 4th ed., *Principles of Financial Management*,

9    and *Debt Management*, and more than 100 articles and professional papers with

10    respect to corporate finance, fixed income, and business and securities valuation.  I

11    have served as the Chair of the Trustees, President, and Director, and I am

12    currently a Trustee, of the Eastern Finance Association, an academic finance

13    organization.  I am also a Director of the Financial Management Association.  I

14    have also served as the President and Director of the Fixed Income Analysts

15    Society, an association of finance professionals based in New York City.  I am a

16    former editor of *Financial Management*, one of the leading academic finance

17    journals, and a former editor of *FMA Online*.  I am a member of the editorial board

18    of the *Journal of Portfolio Management* and the *International Journal of Portfolio*

19    *Analysis & Management*.  I was inducted into the *Fixed Income Analysts Society*

20    *Hall of Fame* in 2011.

21    2.    My teaching and research deal mainly with corporate finance,

22    investment banking, and fixed income securities valuation and portfolio

23    management.  I have previously published a paper on the calculation of damages in

24    securities fraud cases entitled, "An Improved Two-Trader Model for Measuring

25    Damages in Securities Fraud Class Actions," which was published in the Spring

26    2003 issue of the <u>Stanford Journal of Law, Business & Finance</u>.  I have extensive

27    experience testing for market efficiency, performing loss causation analysis, and

28    calculating damages in securities fraud cases.

3.      I am also a Managing Principal at Finnerty Economic Consulting, LLC (FinnEcon®), which provides financial consulting and valuation services to law firms, corporations, industry associations, and government agencies.

4.      Prior to forming FinnEcon® in 2003, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner (non-audit) in the PricewaterhouseCoopers Financial Advisory Services Group for five years, and previously held investment banking positions at Morgan Stanley, Lazard Frères, McFarland Dewey, and Houlihan Lokey Howard & Zukin.

5.      I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within at least the past four years.

6.      My firm is being compensated at a rate of $695 per hour for my work on this matter, and my compensation is not contingent on my findings or on the outcome of this matter. Some of the analyses in this declaration have been performed by my staff working under my direction.

7.      Appendix B lists the documents I considered in coming to my opinions in this matter.

**II.    Assignment**

8.      Labaton Sucharow LLP ("Labaton") and Lite DePalma Greenberg, LLC ("Lite DePalma"), lead counsel for the plaintiffs in this matter, have asked me to conduct appropriate studies and opine on the efficiency of the market for the common stock of STEC, Inc. ("STEC" or the "Company") during the period extending from June 16, 2009 through February 23, 2010 (the "Class Period").

1    **III.    Summary of Opinions**

2        9.    I have reached the opinion, after conducting appropriate studies, the

3    results of which are described in this declaration, that the market for the common

4    stock of STEC was open, developed, and efficient during the Class Period.  This

5    opinion is based on the results of the market efficiency tests described in this

6    declaration.

7    **IV.    Efficiency of the Market for STEC's Common Stock**

8        10.    An efficient market is one in which "security prices fully reflect all

9    available information."[1]  Stock price movements take place only after someone, on

10   the basis of new information, is able to better assess the value of the asset.[2]  There

11   are three versions of the Efficient Market Hypothesis ("EMH").[3]  The weak form

12   of the EMH states that prices reflect all information contained in past trading in the

13   market.  The semi-strong form of the EMH holds that stock prices reflect all

14   publicly available information.  This is the form of the EMH adopted by the

15   Supreme Court in <u>Basic</u>.[4]  The strong form of the EMH states that stock prices

16   reflect all public and private information.  There is little evidence that the strong

17   form of the EMH holds, and it would be surprising if insiders with possession of

18   material non-public information could not earn abnormal trading profits.[5]

19       11.    The focus of my declaration is on the semi-strong form of the EMH,

20   which is the most widely accepted characterization of what is meant by an

21

22   ---
       [1] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N.
23   Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, 6th ed., John
     Wiley & Sons, Inc., Hoboken, NJ, 2003, page 402.
24       [2] Emery, Douglas R., John D. Finnerty, and John D. Stowe, <u>Corporate Financial
     Management</u>, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 452.
25       [3] Fama, Eugene, "Efficient Capital Markets: A Review of Theory and Empirical
     Work," *Journal of Finance*, 25, March 1970, pages 383-417.
26       [4] <u>Basic Incorporated, et al.</u>, Petitioners v. Max L. Levinson et al., 485 U.S. 224
     (1988).
27       [5] Jaffe, Jeffrey, "Special Information and Insider Trading," *Journal of Business*,
     47, July 1974, pages 410-428, and Lorie, James, and Victor Niederhoffer,
28   "Predictive and Statistical Properties of Insider Trading," *Journal of Law and
     Economics*, 11, April 1968, pages 91-103.

1   "efficient market" in the securities industry and in academia.  If a security's price

2   reflects all public information, an investor can rely on it as the market's consensus

3   of the security's fair value.  Judge Alfred J. Lechner, Jr., in <u>Cammer v. Bloom</u>,[6]

4   cited commentators Bromberg & Lowenfels[7] ("Bromberg") in defining certain key

5   terms related to market efficiency in the context of a stock traded other than on the

6   New York Stock Exchange where trading is subject to overall capitalization

7   requirements and other indicia suggesting market efficiency:

8   •   An open market is one in which anyone, or at least a large number of

9       persons, can buy or sell.

10  •   A developed market is one which has a relatively high level of activity

11      and frequency, and for which trading information (e.g., price and

12      volume) is widely available.  It is principally a secondary market in

13      outstanding securities.  It usually, but not necessarily, has continuity and

14      liquidity (the ability to absorb a reasonable amount of trading with

15      relatively small price changes).

16  •   An efficient market is one which rapidly and accurately reflects new

17      information in the security's price.

18  These terms are cumulative in the sense that a developed market will almost

19  always be an open one, and an efficient market will almost invariably be a

20  developed one.[8]

21      12.    The <u>Cammer</u> Court described five factors which should be considered

22  in determining whether a market for a specific security is efficient:

23          a.    the stock's average trading volume;

24

25

26  ─────────────

    [6] <u>Cammer v. Bloom</u>, 711 F. Supp. 1264 (D.N.J. 1989).

27  [7] *Ibid.* at 1276, citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6, August 1988.

28  [8] *Ibid.*

    DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF                                    4
    LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
    NO. SACV 09-01304-JVS (MLGX)

1            b.      the number of securities analysts who follow and report on the

2  stock;

3            c.      the presence of market makers and arbitrageurs;

4            d.      the company's eligibility to file a Form S-3 Registration

5  Statement; and

6            e.      a cause-and-effect relationship, over time, between unexpected

7  corporate events or financial news releases and an immediate response in stock

8  price.[9]

9      13.    It is my opinion that the <u>Cammer</u> factors are consistent with the

10  economics literature and that they provide valuable insight into whether the market

11  for a security is efficient.[10]  <u>Cammer</u> Factor Five is especially important because it

12  relates directly to the definition of an efficient market.  I examined each of these

13  factors for the market for STEC's common stock during the Class Period.

14      14.    In addition to the <u>Cammer</u> factors, I also considered the three

15  supplemental tests cited in <u>Elmer Krogman v. R. Dale Sterritt, Jr.</u>[11] to examine the

16  market efficiency for a security:

17            a.      the company's total market capitalization;

18            b.      the stock's bid-ask spread; and

19            c.      the stock's public float.

20      15.    Additionally, I analyzed whether put-call parity held throughout the

21  Class Period and tested whether the price of STEC's common stock followed a

22  random walk during the Class Period.  Put-call parity should hold, at least to a

23  close approximation, and STEC's stock price movements should follow a random

24  walk if the market for STEC's common stock is efficient.  Put-call parity is a

25

26  ---
    [9] <u>Cammer</u>, at 1286-1287.

27    [10] Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market
    Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation
    Law*, 19, Winter 1994, pages 285-312.

28    [11] 202 F.R.D. 467 (N.D. Tex. 2001)

mathematical relationship between the price of a company's common stock and the prices of its call and put options, which holds when all those instruments are accurately priced.  The random walk model suggests that, in an efficient market, stock price movements are independent and the returns on the stock are identically distributed over time.[12]

16.     The Elmer Krogman tests, the put-call parity tests, and the random walk tests, taken in conjunction with the Cammer factors, collectively facilitate a thorough assessment of whether the market for STEC's common stock was efficient during the Class Period.

### A.     Application of the Cammer Factors to the Market for STEC's Common Stock

#### 1.     Cammer Factor One: Weekly Trading Volume

17.     High trading volume is indicative of an efficient market.  As stated in Cammer:

> The reason the existence of an actively traded market, as
> evidenced by a large weekly volume of stock trades,
> suggests there is an efficient market is because it implies
> significant investor interest in the company.  Such
> interest, in turn, implies a likelihood that many investors
> are executing trades on the basis of newly available or
> disseminated corporate information.[13]

According to Bromberg, "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[14]

---

[12] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003, page 405.
[13] Cammer at 1286.
[14] Ibid. at 1286, citing Bromberg, et al.

18.   During the Class Period, STEC's common stock was listed on the NASDAQ Global Select Market, which was formerly part of the NASDAQ National Market.[15]  It is the tier of the NASDAQ market with the largest, most liquid NASDAQ stocks.[16]  The average weekly reported trading volume for STEC's common stock was 12,053,008 shares. (See Exhibits A and B.)  STEC's weekly trading volume averaged 48.24% of shares outstanding, which provides a strong presumption of a liquid and efficient market.  In addition, the examination of weekly historical turnover ratios indicates that the volume of trading was large enough each week during the Class Period to support an efficient market for STEC's common stock.

19.   The annualized turnover ratio is the annual reported trading volume divided by the number of shares outstanding.  A total of 910,169,030 STEC shares traded during the Class Period, and the average number of STEC shares outstanding during the Class Period was 49,783,803 shares.  Since the Class Period spans 0.69 years, the annualized turnover ratio was 2637.58%.  (See Exhibit B.)  In comparison, the average annualized turnover ratio for NASDAQ-listed common stocks was 484.5% between 2005 and 2010.[17]  (See Exhibit C.)  STEC's high turnover ratio, which greatly exceeds the NASDAQ average, justifies a strong presumption that the market for STEC's common stock was efficient during the Class Period.

---

[15] The NASDAQ stock market classifies its listings into three market tier designations, the NASDAQ Global Select Market, the NASDAQ Global Market (formerly the NASDAQ National Market), and the NASDAQ Capital Market (formerly the NASDAQ SmallCap Market).  STEC was listed on the NASDAQ Global Select Market which consists of "companies that meet the most stringent initial financial listing standards ever set by a stock market."  The NASDAQ Global Select Market makes up "approximately one third of NASDAQ listings."  NASDAQ Global Select Fact Sheet, http://www.nasdaq.com/newsroom/presskit/reports/NASDAQ_Global_Select_Fact_sheet.pdf, last accessed 11/15/2011.

[16] *Ibid.*

[17] NASDAQ annual turnover rates were obtained from World Federation of Exchanges, www.world-exchanges.org, last accessed 11-14-2011.

