UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

|  |  |
|---|---|
| IN RE: | )CASE NO: 8:09-CV-1304-JVS-MLG )  )                    CIVIL )  )     Santa Ana, California |
| STEC, INC. SECURITIES LITIGATION | )  )   Friday, February 10, 2012 ) (11:05 a.m. to 12:41 p.m.) ) ( 2:37 p.m. to  2:48 p.m.) |

ORDER RE PLAINTIFF'S MOTION TO COMPEL;
ORDER ESTABLISHING EXPEDITED DISCOVERY DISPUTE
RESOLUTION PROCEDURE

BEFORE THE HONORABLE MARC L. GOLDMAN,
UNITED STATES MAGISTRATE JUDGE

Appearances:              See next page

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Terri Steele

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

**APPEARANCES FOR:**


Plaintiffs:                 THOMAS A. DUBBS, ESQ.
                            RICHARD T. JOFFE, ESQ.
                            JAMES W. JOHNSON, ESQ.
                            Labaton Sucharow
                            140 Broadway
                            New York, NY 10005

Defendants:                 PATRICK E. GIBBS, ESQ.
                            Latham & Watkins
                            140 Scott Drive
                            Menlo Park, CA 94025

                            MICHELE D. JOHNSON, ESQ.
                            Latham & Watkins
                            650 Town Center Drive, Suite 200
                            Costa Mesa, CA 92626

                            COLLEEN CARLTON SMITH, ESQ.
                            Latham & Watkins
                            600 W. Broadway, Suite 1800
                            San Diego, CA 92101

1    **Los Angeles, California; Friday, February 10, 2012; 11:05 a.m.**

2                          **(Call to Order)**

3              **THE COURT:**  You can be seated.

4              This is Case Number 9-1304, *In re STEC Securities*

5    *Litigation, Inc*.

6              May I have counsel's appearances, please?

7              For the Plaintiff?

8              **MR. DUBBS:**  May it please the Court, my name is

9    Thomas Dubbs from the Labaton firm for lead Plaintiff, the

10   State of New Jersey.  With me is my colleague, Rich Joffe, and

11   my partner, Jim Johnson.

12             **THE COURT:**  Okay.  Thank you, sir.

13             **MR. GIBBS:**  Good morning, your Honor, Patrick Gibbs

14   for the Defendants.

15             **MS. JOHNSON:**  Good morning, your Honor, Michelle

16   Johnson, also for the Defendants.

17             **THE COURT:**  Someone else is here.

18             **MR. GIBBS:**  Our colleague, Colleen Smith, is with us

19   as well, your Honor.

20             **THE COURT:**  All right.  Thank you.

21             All right, so we have a couple of things we need to

22   deal with today.  First is the Motion -- I don't know if it's

23   first, but we have the Motion to Compel that was filed a while

24   back.  And then Judge Selna asked me to monitor the discovery

25   process, I think that's what he wants me to do, and to try to

4

```
 1   facilitate that process and try to keep you out of court as

 2   much as possible.  That's my goal, is to keep you out of court

 3   as much as possible.

 4          So let's start off doing this as a status conference.

 5   So I know what the case is about, all right, so I've read that.

 6   I know you're having some problems with the documents, but I

 7   don't know what else is going on.  I'm not sure exactly why he

 8   sent this to me.

 9          So I'm going to ask Mr. Dubbs to give me some

10   background on this and tell me what you would like me to do to

11   move this case along --

12          MR. DUBBS:  Well --

13          THE COURT:  -- other than grant your motion in its

14   entirety.

15          MR. DUBBS:  Well, that I under -- that goes without

16   saying.  But that may be premature initially.

17          Thank you for hearing us and indeed this is in

18   response to my request in particular that we try to find some

19   way to make discovery move quicker and more effectively, given

20   the time limits that we have, which --

21          THE COURT:  I think Judge Selna told me you wanted a

22   discovery master at some point -- one point.  Does the case --

23          MR. DUBBS:  Well, we had urged a special master --

24          THE COURT:  Right.

25          MR. DUBBS:  -- as just a way to do it.  And what is
```

1    driving this is a number of things that have sort of come

2    together.  And let me say that this is not a question of the

3    lawyers fighting or not being able to agree on things, it's

4    just I think in the nature of this fact pattern, the nature of

5    this case, and the nature of how we got into it.

6           We got appointed as lead Plaintiff for the State of

7    New Jersey after the case had been going on for a while.  The

8    discovery schedule was not extended.  We wanted it extended.

9    We lost on that.  There was some back and forth on that and

10   whether we could have been faster or not faster and we don't

11   need to rehash all that, it is what it is.

12          So we have a very rapid discovery cutoff and we have

13   a lot of work to do.  And that's okay and we're prepared to do

14   it and to put the person in power necessary to accomplish the

15   mission to the task.  But one of our threshold problems is

16   that, given the Local Rules, getting a discovery motion teed up

17   in 30-plus days is just very, very difficult and my proposal of

18   the special master was to get this on more of a real time basis

19   so that win or lose or draw discovery disputes or discovery

20   issues would be teed up and decided very quickly.

21          So, you know, we would propose that we adopt a

22   protocol something along the lines of that we could do letter

23   briefs whenever there's a discovery dispute and I've been in

24   other cases where the Magistrate Judge or a special master has

25   had weekly or biweekly phone conferences, which if they are

6

1    cancelled they're cancelled, but everybody knows they're coming

2    and it keeps everything on track.

3            THE COURT:  But Judge Selna already modified Local

4    Rule 37 for this case.  It looks like he cut everything in

5    half.  Am I right on that?

6            MR. DUBBS:  He cut it.  I don't think he cut it in

7    half, but he cut it.  But I may --

8            THE COURT:  Close to it, close to in half.

9            MR. DUBBS:  He cut it back, there's no question about

10   that.

11           THE COURT:  All right.  Mr. Gibbs agrees with me on

12   that, so -- but it's cut -- okay, so it's cut back.  But you

13   would like to do something even more informal?

14           MR. DUBBS:  That's correct, we would.

15           THE COURT:  Okay.

16           MR. DUBBS:  Because we've got a lot of work to do in

17   a very short period of time.  It looks like we're going to be

18   double or triple tracking depositions, so there may be

19   deposition issues.  We still have a bunch of document issues

20   that are outstanding.

21           And just by way of background, and this is more at

22   30,000 feet, as your Honor knows, I mean this is a case about a

23   company that had one concededly very good product and it was

24   selling it to a variety of people and potentially selling it to

25   a variety of other customers and telling the market place and

7

1    telling analysts who covered the computer industry what was

2    going to happen and what they -- based on what they knew what

3    they expected to happen.  So by definition, we have a broader

4    cast of characters than one might have; namely, we have these

5    customers out there who we have no intention of bothering for

6    the sake of bothering them, some of whom are still customers of

7    STEC, and in addition to that we have a bunch of securities

8    analysts.  So we have a list of people that looks quite

9    fulsome, but is just the way this product and this industry

10   works.

11         Now, I've had some preliminary discussions with

12   Mr. Gibbs on how we can try to compress the deposition schedule

13   and we are prepared to talk in terms of 30 deposition days,

14   meaning if we find someone who we would need for a half a day

15   or two or three hours, that would count as a half a day against

16   the 30, so we could have two people, and that we would also

17   take a hard look as to whether we needed the number of analysts

18   that we told them that we need and we would try to cut that

19   down substantially, perhaps as much as a half.

20         So we are prepared to work on this and another part

21   of this whole puzzle is why haven't depositions begun already,

22   and the answer is because we haven't gotten all the documents.

23   And as your Honor knows, starting depositions when you don't

24   have all the documents in a large commercial case only leads to

25   arguments about can you bring Mr. or Ms. Smith back later,

1    which is sort of totally counterproductive.  So even though

2    it -- even though one can say well, you've guys have been at it

3    for umpteen months and you haven't taken any depositions,

4    that's true, but it's also true we haven't had a chance to

5    review all the documents.

6            Now, we've reviewed all the documents we've been

7    given, but there are some claims where we have virtually no

8    documents.  And it must be borne in mind that another problem

9    or issue with this case is it's no secret that STEC is in the

10   middle of a serious SEC investigation.  And so our initial

11   document production or their initial document production to us

12   was essentially what they have given to the SEC, which was a

13   lot in terms of numbers of documents, but that's a little bit

14   inaccurate or doesn't portray the total picture because the SEC

15   investigation dealt with insider trading, which we don't care

16   about, but it also overlapped with some of the issues that we

17   do care about.  So not all of those SEC documents were relevant

18   to the issues that are presented in this case, but

19   notwithstanding that we've gone through them.

20           Then we have a second document request, which we'll

21   get to later on, which deals with issues that were not on the

22   table with the SEC which are, we would submit --

23           **THE COURT:**  Those are outside, that's outside of the

24   motion that's in front of me?

25           **MR. DUBBS:**  No, that's part of the motion.

1          **THE COURT:**  Okay.  All right.

2          **MR. DUBBS:**  That's part of the motion.

3          **THE COURT:**  That's what I thought.  I was hoping.

4          **MR. DUBBS:**  In terms of things that were going on

5   with the other customers.

6          So that may be a somewhat wandering way to give you

7   some picture of what's going on and why there are a lot of

8   moving parts in this which are just part of this fact pattern.

9   And we are trying to work with Mr. Gibbs to do it.

10          Now, I would be less than candid if I didn't say as

11   an advocate that it's no secret that Mr. Gibbs and his

12   colleagues have been at this for two-plus years because of the

13   SEC investigation.  They have --

14          **THE COURT:**  Let me ask a question.  Was this case

15   stayed at any period of time?  It's a 09 --

16          **MR. DUBBS:**  No, it wasn't.

17          **THE COURT:**  -- it's a 2009 case and I'm looking at,

18   is this discovery cutoff right, April 10th?  Is it still

19   April 10th?

20          **MR. DUBBS:**  Yes.

21          **THE COURT:**  Okay.

22          **MR. DUBBS:**  I mean that's the problem that -- and

23   there was a discovery stayed, it was mandated --

24          **THE COURT:**  So it was stayed?

25          **MR. DUBBS:**  Well, it was stayed by virtue of a

1    statutory stay.

2              THE COURT:  Okay.

3              MR. DUBBS:  Under the Private Securities Litigation

4    Reform Act, until there's a lead plaintiff appointed and a

5    motion to dismiss decided there can be no discovery.  So by

6    virtue of the fact that Judge Selna decided midstream he wanted

7    to see if there was a more appropriate lead Plaintiff there was

8    a lead Plaintiff battle, which New Jersey prevailed on.  Then

9    there was a Motion to Dismiss and he granted the initial Motion

10   to Dismiss.  He gave us leave to re-plead.  We re-pled.  There

11   was a second round of Motions to Dismiss and we prevailed on

12   that second round.  Now, during that entire period in the

13   wisdom of Congress there is a discovery stay, so there's

14   nothing else that's happened.

15             Now, Mr. Gibbs will say well, there was a two-month

16   hiatus after that where we didn't do what we were supposed to

17   do and we can argue about that, but --

18             THE COURT:  But you've already lost that one in front

19   of Judge Selna.  I can't --

20             MR. DUBBS:  Well, yeah, that's it.

21             THE COURT:  Right.

22             MR. DUBBS:  I mean we are --

23             THE COURT:  We are where we are.

24             MR. DUBBS:  We are where we are.  And the discovery

25   is not -- the discovery deadlines aren't moving and we have

11

1   sort of sucked it up and said, you know, that's the way it is

2   and we're going to through the amount of people at it that we

3   can, but we need the documents and we need some, you know -- if

4   we're not getting -- playing well together on depositions, and

5   hopefully we will, but it's always nice to have somebody in the

6   background who can --

7        **THE COURT:**  And you look at me when you say somebody.

8        **MR. DUBBS:**  Well, I don't know who else there is.

9        **(Laughter)**

10       **THE COURT:**  I was looking to see if there was -

11       **MR. DUBBS:**  Well, I mean I -- you know, I mean --

12       **THE COURT:**  -- there might be somebody back there,

13   but there isn't.

14       **MR. DUBBS:**  Well, I didn't -- I was taking my --

15       **THE COURT:**  You can always hope, you know.

16       **MR. DUBBS:**  Well, I was taking my chances.  I said a

17   special master and, you know, I don't know who's in Orange

18   County.  I could have --

19       **THE COURT:**  We don't know how special I am, so….

20       **MR. DUBBS:**  -- gotten God knows whom, so I was at

21   risk there.  But anyway we are where we are.

22            So net-net, we are proposing -- and Judge Selna did

23   specifically give your Honor the authority to further truncate

24   or modify the Local Rules, so we are proposing a even shorter

25   mode of keying up discovery disputes, you know, I would say by

1    letter, but if the Court wants to do it by formal motion,

2    that's fine, and --

3            **THE COURT:**  It depends on what kind of dispute it is.