## 2.    **Cammer** **Factor Two: Stock Analyst Coverage**

20.    Securities analysts play a critical role in promoting the efficiency of the securities markets.  Analysts devote substantial amounts of time and resources to collecting and assessing information regarding the companies they follow. Their ability to provide sophisticated analysis and convey new information and their conclusions as to its implications for investors in the market for a stock improves the speed and accuracy with which market prices adjust to reflect new information.  Within twenty-four hours of a company's earnings release, many stock analysts in an efficient market will have disseminated in-depth research reports.

21.    During the Class Period, at least 28 securities firms had stock analysts that covered the Company and its common stock.[18]  (See Exhibit D.)  Deutsche Bank Securities, Inc., J.P. Morgan, Oppenheimer & Co., Stifel Nicolaus, and Thomas Weisel Partners are some of the firms that had analysts who followed STEC.

22.    The regular availability of stock analyst research reports from leading broker-dealers who covered STEC during the Class Period, is evidence that the market for STEC's common stock was efficient during the Class Period.

23.    In addition, STEC issued regular press releases during the Class Period, made regular securities filings with the Securities and Exchange Commission ("SEC"), and held regular analyst conference calls; STEC received regular press coverage throughout the Class Period, and information concerning STEC was widely disseminated throughout the Class Period through Bloomberg and other news services.

---

[18] Based on the actual stock analyst and rating agency reports issued during the Class Period and obtained through Investext and Capital IQ, the analysts reported as attending STEC securities analyst conference calls, and analysts quoted in news stories about the performance of STEC.

### 3.   Cammer Factor Three: Existence of Market Makers, Institutional Investors, and Arbitrageurs

24.    STEC's common stock was listed on the NASDAQ during the entire Class Period.[19]  During this period, numerous financial entities were actively buying and selling STEC's common stock.  As disclosed in Schedule 13-F filings, shares representing between 59 and 96 percent of STEC's shares outstanding were held by institutional investors during the Class Period.[20]  (See Exhibit E.)   These institutions actively adjusted their holdings of STEC's common stock.  The sum of the absolute values of the quarterly changes in securities held by each individual institutional shareholder ranged from 4.9 million shares to 14.2 million shares during the Class Period.  Schedule 13-F filings report the holdings of institutional investors on one day in each calendar quarter, which can significantly understate the total volume of trading by these institutional shareholders by failing to account for instances where institutional shareholders bought and sold shares during the respective periods.  Thus, my estimation of the volume of institutional trading in STEC's common stock is conservative.   High levels of institutional ownership and the active trading by these holders is further evidence that the market for STEC's common stock was efficient during the Class Period.

25.    There is evidence that numerous financial entities were actively buying and trading STEC's common stock during the Class Period.  According to Bloomberg, there were 70 active market makers for STEC's common stock

---

[19] The NASDAQ stock market classifies its listings into three market tier designations, the NASDAQ Global Select Market, the NASDAQ Global Market (formerly the NASDAQ National Market), and the NASDAQ Capital Market (formerly the NASDAQ SmallCap Market).  STEC was listed on the NASDAQ Global Select Market which consists of "companies that meet the most stringent initial financial listing standards ever set by a stock market."  The NASDAQ Global Select Market makes up "approximately one third of NASDAQ listings." NASDAQ Global Select Fact Sheet, http://www.nasdaq.com/newsroom/presskit/reports/NASDAQ_Global_Select_Fact _sheet.pdf, last accessed 11/15/2011.
[20] Thomson Reuters and STEC Forms 10-K and 10-Q.

1    between June 2009 and February 2010 with trading volumes in excess of one

2    million shares.[21]  (See Exhibit F.)  The large number of market makers facilitating

3    trading in STEC's common stock during the Class Period is indicative of a liquid

4    and efficient market for STEC's common stock during this period.

5         **4.     <u>Cammer</u> Factor Four: STEC's Eligibility to File SEC Form S-3**

6    26.     The Securities Act of 1933 requires companies to file registration

7    statements prior to the sale of securities to the public.  Form S-3 is a simplified

8    form that allows incorporation by reference of Securities Exchange Act of 1934

9    (the "Exchange Act") reports.[22]  Form S-3 is available to large, seasoned

10   companies, and an amendment to the eligibility requirements for Form S-3, which

11   was effective January 28, 2008, now allows for smaller companies to file on Form

12   S-3.[23]  The primary requirements are that the issuer has filed all materials required

13   under the Exchange Act for at least twelve months and that the public float of the

14   Company's common equity is $75 million or more.  As stated in the SEC release

15   establishing the requirements for S-3 eligibility, "This form is predicated on the

16   Commission's belief that the market operates efficiently for these companies, i.e.,

17   that the disclosure in Exchange Act reports and other communications by the

18   registrant, such as press releases, has already been disseminated and accounted for

19   by the market place."[24]

20

21

22

23   [21] 21.     Bloomberg L.P.  According to Bloomberg, there were 70 market makers with trading volumes in excess of one million shares during the Class Period.  Bloomberg's list of market makers includes 448 entities, although some reported very low trading volumes.

25   [22] http://www.sec.gov/about/forms/forms-3.pdf.

26   [23] Securities and Exchange Commission, "Revisions to the Eligibility Requirements for Primary Securities Offerings on Forms S-3 and F-3," Release No. 33-8878; File No. S7-10-07, December 2007.

27   [24] <u>Cammer</u>, at 1284-1285 citing SEC Securities Act Release No. 6331, 46 Red. Reg. 41,902, reprinted in Fed. Sec. L. Rep. (CCH) Spec. Regs. No. 926, extra ed. (Aug. 13, 1981).

1    27.    STEC was eligible to file on Form S-3 throughout the Class Period

2 since it was listed on the NASDAQ throughout the Class Period and STEC filed an

3 S-3 on August 3, 2009.

4          **5.    Cammer Factor Five: The Relationship between News Events and Security Price Changes**

5

6    28.    In evaluating market efficiency, perhaps the most reliable test of

7 market efficiency comes from Cammer Factor Five, the relationship between news

8 events and securities price changes.  An efficient market will react to new

9 information that is economically significant.  I examined the responsiveness of

10 STEC's common stock price to news events to test whether the market for STEC's

11 common stock was efficient during the Class Period.  I performed an event study to

12 investigate this relationship between changes in STEC's common stock price and

13 news events concerning STEC.

14    29.    An event study is a standard statistical technique that financial

15 economists use to determine whether a security's price reaction to a news

16 announcement (or some other event) is statistically significant.  The event study

17 analyzes the daily return on STEC's common stock, which is the daily percentage

18 change in the price of a share, adjusted for any dividend distributions.  In order to

19 focus on the impact of the company-specific news on the price of a security, one

20 calculates a security's abnormal return around the time of the announcement.  A

21 security's abnormal return is the difference between the security's actual return and

22 its expected return.  A security's expected return is the return one would expect

23 based on general stock market price movements and industry-related factors that

24 are unrelated to the specific event that is being examined, as reflected in the

25 changes in the prices of stocks of firms in the same industry.  Once one has

26 calculated a security's abnormal returns, one can use standard statistical tests to

27 determine whether these abnormal returns are statistically significant.

28

1    30.    I calculated the expected return on STEC's common stock by

2  applying the widely accepted Fama-French Three-Factor Model.[25]   Eugene Fama

3  and Kenneth French developed what is now known as the Fama-French Three-

4  Factor Model in 1993.[26]   The Fama-French Three-Factor Model expresses the

5  excess return on a common stock on day t (Rt) over the return on Treasury bills

6  that day (RF) in terms of three key factors.   The return on Treasury bills represents

7  the return one would expect on a risk-free investment.   This model "has become

8  widely known and adapted."[27]   The model identifies the following three factors

9  that explain excess stock returns:

10   • $R_m$ - $R_F$ – the excess return on the equity market portfolio ($R_m$) over the

11       return on Treasury bills ($R_F$);[28]

12   • SMB ("small minus big") – the difference between the returns on small-

13       capitalization stocks and the returns on large-capitalization stocks; and

14   • HML ("high minus low") – the difference between the returns on high

15       book-to-market stocks (commonly known as value stocks) and the

16       returns on low book-to-market stocks (commonly known as growth

17       stocks).

18    31.    The regression formula for the Fama-French Three-Factor Model,

19  which is fitted to daily data, is:

20   $$R_t - R_F = \alpha + \beta(R_m - R_F) + s\, SMB + h\, HML + e \qquad \text{(Equation 1)}$$

21    32.    The variables $R_m - R_F$, SMB, and HML are defined above.   The

22  coefficients β, s, and h measure the contributions of the respective factors to the

23

24  _____

     [25] Fama, Eugene F., and Kenneth R. French, "Common Risk Factors in the
25  Returns on Stocks and Bonds," *Journal of Financial Economics*, 33, 1993, pages
     3-56.
26    [26] *Ibid.*
     [27] Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial
27  Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 191.
     [28] The equity market portfolio return, $R_m$, represents the value-weighted return
28  on all NYSE, AMEX and NASDAQ stocks.

1    excess return on the stock, $R_t - R_F$.  A positive coefficient suggests a direct

2    relationship between that factor and the return on the analyzed stock.  The larger

3    the coefficient, the more responsive the stock's return will be to that factor on any

4    given day.  The Fama-French Three-Factor Model has become widely accepted for

5    event study analysis.[29]  It is a significant improvement over the (unadjusted)

6    Capital Asset Pricing Model ("CAPM") because it prices the risks associated with

7    small firm size and financial distress.[30]  Morningstar's Cost of Capital Yearbook,

8    which is widely relied upon for historical rate of return data in the investment

9    management industry, uses the Fama-French Three-Factor Model, among other

10   models, to calculate the cost of equity capital for firms in various industries.[31]

11         33.    Controlling for industry factors that can affect the price of a

12   company's stock is appropriate in an event study, as several articles in the

13   academic and professional literature have previously noted.[32]  Indeed, academic

14   research has pointed out the importance of making sure that estimates of returns to

---

[29] See, for example, Boehme, Rodney D., and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Change," *Journal of Finance*, 57, 2002, pages 871-900, and Ang, James S., and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274.

[30] Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 192.

[31] Morningstar, Cost of Capital 2007 Yearbook, 2007, page 23.