4            **MR. DUBBS:**  Well, that's fair enough.

5            **THE COURT:**  Right.

6            **MR. DUBBS:**  If it's something that requires extensive

7    briefing and there's a ton of cases on it, that may lead to

8    something else.  If it's pretty fact intensive and it can be

9    put into a two-page letter, that's something else.  I can't

10   disagree with that.  But some mechanism we would submit, you

11   know, if we really want to hit these deadlines, which we want

12   to hit, I think has to be, you know, put in place fairly soon.

13   And I've been in one or two cases where, as I say, the

14   Magistrate Judge or the special masters had periodic phone

15   calls, if only to say how's it going.  And if it's going great,

16   well then it's a five-minute phone call.  But sometimes it

17   isn't, but that can nip issues in the bud.

18           **THE COURT:**  Okay.

19           **MR. DUBBS:**  So that's where we're coming from.

20           **THE COURT:**  All right.  Mr. Gibbs?

21           **MR. GIBBS:**  Thank you, your Honor.  Ms. Johnson will

22   handle the Motion to Compel, but for purposes of the more

23   general background I don't have too much to add because I don't

24   think it would be helpful for your Honor for me to sit there

25   and respond to everything Mr. Dubbs said.  The few points

1    that --

2              **THE COURT:**  No, wait, wait, this is not a finger

3    pointing session.  This is, you know, how do we get this done.

4              **MR. GIBBS:**  Understood.

5              **THE COURT:**  How do we get it done as quickly as

6    possible and with least pain.

7              **MR. GIBBS:**  And for --

8              **THE COURT:**  And the pain I'm most concerned about is

9    mine, so --

10             **MR. GIBBS:**  I understand.  Me too.

11             **THE COURT:**  All right.

12        **(Laughter)**

13             **MR. GIBBS:**  We're on the same page.

14             **THE COURT:**  All right.  So the question is how do we

15   get this done.  You know, I can do -- you know, I can deal with

16   disputes in any number of ways.  You know, some cases when

17   disputes come up I just set up a phone conference, put it on

18   the record.  If it's a problem at a deposition or, you know --

19   but, you know, if there are significant legal disputes then

20   they have to be briefed and we can cut that time too.  But, you

21   know, hopefully we can move forward without significant legal

22   disputes or any disputes.  I mean it's just information

23   gathering at this point.

24             You're grinning at me --

25             **MR. GIBBS:**  Well, I'm grinning because --

1          THE COURT:  -- you don't think that's going to

2     happen, but --

3          MR. GIBBS:  I'm grinning because --

4          THE COURT:  Because I don't know the history here.

5     I'm new here.  All right, so --

6          MR. GIBBS:  For a case --

7          THE COURT:  -- but go ahead.

8          MR. GIBBS:  For a case of this size I have to say

9     there have been remarkably few disputes.  You know, we have

10    produced massive amounts of information already.  We have --

11         THE COURT:  Just not the information they want,

12    according to what they're saying, so….

13         MR. GIBBS:  You know, I never met a plaintiff --

14         THE COURT:  But that's not -- we'll deal with that

15    later.

16         MR. GIBBS:  I never met a plaintiff who had enough

17    discovery.

18         THE COURT:  Right.

19         MR. GIBBS:  But my point is, you know, we've been

20    doing discovery, we've produced a lot of discovery to them, and

21    we have what I think are a relatively narrow set of disputes

22    teed up before your Honor today.  But other than -- and we have

23    some issues that have been bubbling up and we've been talking

24    and we've made progress on them.  So I don't think there's any

25    particular emergency or problem here.

```
 1            We'll deal with disputes any way your Honor wants to

 2   handle them.  I would caution only that, you know, if all it

 3   takes to tee up a discovery dispute is dashing off a letter,

 4   you're probably going to get a lot of discovery disputes that

 5   way.  You know, the burden it takes to get to the Court

 6   sometimes makes people get a little bit more reasonable.  So,

 7   you know, we'll deal with it any way your Honor wants to.  I

 8   don't think there's all that much --

 9            THE COURT:  All right.

10            MR. GIBBS:  -- that's going to be in dispute.

11            THE COURT:  What about this deposition proposal, in

12   terms of 30 -- 30 deposition days?

13            MR. DUBBS:  Well, your Honor, the proposal is we

14   would have 30 days and so 30 days of depositions.

15            THE COURT:  Right.  And then is that split between

16   you?  Is that how this works?

17            MR. DUBBS:  We're just talking about our side and we

18   have said we will --

19            THE COURT:  That about takes us to April 10th,

20   doesn't it?

21            MR. DUBBS:  Well, that's --

22            MR. GIBBS:  It does indeed.

23            MR. DUBBS:  It does indeed, and we're going to have

24   some double tracking and triple tracking --

25            THE COURT:  Right, okay.
```

1          **MR. DUBBS:**  -- and that's just the way it is.  And I

2     told Mr. Gibbs that as long as he doesn't get more than 30 days

3     we will be there, we will show up.  So we will match them.  So

4     I'm not worried about him, I'm more worried about getting what

5     we need.

6          And to answer the question precisely, I'm sorry, but

7     I'm responding to his question, the way the days would be

8     counted under our proposal would be the minimum unit would be a

9     half a day.  So if you took somebody for two hours and it turns

10    out they didn't know anything and we got up and walked out,

11    that would be a half a day --

12          **THE COURT:**  And a day being seven hours.

13          **MR. DUBBS:**  And a day would be --

14          **THE COURT:**  Seven hours under the --

15          **MR. DUBBS:**  -- seven hours.

16          **THE COURT:**  -- under the Rules, right?

17          **MR. DUBBS:**  Right.

18          **MR. GIBBS:**  So just --

19          **THE COURT:**  What do you think about that, Mr. Gibbs?

20          **MR. GIBBS:**  I think it's progress compared to what

21    they first proposed.

22          **THE COURT:**  All right.

23          **MR. GIBBS:**  And Mr. Dubbs just raised this proposal

24    with me out in the hallway --

25          **THE COURT:**  Okay.

1          **MR. GIBBS:**  -- and we're making progress.  I just

2    need to talk to my client and I need to look at the list.

3          **THE COURT:**  Okay.

4          **MR. GIBBS:**  I'm not ruling out the approach of

5    measuring it by deposition days versus witnesses, although, you

6    know, I would like to know what witnesses are going to be

7    deposed fairly soon and, you know, from my perspective there is

8    going to be -- if I've got to fly somebody to North Carolina it

9    doesn't really help me that it only went for half a day, right?

10   That's a deposition as far as I'm concerned.

11         **THE COURT:**  Right.

12         **MR. GIBBS:**  So I'm not ruling it out, but I have that

13   concern.  The other concern I have is that in their original

14   proposal, which was to depose 43 witnesses over a total of 40

15   deposition days, that's the proposal they made earlier this

16   week, the other thing they said was that the deposition days

17   are only going to count the time that the Plaintiffs are

18   questioning, which I take to mean if we have a single

19   deposition day of seven hours they think they're going to use

20   all the questioning.  I don't think that's what the Rules

21   provide for.  A deposition is one day of seven hours and the

22   deposition includes both direct and cross, in effect, and so

23   both sides have to use that seven hours, and there is sometimes

24   some push and pull over who gets how much what -- how much

25   time, but that's a deposition day.  And if the proposal is 30

```
 1   days of all Plaintiffs' questioning and any cross examination

 2   by me has to push a deposition into another day, I'm very

 3   concerned about that.  I think that's too much and I don't

 4   think that's how depositions are supposed to work.

 5          But, you know, 30 we're willing to take a look at.  I

 6   have tried to get a little bit more clarity on which of the

 7   deponents on their 43 deponent list they think will remain on

 8   the list and we're making progress, but that's part of my --

 9          THE COURT:  All right, but it's something we've got

10   to get done.  Okay?

11          MR. GIBBS:  I agree.

12          THE COURT:  Something we have to get done next week,

13   because this has to move.  Okay?  So --

14          MR. GIBBS:  I don't disagree.  We got their proposal

15   on Monday.

16          THE COURT:  So how are we going to get this done?

17   You know.  I mean I can semi hold your hands and -- or is it

18   going to -- are you two going to meet after we're done today

19   and start hashing this out?

20          MR. DUBBS:  Well --

21          THE COURT:  I mean I'd like to get it done -- I'd

22   like to have it done by next Wednesday.  I'd like to have a

23   plan by next Wednesday how we're going to go ahead with

24   depositions.

25          MR. DUBBS:  I think --
```

1           THE COURT:  Because I don't want you coming back to

2   me on a motion.  I mean this is the kind of thing that if you

3   can't resolve I'll just pull a number out of the air, you

4   know --

5           MR. DUBBS:  I know you will.

6           THE COURT:  -- I mean so --

7           MR. DUBBS:  I think we can figure this out.  I mean

8   to his point about the seven hours and he gets what, we face

9   this in every case --

10          THE COURT:  Right.

11          MR. DUBBS:  -- and the defendants usually have some

12  time.  On the other hand, one has to be realistic and

13  appreciate that at least a third of the people on the

14  deposition list are his people and he doesn't need to make a

15  record on them and another third of them are people that his

16  client has an ongoing business relationship with, query how

17  much he needs questioning of them, and then you have analysts,

18  most of whom are still covering the company.  So as long as

19  that's not abused, that's fine.  I'm the one who doesn't know

20  the information.  He or his client have ongoing relationships

21  with these people or they're his employees or ex-employees.  So

22  it's a little disingenuous to say oh, well, let's sort of start

23  with putting the proposition that everybody gets a lot of

24  questioning in the seven hours.

25          THE COURT:  You know, that's the benefit of just

```
 1  doing criminal practice, no depositions, just go and do it, you
 2  know.
 3          MR. GIBBS:  There is something attractive about that,
 4  your Honor.  There is.
 5          THE COURT:  All right.
 6          MR. GIBBS:  I'm not a big fan of the deposition
 7  process myself.
 8          THE COURT:  All right.
 9          MR. GIBBS:  You know, I thought --
10      (Laughter)
11          -- I thought we were getting along quite well until
12  he called me disingenuous.
13          You know, I agree with your Honor we should have a
14  concrete plan in place by next week.
15          THE COURT:  Right.
16          MR. GIBBS:  And I think that plan should say who's
17  getting deposed, roughly in what order, like, you know, these
18  people we're focusing on this week, these people the next
19  week --
20          THE COURT:  Well, you know, to the extent that you
21  can, but, you know, availability also becomes an issue.
22          MR. GIBBS:  Understood.
23          THE COURT:  Right, so --
24          MR. GIBBS:  At least a rough sense of whether, you
25  know, this witness is going to be in the first batch or the
```

21

1    last batch, that sort of thing.

2           THE COURT:  And this should go for both sides, if

3    this is what we're going to do.

4           MR. DUBBS:  Absolutely.

5           THE COURT:  Do you have any problem with trying to

6    come up with -- with doing that at this point?

7           MR. DUBBS:  No, I don't have any problems with it.

8           THE COURT:  All right.

9           MR. DUBBS:  The only footnote I have is on the

10   analysts, we agree that we will cut down the number, we may

11   need some flexibility as to exactly who it is, and I think some

12   of the analysts will go sort of more at the end of the train,

13   as will some of the senior executives of his client, which is

14   typical.

15          THE COURT:  How many witnesses do you anticipate,

16   Mr. Gibbs, in terms of depositions as well?  Are you looking at

17   43, are you looking at 30, are you looking --

18          MR. GIBBS:  No, we're looking at a handful.

19          THE COURT:  Okay.

20          MR. GIBBS:  The Plaintiffs --

21          THE COURT:  One handful or two handfuls?

22          MR. GIBBS:  Somewhere between the two.

23          THE COURT:  Okay.

24          MR. GIBBS:  The Plaintiffs have, as they do in most

25   of these cases, made allegations about a number of confidential

1   witnesses.  Their most recent complaint I think cites four of

2   them.  A prior complaint cites more like 11 of them.  We've

3   asked them to give us the names, they've refused, but we're

4   working on that issue.  I hope we'll get it resolved.  But, you

5   know, we will probably take some of those people, probably not

6   all of them though, and I'm not sure to what extent there's

7   overlap between the two sets, but I think it's going to be a

8   limited subset of that.  We've already deposed the Plaintiffs

9   and I don't anticipate going back for more.  So I think our

10  fact witnesses are going to be ten or less probably.

11            **THE COURT:**  Okay.  Okay.

12            **MR. DUBBS:**  Just so it's clear, we have proposed one,

13  two, three, four, five, six, seven weeks with individual

14  deponent names in the weeks.  Now, obviously that's subject to

15  availability.  So it's not like we haven't started this

16  process.

17            **MR. GIBBS:**  I agree.