[32] Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., Litigation Services Handbook, 3rd ed., Wiley, New York, 2001, chapter 19.  *See also* Alexander, Janet C., "The Value of Bad News," *UCLA Law Review*, 41, August, 1994, pages 1421-69; Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Virginia Law Review Association*, 1017, August 1991, pages 1021-28; A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35, March 1997, pages 13-39; Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, February 1994, pages 545-90; and Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, 37, June 1990, pages 883-923.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

13

1   investors on securities are free of the bias that can occur with the omission of an

2   explanatory factor when using a market model, such as the CAPM or the Fama-

3   French Three-Factor Model, to conduct an empirical study.[33]

4       34.    I modified the Fama-French Three-Factor Model to include the

5   returns on an index of the common stocks of computer storage and peripheral

6   companies to take into account the sensitivity of STEC's common stock price to

7   movements in other computer storage and peripheral companies' stock prices.  The

8   regression formula for my Modified Fama-French Three-Factor Model is:

9       $R_t - R_F = \alpha + \beta(R_m - R_F) + s\ SMB + h\ HML + i\ Industry\ Index + e$    (Equation 2)

10      35.    *Industry Index* is the percentage change in the S&P 500 SmallCap

11  Computer Storage & Peripherals Index.  The coefficient i measures the

12  contribution of industry-wide factors, as measured by the daily percentage change

13  in the S&P 600 SmallCap Computer Storage & Peripherals Index, to the daily

14  excess returns on STEC's common stock. The members of the S&P 600 SmallCap

15  Computer Storage & Peripherals Index as of June 16, 2009 were:  Hutchinson

16  Technology, Inc., Intermec, Inc., Intevac, Inc., Novatel Wireless, Inc., Steel Excel,

17  Inc., and Synaptics, Inc.  I used the S&P 600 SmallCap Computer Storage &

18  Peripherals Index because Capital IQ defines the primary industry for STEC and

19  all members of the S&P 600 SmallCap Computer Storage & Peripherals Index as

20  "Computers & Storage and Peripherals."[34]  In addition, as of December 31, 2009,

21

22

23

24  _____

    [33] Bartholdy, Jan and Paula Peare, "Unbiased Estimation of Expected Return
25  Using CAPM," *International Review of Financial Analysis*, 2003, pages 69-81.
    The article specifically mentions the CAPM but its analysis applies equally to the
26  Fama-French Three-Factor Model because that model is really just an extended
    version of the CAPM.  See Brealey, Richard A., Stewart C. Myers, and Franklin
27  Allen, Principles of Corporate Finance, 9th ed., McGraw-Hill, New York, 2008,
    pages 225-227.
28      [34] Capital I.Q.

1    STEC had a similar market capitalization and revenues as the members of the S&P

2    SmallCap Computer Storage & Peripherals Index.[35]

3        36.    I applied the Modified Fama-French Three-Factor Model for every

4    day in the Class Period to test whether the stock market's reactions to STEC's

5    daily news events were statistically significant during the Class Period.  (See

6    Exhibit G.)  In each case, I used a two-tailed test of statistical significance to test

7    whether the daily abnormal return on STEC's common stock is zero (the null

8    hypothesis) against the alternative that the daily abnormal return is different from

9    zero (the alternative hypothesis).[36]  I employed a critical significance level of 10%

10   in performing these tests.  This critical significance level is consistent with the

11   general practice in the field of financial economics.  (See Exhibit H.)  I also clearly

12   distinguished in Exhibit G, in reporting the results of the statistical testing, when

13   the abnormal stock return is significantly different from zero at the 1% significance

14   level, 5% level, or 10% level, which is also consistent with the general practice

15   within the field of financial economics.

16       37.    I identified news items relevant to STEC during the Class Period to

17   examine the cause-and-effect relationship between news events and the

18   responsiveness of STEC's common stock price.  I selected a set of STEC-related

19   announcements that I believed to be economically significant and which include

20

21   [35] STEC's market capitalization of $469.8 million, was within the range market

22   capitalization for the members of the S&P 600 SmallCap Computer Storage &
     Peripherals Index, which was between $40.5 million and $1.1 billion.  STEC's

23   latest twelve month revenue of $354.2 million, was within the range of latest
     twelve month revenues for the members of the S&P 600 SmallCap Computer

24   Storage & Peripherals Index which was between $54.2 million and $658.2 million.

25   Source: Capital I.Q.
     [36] The two-tailed test is conservative because I would normally expect that a

26   corrective disclosure would elicit a negative stock market reaction, in which case
     the alternative hypothesis is that the abnormal stock market return is less than zero

27   and a one-tailed test would seem more appropriate.  Thus, the two-tailed test with a
     10% critical significance level is equivalent to a one-tailed test with a more

28   conservative 5% critical significance level.

1   many of the most important company news items. I also selected a set of STEC-

2   related announcements from outside the Class Period to compare the market's

3   responsiveness during a control period to its reactions during the Class Period. I

4   then tested STEC's stock price reaction on the news announcement dates for

5   statistical significance. During the Class Period, I identified several dates where I

6   found a cause-and-effect relationship between news events and an immediate

7   response in STEC's common stock price, which is evidence of an efficient market.

8   I describe *below* the stock market's reaction to a selected sample of news

9   announcements concerning STEC during the Class Period, which illustrate this

10  cause-and-effect relationship.

11                          **i.      June 16, 2009**

12          38.     Prior to the start of trading on June 16, 2009, STEC issued a press

13  release announcing that it was increasing its Q2 2009 revenue guidance to $82-84

14  million.[37] The revised revenue guidance represented a $14 million increase over

15  STEC's previously announced revenue guidance.[38] STEC cited increasing sales

16  from STEC's ZeusIOPS solid-state drives as the reason for the improved

17  guidance.[39] In addition to announcing an increase in its revenue guidance, STEC

18  also noted that it expected revenue from the ZeusIOPS product line alone to be $80

19  million for the first half of 2009. This represented an increase from STEC's

20  previous projection of $65 million.[40] Later in the day, an Oppenheimer & Co.

21  securities analyst released a report which maintained Oppenheimer & Co.'s

22  "Outperform" rating and raised its price target for STEC to $30.[41] The securities

23  analyst cited the increased revenue guidance, especially for ZeusIOPS, and the

24

25  _____

26  [37] STEC, Inc., Form 8-K, June 16, 2009.
    [38] *Ibid.*
    [39] *Ibid.*
27  [40] *Ibid.*
    [41] Oppenheimer & Co., "Pre-Announcement Justifies Parabolic Stock - Clear
28  Visibility on ~$2 in EPS," June 16, 2009.

1  consequent improved earnings outlook for STEC as the reason for raising the price

2  target and maintaining the "Outperform" rating despite the recent run-up in

3  STEC's stock price.[42]  STEC's improved guidance was economically significant

4  favorable news, which I would expect to elicit a positive stock price reaction.  Also

5  during the day, a Capstone Investments securities analyst raised his price target for

6  STEC's stock to $28 from $19 citing STEC's higher revenue and earnings

7  guidance and the improved outlook for ZeusIOPS sales to OEMs.[43]

8       39.    I have reviewed the media databases on Bloomberg, Investext, and

9  other news sources for STEC-related news articles published on June 16, 2009.  I

10  did not find any additional material news items regarding STEC that received any

11  news coverage that day.  As a result of the announcement regarding STEC's

12  revision of its second quarter revenue guidance, STEC's common stock price

13  increased 26.97%.  (See Exhibit G.)  I applied the Modified Fama-French Three-

14  Factor Model, including the percentage change in the Industry Index as an

15  explanatory variable.  On June 16, 2009, the abnormal return resulting from the

16  news announcements was 27.74%, which is statistically significant at the 1% level.

17  Such a significance level means that there is less than a 1 in 100 chance that the

18  abnormal return happened by mere chance.

19       **ii.**    **July 13, 2009**

20       40.    Prior to the start of trading on July 13, 2009, STEC announced that it

21  had partnered with a leading defense systems contractor to deploy SSDs to the U.S.

22  military as part of a 12-month, $28 million supply contract.[44]  According to the

23

24  [42] *Ibid.*

25  [43] Capstone Investments, "STEC: More SSD Please – June Guidance Moves Higher Driven by Higher ZeusIOPS – Reiterate Strong Buy – Target to $28 from $19," June 16, 2009.

26  [44] GlobeNewswire, "STEC Announces Major Deployment of Solid State Drives (SSD) Into U.S. Military Project With $28 Million Supplier Contract; STEC MACH8 Solid State Drive Utilized in An Advanced Defense System for the U.S. Military, Furthering SSD Adoption Into Military and Aerospace Applications," July 13, 2009.

27

28

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)
    17

1  announcement, STEC would supply its MACH8 SSD for integration into a

2  platform designed on behalf of the U.S. military.  STEC expected shipments would

3  begin during the third quarter of 2009.[45]  Manouch Moshayedi, Chairman and

4  Chief Executive Officer of STEC stated, "we are proud to have been selected to

5  provide our SSDs for use in this military initiative.  This contract marks the first

6  major military win for our MACH8 line of SSDs.  More significantly this contract

7  win demonstrates that our SSD technologies are adaptable and appropriate for a

8  broad range of industries."[46]  The contract with the U.S. military for STEC's

9  MACH8 SSDs and the remarks provided by Manouch Moshayedi were

10  economically significant favorable news, which I would expect to elicit a positive

11  stock price reaction.

12     41.    I have reviewed the media databases on Bloomberg, Investext, and

13  other news sources for articles published on July 13, 2009 relating to STEC.  I did

14  not find any additional material news items regarding STEC that received any

15  news coverage that day.  As a result of the announcement regarding the 12-month,

16  $28 million supply contract STEC signed with the U.S. military, STEC's common

17  stock price increased 13.60%.  (See Exhibit G.)   I applied the Modified Fama-

18  French Three-Factor Model, including the percentage change in the Industry Index

19  as an explanatory variable.  On July 13, 2009, the abnormal return resulting from

20  the news announcement was 11.51%, which is statistically significant at the 5%

21  level.  Such a significance level means that there is less than a 1 in 20 chance that

22  the abnormal return happened by mere chance.

23          **iii.    July 16, 2009**

24     42.    Prior to the start of trading on July 16, 2009, STEC announced that it

25  had signed a $120 million supply contract for ZeusIOPS SSDs for the second half

26

27  _____
   [45] *Ibid.*
28   [46] *Ibid.*

of 2009.[47]  As a result of the supply contract, STEC revised its ZeusIOPS SSDs

sales forecast to exceed $220 million in 2009.  Later that day, an Oppenheimer &

Co. analyst report cited the STEC contract announcement and accordingly revised

its earnings forecasts for STEC.[48]  Bloomberg L.P published additional news

articles, throughout the day, that repeated the information that STEC had just

signed a large contract and had revised its revenue forecast.[49]  The large new

contract for its main product was economically significant favorable news, which I

would expect to elicit a positive stock price reaction.

43.    I have reviewed the media databases on Bloomberg, Investext, and

other news sources for articles published on July 16, 2009 relating to STEC.  I did

not find any additional material news items regarding STEC that received any

news coverage that day.  As a result of the announcement regarding the $120

million supply contract STEC signed, STEC's common stock price increased

15.22%.  (See Exhibit G.)  I applied the Modified Fama-French Three-Factor

Model, including the percentage change in the Industry Index as an explanatory

variable.  On July 16, 2009, the abnormal return resulting from the news

announcement was 14.70%, which is statistically significant at the 1% level.  Such

a significance level means that there is less than a 1 in 100 chance that the

abnormal return happened by mere chance.