18            **THE COURT:**  Okay.

19            **MR. GIBBS:**  We would love to have a plan in place and

20  Mr. Dubbs has this morning --

21            **THE COURT:**  So he's given you that -- at some point

22  he gave you that list and the weeks over a seven week period?

23            **MR. GIBBS:**  He gave us the list on Monday.

24            **THE COURT:**  Okay.

25            **MR. GIBBS:**  We responded the next day --

1          **THE COURT:**  Okay.

2          **MR. GIBBS:**  -- and we just had a further conversation

3   about it before walking in here and --

4          **THE COURT:**  So it sounds like it's something you'll

5   work out yourselves?

6          **MR. GIBBS:**  I hope so.

7          **THE COURT:**  Okay.  If not, I have to work it out for

8   you.

9          **MR. GIBBS:**  We understand.

10         **THE COURT:**  Okay.  And that's something I can do --

11   you know, no one's going to like it if I have to work it out.

12   You have to realize that, you know.  So you're far better off

13   working it out yourselves.

14         **MR. GIBBS:**  We agree.

15         **THE COURT:**  Okay.  All right.  Because I -- because

16   you know what's going on.  I don't know what's going on.  I'll

17   just pull names and weeks.  It doesn't make any difference to

18   me how it's done.  So you'll be flying all over the country.

19   So it's best off if you guys work it out so perhaps you can,

20   you know, spend a week in New York, or wherever you have to go,

21   North Carolina or Alaska.

22         **MR. GIBBS:**  I think we're going to be going a lot of

23   places, your Honor.

24         **THE COURT:**  All right.  Okay.

25         **MR. GIBBS:**  But we made progress this morning and I

1  think --

2          THE COURT:  Okay.

3          MR. GIBBS:  -- we'll continue to make progress.  If

4  your Honor wants to perhaps set a deadline --

5          THE COURT:  I'm going to.

6          MR. GIBBS:  -- for us to have a plan, I think that

7  would be helpful.

8          THE COURT:  All right.

9          MR. GIBBS:  But, you know, again, I don't think

10  there's been all that many issues.  We have a motion teed up

11  for your Honor.  They've teed up a motion in another

12  jurisdiction that has nothing to do with us, it's a third

13  party.

14          THE COURT:  And that's in front of Judge Selna, I

15  assume.

16          MR. DUBBS:  Well, it's not, and that's -- I'm glad

17  you raised that, because that shows what may be on the horizon

18  and, you know, I think it's a little premature to break into

19  Kumbaya on how well this thing is going.  We have motions

20  pending in Boston and potentially other jurisdictions because

21  these customers are located all over the place.

22          THE COURT:  And they're resisting discovery?

23          MR. DUBBS:  And they're resisting discovery.  Now, we

24  have asked, for example, in Boston that that motion be

25  transferred to Judge Selna, because he's closest to the facts,

1    and --

2            THE COURT:  And he'll send it to me, so….

3            MR. DUBBS:  Well, that may be.  But there are some --

4    but it's an easy issue, so -- and --

5            THE COURT:  Okay.

6            MR. DUBBS:  -- and Judge Selna's already said --

7    already told us how he's going to rule, so --

8            THE COURT:  All right.

9            MR. DUBBS:  -- so --

10           THE COURT:  So that's why you want it here, right?

11           MR. DUBBS:  Yeah, of course.

12           THE COURT:  Okay.  All right.

13           MR. DUBBS:  But, you know, I mean do you give up the

14   Wells transcripts?  I mean that's not a real tough one.  So --

15   but there are other potential repeat performances of that act

16   throughout the country, which is why I think one of the

17   purposes of today is to get an overall structure.  And even

18   though I agree with Mr. Gibbs there are certain things we're

19   working on together, we would really like a framework of how we

20   handle disputes going forward.  Because I do disagree with him

21   about the 30-day business being a deterrent to bringing up

22   frivolous discovery issues, because from our point of view,

23   which is obviously jaundiced, they've been working at this for

24   two years because of the SEC.  And every email, they have a

25   story for every email, and we haven't even seen all the emails.

1   So we feel we are really behind the eight ball.

2          **THE COURT:**  Okay.  You can or cannot respond, it

3   doesn't matter at this point.

4          **MR. GIBBS:**  I won't burden the record or your Honor

5   with a response.

6          **THE COURT:**  Okay.  So I guess the question is dealing

7   with discovery disputes.  You know, there have been complex

8   cases like this where the parties have had discovery disputes

9   but based upon the Rules jurisdiction somehow lies in another

10  District and then we get into a fight about where it's going to

11  be heard.  As long as -- my feeling is if the parties agree, as

12  long as there isn't going to be a third party involved, even

13  though the venue for the discovery motion is in another

14  District, I have no problem if you consensually bringing it to

15  me.  Okay.  So that's the first thing.  I mean I'm hopefully --

16  you know, now I'm somewhat familiar with it, obviously not as

17  familiar as Judge Selna, but at least I know what the case is

18  about and I know what the problems are.  So those can come to

19  me.

20          The other thing that it sounds like is that -- and

21  just from looking at this motion, you know, this is not a

22  complicated legal motion, you know, we're not dealing with a

23  lot of law in here.  We're just dealing with, you know,

24  relevance and lots of documents and the Defendants saying well,

25  they're burdensome and not relevant.  So, you know, that

27

```
 1   doesn't take a lot of briefing or a lot of discussing.

 2           I'm sort of in favor of trying to move this along as

 3   informally as possible as you can in this kind of case.  Now, I

 4   think in doing that, and I want input from you, you know, in

 5   that terms of disputes, we can start off by talking about them

 6   on the record, give me a heads up of what it's about, and if I

 7   think I can resolve the dispute without any further pleadings

 8   then I'll resolve the dispute.  If I think that there's a

 9   significant legal issue that I'm not comfortable resolving

10   without briefing or at least doing some research, having done

11   recent research, we will -- you know, I'll do that.

12           But I'm willing to do this as informally as possible

13   and I've done it in a number of cases.  Sometimes it's worked

14   and sometimes it hasn't, you know.  I mean if you're calling me

15   every day it's not going to work, because I have a million

16   other things to do.  But, you know, if you're making good faith

17   efforts to resolve disputes and if you get to a point about

18   whether or not a certain document, you know, is privileged, you

19   know, I know what privilege is, you know, you can send me the

20   document, I'll look at it and I'll tell you whether it's

21   privileged, you know.  But they've got to be good faith, you

22   know, disputes that you call me on.

23           So I'm willing to give that a try as a way of moving

24   things forward without spending, you know, tens of thousands of

25   dollars and lots of time, you know, preparing joint
```

```
 1    stipulations and replies and flying out here to do this.

 2              What's your thought on that, Mr. Gibbs?

 3         MR. GIBBS:  We can certainly give it a try.

 4         THE COURT:  Okay.  Mr. Dubbs, what do you think about

 5    that approach?

 6         MR. DUBBS:  I think it's still worth a try and we

 7    would like to do it.

 8         THE COURT:  All right.  Then here's how we're going

 9    to do it.  I mean if you're in the middle of a deposition, just

10    call and see if I'm here and available.  And again, you know,

11    certain deposition problems -- and I don't anticipate a whole

12    lot of deposition problems, I think everyone recognizes that,

13    you know, unless we're dealing with privilege issues, your make

14    your object and the person has to answer.  So you folks are

15    sophisticated, you've been through this before, so I don't

16    expect a lot of that.  But, you know, I'm willing to take those

17    as long as, you know, I'm not having to sit through the whole

18    deposition, unless it's somewhere I'd like to go.

19         (Laughter)

20              Then I'll come out and sit through the deposition.

21    But -- so I'm willing to do that.

22              But the other issue is, you know, you get into a

23    dispute over documents, let's say, I need to have a basic idea

24    of what it's about before you get on the phone.  And even if

25    it's a faxed letter from both -- you know, a joint letter
```

1    saying this is what we're fighting about, okay, you know, in

2    two pages, so I know what you're fighting about, at least I'll

3    have a heads up to what's going on.  So my suggestion would be

4    that under these circumstances you contact Ms. Steele, say this

5    is what's going on, we're going to send a joint letter, we'll

6    have it this afternoon to you or tomorrow and we'd like a

7    conference, and then I'll set a conference for the next day

8    after we can read -- we would read the letter and know what's

9    going on.

10          **MR. GIBBS:**  May I make a suggestion, your Honor?

11          **THE COURT:**  Sure.  I mean I'm just talking off the

12   top of my head here.  So anything that would facilitate this or

13   make it easier on each side I'm willing to hear.

14          **MR. GIBBS:**  This is a small suggestion, and we didn't

15   have this problem in this case with the joint stipulation, but

16   I have had bad experiences in the past with joint submissions

17   where you get into an endless loop where they send you their

18   draft, you send them your draft, and then they want to tweak

19   their draft to respond to what you said, and so --

20          **THE COURT:**  You know, if anyone asked me to, you

21   know, to redraft the Rules here, I wouldn't have joint

22   stipulations.  But no one's asked me so --

23          **MR. GIBBS:**  All I was going to suggest is that if

24   someone wants to tee up a discovery dispute they submit a

25   letter of whatever length your Honor wants, the other side gets

30

 1   a chance to submit a letter of the same length, we get on the

 2   phone and we go from there.

 3          **MR. DUBBS:**  I agree with that and I think joint

 4   stipulations cut down a lot of trees and that's about it.

 5          **THE COURT:**  Okay.  Let's do it, let's do it that way.

 6          So when there are disputes let Ms. Steele know some

 7   letters are coming and we'll set a phone conference within two

 8   days.  Get your letter off to me, whoever is seeking the

 9   conference, limit it to three pages.  The other side can file a

10   response.  As long as I have time to read it, that's all I care

11   about.  I want to know what's going on.  I hate walking into

12   situations blind.  So let's do it, let's see how it works.

13          **MR. GIBBS:**  That's fine with us, your Honor.

14          **THE COURT:**  Maybe we won't have any letters.  I think

15   everyone's laughing at me.  But, you know, maybe if we can

16   resolve these quickly I'm willing to do it.  I mean I don't

17   like reading all this stuff either, so I'm glad to do it on

18   three-page letter submissions.

19          But again, if it's -- if it gets to be a

20   sophisticated, complicated legal issue, I'll need some

21   briefing.  Maybe we can cut out these hearings and I think we

22   can just do it on the -- you know, if it gets to that point.

23   But --

24          **MR. GIBBS:**  One other thought, your Honor.  This is

25   not something necessarily you need to rule upon, but a

31

1    suggestion.  We've had a little back and forth about the

2    deposition process and Mr. Dubbs, I think, is being overly

3    optimistic about my ability to corral customers and analysts

4    and people who don't work for my clients.  What I would suggest

5    with respect to third party depositions, and I agree my own

6    witnesses are a different issue, but with respect to third

7    party witnesses what I would propose is that at some point

8    before the deposition we should have a conversation and talk

9    about time estimates.  It's obviously not going to be binding,

10   but, you know, I want to know from him if he thinks he's got

11   seven hours for a witness, then we've got an issue because we

12   may need to go beyond seven hours if I think I have questions.

13          And so I'm just proposing that we have some level of

14   meet and confer about each witness before the deposition starts

15   with some sense of how much each side thinks they're going to

16   have to ask them because my point really is that these third

17   parties, from my perspective, are really third parties.  I

18   don't get to go call up --

19          **THE COURT:**  Right.

20          **MR. GIBBS:**  -- my clients' customers and say, Hey,

21   can you do a two-hour interview with me and nor do I get to

22   say, Hey, will you sit for another day of deposition.  That

23   won't go over very well with my client.  So these are third

24   parties.  I don't have control over them and I really don't

25   have any more access to them than Mr. Dubbs does.  So all I

1   want to suggest is that we have some level of meet and confer

2   about how much of the seven-hour day each side thinks that they

3   need.  For many I suspect the answer's going to be, seven hours

4   is probably enough.  There may be some where he comes and says,

5   I think I've got seven hours; I think I need two days -- at

6   which point we may need to deal with the witness, you know,

7   there may be an issue there.  But at least we've had a

8   conversation about it; we're not at the end of the seven-hour

9   day and I'm saying, "Hey, I have three hours of questioning

10  left."

11          **THE COURT:**  I think that makes perfect sense.

12          **MR. DUBBS:**  Yeah; without adopting his premise about

13  control or lack of control, I think it's a very helpful

14  suggestion, and we'll do that.

15          **THE COURT:**  Right.  So, if we're running into

16  problems where you think, okay, you're going to need six hours

17  and you think you're going to need three hours, you know, we'll

18  have to deal with that.  Maybe we'll have to go over to two

19  days.  Maybe the witness is willing to sit for nine hours, and

20  maybe you can do it in a day.