### iv.    August 3-4, 2009

44.    Shortly after the market closed on August 3, 2009, STEC filed a

prospectus for the sale of 7.5 million common shares in a secondary offering.[50]

---

[47] Bloomberg L.P., "STEC Signs a $120M Supply Pact for ZeusIOPS SSDs for 2H 2009," July 16, 2009 and Bloomberg L.P., "STEC Sees Sales of SSDs to Exceed $220M in 2009," July 16, 2009.
[48] Oppenheimer & Co., "Bringing Out the Big Gun – 2H Contract Ups Visibility, Ests, PT, Everything," July 16, 2009.
[49] Bloomberg L.P., "STEC Signs a $120M Supply Agreement for ZeusIOPS SSDs, Sees Higher Revenue," July 16, 2009.
[50] STEC, Inc., Form 424B3, filed August 3, 2009.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGx)

19

1    Such an announcement of significant share sales by insiders is generally

2    considered negative news, which leads to investor share sales.[51]  In addition, a

3    Capstone Investments securities analyst, who was one out of 28 analysts covering

4    STEC, downgraded STEC's stock from "Buy" to "Hold."[52]

5        45.    However, also after the market closed on August 3, 2009, STEC filed

6    its 2009 second quarter Form 10-Q and held an earnings conference call with

7    investors and securities analysts.  STEC reported second quarter revenue of $86.4

8    million, which was slightly above its previously raised guidance of $82 million to

9    $84 million and the analysts' consensus of $83 million.[53]  STEC reported GAAP

10    earnings per share of $0.38, which was above the analysts' mean consensus for

11    GAAP earnings per share of $0.28.[54]  The earnings release also reiterated

12    information from the July 16 announcement, which stated that during the second

13    quarter, STEC had signed a "120 million contract to supply ZeusIOPS SSDs to a

14    major Enterprise-Storage customer for the second half of 2009."[55]  In addition,

15    STEC's 10-Q and offering prospectus both filed after the market closed on August

16    3 stated that it expected growth in its sales of ZeusIOPS through the end of 2009 to

17    its major OEM customers based on "accelerated adoption of our ZeusIOPS SSDs

18    by most of our major Enterprise-Storage and Enterprise-Server OEM customers

19    into their systems."[56]

---

[51] Seyhun, H. Nejat, "Insiders' Profits, Costs of Trading, and Market Efficiency," *Journal of Financial Economics*, 16, June 1986, pages 189-212 and Inci, A. Can, Biao Lu, and H. Nejat Seyhun, "Intraday Behavior of Stock Prices and Trades around Insider Trading," *Financial Management*, Spring 2010, pages 323-363.
[52] Capstone Investments, "STEC: Near-term ZeusIOPS Adoption Strong – Secondary Blurs Future Prospects – FY10 Consensus Likely Too High – Downgrading to Hold from Buy," August 4, 2009.
[53] STEC, Inc., Q2 2009 - Earnings Conference Call, August 3, 2009.
[54] I/B/E/S Thomson Reuters / First Call.
[55] STEC Press Release filed as Form 8-K, August 3, 2009.
[56] STEC, Inc., Second Quarter 2009 Form 10-Q and Offering Prospectus both filed August, 3, 2009.

46.     Based on STEC's positive announcements about the expected
continuing growth in ZeusIOPS sales to most of its major OEM customers in the
second half of the year, the repetition of the announcement of the EMC agreement,
and slightly higher second quarter earnings than expected, securities analysts
expected continuing upside to the sales of ZeusIOPS.  ThinkEquity, for example,
raised its 2009 and 2010 earnings estimates and its stock price target for STEC,
stating in its report that it "believe[s] 2H09 should see continuing upside to the
consensus, with ramps outside EMC....with strength from the EMC ramp."[57]  The
Capstone analyst also expected that sales of ZeusIOPS to IBM and other OEMs
would increase in the second half of 2009.[58]

47.     Thus, the negative news about the secondary offering was
counterbalanced by positive news about STEC's better-than-expected revenue and
earnings during the second quarter, and expected growth in ZeusIOPS sales to
most of its OEM customers during the second half of 2009.  On balance, however,
I would expect the news about STEC on August 3-4, 2009 to elicit a negative stock
price reaction.

48.     I have reviewed the media databases on Bloomberg, Investext, and
other news sources for STEC-related news articles published on August 3 and
August 4, 2009.  I did not find any additional material news items regarding STEC
that received any news coverage on those days beyond the information discussed
in the preceding paragraphs.  As a result of STEC's announcement regarding the
secondary offering and the subsequent analyst's stock downgrade, STEC's
common stock price fell 7.75% on August 4, 2009.  (See Exhibit G.)  I applied the
Modified Fama-French Three-Factor Model including the percentage change in the

---

[57] ThinkEquity LLC, "STEC: Solid Quarter; Good Guidance; Raise Price
Target," August 4, 2009.
[58] Capstone Investments, "STEC: Near-term ZeusIOPS Adoption Strong –
Secondary Blurs Future Prospects – FY10 Consensus Likely Too High –
Downgrading to Hold from Buy," August 4, 2009.

1   *Industry Index* as an explanatory variable.  On August 4, 2009, the abnormal return

2   resulting from the news announcement was -7.77%, which is statistically

3   significant at the 10% level.  Such a significance level means that there is less than

4   a 1 in 10 chance that the abnormal return happened by mere chance.  In my

5   opinion, the relatively weak statistical significance of the negative stock price

6   reaction to the mix of news on August 3-4, 2009 is due to the mitigating impact of

7   the news regarding STEC's better-than-expected revenue and earnings during the

8   second quarter, and expected growth in ZeusIOPS sales to most of its OEM

9   customers during the second half of 2009.

10            **v.**      **September 17, 2009**

11       49.     Prior to the start of trading on September 17, 2009, Wedbush Morgan

12   Securities Inc. ("Wedbush") lowered its price target on STEC's common stock to

13   $39 from $45.[59]  The price target reduction was a result of the firm's recent

14   industry research, which indicated a competitive landscape in the SATA/SAS

15   enterprise SSD market that was intensifying above the firm's previous

16   expectations.  Wedbush's research indicated that one of the leading hard drive

17   original equipment manufacturers ("OEM") would likely introduce a competing

18   product in the fourth quarter of 2009.  While the Wedbush securities analyst was

19   unclear about the exact timing of the release of the new product by the competitor,

20   the Wedbush securities analyst was "concerned STEC's 'window of opportunity'

21   to maintain a market leadership position and secure design wins at Tier 1 OEMs in

22   the SATA/SAS SSD enterprise market ahead of the competition may be closing."[60]

23       50.     I have reviewed the media databases on Bloomberg, Investext, and

24   other news sources for articles published on September 17, 2009 relating to STEC.

25

26   <sub>59</sub> The firm changed its name to Wedbush Securities Inc. from Wedbush Morgan
    Securities Inc. in late 2009.  Wedbush Securities Inc., "STEC Inc., Checks Indicate

27   Q3 Beat Likely in Cards; but Expect Changing Competitive Landscape to Pressure
    Shares Downward," September 17, 2009.

28   <sup>60</sup> *Ibid.*

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

22

1   I did not find any additional material news items regarding STEC that received any
2   news coverage that day.  As a result of the Wedbush analyst report regarding the
3   unexpected changes to the competitive landscape and the subsequent price target
4   reduction, STEC's common stock price decreased 16.81%.  (See Exhibit G.)   I
5   applied the Modified Fama-French Three-Factor Model, including the percentage
6   change in the Industry Index as an explanatory variable.  On September 17, 2009,
7   the abnormal return resulting from the news announcement was  17.43%, which is
8   statistically significant at the 1% level.  Such a significance level means that there
9   is less than a 1 in 100 chance that the abnormal return happened by mere chance.

### vi.    November 3-4, 2009

11       51.    After the market closed on November 3, 2009, STEC filed its 2009
12   third quarter 10-Q report and held an earnings conference call with investors and
13   securities analysts.  STEC reported third quarter revenue of $98.3 million, which
14   was only slightly above its guidance of $95 million to $97 million.[61]  STEC
15   reported GAAP earnings per share of $0.47 which was slightly higher than the
16   analysts' mean consensus for GAAP earnings per share of $0.45.[62]  However,
17   STEC's projected revenue of $101 million to $103 million for the fourth quarter
18   was lower than the securities analysts' consensus forecast of $106 million.  In
19   addition, STEC disclosed during the earnings conference call that sales to other
20   OEM customers besides EMC were down.[63]  In response to an analyst's question
21   about his expectation for the fourth quarter ZeusIOPS sales, CEO Manouch
22   Moshayedi stated that "the rest of the [ZeusIOPS] account did not come along as
23   fast as we had anticipated.  So, therefore, their numbers were down."[64]  STEC also
24   announced that there was an accumulation of inventory of ZeusIOPS storage

---

[61] STEC Announces Third Quarter 2009 Results, November 3, 2009.
[62] I/B/E/S Thomson Reuters / First Call.
[63] STEC, Inc., Q3 2009 - Earnings Conference Call, November 3, 2009.
[64] *Ibid.*

1   devices at EMC, STEC's major customer for this product.  STEC disclosed in the

2   earnings release that "[w]e recently received preliminary indications that our

3   customer might carry inventory of our ZeusIOPS at the end of 2009 which they

4   will use in 2010,"[65] which contradicted its prior statements that EMC would be

5   purchasing roughly $60 million of ZeusIOPS every quarter.

6          52.    The news about excess inventory at EMC and the delayed growth in

7   business from other customers raised equity analysts' concerns, which led them to

8   focus on the inventory of ZeusIOPS devices in the Q&A session during the

9   earnings conference call. As a result of the negative news, most analysts lowered

10  their earnings estimates and their stock price targets for STEC, and some analysts

11  even lowered their ratings. Oppenheimer & Co., for example, downgraded STEC's

12  stock to "Perform" from "Outperform", stating in the analyst report that "the

13  disappointing ZeusIOPS sales were attributed to slower than expected sell-through

14  at EMC, and the lack of revenue contribution from any other customers,

15  particularly the highly expected IBM."[66]  ThinkEquity LLC also downgraded its

16  rating from "Buy" to "Hold" based on its concerns about STEC's inventory risk.[67]

17  The surprise regarding the buildup of ZeuSIOPS inventory at STEC's main

18  customer was economically significant negative news, which I would expect to

19  lead to a negative stock price reaction.

20         53.    I have reviewed the media databases on Bloomberg, Investext, and

21  other news sources for STEC-related news articles published on November 3 and

22  November 4, 2009.  I did not find any additional material news items regarding

23  STEC that received any news coverage on those dates other than the earnings-

24  related news and the projected lower revenue due to the customer's inventory

25

26  [65] *Ibid.*
    [66] Oppenheimer & Co., "STEC Inc., No Smoking Gun, But Pistol-Whipped

27  Instead: Downgrading to Perform, $21 PT," November 3, 2009.
    [67] ThinkEquity LLC, "STEC: Believe Competition and Pricing Imply More

28  Downside; Downgrade to Hold," November 4, 2009.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF                              24
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

1   buildup.  As a result of STEC's announcement regarding the weaker earnings

2   guidance due to the buildup of inventory of ZeusIOSPS at EMC and subsequent

3   analysts' downgrades, STEC's common stock price fell 38.92% on November 4,

4   2009. (*See* Exhibit G.)   I applied the Modified Fama-French Three-Factor Model

5   including the percentage change in the *Industry Index* as an explanatory variable.