21          So, yeah; I mean, when we're doing these things, we

22  just -- you know, we're not going to have a stop clock,

23  stopwatch going.  We're going to have to be flexible.  You're

24  going to have to be flexible.  Because I'm going to be --

25          **MR. DUBBS:**  That's fine.

1          **THE COURT:**  -- because I'm going to be flexible on

2   this.  So, I think that's a really good idea.  Okay.  So, talk

3   about it.

4          And, again, if a dispute comes up, you know, this is

5   the kind of dispute I only need one page -- (**Laughter**) a one-

6   page letter to resolve, or maybe a half page.  I don't need

7   three pages.  Just let Ms. Steele know if anything is in

8   dispute, call me up, and I'll make the decision.  You know,

9   it's that -- this is not going to be that hard.  That part's

10  not going to be that hard.  Okay?

11         Any other issues, problems you foresee?  I mean, I

12  know you probably see a number of problems; but just in terms

13  of getting this thing moving?  And I know you want your

14  documents, or the documents.

15         **MR. DUBBS:**  Well, I think if we get our documents,

16  that's our main issue.  For sake of completeness, there is a

17  reliance on counsel issue as to some little part of the case,

18  and right now that looks like a pimple on the elephant, so I

19  don't -- but it's out there, and we really haven't discussed

20  it.  But -- and I don't think that will be a burden on the

21  Court, but it's a potential issue out there.  But I --

22         **THE COURT:**  Reliance on counsel is always a burden on

23  the Court, so --

24         **MR. DUBBS:**  I understand that.

25         **THE COURT:**  -- when that --

1          **MR. DUBBS:**  And I think they -- they --

2          **THE COURT:**  Everyone knows that.

3          **MR. DUBBS:**  -- they pretty much telegraph where

4    they're coming from, and, so, we'll see how that plays out.

5          **THE COURT:**  Okay.

6          Mr. Gibbs, anything that -- anything else that you

7    see right now that we can -- I mean, most of this stuff I'm

8    throwing on you, obviously, still.  I mean, I'm not issuing any

9    orders yet.  I'm still assuming that based upon the framework

10   that you're setting that we can resolve these --

11         **MR. GIBBS:**  I agree.  I --

12         **THE COURT:**  -- get the schedule going.

13         **MR. GIBBS:**  I continue to think we're doing okay on

14   that front.

15         **THE COURT:**  Okay.  Sounds like it to me.

16         **MR. DUBBS:**  Uh --

17         **THE COURT:**  At least, everyone always does alright in

18   the courtroom.  It's the minute they walk out in the hallway

19   where all the fireworks start.  But --

20         **MR. DUBBS:**  There is -- my colleague advised me there

21   is one other issue, which is that they have served a bunch of

22   contention interrogatories on us.  I don't have problems with

23   contention interrogatories in the abstract.  It's a question of

24   when.  So, I would prefer that Mr. Gibbs consider modifying his

25   position and doing it at the end after we've deposed these

1    people so that we can meaningfully answer --

2         THE COURT:  So --

3         MR. DUBBS:  -- what he says we're contending, because

4    right now all we're going to do is cut down trees and say, "We

5    don't know."

6         THE COURT:  There's a lot of cases on contention

7    interrogatories out of the Northern District I know, so --

8         MR. GIBBS:  I understand, your Honor.  And --

9         THE COURT:  Judge Brazil did a bunch of them and --

10        MR. GIBBS:  We're not early in the case.

11        THE COURT:  Yeah, I know.

12        MR. GIBBS:  Discovery closes April 10.

13        THE COURT:  He's really -- they're --

14        MR. GIBBS:  And I have to have a motion for summary

15   judgment on file by May 7th?  Right.  So, I need to know what

16   I'm shooting at.  And I appreciate that he -- that if he hasn't

17   taken a deposition yet he may supplement that interrogatory

18   response based on what he gets out of the deposition.  I think

19   I am entitled at least to what he knows now based on the

20   millions of documents they have had access to, based on the

21   public information that forms part of the basis for this case.

22   I am entitled to start figuring out what I'm shooting at.  And

23   I recognize it may not be complete until after the depositions

24   are closed, but with summary judgment due on May 7th, I don't

25   think it's fair to just say "I don't know" as of February 27th

36

```
 1    when this answer is due.

 2          MR. DUBBS:  Well, we'd be further down the -- of

 3    course, our answer is we would be further down the line if we

 4    had the documents and read them the depositions.  But right

 5    now --

 6          THE COURT:  When did you -- when did you get into

 7    this case, Mr. Dubbs?

 8          MR. DUBBS:  I don't know.

 9       (Pause; voices and whispers off the record)

10          MR. GIBBS:  Your Honor, I --

11          MR. DUBBS:  November?  I don't know.  Something like

12    that.

13          MR. GIBBS:  -- I have some timing information that I

14    think bears on that; if I could, your Honor.

15          THE COURT:  Okay.

16          MR. GIBBS:  Mr. Dubbs is correct that during the

17    motion to dismiss briefing discovery was stayed.  Judge Selna

18    denied our most recent motion to dismiss in June of last year.

19    At that point in time there was a November trial date.  Now, I

20    expected the discovery to start flying the day after the motion

21    was denied.  It did not.  Nothing happened.

22          THE COURT:  Have you done mediation?

23          MR. GIBBS:  We have.

24          THE COURT:  Okay.  All right.  I was being hopeful

25    here, maybe that was a possibility.
```

37

1          (Laughter)

2               All right.  Go ahead.

3          **MR. GIBBS:**  We have.

4               Nothing happened.  In late September or early

5     October, Judge Selna gathered us and said, "We have a trial

6     date in November; what on earth is going on?  I don't see any

7     docket activity."

8               And there was some discussion, at which point,

9     following some back-and-forth, the judge set the current trial

10    date, set the current discovery cutoff, et cetera.  He did all

11    of that on October 10th or 11th.  So, you know, we've all known

12    the discovery cutoff since early October.  We have all known

13    the trial date since early October.  We have been trying very

14    hard to produce documents quickly, in many cases ahead of

15    schedule.

16              We do have some disputes.  They're in good faith.  I

17    think we're right.  We may lose.  But I don't think we've done

18    anything wrong by asserting some objections to those.  We have

19    been trying to move this process along.  And I'm not trying to

20    jam him up and tell him -- and say he needs to know his whole

21    case by February 27th, but I think he needs to give me a good

22    faith response based on what he knows so far, even if it is

23    subject to being supplemented later.  They have had time.

24          **MR. UNIDENTIFIED:**  Contention interrogatories are a

25    waste of time until the end of the case, and this is just a --

38

```
 1   a side issue.  And with respect to -- since he's brought up
 2   ancient history, the reason there was a gap there was, among
 3   other things, that we were talking to a number of institutional
 4   clients about bringing a Section 11 claim.  And had we brought
 5   a Section 11 claim, this case would have been a lot easier.
 6   There would not be a parallel case in state court, parallel
 7   sets of motions to intervene here, and all kinds of other
 8   stuff, all of which is going to accomplish absolutely nothing
 9   except give another law firm a blocking position in a
10   mediation.  So, it's not like we were sitting around in New
11   York staring out the window.
12            THE COURT:  Okay.  Let's move on past this.
13            Well, I'll take a look at those contention
14   interrogatories.  I mean, you're obviously entitled to them at
15   some point.  You're entitled to that information.  They're
16   entitled to know the information that they're providing you.
17   So, let me see if I can figure that out.  Why don't you lodge
18   them with me.
19            MR. GIBBS:  And I -- and we'll do that, your Honor,
20   and maybe we'll have a further discussion; maybe we won't.
21            THE COURT:  Yeah.  Maybe we should have --
22            MR. GIBBS:  But just to be clear --
23            THE COURT:  -- a further discussion on this.
24            MR. GIBBS:  -- many of these are not contention
25   interrogatories in the sense of:  List all facts that support
```

39

1   this contention.

2            **THE COURT:**  Okay.

3            **MR. GIBBS:**  There are some like that.

4            **THE COURT:**  Right.

5            **MR. GIBBS:**  Many of them are really kind of a

6   different kind of contention interrogatory that are really just

7   trying to pin down --

8            **THE COURT:**  They're more --

9            **MR. GIBBS:**  -- what is the claim.  Right?

10           So, for example, they claim that we failed to

11  disclose material facts on July 16th.  Right?  And we have

12  asked them:  State, specifically, what are the facts that you

13  claim we withheld.  Because notwithstanding the particularized

14  pleading requirements of the PSLRA, I still got three or four

15  or five different articulations of the fact that they claim we

16  withheld.  And I'm trying to prepare for summary judgment.  I

17  need to know:  What is it they say we knew but didn't disclose?

18  That's not:  Tell me all facts that support this contention.

19  It's different.

20           So, you know, we're happy to discuss it further with

21  your Honor.  We're not expecting a definitive response at the

22  end of February, but we do think a preliminary good faith

23  response based on what they know now is not unreasonable given

24  that I have to file a motion for summary judgment on May 7th.

25           **THE COURT:**  Okay.

1          **MR. DUBBS:**  We will lodge the interrogatories, your

2     Honor.  We'll make --

3          **THE COURT:**  I'll take a look at them and then we'll

4     probably have a phone conference on it; sooner rather than

5     later.

6          **MR. DUBBS:**  But putting bodies to answer contention

7     interrogatories early in the case takes away from --

8          **THE COURT:**  But it's late in the case.

9          **MR. DUBBS:**  Well --

10          **THE COURT:**  It's early in the case and it's late in

11     the case.

12          **MR. DUBBS:**  Well, that's fine.  And --

13          **THE COURT:**  Yeah.  All right.  I don't think we need

14     to talk about it anymore.  Okay.

15          Yeah, just lodge them with me so I -- so I can take a

16     look at them and -- yeah, we may -- we may have to compromise

17     on this one, give you a little more time, but give enough time

18     so that defendant can work on summary judgment.  I just can't

19     say, okay, under discovery -- and maybe there are certain ones

20     that need to be answered now and certain ones that can -- can

21     wait.  So --

22          **MR. DUBBS:**  Well, if he can tee up particularly which

23     ones he's interested in that are relevant to summary

24     judgment --

25          **THE COURT:**  Well, I'm sure he's interested in all of

41

```
 1   them, but --

 2        MR. DUBBS:  Well, I know he's interested in all of

 3   them, just like we're interested in all of his documents.

 4   But --

 5        (Laughter)

 6        THE COURT:  Okay.  All right.  Let me look at them.

 7   See if you can work something out, because -- I'm telegraphing

 8   something here, if you --

 9        MR. DUBBS:  Yes, your Honor.

10        THE COURT:  -- if you don't have it yet.  And that

11   is, you know, we may have to compromise on this so that you at

12   least provide what you knew, you know, within a reasonable time

13   before the summary judgment motion is due so that -- and you'll

14   find I do a lot of splitting the baby here, so you might as

15   well --

16        MR. DUBBS:  Fair enough.

17        THE COURT:  -- be prepared.

18        MR. GIBBS:  Work out a custody arrangement?

19        THE COURT:  Yeah, exactly.  Okay?  All right.

20        What else, besides that motion?

21        MR. DUBBS:  Unless Mr. Gibbs has something, I think

22   those are the general issues, and I think we've established a

23   framework to go forward.

24        THE COURT:  Okay.

25        MR. GIBBS:  Agreed.
```

EXCEPTIONAL REPORTING SERVICES, INC

42

| | |
|---|---|
| 1 | **THE COURT:**  All right.  Very good. |
| 2 | All right.  So, let's talk about this motion.  So, |
| 3 | I've gone over the bunch of interrogatories dealing with a |
| 4 | bunch of specific allegations and facts that the plaintiff has |
| 5 | alleged in the complaint.  You know, I've got -- I've got, in |
| 6 | response, I've got some broad claims of burdensomeness and |
| 7 | relevance.  But I can't say that, now, in light of the overall |
| 8 | case, I really understand what's -- where the burdensomeness |
| 9 | comes in -- or why these documents aren't relevant at this |
| 10 | point.  So, that's the problem I'm having looking at this. |
| 11 | Now, the plaintiff has offered some compromises as |
| 12 | the meet-and-confers have gone on.  The defendant has asked to |
| 13 | meet and confer for additional meetings and feel we haven't |
| 14 | exhausted that avenue.  But, given the time, I think I have to |
| 15 | decide something here. |
| 16 | So, I haven't seen any -- let me -- and I haven't |
| 17 | seen -- in looking at this, I haven't seen any alternative |
| 18 | proposals.  In other words, what I'm seeing -- and correct me |
| 19 | when you get up if I'm wrong on this -- that you've pretty much |
| 20 | dug in your heels that this is overly burdensome and that the |
| 21 | documents requested aren't relevant. |
| 22 | So, I'm going to start with Mr. Dubbs.  And I am not |
| 23 | going to do this interrogatory by interrogatory.  You know, we |
| 24 | could be here till Monday if we wanted to argue each one of |
| 25 | these.  So, Mr. Dubbs, if you want to give me just an overview |

1  here, I'll -- it's your motion, right?