6   On November 4, 2009, the abnormal return resulting from the news announcement

7   was -39.45%, which is statistically significant at the 1% level.  Such a significance

8   level means that there is less than a 1 in 100 chance that the abnormal return

9   happened by mere chance.

10                         **vii.    February 23-24, 2010**

11          54.    After the market closed on February 23, 2010, STEC released its

12   fourth quarter 2009 earnings press release with revenue guidance of $33 million to

13   $35 million.  This guidance was below investors' expectations by "as much as 53

14   percent".[68]   STEC reported GAAP earnings per share of $0.50, which was only

15   slightly above the analysts' mean consensus for GAAP earnings per share of

16   $0.49.[69]  During its subsequent earnings conference call, STEC disclosed that its

17   contract with EMC was a not a recurring higher volume contract as it had

18   previously implied, and as a result, STEC did not expect "any meaningful

19   production orders" from EMC during the first half of 2010.[70]  In addition, STEC

20   also disclosed that its ZeusIOPS sales to its customers (other than EMC) were far

21   below their quarterly levels during the first half of 2009 and that STEC did not

22   expect to recover those sales in the first quarter 2010.[71]

23

24

25        [68] Associated Press, "STEC shares plunge on dismal 1Q revenue outlook,"
26   February 24, 2010.
          [69] I/B/E/S Thomson Reuters / First Call.
27        [70] Bloomberg L.P., "STEC Announces Fourth Quarter and Full-Year 2009
     Results," February 23, 2010.
28        [71] *Ibid.*

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF                                25
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGx)

55.     As a result of these disclosures, multiple securities analysts, including analysts from J. P. Morgan and Deutsche Bank, lowered their stock price targets for STEC.  J. P. Morgan cited STEC's expectation of first quarter 2010 revenues of only $33-$35 million as the reason for lowering its stock price target, noting that STEC's estimates "implie[d] a QoQ revenue decline of 66.4% and a YoY revenue decline of 36.5%."[72]  In addition, the stock analysts from Deutsche Bank cited STEC's disclosure that all of STEC's other customers combined would "not be enough to offset lost EMC biz"[73] as a reason for lowering their stock price target. The disclosures on February 23, 2010 were economically significant negative news, which I would expect to elicit a negative stock price reaction.

56.     I have reviewed the media databases on Bloomberg, Investext, and other news sources for STEC-related news articles published between the dates of February 23, 2010 and February 24, 2010.  I did not find any additional material news items regarding STEC that received any news coverage on these dates.  As a result of STEC's disclosures that its contract with EMC was not a recurring higher-volume contract as it previously had implied, that all of STEC's other customers combined could not make up for the purchases made by EMC under the EMC agreement, and its substantially lower revenue guidance, STEC's common stock fell 23.4%."I applied the Modified Fama-French Three-Factor Model, including the percentage change in the Industry Index as an explanatory variable. On February 24, 2010, the abnormal return resulting from the news announcement was -24.07%, which is statistically significant at the 1% level.  Such a significance level means that there is less than a 1 in 100 chance that the abnormal return happened by mere chance.

---

[72] J. P. Morgan, "Downgrading to Neutral; Major Downdraft in Outlook Derails High-Growth Story," February 24, 2010.
[73] Deutsche Bank, "F4Q-09 results: F1Q-10 worse than worst-case scenario," February 23, 2010.

1

### 6.     The Relationship between News Events and Security Price Changes During the Control Period

2

3      57.     Although the above analysis demonstrates that the market for STEC's
common stock was efficient during the Class Period, I also tested the market
4
efficiency for dates outside the Class Period as a control period to buttress the
5
findings described above.
6
### i.     November 17-18, 2008
7
8      58.     On November 17, 2008, STEC held its annual Analyst Day in New
York, where it announced that STEC was going to focus on enterprise SSDs as a
9
growth engine for the Company.  For the third calendar quarter, STEC reported a
10
non-GAAP gross margin of 34.1% and a non-GAAP operating margin of 12.1%.
11
In presenting its margin estimates, STEC told securities analysts that it would need
12
a "very high" contribution from its ZeusIOPS product, which STEC said carried a
13
50-60% gross margin.[74]  Additionally, STEC announced a $10 million stock
14
buyback program, which would begin on November 19, 2008.
15
16      59.     Based on STEC's announcements, several securities analysts, such as
those at Wachovia, revised their earnings estimates upward on the belief that STEC
17
would be able to "execut[e] on its core competency (i.e. focus on enterprise SSD
18
opportunities)."[75]  The securities analyst from Wachovia estimated that "a 50%+
19
contribution from ZeusIOPS would be required" for STEC to achieve its projected
20
margin levels of 40%.[76]  In addition, while securities analysts from Caris &
21
Company had lowered their price target from $5.50 to $3.75, they maintained their
22
"Average" rating and cited STEC's competitive positioning in SSDs, its stock
23
buyback program, and its "very well attended Analyst Day" as positive factors.[77]
24

25      [74] Wachovia, "Equity Research STEC, Inc.," November 17, 2008.
26      [75] *Ibid.*
        [76] *Ibid.*
27      [77] Caris & Company, "STEC, Inc. Well Attended Analyst Day; But With No
Near-term Positive Catalyst; Maintain 3*/Average and Lowering PT," November
28      18, 2008.

1    On balance, the news announced by STEC at its Analyst Day in New York was

2    economically significant positive news, which I would expect to elicit a positive

3    stock price reaction.

4        60.    I have reviewed the media databases on Bloomberg, Investext, and

5    other news sources for STEC-related news articles published on November 17-18,

6    2008.  I did not find any additional material news items regarding STEC that

7    received any news coverage on November 18 beyond the information discussed in

8    the preceding paragraph.  As a result of STEC's announcement regarding its focus

9    on enterprise SSD and its stock buyback program, STEC's common stock price

10   rose 11.73% on November 18, 2008.  (See Exhibit G.)  I applied the Modified

11   Fama-French Three-Factor Model including the percentage change in the *Industry*

12   *Index* as an explanatory variable.  On November 18, 2008, the abnormal return

13   resulting from the news announcement was 11.28%, which is statistically

14   significant at the 5% level.  Such a significance level means that there is less than a

15   1 in 20 chance that the abnormal return happened by mere chance.

16                    **ii.    December 15-16, 2008**

17       61.    After the market closed on December 15, 2008, STEC announced that

18   it would be lowering its revenue guidance to the range of $55 million to $59

19   million for the fourth quarter of 2008,  as compared to securities analysts'

20   consensus of $70.5 million.[78]  STEC announced that it expected revenue for 2009

21   "to be under pressure" citing the severe current economic downturn and poor

22   visibility in its DRAM business.[79]  STEC provided its revenue guidance for the

23   first quarter of 2009, with the expectation that revenues would range from $42

24   million to $50 million, as compared to securities analysts' consensus of $64

25

26

27   [78] Bloomberg, L.P., "STEC Inc. - STEC lowers Q4 revenue to $55M-$59M from
     prior $69M-$72M," December 15, 2008.

28   [79] *Ibid.*

1  million.[80]  STEC also provided it revenue guidance for full year 2009, and

2  informed the market that it expected its revenues to range from $200 million to

3  $240 million, as compared to securities analysts' consensus forecast of $289

4  million.[81]  In addition, the Company announced that it was "currently taking

5  measures" to reduce costs by $4 million to $8 million annually through the

6  transitioning of significant operations to Malaysia.[82]  On the morning of December

7  16, 2008, prior to the opening of the market, STEC announced the appointment of

8  Matthew Witte to the Board of Directors.[83]

9       62.    As a result of the negative news regarding STEC's lowered fourth

10  quarter guidance, a number of securities analysts reduced their estimates and stock

11  price targets for STEC.  In addition, some securities analysts expressed concern

12  over the 2009 guidance STEC provided.  A securities analyst at Caris & Company

13  stated that the first quarter and full year 2009 revenue ranges were "considerably

14  below the Street and our estimates."[84]  A securities analyst at Deutsche Bank stated

15  that "Perhaps more ominous is the accelerating decline in 1Q09 (-18% q/q) and the

16  lack of any visibility."[85]  Despite the positive news regarding increasing SSD

17  business, Deutsche Bank stated that it "expect[ed] the SSD market to become

18  increasingly competitive in 2009."[86]

19       63.    I have reviewed the media databases on Bloomberg, Investext, and

20  other news sources for articles published on December 15 and December 16, 2008

21  relating to STEC.  I did not find any additional material news items regarding

22

23  [80] Bloomberg, L.P., "STEC: STEC Inc Lowers revs guidance for Q4 below
24  consensus; guides Q1 and FY09 revs below consensus," December 15, 2008.
    [81] Ibid.
    [82] Bloomberg, L.P., "STEC Lowers Guidance for the Fourth Quarter of 2008,"
25  December 15, 2008.
    [83] Bloomberg, L.P., "STEC Appoints Matthew Witte to Board of Directors,"
26  December 16, 2008.
    [84] Caris & Company, "Very Tough Macro Takes Wind Out of Sails; Lowers Q4
27  Revenue Guidance and Provides Somber 2009E Outlook," December 16, 2008.
    [85] Deutsche Bank, "Lowers 4Q08 revenue guidance," December 15, 2008.
28  [86] Ibid.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF                                    29
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

1  STEC that received any news coverage on those days.  As a result of the

2  announcements of lowered guidance for the fourth quarter 2009 and also for full

3  year 2009, STEC's common stock price fell 21.75% on December 16, 2008.  (See

4  Exhibit G.)   I applied the Modified Fama-French Three-Factor Model, including

5  the percentage change in the Industry Index as an explanatory variable.  On

6  December 16, 2008, the abnormal return resulting from the news announcement

7  was     -24.66%, which is statistically significant at the 1% level.  Such a

8  significance level means that there is less than a 1 in 100 chance that the abnormal

9  return happened by mere chance.

10              **iii.    March 12-13, 2009**

11         64.    After the market closed on March 12, 2009, STEC announced its

12  fourth quarter and full year 2008 results and held an earnings conference call with

13  investors and securities analysts.[87]  STEC reported fourth quarter revenue of $57

14  million, which was slightly above the Street consensus of $56.5 million.[88]  STEC

15  also reported GAAP earnings per share of $0.00, which, quarter over quarter, was

16  down compared to $0.03 in fourth quarter 2007.[89]  In its earnings release, STEC

17  informed the market that it had realized 44% quarter over quarter growth in its

18  ZeusIOPS enterprise SSD revenues, while it also realized a 63% quarter over

19  quarter drop in DRAM revenues due to a $20 million order cancellation from

20  Cisco Systems, Inc. ("CSCO").[90]

21         65.    Despite STEC's lower revenues from the sales of DRAMs, securities

22  analysts reacted positively to the news that STEC was increasing its enterprise

23  SSD business, and the securities analysts raised their earnings estimates for STEC.

24  For example, the securities analysts from Oppenheimer & Co. raised their 2009

25

26  _____

[87] Bloomberg, L.P., "STEC Announces Fourth Quarter and Full-Year 2008 Results," March 12, 2009.