2          MR. DUBBS:  Well, yes, it is, your Honor.  My

3  colleague, Mr. Joffe, will get into the more details.  But our

4  problem is that there is a claim that has been sustained

5  dealing with income, and we have gotten nothing.  And we have

6  not gotten a proposal saying, well, we'll give you, you know,

7  so much, and then if that doesn't do it, come back, or we'll

8  talk about it.  We've gotten nothing, as if that claim hasn't

9  been sustained, and it has been sustained.  And that's the

10  fundamental problem, and my colleague, Mr. Joffe, will get more

11  into the nuts and bolts.

12          THE COURT:  Mr. Joffe?  Yeah.

13          MR. JOFFE:  Thank you, your Honor.

14          What I'd like to do -- and just let me know if some

15  of this is unnecessary.  I thought very quickly I'll repeat

16  what the claims are in the case, and then, secondly, I'd like

17  to clarify something that is not in dispute, although it may

18  appear otherwise.  And then I'd like to clarify the things that

19  are in dispute.

20          So, the claims all involve alleged misstatements made

21  after the close of the second quarter in 2009.  And it was

22  shortly after those misstatements were made, a week later,

23  there was a secondary offering in which two of the defendants

24  sold half of their STEC stock.  The alleged misstatements can

25  be roughly broken into three categories.

1           The first category was regarding STEC's contract with

2    its biggest customer, EMC, and their omission to disclose that

3    it was not a recurring contract.

4           The second group of misstatements have to do with the

5    defendants having stated that they expected sales to most of

6    their major customers to increase during the second half of

7    2009.

8           And the third group of misstatements have to do with

9    their simply having reported inflated revenue for the second

10   quarter.

11          So, all of these misstatements were made at roughly

12   the same time, and it was a week before this secondary

13   offering.

14          Now, in the SEC's case against the defendants,

15   although they initially were just looking into insider trading,

16   whether employees, friends, and family had been tipped before

17   public announcements were made, while they were doing it, they

18   noticed this issue with the EM -- with the biggest customer's

19   contract; that's EMC, that customer.  So, that --

20          **THE COURT:**  Regarding the recurring contract?

21          **MR. JOFFE:**  That's right.

22          So, that also got folded in to the SEC case.  And

23   it's very much part of the documents that were produced to us,

24   because we asked for what was produced to the SEC.  So, that

25   claim is essentially not part of this motion to compel.  This

1    motion to compel deals exclusively with the other two claims,

2    the claims that the defendants misstated what their

3    expectations were about sales to the other customers during the

4    second half of 2009 and the claim that they reported inflated

5    revenue for the second quarter of 2009.  Okay.  So, that's the

6    background.

7            Now, one thing that I would like to clarify is not

8    really in dispute here, although one might get a different

9    impression from reading some of the papers, is the period of

10   time from which we are requesting that e-mails be produced.

11   This is an issue that it's -- defendants mention it in their

12   supplemental memorandum and they mention it in their

13   contentions in the joint stipulation, but they never mentioned

14   this in their original objections.  They never mentioned it in

15   the original meet-and-confer.  They never mentioned it in the

16   letter that they wrote to use after the meet-and-confer.

17   That's point number one.

18           And point number two is, the time periods that they

19   insist on are, with only one exception, perfectly fine with

20   lead plaintiff.  Okay?  There is only one time period regarding

21   those e-mails that we have a disagreement about, and that's in

22   regard to request number 21, which I'll come back to and

23   explain what the disagreements are.

24           So, now I want to talk about what is in dispute,

25   first on the inflated revenues claim, and then I'll move on to

46

1    the other claim.

2          The requests that go to the inflated revenue claim,

3    in particular, are 23, 24, 25; and they ask for documents

4    relating to sales, shipments, and revenues.  Now, ordinarily,

5    in a case where there is an allegation that the financial

6    statements misstate something, what you're looking for in

7    discovery is evidence of the underlying transactions, which is

8    why originally we asked for such things as all purchase orders,

9    all invoices, so on.  Okay.

10          After the meet-and-confer we tried to come up with

11    some way of really streamlining this and reducing any

12    burdensomeness, and for that reason, what we suggested is

13    that -- we request that defendant produce the same documents

14    that they gave to their auditor for the year-end audit that are

15    related to the second-quarter sales, the second-quarter

16    shipments, the second-quarter revenues.  It's our belief that

17    these documents were previously collected, they're sitting in a

18    bundle with a big ribbon and a bow on it tied up; all they have

19    to do, just like with the SEC documents, is give them to us.

20          Now, defendants seem to think there is something

21    nefarious about our requesting the documents that they -- a

22    copy of the documents that they gave to the auditor.  But

23    really our motive is to come up with something that they can do

24    that is relatively simple and that will still satisfy us.

25    We're not asking for every invoice.  We're not asking for every

47

1    purchase order.  But we think we should have a fair chance to

2    get a good sample, and that's what we would get from the same

3    documents they gave their auditor.

4           Now, in addition to that, we identify four specific

5    employees whose e-mails regarding the second quarter sales,

6    shipments, and revenues we would like produced.  So, it's their

7    e-mails narrowed to in certain cases the sales, in other cases

8    the shipments, in other cases the revenues, just for these

9    people:  the senior vice president of finance, the director of

10   finance, an employee whose job it was to circulate summaries of

11   set sales, and the director of operations.

12          Now, defendants have made two arguments as to why

13   they shouldn't have to give us anything in regard to these

14   requests.  One is that on a previous motion to dismiss, this

15   claim was dismissed.  Well, on a previous motion to dismiss,

16   all the claims were dismissed.  Judge Selna stated in his

17   decision on the motion to dismiss that goes to the operative

18   complaint that all the claims are not dismissed, and I am not

19   aware of any authority -- they haven't cited any -- that

20   discovery can be judged irrelevant because some previous

21   complaint was dismissed that had that claim in it.

22          The second argument that they have raised is that

23   they have produced some documents in the SEC production that

24   are relevant to this.  And the reason for that is that, for

25   example, in responding to the SEC, one of the things that they

48

```
 1  gave the SEC was all e-mails, without any limitation, of their

 2  CEO.  So, if their CEO happened to get a document regarding

 3  sales, it was produced to the SEC; it's also produced to us.

 4  But these are summary documents.

 5          What we feel is appropriate on discovery on an issue

 6  like this is documents relating to the transactions, not some

 7  summary of the transactions, which could be not much different

 8  from the financial statement that we're alleging is false to

 9  begin with.  That's why we believe we can get a sample of that,

10  of the actual information -- evidence regarding the actual

11  transactions by the documents that the auditor reviewed and

12  these four employees who are essentially in the financial

13  department.

14          Okay.  Now I'm going to move on to the other major

15  part of these requests.  The custodians that are involved in

16  this, the first part that I was talking about, are mostly in

17  the financial department.  The custodians in the second group

18  of requests are all sales representatives.

19          There is one request regarding the sales

20  representatives that regards this misstatement of what the

21  expected sales to the big customers would be in the second half

22  of 2009, and that's the one I would like to talk about first.

23          As I said, the claim is that they falsely stated that

24  they were expecting sales to most of these big customers to

25  increase during the second half of 2009.  So, of course, part
```

49

```
 1   of the issue here is that the sales declined.  Instead of

 2   increasing, they declined.  That's part of the issue.  But an

 3   even more important -- important part of the issue is:  Did

 4   they have advance warning that these sales were going to

 5   decline?  When they said they expected them to increase, was

 6   that really their expectation?  Or was their expectation that

 7   they would decline?

 8           So, the defendants announced during the second half

 9   when the sales, in fact, did -- when it became apparent that

10   they were declining, they announced more than one reason for

11   this.  One reason was they disclosed that their customers had

12   not started building their product, this solid-state drive

13   called the ZeusIOPS.  They hadn't started building it into

14   their system.  So, that's why they weren't actually buying it

15   yet, even though they had tested it.  They hadn't built it into

16   their system, so they weren't buying it in quantity.

17           Another disclosure that they made was that to the

18   extent that their customers were selling this product of

19   STEC's, this ZeusIOPS hard drive, in their systems, it was

20   being sold as an option, not as a standard feature, so that

21   when they would sell system X to the customer, the customer

22   could buy it with no ZeusIOPS in it at all if that's what they

23   preferred.  Okay.  The investors didn't know this until --

24   these things, until they were disclosed during the second half

25   of 2009, subsequent to defendants having said they expected
```

1   sales to these customers to increase.

2          So, in order to -- proper discovery as to this claim

3   is trying to discover, first of all, during the second half of

4   2009, what was it that was disclosed about the conditions of

5   the business of these customers that caused their purchases of

6   this drive to actually decline?

7          And the second part of the discovery regarding this

8   claim is, essentially:  What did defendants know and when did

9   they know it, in advance of the second half of 2009?

10          So, first of all -- so, we asked for all the -- each

11   one of these big customers had one -- there was one --

12          **THE COURT:**  And there's approximately five, if I

13   remember; five or six, if I remember?

14          **MR. JOFFE:**  That's right.  There's -- there's five,

15   and then a sixth big customer who doesn't buy this particular

16   product.  There's five who buy this product.

17          **THE COURT:**  Right.

18          **MR. JOFFE:**  Two -- EMC, the big one, who had the big

19   contract, is one of them; and the second one is IBM.  Now,

20   initially we asked for each vice president who deals with each

21   of these customers, and one of their subordinates in a couple

22   of cases, for their e-mail exchanges with these customers.

23   During the meet-and-confer we learned that the exchanges

24   regarding EMC and IBM have already been produced for the

25   following reason.

51

1          The EMC documents, as I explained before, were part

2     of the SEC investigation.  And it turns out that the same vice

3     president who handled EMC for STEC also handled IBM.  So, those

4     are taken care of.  Okay?  But what's left is Hewlett-Packard,

5     Hitachi, and Sun.  So, we narrowed our request to say all the

6     e-mail communications between these five STEC employees:  three

7     vice presidents and two people working under them, and, for the

8     vice president who worked with Hitachi, his communications with

9     Hitachi relating to ZeusIOPS, this drive; and for the one who

10    dealt with Sun, his communications with Sun; and so on, for

11    these three: Hitachi, Sun, and Hewlett-Packard.

12          Now, defendants counter-proposed that it should just

13    be limited to their communications about sales of this drive.

14    But, of course, sales, the actual sales, are a secondary issue.

15    The real issue here is:  Why didn't their sales increase, and

16    what did the defendants know about those business conditions

17    and when did they know it?

18          Now, secondly, this is the one request on which there

19    is an issue about the time period.  They would like to narrow

20    down the time period to just the second and third quarter.  But

21    our view is that the second half -- now, admittedly, originally

22    we asked for an 18-month period from January 1 to end of June.

23    And it's of some significance that the SEC's request also began

24    January 1.  Their request didn't end in June of 2010.  Their

25    requests go right up to the present.  But we asked for a year

1   and a half period.  And we are willing to cut off the last half

2   year and just make it the full year, 2009.  But the reason why

3   we don't believe it would be appropriate to cut it down to just

4   the second and third quarters is, first of all, this was a

5   misstatement about what would happen the second half of 2009.

6   So, the entire second half is relevant.

7           Secondly, for the period before the second half, when

8   we're trying to find out what they knew, one of the things that

9   would be important information to them was:  What kind of

10   development is there in the buying pattern of these customers

11   during the first half year, to see what to expect during the

12   second half year.  So, in our view, an appropriate period of

13   time in which to cull the e-mails of these employees is a full

14   year -- the full year 2009.  Again, it can't be just limited to

15   the sales.  That would -- that would, you know, have minor

16   relevance to this request.

17           Okay.  The other requests that deal with these same

18   custodians, who are sales representatives, the other requests

19   regarding these custodians deal with their e-mail traffic as

20   it's relevant to the inflated revenue claims.  So, for that one

21   we only asked -- and there is no disagreement about this with

22   defendant about their e-mails during the second and third

23   quarter.  Same custodians with the same customers; the only

24   difference is that in this instance we add in one more vice

25   president, the one who dealt with Cisco.  He dealt actually

53

```
 1   with -- he's on the -- he's in the first request that I

 2   mentioned, Request Number 21, because he also dealt with

 3   Hewlett-Packard.  He's the only one who dealt with two

 4   companies, Hewlett-Packard and Cisco, but we would like for

 5   this purpose his e-mails to Cisco, as well as Hewlett-Packard.

 6   Cisco didn't buy this ZeusIOPS hard drive; they bought other

 7   things.

 8            THE COURT:  So, why do you want the Cisco

 9   information?

10            MR. JOFFE:  The --

11            THE COURT:  You lost me there for a minute.

12            MR. JOFFE:  Okay.  Now, this is -- for -- this is

13   also relevant to the inflated revenue claim.  For example, it's

14   alleged --

15            THE COURT:  Oh.  Okay.

16            MR. JOFFE:  You know, were there unordered products

17   shipped?  Were there products that were returned?  Was the

18   actual sales maybe not the sales that later were recorded?

19   These people, obviously, are the best source of that

20   information, and the thing is this kind of communication

21   between a sales representative and his customer is not going to

22   involve any personal e-mails.  That's not going to be part of

23   this.  It's also not going to involve any e-mails with other

24   employees at STEC, except when they're cc'd.  This is just the

25   communications of a sales rep with his customer.  There is not
```

54

1    going to be any attorney-client privilege, because if it's a

2    communication between the sales rep and his customer, it's,

3    obviously, not going to be confidential.