27  [88] *Ibid.*

[89] *Ibid.*

28  [90] *Ibid.*

1   earnings per share ("EPS") estimate from $0.09 to $0.45 and their stock price

2   target from $6 to $9.[91]   The Oppenheimer securities analysts cited "the acceleration

3   of STEC's high-margin enterprise SSD business" as one of the major reasons for

4   increasing the estimates.[92]   Oppenheimer also kept STEC's rating at "Outperform"

5   and cited the accelerated growth in STEC's enterprise SSD business as the reason

6   for maintaining STEC's rating.[93]   Securities analysts from Capstone Investments

7   also raised their stock price target for STEC from $7 to $10.[94]   On balance, the

8   news about ¬STEC's enterprise SSD business growth was economically significant

9   positive news, which I would expect to elicit a positive stock price reaction.

10      66.     I have reviewed the media databases on Bloomberg, Investext, and

11   other news sources for STEC-related news articles published on March 12, 2009

12   and March 13, 2009.  I did not find any additional material news items regarding

13   STEC that received any news coverage on March 12, 2009 and March 13, 2009

14   beyond the information discussed in the preceding paragraph.  As a result of

15   STEC's announcement regarding the growth in its ZeusIOPS enterprise SSD

16   revenues, STEC's common stock price rose 18.55% on March 13, 2009.  (See

17   Exhibit G.)  I applied the Modified Fama-French Three-Factor Model including the

18   percentage change in the *Industry Index* as an explanatory variable.  On March 13,

19   2009, the abnormal return resulting from the news announcement was 18.53%,

20   which is statistically significant at the 1% level.  Such a significance level means

21   that there is less than a 1 in 100 chance that the abnormal return happened by mere

22   chance.

23

24

25   [91] Oppenheimer & Co., "STEC Inc., Enterprise SSD Business Taking Off,
26   Raising Estimates and PT," March 13, 2009.
       [92] *Ibid.*
27     [93] *Ibid.*
       [94] Capstone Investments, "STEC Inc., STEC: March Guidance Suggests 15%
28   Sequential SSD Growth – Raising Target to $10," March 13, 2009.

1          **iv.     May 11-12, 2009**

2          67.    After the market closed on May 11, 2009, STEC announced its first

3    quarter 2009 results and held an earnings conference call with investors and

4    securities analysts.  STEC reported first quarter revenue of $63.5 million, which

5    was above STEC's revenue guidance of $58 to $60 million and was also above the

6    securities analysts' consensus of $59 million.[95]  STEC also reported GAAP

7    earnings per share of $0.17, which exceeded STEC's GAAP earnings per share of

8    $0.05 in fourth quarter 2008.[96]  In its earnings release, STEC informed the market

9    that it expected an increase in ZeusIOPS revenues for the first half of 2009.[97]

10         68.    Securities analysts found this news not only hopeful, but so promising

11   that they raised their earnings estimates for STEC.  Analysts from Oppenheimer,

12   for example, raised their 2009/2010 EPS estimate from $0.45/$0.89 to $0.80/$1.65

13   and their price target from $9 to $17, citing "revenue/GM expansion and lower

14   cost structure" as the reason for increasing their estimates, among other reasons.[98]

15   As Oppenheimer saw STEC "as the best growth story in [their] coverage space,"

16   they accordingly kept their rating of STEC's stock at "Outperform."[99]  Securities

17   analysts from Capstone Investments also increased their target price for STEC

18   from $13 to $19, basing their analysis on the belief that "STEC offer[ed] investors

19   pure-play investment in SSD expansion" and that STEC had "raised 1H09

20

21

22

---

23   [95] STEC Press Release filed as Form 8-K, "STEC Announces First Quarter 2009
     Results – Company Surpasses Previous Revenue and EPS Guidance," May 11,
24   2009.
         [96] Bloomberg, L.P., "STEC Inc. Earnings Teleconference STEC US," May 11,
25   2009.
         [97] STEC Press Release filed as Form 8-K, "STEC Announces First Quarter 2009
26   Results – Company Surpasses Previous Revenue and EPS Guidance," May 11,
     2009.
27       [98] Oppenheimer & Co., "STEC Inc., Best Growth Story in Our Space, Raising
     Estimates and PT," May 12, 2009.
28       [99] *Ibid.*

1    expectations for ZeusIOPs to $65m vs. $53m."[100]   On balance, the news about

2    ¬STEC's revenue growth and the elimination of its backlog was economically

3    significant positive news, which I would expect to elicit a positive stock price

4    reaction.

5           69.    I have reviewed the media databases on Bloomberg, Investext, and

6    other news sources for STEC-related news articles published on May 11, 2009 and

7    May 12, 2009. I did not find any additional material news items regarding STEC

8    that received any news coverage that day beyond the information discussed in the

9    preceding paragraph. As a result of STEC's announcements about its backlog and

10   its increased guidance, STEC's common stock price rose 30.90% on May 12,

11   2009. (*See* Exhibit G.)   I applied the Modified Fama-French Three-Factor Model

12   including the percentage change in the *Industry Index* as an explanatory variable.

13   On May 12, 2009, the abnormal return resulting from the news announcement was

14   30.43%, which is statistically significant at the 1% level.  Such a significance level

15   means that there is less than a 1 in 100 chance that the abnormal return happened

16   by mere chance.

**B.     Application of the Elmer Krogman Factors to the Market for
        STEC's Common Stock**

17
18         70.    In addition to the five Cammer factors, I also applied the three Elmer

19   Krogman factors to examine further the efficiency of the market for STEC's

20   common stock during the Class Period.

21                 **1.     Market Capitalization**

22         71.    During the Class Period, the quarterly average market capitalization of

23   STEC's common stock ranged from $356 million to $1.5 billion. (See Exhibit I.)

24

25

26

27   ───────────────
[100] Capstone Investments, "STEC Inc., STEC: March Delivers Beat and Raise
28   Quarter – SSD Growth Still Early In Adoption – Raising Target to $19 from $13,"
     May 12, 2009.

1    72.    The NASDAQ stock market is a large and liquid stock market.[101] Its

2  infrastructure and participants allow it to provide a reliable, liquid, and efficient

3  market place.[102] Its stringent listing standards insure that issuers are large enough

4  to facilitate a liquid market, and its regulations insure that material company

5  information is disclosed promptly to investors.[103] In general, to be listed on the

6  NASDAQ Global Select Market (formerly the NASDAQ National Market), the

7  market value of publicly held equity must exceed $45 million.[104]

8    73.    STEC's common stock was traded on the NASDAQ.   As Bromberg

9  stated:

10              [A]t a minimum, there should be a presumption –

11              probably conditional for class determination – that

12              certain markets are developed and efficient for virtually

13              all securities traded there: the New York and American

14              Stock Exchanges, the Chicago Board Options Exchange

15              and the Nasdaq National Market System.[105]

16  STEC's listing on the NASDAQ Global Select Market is strong evidence that the

17  market for its common stock was efficient during the Class Period.

18    74.    During the Class Period, STEC's common stock market capitalization

19  on average was almost 22 times as large as the $45 million minimum for

20  NASDAQ Global Select Market listing.   The median market capitalization for all

21  stocks traded on the NASDAQ ranged from $134 million to $163 million, during

22

23

24

---

25   [101] http://nasdaqomx.com/digitalAssets/74/74605_corporatefactsheet_us_na_
0427.pdf and http://nasdaqomx.com/listingcenter/usmarket/, last accessed
26   11/15/2011.
   [102] *Ibid.*
27   [103] *Ibid.*
   [104] The NASDAQ Listing Standards and Fees, July 2010.
28   [105] Cammer at 1292, citing Bromberg.

1    the Class Period.[106]  The market capitalization of STEC suggests that the market

2    for its common stock was liquid and efficient during the Class Period.

3                    **2.     Bid-Ask Spread**

4           75.     During the Class Period, the average bid-ask spread for STEC's

5    common stock, according to Center for Research in Security Prices ("CRSP") data,

6    was 0.11% based on the daily bid and ask prices, and the median bid-ask spread

7    was 0.09%. (See Exhibit J.)  For the calendar years 2009 and 2010, the average

8    bid-ask spread for all ordinary common shares traded on the NASDAQ was 2.09%,

9    and the median was 0.46%.[107]  Thus, the average and median bid-ask spreads for

10   STEC's stock were below the average and close to the median, respectively, for all

11   NASDAQ common stocks in 2009 and 2010.

12                   **3.     Public Float**

13          76.     During the Class Period, the percentage public float of STEC's

14   common stock, calculated as the number of shares outstanding less the number of

15   shares held by insiders divided by the number of shares outstanding, ranged from

16   49 percent to 77 percent.  (See Exhibit I.)  STEC's common stock was mainly held

17   by outside investors during the Class Period.  Additionally, the quarterly average

18   market value of the public float for STEC's common stock ranged from $173

19   million to $864 million during the Class Period.  (See Exhibit I.)

20          77.     The size of the public float for STEC's common stock is consistent

21   with the hypothesis that the market for STEC's common stock was liquid and

22   efficient during the Class Period.

23

24

25   _____
     [106] The market capitalization for the NASDAQ is based on the market
26   capitalization for all NASDAQ composite index members as reported by
     Bloomberg L.P.
27        [107] Based on data from the Center for Research in Security Prices (CRSP).  The
     data for the NASDAQ Stock Market consists of data from the NASDAQ Global
28   Select Market, NASDAQ Global Market and NASDAQ Capital Market.

## C.    Additional Factors Considered

78.    In addition to the Cammer factors and the Elmer Krogman factors discussed in the previous sections of this declaration, I also performed two sets of additional tests for market efficiency that are described in the economics literature. These tests can provide valuable insights into whether the market for a security is efficient.[108]    The additional tests I conducted are a) testing whether the put-call parity relationship between STEC's common stock prices and the prices of the call options and put options on STEC's common stock was satisfied during the Class

---

[108] This literature includes Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342; Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980; Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of Finance*, 2006, pages 2071-2102; Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, pages 34-105; Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N. Goetzmann, Modern Portfolio Theory and Investment Analysis, 6th ed., John Wiley & Sons, Inc., Hoboken, NJ, 2003; Fama, Eugene F. and Kenneth R. French, "Permanent and Temporary Components of Stock Prices," *Journal of Political Economy*, 96, 1988, pages 246-273; Dufour, Jean-Marie, Y. Lepage, and H. Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian Journal of Statistics*, 10, 1982, pages 1-38; Mittsdorffer, R., and J. Diederich, "Prediction of First Day Returns of Initial Public Offering in the US Stock Market Using Rule Extraction from Support Vector Machines," *Studies in Computational Intelligence* (SCI), 80, 2008, pages 185–203; Hunsader, Kenneth J., "Two Essays on the Strategic Aspects of Information Release," Doctoral Dissertation, Florida State University, Spring 2005; Luger, Richard, "Exact Nonparametric Tests for a Random Walk With Unknown Drift Under Conditional Heteroscedasticity," Research Department, Bank of Canada, pages 2 - 3; Campbell, B., and Jean-Marie Dufour, "Exact Nonparametric Orthogonality and Random Walk Tests," *Review of Economics and Statistics*, 77, February 1995, pages 1-16; Boehmer, Ekkehart and Eric K. Kelley, "Institutional Investors and the Informational Efficiency of Prices," *Review of Financial Studies*, 22, 2009, pages 3563-3594; Boehmer, Ekkehart, Charles M. Jones, and Xiaoyan Zhang, "Which Shorts Are Informed?," *Journal of Finance*, 63, pages 491-527; Boehmer, Ekkehart and Juan Wu, "Short Selling and the Informational Efficiency of Prices," Working Paper, University of Oregon, September 2009, pages 1-50; Klemkosky, Robert C. and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *Journal of Finance*, 34, December 1979, pages 1141-1155; Bris, Arturo, William N. Goetzmann, and Ning Zhu, "Efficiency and the Bear: Short Sales and the Markets Around the World," *Journal of Finance*, 62, June 2007, pages 1029-1079; and Elyasiani, Elyas, Shmuel Hauser, and Beni Lauterbach, "Market Response to Liquidity Improvements: Evidence from Exchange Listings," *Financial Review*, 41, 2000, pages 1-14.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGx)

36

1   Period and b) performing random walk tests to investigate whether it would be

2   possible for investors to predict future stock returns from past stock returns, which

3   cannot happen in an efficient market.