4          And, again, it cannot be limited to -- there is no

5    need to limit it to just sales, because everything these people

6    are going to talk about with their customer -- things like

7    purchase orders, costs, prices that they're going to charge,

8    how much the payment's going to be, was the shipment made, when

9    was the shipment received, was the product defective -- all the

10   things that salesmen talk about with their customer are going

11   to be relevant to this inflated revenue claim.  So it's our

12   belief that by cutting it down to the two-quarter period, there

13   is nothing wrong with simply asking for all their e-mails sent

14   and received with this one particular customer, or in the case

15   of the one VP who dealt with HP and Cisco, his two -- his two

16   customers.

17         Okay.  Finally, again, they want to -- the defendants

18   have insisted on narrowing it to only sales; and, secondly,

19   only sales of this hard drive.  But Cisco doesn't even buy this

20   hard drive.  All -- that would completely cut out all the

21   communications with Cisco, who doesn't buy this hard drive, and

22   narrowing it down to just sales would eliminate quite a few

23   other things relevant to our claim that the revenues were

24   inflated.

25         Okay.  Now, just a couple of loose ends, and I'll be

1    finished.  First of all, one serious dispute is that in regard

2    to all the requests in which we've asked for e-mail exchanges,

3    defendant's position is that they only want to produce e-mails

4    so-called "held" -- that's the word that they use -- by the

5    custodian.  Now, I am not aware of any -- so, in other words,

6    they would not have to look on the server to see what e-mail is

7    on there.  If they have backup systems, they would not have to

8    look on the backup system.

9         **THE COURT:**  Let me stop you for a minute.  You're

10   shaking your head no.  Is that -- if I grant this, is that your

11   position?  So, if we can cut him --

12        **MR. GIBBS:**  I'll let Ms. Johnson --

13        **THE COURT:**  Okay.

14        **MR. GIBBS:**  -- correct me if I'm wrong, but I -- the

15   backup tapes are one thing.  I don't understand the limitation

16   held by a custodian to exclude things just because they're

17   sitting on a server as opposed to on someone's laptop.  I

18   believe that the point of this limitation is:  We want to

19   search the files of specific custodians, not search the entire

20   company just to find an e-mail that's got that custodian's name

21   on it.  Does that make sense?

22        **THE COURT:**  Yeah.  Okay.

23        Does that make any difference?

24        **MR. JOFFE:**  Well, it makes a big difference.  I don't

25   quite understand, then, why they made a point of that language,

56

```
 1   because if we asked for all e-mails sent and received by person
 2   X, you know, how would you find that on -- you know, under some
 3   other person's e-mail file?  I don't --
 4           THE COURT:  Okay.
 5           MR. JOFFE:  -- I don't get it.
 6           THE COURT:  Well, I'm going to let you finish, and
 7   then I'll let Ms. Johnson tell me how.
 8           MR. JOFFE:  Okay.  Now, I'd just like to -- two
 9   details.  There were two specific requests that in our
10   supplemental response I didn't get a chance to deal with, so
11   I'd just like to mention them.  And I'm not singling them out
12   because they're of any special importance.
13           Request Number 26 was a request for information about
14   the revenues reported in the third quarter.  And the purpose of
15   that was for comparison purposes to what was reported in the
16   second quarter.  And my understanding is the time that they --
17   you know, the time period from which to cull e-mails that they
18   have insisted on is fine with us.  They said it should be the
19   third quarter and one month after the third quarter, October.
20   That's fine with us.
21           However, first of all -- and interestingly enough,
22   this response is different from their response to the second
23   quarter revenues, which they don't want to give us anything at
24   all about.  On the third quarter revenue, they say they'll give
25   us stuff, but it still eliminates our request for the documents
```

57

1    that were given to the auditor.

2            Now, assuming this -- and they also, you know, put in

3    this word about e-mails "held."  If I'm wrong about that word,

4    then the only disagreement on 26 is whether the documents given

5    to the auditor would be included.

6            And, then, finally, Request Number 36.  Last thing

7    here.  Request Number 36 asked for documents relating to the

8    composition of the cost of revenues during each of the quarters

9    in the second half of the year.

10           Now, they said at the meet and confer that this was

11   too broad to ask for all those documents, so we said, "Okay.

12   Just give us the ones used, received or used by the financial

13   department," okay?  They said that was still too broad, but

14   didn't give us any counter proposal, okay?

15           Subsequent to the motion being filed, they then

16   started saying, you know, "We'll give you a document or two.

17   We'll give you some reports."  In other words, they'll pick out

18   what they'd like to produce and produce it.

19           Well, what they produced as far as we can tell is a

20   two-page document which, again, as far as we can tell, was

21   created now.  It's essentially -- I may be wrong, but this is

22   all I can tell by looking at the document -- an unsupported

23   assertion as to what the composition of the cost of revenues

24   was, breaking it down into how much is inventory, how much is

25   labor, how much is overhead, how much was for this product, how

58

1    much was for another product.  This is not a response to a

2    document request.

3             Now, even if I'm wrong and that document is something

4    that was actually created in 2009, it's still -- all it is is a

5    summary document.  It's not evidence of actually what went into

6    the cost of revenues; therefore, we're willing to -- on this

7    one - to really make it easy for defendants and we'll change

8    our request and let them produce documents from 2009 sufficient

9    to show what went into the cost of revenues in those two

10   quarters.

11            And as far as the time period goes, obviously, you

12   know, as with many of these requests, the request sort of

13   implicitly carries its own time period; documents from those

14   two quarters.  Thank you, your Honor.

15            **THE COURT:**  Okay.  Thank you.

16            **MS. JOHNSON:**  Thank you, your Honor.  I feel a little

17   bit like we're doing the meet and confer in front of your

18   Honor.

19            **THE COURT:**  That happens sometimes, so it --

20            **MS. JOHNSON:**  Which is fine.  So --

21            **THE COURT:**  Well, let me ask this.  It's 12:25, all

22   right.  You going home today?  No?  Do you want -- I mean,

23   you've heard some positions put forward.  Would you like to

24   take some time to talk about this and try to resolve it and

25   then come back at, you know, in an hour or an hour and a half

1   and tell me what's been resolved?  Or do you want to roll the

2   dice?

3          **MS. JOHNSON:**  Your Honor, I think that makes sense

4   for half of the requests that are in dispute, because -- and

5   some new proposals have been put on the table as he's been

6   standing here.  And I think to hear that --

7          **THE COURT:**  Although, you know, but I'm not going to

8   give you more -- I'm not going to send you back out to meet and

9   confer again, okay?  I want to resolve -- we're going to get

10  this resolved today.

11         **MS. JOHNSON:**  Yeah.

12         **THE COURT:**  But, I mean, if you're stepping up here

13  and saying, you know, half of these requests now, as modified,

14  are fine, then I don't have to decide anything, which is --

15         **MS. JOHNSON:**  I think that's right.  What I've heard

16  him say is that our time periods are fine.  I think I can

17  identify for you what the disputes still are --

18         **THE COURT:**  Okay.

19         **MS. JOHNSON:**  -- so that we can talk about them.  And

20  I think it's very important context what he said about the SEC

21  production, because what we've produced to the SEC are the

22  entire period worth of e-mails for seven top executives,

23  including the CEO, the COO, the CFO, VP of Investor Relations,

24  VP of Sales for IBM and EMC as counsel told you, Director of

25  Sales for EMC, VP of Corporate Development.  Those are the vast

 1   majority of the documents we produced to the SEC and which they

 2   have.

 3        What he's told you is that they've reviewed all of

 4   those documents and as to the two issues that we're talking

 5   about -- not the EMC agreement, but sales to other OEMs and

 6   allegedly inflated revenues in the second quarter -- we have

 7   virtually no documents.  That's critical, because they have a

 8   lot of e-mails from a lot of the key folks, including all three

 9   individual defendants.  And this is a securities case.  What

10   those guys knew was important.  So, they have all of those e-

11   mails and they've, you know, represented to the Court that they

12   have virtually no documents as to these other two theories.

13        Now, as to the OEM sales, we've agreed on the five

14   custodians.  It sounds like we've mostly agreed on the time

15   period.  They don't want to limit by subject matter at all the

16   communications for the second and third quarter.  We believe

17   that a subject matter limitation is appropriate.

18        The meet and confer that's been going on here is what

19   is that limitation; what is appropriate?  We suggested sales.

20   They filed a motion and didn't suggest something in return.  In

21   their supplemental brief they suggested, "Well, we also want

22   expectations of sales, adoptions by the customers," that sort

23   of thing.  That's all fine.  Right?  So, I think we can agree

24   on those types of things.

25        What I think we can't agree on and it makes sense to

1   talk to your Honor about is the second quarter revenue.

2   There's an allegation in the complaint, that was in the first

3   complaint, that says based on four confidential 4/2/11

4   confidential witnesses, second quarter revenues were inflated.

5           We said in our motion if that is true, there's never

6   been a corrected disclosure.  If they were inflated, there was

7   never a restatement.  There was never an analyst to question

8   them.  There was never any problem with the second quarter in

9   2009 revenues.

10          The Court on the first motion said the confidential

11  witnesses have no basis for personal knowledge.  That claim is

12  out.  They filed a new complaint on the second motion to

13  dismiss.  We made similar arguments.  The Court found that they

14  had stated a claim about the EMC agreement and said, therefore,

15  "I'm not going to reach the rest of the issues."

16          **THE COURT:**  So, it's still in the case.

17          **MS. JOHNSON:**  So, it's still in the case.  But there

18  is case law that says if an issue is of such marginal relevance

19  that that marginal relevance goes to *Burton*.  And if they open

20  up all of this discovery for something that the Court has

21  already held the same confidential witnesses lack a personal

22  knowledge and there was never a corrected disclosure, then I

23  think the burden outweighs.

24          **THE COURT:**  See, the problem is with that argument --

25  and I understand the argument and I, you know, frequently make

```
 1   determinations based upon a cost benefit analysis -- the
 2   problem is it's still in the case.  By denying discovery, I
 3   eliminate their ability to go any further on that issue and, in
 4   essence, I'm granting you summary judgment or dismissal of the
 5   claim.  So, they have no basis to go forward on a claim that
 6   Judge Selna has refused to dismiss.
 7            This is a frequent problem that comes up when the
 8   discovery judge and the substantive judge are different, okay?
 9   All I have to work with is what is relevant to a claim or
10   defense that is currently in the case and this is currently in
11   the case.
12            MS. JOHNSON:  I agree with that.
13            THE COURT:  Thank you.
14            MS. JOHNSON:  The only reason I disagree with the
15   application in this instance is that there has already been
16   such a substantial production of irrelevant information.  If
17   they say they can't find anything, that's because it's not
18   there.  The vast majority of our production --
19            THE COURT:  Well, if there's nothing else there, you
20   can say there's nothing else there.
21            MS. JOHNSON:  In what they have.  They're asking for
22   more.  And I'll take the point that your Honor is saying that
23   there's going to have to be some production on the second
24   quarter revenues.  But the scope of what they've asked for, in
25   my view, needs to be balanced against the allegations that are
```

63

1    in their complaint.

2         **THE COURT:**  But see, I don't really know what the

3    scope is.  You've never -- you know, you've made all these

4    claims and I started off by saying that.  You've made all these

5    claims that this would be burdensome.  I don't know how

6    burdensome.  You know?  I mean, is it a thousand documents?  Is

7    it ten million documents?  How many -- I don't have anything

8    here.  And in claims of burdensomeness, it's the party

9    asserting the burdensomeness who has the burden of showing it.

10   And you haven't done it.

11        **MS. JOHNSON:**  Well, let me address that if I could?

12   What they asked --

13        **THE COURT:**  I'll listen, but go ahead.  You know, so

14   you see where I'm going with this?

15        **MS. JOHNSON:**  I absolutely do.

16        **THE COURT:**  All right.

17        **MS. JOHNSON:**  And I'm going to address it directly.