### 1.   Put-Call Parity Tests

5   79.   Put-call parity expresses a relationship between the prices of a

6   company's put and call options and the price of its common stock. *Put-call parity*

7   *should hold in an efficient capital market.*[109]   Testing whether put-call parity holds

8   can assist in assessing whether the market for a company's common stock and the

9   market for options on its common stock are efficient. Put-call parity tests are joint

10  tests of the efficiency of the markets for the stock and for the options written on the

11  stock.

12  80.   A holder of an equity call option has the right to purchase the

13  underlying stock at a specified strike price, or exercise price. A holder of an equity

14  put option has the right to sell the underlying stock at a specified exercise price. If

15  put-call parity holds, then the price of a put option ("P") with a particular strike

16  price and expiration date will equal the price of a call option ("C") with the same

17  strike price and expiration date minus the price of the underlying stock ("S0") plus

18  the present value of the exercise price ("PV(X)") plus the present value of the

19  dividends on the underlying common stock expected to be paid during the

20  remaining duration of the options ("PV(dividends)"), or in equation form:

21  $$P = C - S_o + PV(X) + PV(dividends).$$   (Equation 3)

22  81.   In this equation, the put and call options must have the same exercise

23  price and expiration date. Rearranging this equation to express the share price

24  produces the following equation:

[109] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

37

$$S_o = C - P + PV(X) + PV(dividends). \quad \text{(Equation 4)}$$

82.     If this relationship does not hold,[110] which is commonly referred to as a put-call parity violation, arbitrageurs should be able to earn riskless profits by buying the relatively cheap assets and selling the relatively expensive ones.  Such arbitrage opportunities generally do not occur (except possibly for very short periods of time) in an efficient market. Academics have argued that in certain situations, short sale restrictions have limited the ability of arbitrageurs to take advantage of the mispricing of assets.[111]  In particular, it has been argued that if investors are limited in their ability to sell the stock short, there will be a tendency for the share price on the left-hand side of Equation 4 to be greater than the sum of the elements on the right-hand side, in which case the stock will be overpriced.

83.     First, I investigated whether there is any evidence that might indicate whether short-sale constraints might have impeded an efficient market for STEC's common stock during the Class Period.[112]  For NASDAQ stocks, the average short interest as a percentage of shares outstanding was 3.5% during the Class Period.[113]  STEC's average short interest as a percentage of the shares outstanding during the Class Period was 24.8%.  (See Exhibit K.)

84.     The put-call parity test results will indicate whether any short-sale effects were strong enough to induce significant violations of put-call parity in the

---

[110] This relationship is referred to as put-call parity. When put-call parity exists, the price of the firm's common stock, which is on the left-hand side of the equal sign in Equation 4, equals the sum of the variables on the right-hand side of the equal sign, which means that the combination of items produces exactly the same value as the share of common stock.

[111] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence from the Options Markets," *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22, 2009, pages 1955-1980.

[112] Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of Finance*, 2006, pages 2071-2102.

[113] The short interest for the NASDAQ is based on the short interest for all NASDAQ composite index members as reported by Bloomberg L.P.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGX)

38

1    market for STEC's common stock during the Class Period.  As long as there are

2    sufficient shares available to borrow, an above-average level of short interest will

3    not give rise to market inefficiency.  The put-call parity tests, which I perform

4    next, test whether STEC's share price traded above where it would be expected to

5    trade in a market with effective short selling.

6        85.    Using option pricing data obtained from the OptionMetrics database

7    and common stock pricing data obtained from Bloomberg, L.P., I was able to

8    examine whether put-call parity held for STEC's common stock during the Class

9    Period.[114]  When put-call parity holds, the share price satisfies the equilibrium

10   relationship stated earlier in this section, and it may be concluded that short selling

11   is not being restricted.  I matched calls and puts based on their exercise prices and

12   expiration dates.  I took the average of the best last bid and best last ask quotes to

13   estimate the prices of the calls and puts.  For the price of STEC's common stock, I

14   used the common stock's last traded price.  Dividends were set equal to the

15   expected dividends received during the life of the option.  The dividends and the

16   exercise price were discounted using interpolated yields on risk-free rates obtained

17   from the OptionMetrics database.  To improve the quality of the data, I deleted

18   options with fewer than six calendar days to maturity or greater than 180 calendar

19   days to maturity and options with a price less than $0.375.[115]

20       86.    After applying these filters, I was left with 5,510 pairs and a total of

21   1,589,826 put option and call option contracts.  I calculated the put-call parity

22   violation for each of these pairs using the following equation:

23
$$Put-Call\ Parity\ Violation = \frac{[S_o - C + P - PV(X) - PV(dividends)]}{S_o} \quad \text{(Equation 5)}$$
24

25   [114] Option market makers generally change their bid and ask quotes each time
     the underlying stock price changes.  Consequently, there are bid and ask quotes
26   regardless of the number of options contracts traded each day.  Bid and ask quotes
     come from the NBBO (National Best Bid and Offer) data.
27   [115] These filters were applied in Evans, Richard B., Christopher C. Gezvy, David
     K. Musto, and Adam V. Reed, "Failure is an Option: Impediments to Short Selling
28   and Option Prices," *Review of Financial Studies*, 22, 2009, page 1960.

1   Exhibit L shows the results for the put-call parity violation calculations for STEC

2   on a monthly basis between June 2009 and February 2010.

3       87.    Although the OptionMetrics database can be considered one of the

4   best publicly available databases for options pricing data, some researchers have

5   found that the option prices from the database have the potential to exaggerate the

6   frequency of put-call parity violations.[116]  Even after considering the potential for a

7   higher frequency of put-call parity violations from the pricing data, I found that the

8   average put-call parity violation for STEC's stock and options during the Class

9   Period was only 0.632%.  (See Exhibit L, Panel A.)  The average STEC put-call

10  parity violation is within the range of what is found in published academic

11  research.  The authors of "Failure is an Option: Impediments to Short Selling and

12  Option Prices" found that the average put-call parity violation for 4.5 million pairs

13  traded during 1998 and 1999 was 0.36% and that the standard deviation was

14  1.79%.[117]  Thus, the range between minus one standard deviation and plus one

15  standard deviation extends from -1.43% to 2.15%.  The average monthly put-call

16  parity violation falls outside this range only once, for part of February 2010, which

17  is the last month in the Class Period.  The overall results of this test support the

18  efficiency of the market for STEC's common stock during the Class Period.

19      88.    The authors of "Limited Arbitrage and Short Sales Restrictions:

20  Evidence from the Options Markets" analyzed 80,614 option pairs between July

21  1999 and November 2001.[118]  They measured put-call parity violations by

22  calculating the ratio  , where S is the stock price and S* is the price predicted by

23

24  ───────────────────
    [116] Battalio, Robert, and Paul Schultz, "Options and the Bubble," *Journal of
25  Finance*, 2006, page 2086.
        [117] Evans, Richard B., Christopher C. Gezvy, David K. Musto, and Adam V.
26  Reed, "Failure is an Option: Impediments to Short Selling and Option Prices,"
    *Review of Financial Studies*, 22, 2009, pages 1955-1980.
27      [118] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited
    Arbitrage and Short Sales Restrictions: Evidence from the Options Markets,"
28  *Journal of Financial Economics*, 74, 2004, pages 305-342.

1  put and call option prices.  The average R for their sample was 0.30.  The average

2  R for my sample of STEC pairs is 0.6370.  (See Exhibit L, Panel B.)  The

3  interquartile range for this ratio (25th percentile to the 75th percentile) in the

4  aforementioned study extends from -0.16 to 0.65.[119]  The average R of 0.6370 is

5  within this range.  While the February 2010 monthly average falls outside the 90%

6  confidence band, which extends from -1.22 to 1.97, the month in question is again

7  the last month in the Class Period, and the overall results of this test support the

8  efficiency of the market for STEC's common stock during the Class Period.

9      89.    The test results reported in Exhibit L show that the put-call parity

10  relationship held for STEC's common stock throughout the Class Period, again

11  with the lone exception being part of February 2010, the last month in the Class

12  Period.

13      90.    I also examined the average absolute value of Put-Call Parity

14  Violations, which was 0.730% for the "Failure is an Option" method (see Exhibit

15  L, Panel A) and 0.7354% for the "R" method (see Exhibit L, Panel B.)  The

16  average bid-ask spread for the 5,510 pairs of call and put options written on

17  STEC's common stock was 17.375% during the Class Period.  Thus, an average

18  absolute value of 0.730% or 0.7354% for the Put-Call Parity Violations is very

19  reasonable in light of the much greater average bid-ask spreads for call and put

20  options and is consistent with the market for STEC's common stock and the

21  market for STEC's call options and put options both being efficient during the

22  Class Period.  (See Exhibit L.)

23      91.    I also examined put-call parity for those options that were trading

24  "near the money."[120]  These options had exercise prices near the price of the

25

26  [119] *Ibid.*, page 316.
   [120] The sample was restricted to those pairs for which $-0.1 < \ln (S_0/\text{Exercise}$

27  Price$) < 0.1$.  This filter is discussed in Ofek, Eli, Matthew P. Richardson, and
   Robert F. Whitelaw, "Limited Arbitrage and Short Sales Restrictions: Evidence

28  from the Options Markets," *Journal of Financial Economics*, 74, 2004, page 340.

1  common stock.  The results from this sub-sample are consistent with the results for

2  the overall sample.  The Average Put-Call Parity Violation was 0.474% for the

3  "Failure is an Option" method, which is near the mean of 0.36%, and the Average

4  Absolute Value Put-Call Parity Violation was 0.539% which is within one standard

5  deviation of the mean.  These test results are consistent with market efficiency for

6  STEC's common stock during the Class Period.  (See Exhibit L.)

7      92.    The fact that the Put-Call Parity relationship held throughout the Class

8  Period suggests that STEC's common stock price fairly reflected its intrinsic value,

9  as would be expected in an efficient market.[121]  This is further evidence that the

10  market for STEC's common stock was efficient during the Class Period.