18        **THE COURT:**  All right.

19        **MS. JOHNSON:**  You're going to be happy.  As to what

20   they've requested for the second quarter revenues, they've

21   said, "We've asked for documents about sales, about shipments

22   and about revenues."  What this company does for a living is

23   make sales and make shipments and earns revenue.  So, that

24   would be all of the documents in the entire company for the

25   second and third quarters.

64

1          **THE COURT:**  But we're talking about these five or six

2    different --

3          **MS. JOHNSON:**  We're not for these.

4          **THE COURT:**  Oh, no, we're talking about all of them.

5          **MR. DUBBS:**  No, no.  We're talking about four

6    individuals plus what the auditor got.

7          **MS. JOHNSON:**  Okay.  So, the four individuals is

8    fine.  Now that we have an agreement on the time period, which,

9    you know, wasn't communicated --

10          **THE COURT:**  Okay.

11          **MS. JOHNSON:**  -- during the meet and confer.  That's

12   fine.  But what they've also asked for is documents that have

13   been given to the auditors.

14          **THE COURT:**  So, where's --

15          **MS. JOHNSON:**  Any public company audit does not have

16   a file where all the documents given to the auditors are

17   wrapped with a ribbon and a bow.  The auditor comes in; they

18   ask for things; some people give them.  What we have proposed

19   is documents from the Senior VP of Finance, from his e-mails

20   for that time period.  And we're saying that that is as good as

21   we can get at recreating what was sent to the auditors, because

22   in his e-mails there will be what was sent to the auditors.

23   And that has not been sufficient -- I mean, that is the best

24   way to recreate what was sent to the auditor for that

25   particular time period.

1       **THE COURT:**  So, what you're telling me is that what

2   was sent to the auditors or what the auditors demanded are not

3   maintained as they were presented to the auditors.

4       **MS. JOHNSON:**  No, because it is always given over a

5   period of time.

6       **MR. UNIDENTIFIED:**  Can I speak to that, your Honor?

7       **THE COURT:**  Sure.

8       **MR. UNIDENTIFIED:**  I've spent a fair amount of time

9   working for auditors, so I think I can give your Honor some

10  color here.  When a public company audit goes on, what happens

11  is you have a team of auditors come in from PwC.

12      **THE COURT:**  Right.

13      **MR. UNIDENTIFIED:**  And you have various pieces of the

14  financial statements parceled out to different members of the

15  team.  And they will sit in a room and they'll walk down the

16  hall to the finance person, "Hey, can I see A, B and C?"  And

17  the person from the finance department says, "Yeah, here it

18  is."  Right?  And the auditors go through and they do their

19  little tic marks and their checks in their check lists and then

20  it goes back, right?

21      The auditors keep work papers.  The plaintiffs have

22  subpoenaed that.  Work papers are not coextensive with

23  everything they got from the company.  They don't keep

24  everything.  All right?  Work papers they have a set of rules

25  around what they keep for work papers.

1           But there isn't a big magic moment where we hand over

2    the files to the auditors in a little box or something.  It's a

3    series of interactions between a number of different people,

4    some of which may not be preserved at all, because they may

5    just say, "Yeah, show me this thing."  The auditor looks at it.

6    The auditor says, "I checked the thing."  All right?

7           So, no, there isn't a file somewhere that magically

8    recreates everything the auditor saw.  We've proposed what we

9    think is the best way --

10          **THE COURT:**  Have a seat.  Give me a minute here.

11          **MR. UNIDENTIFIED:**  We've proposed what we think is

12   the best way to recreate that.  It's not going to be perfect,

13   but we think it's the most reasonable thing to do.  And they

14   rejected it.

15          **THE COURT:**  Compromised.  All right.  Let me hear --

16          **MR. DUBBS:**  Your Honor, every auditor gives its

17   client something called a work paper request list and we stated

18   in the joint stipulation that what we want can be simply

19   assembled if they don't already have it and if for some reason

20   they're too sensitive to ask their auditor for it, they can

21   just assemble what the work paper request list asked them for.

22          E-mails, not asking for that; papers sent this month,

23   that month, not asking for that; just the things responsive to

24   the work paper request list for the second quarter of 2009

25   regarding sales, shipments, revenues.

1          **MS. JOHNSON:**  And what my finance guys are telling me

2  is that there is no work paper audit request list and that this

3  is the best way to recreate it.  They don't have -- at least

4  for second quarter of 2009, there is not some easily findable

5  or creatable list that they can then reassemble.

6          **MR. DUBBS:**  They never said that before.

7          **THE COURT:**  All right.  Well, if they're saying that

8  now, you know, I want a declaration under oath that that

9  doesn't exist by someone with knowledge.

10          **MS. JOHNSON:**  That's something that we can certainly

11  meet and confer (indiscernible) then confirm.

12          **THE COURT:**  And then, well, right.  That's not part

13  of the meet and confer.  If you're representing to me that what

14  the plaintiff is seeking that might be a reasonable compromise

15  doesn't exist, then we've got to come up with another

16  compromise.

17          But I need to know by someone with knowledge that

18  that -- that this doesn't exist.  Mr. --

19          **MR. UNIDENTIFIED:**  I apologize.  I don't mean to

20  keep --

21          **THE COURT:**  That's okay.

22          **MR. UNIDENTIFIED:**  I'm just -- I'm concerned because

23  I think there's a little ambiguity here, because --

24          **THE COURT:**  Well, you know, I don't know what's going

25  on here.  I don't know how these companies keep their records.

1          **MR. UNIDENTIFIED:**  No, I understand.  And I want to

2    try to be helpful.

3          **THE COURT:**  Okay.

4          **MR. UNIDENTIFIED:**  So, what I heard was a request

5    from the year-end audit --

6          **THE COURT:**  Right.

7          **MR. UNIDENTIFIED:**  -- but they only want second

8    quarter and I'm glad, but there's a disconnect there, because

9    at a year-end audit, what they're auditing is the year, right?

10   They don't audit quarter by quarter at the end of a year.

11   There's a review that gets done at the end of every quarter and

12   that focuses on the quarter.

13         And so, look, our position going into this has been

14   there's -- we need more meet and confer and I think this is

15   proving it, right?  But my point is I'm not sure that what

16   they're asking for is what they want, because the year-end

17   audit stuff may not be second quarter.  It may be yearly.

18         I would be happy to explore this more with our client

19   and with plaintiffs, but they pulled the plug on the meet and

20   confer process.

21         **THE COURT:**  Mr. Joffe?

22         **MR. JOFFE:**  Okay.

23         **THE COURT:**  So, here's one of the problems that I

24   always run into in these cases where one side says, "We want

25   these documents.  Every company keeps these documents."

1          The other side says, "We don't have these documents.

2    We don't keep them that way."

3          So, I can't force them to give you something they

4    don't have or in a form they don't have.

5          **MR. JOFFE:**  Oh, absolutely.  Absolutely.

6          **THE COURT:**  So --

7          **MR. JOFFE:**  But we would never have had this

8    information if we weren't in the court because they never said

9    it before.

10         **THE COURT:**  Okay.

11         **MR. JOFFE:**  We'll be happy to have them give us the

12   papers relating to those three items:  sales, shipments and

13   revenues for the quarterly review for the second quarter and

14   for the interim testing that the auditor did for the second

15   quarter.

16         **THE COURT:**  Is someone keeping notes on this, because

17   this is going to be one of the more interesting orders I've

18   ever have to put together.

19         **MR. JOFFE:**  Okay.  That's fine.  If they don't want

20   to do that, they can give us the papers that were given to the

21   auditor at the year end.

22         **THE COURT:**  Ms. Johnson?

23         **MS. JOHNSON:**  It's tough for me to hear they never

24   said, because we've been asking to meet and confer.

25         **THE COURT:**  Okay.  Well, we're working it out.  If we

1    have to do it this way one time, I'm willing to do it this way

2    one time.  This will be the last time.  But, you know, we're

3    working it out.  That's all I care about right now.  Okay?

4         **MS. JOHNSON:**  I agree.  What I think we should do is

5    go out and see if we can, based on what has been said here

6    today -- but I have two more --

7         **THE COURT:**  I think it's a good idea.  I want to give

8    my staff a break.  I want to give me a break.

9         **MS. JOHNSON:**  Okay.  I had two more issues, but we

10   can --

11        **THE COURT:**  Go ahead.  No, go ahead.

12        **MS. JOHNSON:**  Okay.

13        **THE COURT:**  Let's hear your other two issues and

14   then, you know, you guys can go to lunch.  You can even go to

15   lunch together and talk about this.  I'm not directing that,

16   though.  I'm not ordering that.  I just want you to know that.

17        **MR. UNIDENTIFIED:**  Not overdo it, your Honor.

18        **MS. JOHNSON:**  Sounds like you're ordering Kumbaya.

19   All right.  The two issues that I have left to respond to what

20   he said were there is one request where we have a disagreement

21   over dates and that's number 21.  They say beginning of 2009 to

22   the middle of 2010.

23        **THE COURT:**  No, that's been changed.

24        **MR. JOFFE:**  Not the end of 2009; just the year 2009.

25        **MS. JOHNSON:**  That's right.  That's been changed.

1  From the beginning of 2009 to the end of 2009.  And what I

2  would say to that is there are no allegations in the first

3  quarter about anything in the complaint and the date of the

4  corrected disclosure where they said all the truth came out was

5  November 3rd.  So, in any event, it should stop on November

6  3rd, because according to them everybody knew that the sales to

7  the OEMs were not doing whatever it was that people thought

8  before that they were doing.  As of November 3rd, it should be

9  cut off.

10          **THE COURT:**  Okay.

11          **MS. JOHNSON:**  Okay.  And the last issue is on number

12  36 regarding cost of revenues.  They have asked for all

13  documents regarding cost of revenues.  Again, what this company

14  does is create revenues at the associated cost, so all

15  documents were too much.  We went to the database and created a

16  document.  Yes, it was new, but it's from the data that they

17  asked for that shows what the cost of revenues were.

18          We invited them in the meet and confer to say, "Okay.

19  After we produce that, let us know what it is that you need

20  behind it."  I think we're not done on that one, but to the

21  extent they're saying it was a new document created, that's

22  because the data that they're asking for was pulled and

23  provided to them by the company.

24          And one final issue, if I could on Cisco -- I know I

25  said two.  One final issue, if I could on Cisco.  They are, by

72

1    asking for Cisco documents, opening up the complaint to other

2    products.  I would submit that it is a fishing expedition that

3    shouldn't be allowed because this entire complaint is about the

4    Zeus-IOPS drives.  There are two paragraphs in the 400-

5    paragraph complaint about Cisco --

6          THE COURT:  About inflated -- okay.

7          MS. JOHNSON:  -- that says --

8          THE COURT:  But, you know, there is an allegation of

9    inflated revenue.  Cisco is part of that, I assume.  I haven't

10   read the 400-paragraph complaint, I'll tell you that.  So --

11         MS. JOHNSON:  I would say it's a dominium part of

12   that complaint and if there's any, you know, burden and benefit

13   analysis to be done here, a two-paragraph, I would submit,

14   throw-away allegation that, again, the Court found in the

15   previous complaint was based on a confidential witness without

16   personal knowledge.  It shouldn't be allowed to open up all of

17   this -- this company produces a dozen or more products.  Zeus-

18   IOPS is the only thing at issue in this complaint and to open

19   it up to all other products I think does merit a burden and

20   benefit analysis.

21         THE COURT:  Okay.  Well, let me say a couple of

22   things, then I'm going to send you on your way.  In terms of --

23   now, Mr. Joffe, you want to say -- I'll give you two minutes.

24         MR. JOFFE:  Yes.  There's nothing to meet -- I wish

25   there were -- but there's nothing to meet and confer on

73

1    regarding the sales rep.  We have an irresolvable disagreement

2    about what subjects the e-mails should be about, okay?

3         Defendants would like the process to go on as long as

4    possible, so they're always glad to say, "Yes, let's have a

5    meet and confer."  But based on what Ms. Johnson said and what

6    I said, there's an irreconcilable conflict, okay?

7         The other thing is that Cisco is very much a part of

8    the complaint.  It specifically alleged that unearned income

9    kind of activities that are usually used to generate unearned

10   income were conducted with Cisco.  So, there's nothing in the

11   complaint saying this complaint is just about Zeus-IOPS.

12        **THE COURT:**  Okay.  A couple of things which both of

13   you need to think about.  I'm inclined to cut down the cost of

14   revenue request.  I think you're asking for too much.  I think

15   you need to work out and see what can be done on that, so you

16   get the information you need in an admissible way now, you

17   know.  If you look at it and say, "All right.  This is what we

18   thought.  This is what we're looking for."  And get a

19   stipulation to admit that two-page document.  That puts it to

20   rest.  Okay.