11  **2.    Random Walk Tests**

12      93.    Common stock returns follow what is known as a random walk in an

13  efficient market.[122]  Stock prices in an efficient market move from moment to

14  moment much like bubbles in a glass of soft drink; that is, when stock returns

15  follow a random walk, stock price movements are independent from moment to

16  moment.  Accordingly, the returns on the stock each day are identically distributed,

17  and investors cannot use past stock price movements to predict the next day's stock

18  price movement.[123]

19      94.    I performed two types of tests, parametric tests and non-parametric

20  tests, to examine whether the random walk hypothesis could be rejected for

21  STEC's common stock during the Class Period.  Parametric tests examine whether

22

23  [121] Ofek, Eli, Matthew P. Richardson, and Robert F. Whitelaw, "Limited
    Arbitrage and Short Sales Restrictions: Evidence from the Options Markets,"
24  *Journal of Financial Economics*, 74, 2004, pages 305-342, and Evans, Richard B.,
    Christopher C. Gezvy, David K. Musto, and Adam V. Reed, "Failure is an Option:
25  Impediments to Short Selling and Option Prices," *Review of Financial Studies*, 22,
    2009, pages 1955-1980.
26  [122] Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38,
    1965, pages 34-105.
27  [123] Elton, Edwin J., Martin J. Gruber, Stephen J. Brown, and William N.
    Goetzmann, <u>Modern Portfolio Theory and Investment Analysis</u>, 6th ed., John
28  Wiley & Sons, Inc., Hoboken, NJ, 2003, page 405.

1  there is any serial correlation evident in day-to-day stock returns.[124]  Parametric

2  tests make certain assumptions about the stock returns that are inconsistent with

3  actual stock returns.  For example, the conventional regression test makes the

4  assumption that the errors around the fitted regression line are normally

5  distributed.  The normal probability distribution allows for outcomes between

6  negative and positive infinity.[125]  However, stock returns are bounded below by

7  returns of    -100%, since stock prices cannot fall below zero.  Consequently, the

8  basic assumption underlying the conventional regression test does not strictly fit

9  the data, even though it is usually a reasonable approximation.  On the other hand,

10  non-parametric tests are distribution-free and thus may be considered more

11  appropriate when performing random walk tests to examine market efficiency.[126]

12  In an abundance of caution, I ran both types of tests.

13      95.    I ran two non-parametric statistical sign tests, the McNemar test and

14  the Wilcoxon signed-rank test, to investigate whether the returns on STEC's

15  common stock followed a random walk during the Class Period.  There is an

16  extensive financial literature on the use of non-parametric sign tests to examine

17  evidence of a random walk in stock returns.[127]  As I have noted, in an efficient

18  market, the stock price follows a random walk.  Consequently, the returns on

19  successive days are independent of one another, and the probability of an increase

20

21  [124] Fama, Eugene F. and Kenneth R. French, "Permanent and Temporary
Components of Stock Prices," *Journal of Political Economy,* 96, 1988, pages 246-

22  273.  When serial correlation is present, day-to-day stock price movements are not
independent, but instead, are systematically related in some manner.

23  [125] There is an extensive academic literature that furnishes evidence that stock
returns are not normally distributed.  One of the most often cited papers in this

24  literature is Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business,*
38, 1965, pages 34-105.

25  [126] One drawback of the non-parametric tests I performed is that the tests can
only detect 1-day lag serial correlation.  Therefore, I also performed parametric

26  tests to confirm the results of the non-parametric tests and to test for the existence
of serial correlation lags of up to five days.

27  [127] For a survey of this literature, see Dufour, Jean-Marie, Y. Lepage, and H.
Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian

28  Journal of Statistics,* 10, 1982, pages 1-38.

1   in price and the probability of a decrease in price should be equal and independent

2   of past returns.  However, as pointed out by Professor Eugene Fama in his seminal

3   paper on the behavior of stock prices, "Now in fact we can probably never hope to

4   find a time series [of stock prices] that is characterized by perfect independence.

5   Thus, strictly speaking, the random walk theory cannot be a completely accurate

6   description of reality.  For practical purposes, however, we may be willing to

7   accept the independence assumption of the model as long as the dependence in the

8   series of successive price changes is not above some 'minimum acceptable'

9   level."[128]

10      96.    The McNemar test is used to determine whether there is an equal

11   probability that a positive (negative) return today is followed by a negative

12   (positive) return tomorrow.[129]  In an efficient market where stock prices exhibit a

13   random walk, the probabilities of both events happening should be the same.  As

14   shown in Panel A of Exhibit M, during the Class Period, there are 43 observations

15   where a positive return one day is followed by a negative return the next day and

16   also 43 observations where a negative return one day is followed by a positive

17   return the next day.  The McNemar Statistic, revised to correct for discontinuity, is

18   0.0116  with a p-value of 0.9141.  Therefore, the null hypothesis that the

19   probabilities of a positive (negative) return one day followed by a negative

20   (positive) return the next day are equal cannot be rejected.  Simply, an investor

---

[128] Fama, Eugene, "The Behavior of Stock Prices," *Journal of Business*, 38, 1965, page 35.

[129] Mittsdorffer, R., and J. Diederich, "Prediction of First Day Returns of Initial Public Offering in the US Stock Market Using Rule Extraction from Support Vector Machines," *Studies in Computational Intelligence* (SCI), 80, 2008, pages 185–203;  Hunsader, Kenneth J., "Two Essays on the Strategic Aspects of Information Release," Doctoral Dissertation, Florida State University, Spring 2005;  and Dufour, Jean-Marie, Y. Lepage, and H. Zeidan, "Nonparametric Testing for Time Series: A Bibliography," *Canadian Journal of Statistics*, 10, 1982, pages 1–38.

1 cannot profit on one day solely by knowing the return of the stock the previous

2 day.

3       97.    The second non-parametric random walk test I performed is the

4 Wilcoxon signed-rank test.[130]  It examines whether there is an equal probability

5 that a positive (negative) return one day is followed by a negative (positive) return

6 the next day.  This test is different from the McNemar Test because it accounts for

7 both the direction and the magnitude of the return changes.  The median difference

8 between consecutive daily returns should be zero in a random-walk time series.  As

9 shown in Panel B of Exhibit M, during the Class Period, the Wilcoxon signed-rank

10 test t-statistic is 0.1894, and the p-value is 0.8498.  Therefore, the null hypothesis

11 that the median difference in consecutive daily returns is zero cannot be rejected.

12 These results are consistent with a random walk time series of STEC stock prices

13 and support the hypothesis that STEC's common stock traded in an efficient

14 market during the Class Period.

15       98.    The time series of STEC stock returns should not exhibit any serial

16 correlation in an efficient market.  In addition to the two non-parametric tests I just

17 described, I ran two sets of parametric tests, regression tests for serial correlation

18 between STEC's common stock daily raw returns and prior day raw returns and the

19 Portmanteau test (Q-Test), to examine whether there is any serial correlation

20 evident in STEC's common stock returns during the Class Period.   For each set of

21 tests, I examined both STEC's common stock raw returns and the excess returns

22 from the Modified Fama-French Three-Factor Model.

23

24

25

26     [130] Luger, Richard, "Exact Nonparametric Tests for a Random Walk With
Unknown Drift Under Conditional Heteroscedasticity," Research Department,

27 Bank of Canada, pages 2–3;  and Campbell, B., and Jean-Marie Dufour, "Exact
Nonparametric Orthogonality and Random Walk Tests," *Review of Economics and*

28 *Statistics*, 77, February 1995, pages 1–16.

99.   In performing the autocorrelation test, I first regressed STEC's raw

returns on the stock's prior day returns.  I found that the test result was not

significant at the 10% level. (See Exhibit N, Panel A.)

100.   Next, I also regressed STEC's residuals (or excess returns) for the

Class Period estimated from the Modified Fama-French Three-Factor Model on the

stock's prior day residuals.   I ran the regressions for STEC's residuals (or excess

returns), just as I did the regressions based on raw returns.  I found that the test

result was not significant at the 10% level. (See Exhibit N, Panel A.)

101.   Thus, these tests do not furnish evidence of statistically significant

serial correlation for the Class Period.  The test results are consistent with market

efficiency; both test results indicate that the pattern of returns for STEC's common

stock is consistent with a random walk during the Class Period.

102.   The Portmanteau test (or Q-Test) I performed examines whether there

is any serial correlation between STEC's common stock returns and its prior daily

returns based on one-day to five-day lags.  Using STEC's raw returns, I found that

the p-values of the raw returns are in excess of 0.10 for each of the one-day to five-

day lags. Thus, these test results do not support the hypothesis of serial correlation

between returns with lags of five days or less. (See Exhibit N, Panel B.)   The

Portmanteau test of the raw returns does not detect any statistically significant

serial correlation during the Class Period.

103.   I reran the Portmanteau test on STEC's excess returns.  I found that

the p-values of the raw returns are in excess of 0.10 for each of the one-day to five-

day lags. Thus, these test results also do not support the hypothesis of serial

correlation between returns with lags of five days or less.  (See Exhibit N, Panel

B.) Consequently, based on the results of the non-parametric and parametric tests,

I believe that it is reasonable to conclude that there is no significant serial

correlation evident in STEC's common stock returns during the Class Period.

None of the tests conducted has produced evidence of serial correlation that would

1  contradict market efficiency for STEC's common stock. It is my opinion that the

2  hypothesis that STEC's common stock returns followed a random walk during the

3  Class Period, which would be indicative of an efficient market, cannot be rejected.

4  **V.   Conclusions**

5      104.   It is my opinion that the market for STEC's common stock was open,

6  developed, and efficient during the Class Period.

7      105.   This opinion is based on the common stock's high volume of trading,

8  the large number of securities analysts following STEC and its common stock

9  coupled with a regular flow of company-specific information, the presence of a

10  large number of market makers, the substantial number of STEC's common shares

11  held and traded by institutional investors, STEC's eligibility to file registration

12  statements on Form S-3, the demonstrable cause-and-effect relationship between

13  the release of STEC-specific news and the prompt price reactions of STEC's

14  common stock price, STEC's large market capitalization and large public float, the

15  fact that STEC's common stock traded on the highly liquid NASDAQ throughout

16  the entire Class Period with reasonably sized bid-ask spreads, and the evidence that

17  STEC's common stock returns followed a random walk during the Class Period.

18      106.   My analysis is based on the materials I have reviewed to date. I

19  reserve the right to amend my opinion and file a supplemental declaration in this

20  matter should I obtain any other significant information that leads me to change

21  any of the opinions expressed in this declaration. To the extent this matter is

22  adjourned for any reason, I further reserve the right to supplement this declaration.

23

24      I declare under penalty of perjury that the foregoing is true and correct to the

25  best of my knowledge.

26

27  Executed: November 21, 2011

28  _John D. Finnerty_
John D. Finnerty, Ph.D.

DECLARATION OF JOHN D. FINNERTY, PH.D. IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
NO. SACV 09-01304-JVS (MLGx)          47