21        That's always one way of resolving things and short-

22   circuiting things.  So, that's something that you need to think

23   about.  I'm inclined to go for the whole, you know, all of 2009

24   on this time limitation that we were just talking about.  I

25   think that given the nature of the case, the allegations being

1    made, there may be some information from the first quarter

2    which would be relevant to the claims and defenses in this

3    case, particularly in light of the allegations.

4          So, something to think about as you're discussing

5    this.  So, why don't we take a break?  Why don't we come back

6    at 2:00?

7          **(Court confers with clerk)**

8          Why don't we come back at 2:30?  I think that's the

9    best I can do, 2:30.  So, hopefully, I'll have cleared out

10   those arraignments and -- I didn't think this was going to go

11   this long, but, you know, the more -- the more you can work it

12   out, obviously, the better each side is going to be.  Because

13   if I start making decisions, that could mess up both sides'

14   cases.  So, see you back at 2:30 and we'll finish this.

15         **THE CLERK:**  All rise.

16         **(A recess was taken from 12:41 p.m. to 2:37 p.m.)**

17         **THE CLERK:**  This Court is now again in session, the

18   Honorable Marc L. Goldman, United States Magistrate Judge,

19   presiding.

20         **THE COURT:**  Thank you.  Be seated.  Okay.  I need you

21   to put your appearances back on the record.  For the -- I'll

22   call the case.  In Re -- is it STEC or STEC?  How should I

23   refer to it?  I'll ask you folks, because you represent them.

24         **MR. GIBBS:**  I've heard it both ways, your Honor,

25   including the people at the company.

1          **THE COURT:**  All right.  All right.  I'll call it In

2    Re STEC -- easier for me -- In Re STEC Securities Litigation,

3    Incorporated.

4          For plaintiff -- for the lead plaintiff, please?

5          **MR. DUBBS:**  Good afternoon, your Honor, Thomas A.

6    Dubbs of the Labaton firm for the lead plaintiff, along with my

7    partner Jim Johnson and my colleague Rich Joffe.

8          **THE COURT:**  Okay.  And for defendant?

9          **MR. GIBBS:**  Patrick Gibbs, your Honor, along with

10   Michele Johnson and Colleen Smith.

11         **THE COURT:**  Okay.  All right.  So, Mr. Dubbs, where

12   are we?  Have you resolved everything?

13         **MR. DUBBS:**  Your Honor, I think we're 90 percent of

14   the way there --

15         **THE COURT:**  Okay.

16         **MR. DUBBS:** -- which is not to say that the last ten

17   percent isn't very important.  But we'll save the best until

18   last and with the Court's permission I would have either

19   Mr. Gibbs or his colleague Ms. Johnson articulate what she

20   thinks the understanding is and then if we have a moment to see

21   if we're in agreement, then we can get that 90 percent out of

22   the way and proceed to the final ten percent.

23         **THE COURT:**  All right.  Terrific.  Go ahead,

24   Ms. Johnson.

25         **MS. JOHNSON:**  Thank you, your Honor.  As to request

1    number 21, the parties have agreed to communications between

2    Steve Cox and/or Yanni Youssef and Son; Yoda Yasinova and Tommy

3    Volkmann and Hitachi; and Lorenzo Salhee with HP and Cisco (all

4    phonetic).  The time period will be January 1st, 2009 to

5    December 31st, 2009; and the subject matter limitation will

6    Zeus-IOPS.

7         THE COURT:  Will be what?

8         MS. JOHNSON:  Zeus-IOPS.

9         THE COURT:  Okay.  Thank you.

10        MS. JOHNSON:  The name of the product.  Thank you.

11   Request number 22 will be communications between the same five

12   individuals and customers that I just referenced.  The time

13   period will be April 1st, 2009 to September 30th, 2009, with no

14   subject matter limitation.

15        Request number 26 will be all documents regarding any

16   revenue reported by STEC for its Q3 2009 that were created,

17   sent to or received by Mike Higa (phonetic) or Grace Lee.  The

18   time period is July 1st, 2009 to November 3rd, 2009 with a

19   caveat that the plaintiff has reserved the right to ask for

20   additional specific documents that were sent to the auditor, if

21   such are suggested by the document production after having been

22   reviewed.

23        THE COURT:  Okay.  Before we go any further.  Do you

24   agree with 21, 22 and 26?  And looks like Mr. Joffe is handling

25   it.

1          **MR. JOFFE:**  Yes, your Honor, we do.

2          **THE COURT:**  Okay.  Good.  Yeah, let's make sure we

3    agree one at a time, because I don't want to go back.  I'll

4    never remember what was said.

5          **MR. DUBBS:**  Nor will we.

6          **THE COURT:**  All right.  Go ahead, Ms. Johnson.

7          **MS. JOHNSON:**  All right.  On request number 36, we

8    have agreed that the production made to date is sufficient,

9    subject to a certification by the company that this is what the

10   cost of revenues was for that time period.

11         **THE COURT:**  Okay.  Very good.  Is that right?

12         **MR. DUBBS:**  Yes.

13         **MR. JOFFE:**  Yes, your Honor.  That's acceptable.

14         **THE COURT:**  And request number 49 has been covered by

15   the response to 22.

16         **MR. DUBBS:**  No, that's not right.

17      **(Pause)**

18         **MR. UNIDENTIFIED:**  With the Court's permission, I

19   think Mr. Joffe has a comment on 49.  There may be a

20   misunderstanding on that one.

21         **THE COURT:**  Okay.  Mr. Joffe?

22         **MR. JOFFE:**  On 49, that's -- my notes indicate those

23   are the documents modified or used during the second and third

24   quarters of 2009 relating to communications between Salhee and

25   HP or Cisco.

1          **MR. DUBBS:**  Yes.

2          **THE COURT:**  Sounded like it was covered by the

3   other --

4          **MR. DUBBS:**  No, no, because the other one was 21,

5   which was limited to the subject of Zeus-IOPS.

6          **MS. JOHNSON:**  Twenty-two.  Twenty-two is the one that

7   it's covered by.

8          **MR. DUBBS:**  Oh, I'm sorry, then.  That's right.

9   Okay.  Yeah, that's right, except that literally 22 only asks

10  for documents between Salhee and HP; 49 asks for them between

11  Salhee and HP and Cisco.

12         **MS. JOHNSON:**  And as I indicated in my recitation of

13  our agreement on 22, I included the word Cisco.

14         **THE COURT:**  Okay.  So, Cisco's included on 22.

15         **MR. JOFFE:**  Cisco's included and that's acceptable,

16  your Honor.

17         **THE COURT:**  Okay.  Very good.

18         **MS. JOHNSON:**  All right.  Request number 23 will be

19  all documents regarding any sales made by STEC during the

20  second quarter of 2009 that were created and/or received Shane

21  Mortizappe, Brandon Lucero, Mike Higa and/or Grace Lee (all

22  phonetic).  The time period will be April 1st, 2009 to

23  September 30th, 2009.

24         **MR. UNIDENTIFIED:**  That's acceptable, your Honor.

25         **THE COURT:**  Very good.

1          **MS. JOHNSON:**  And that covers 24 and 25, as well.

2          **MR. DUBBS:**  Well, your Honor, 24 -- I'm sorry.  Can

3     you repeat -- you said sales?  Did you say anything else?

4          **MS. JOHNSON:**  That's a good clarification.  Sales,

5     shipments or revenue.

6          **MR. DUBBS:**  Thank you.

7          **THE COURT:**  Satisfactory?

8          **MR. JOFFE:**  With that addendum, that's acceptable.

9          **THE COURT:**  Twenty-three, 24 and 25.

10         **MR. DUBBS:**  Right.

11         **THE COURT:**  Okay.

12         **MS. JOHNSON:**  And 40 and 41, as I understand it, were

13    covered by the earlier ones because we removed the subject

14    matter limitation and so we're good there, as well.

15         **THE COURT:**  Is that right?

16         **MR. DUBBS:**  Yes, it is.

17         **THE COURT:**  Okay.  That's it?

18         **MS. JOHNSON:**  That's it on what we have agreed to.

19         **THE COURT:**  See how easy that was?

20         **MS. JOHNSON:**  Thank you so much for making it easy,

21    but there's a disagreement on time period that I will let

22    counsel articulate.

23         **THE COURT:**  Go ahead, whoever's going to do it and

24    then we'll get you out of here.  Time period as to --

25         **MR. JOFFE:**  Time period as to production, I will only

80

1    make one -- a rhetorical footnote and say that I hope that

2    today's progress in no way has the Court rethinking the

3    beneficial results it might obtain from expedited discovery

4    procedures in the future.

5            **THE COURT:**  Oh, no.  I haven't had this much fun in I

6    don't know how long.

7            **MR. JOFFE:**  I didn't think so.  The issue -- we've

8    had a fairly extensive discussion on the issue of when the

9    documents will be produced.

10           **THE COURT:**  Okay.

11           **MR. JOFFE:**  And not surprisingly, we want dates

12   certain, and not surprisingly, the defendants want a little bit

13   more flexibility.  We proposed that we bifurcate it by person

14   and that we have a two-track system of best efforts and final

15   production.  And as to the sales persons, we urged best efforts

16   on February 24 with a drop dead date of February 27 with

17   respect to the sales people.

18           And then, with respect to the finance people and

19   anything else that may be covered, that we have a best efforts

20   date of March 2nd and a final date of March 9.  As I understand

21   it, the defendants take the position and I've been in the same

22   place that they have outside vendors, et cetera, et cetera.

23   Our view is we need some finality and nothing concentrates the

24   mind like a Court order, particularly when it's from a company

25   that does document hosting for a living.

1          So, we would urge that there be some order that has a

2    fixed date on it so that we could get the depositions moving,

3    because that's what the object of exercise is.   Thank you.

4          **THE COURT:**  Ms. Johnson?

5          **MS. JOHNSON:**  And what we had said to counsel in

6    response is that we could move heaven and earth and still not

7    get a year's worth of e-mails collected, processed, reviewed.

8    We will review them -- you know, that's what we can control and

9    we will do it as fast as humanly possible.  I'm confident we

10   can do it quickly.

11         But the collection process and then process for

12   production would not get done in the two weeks that he's

13   requesting.  What we have proposed is best efforts by March 2nd

14   and make every effort --

15         **THE COURT:**  On everybody?

16         **MS. JOHNSON:**  On everyone.  And every effort to

17   complete it without saying that that is the end all be all,

18   because, you know, we will come in here and make a

19   representation to the Court in good faith what we were able to

20   do, but with the goal of having it produced by March 9th.

21         **MR. DUBBS:**  Your Honor, I have a problem with the

22   word goal.  I think if they need -- we need finality, we need -

23   - they will produce.  And if there's some extrinsic good reason

24   that they come in and they have an affidavit that says, "We

25   tried this.  We tried that and we just couldn't do it,"

82

1   nobody's -- the world isn't going to stop.

2          **THE COURT:**  Well, you know.  I mean, I'm not going to

3   blow up the case because it's not done on time, but if I give

4   you, you know -- if I give you to the 9th for best effort or

5   9th for finality, you know, I expect 95 percent or 99 percent

6   of the stuff to be done.

7          So, I'm going to go with your date, but you've really

8   got to push to finish this by then, you know.  Try to get as

9   much as you can to them by the 2nd -- or even before, if you

10  can.  If you can segregate it in some way that they -- that the

11  plaintiff gets -- you can get the sales stuff out quicker and

12  the sales staff out, I think that's going to make everybody

13  happy and it's going to lead me to conclude that everyone's --

14  that you're acting in really good faith.

15         So, best efforts of March 2nd; everything by March

16  9th.  I understand glitches happen.  So, but if you can do --

17  if you can get some out before then, let's do that.  Okay.

18         **MS. JOHNSON:**  Thank you, your Honor.

19         **THE COURT:**  All right.  Was that the last ten

20  percent?

21         **MR. UNIDENTIFIED:**  Yes, your Honor.

22         **THE COURT:**  Okay.  All right.  I'm just going to

23  issue an order saying you resolved everything except I'll put

24  in these dates.

25         **MR. UNIDENTIFIED:**  That should be fine, your Honor.

**EXCEPTIONAL REPORTING SERVICES, INC**

83

1          THE COURT:  And I think you've all agreed on the

2    record as to everything else.  You're going to work on the

3    deposition issues.  If you run into a problem, let's talk about

4    and I'll decide how it's going to go.

5          MR. UNIDENTIFIED:  Very well, your Honor.

6          THE COURT:  Okay?  All right.  Thanks for your good

7    efforts and good work.  I appreciate it.  I know we'll be

8    talking.  All right.

9          THE CLERK:  All rise.

10       (Proceeding was adjourned at 2:48 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>February 28, 2012</u>

Signed                                                    Dated


*TONI HUDSON, TRANSCRIBER*