Christopher Kim (Bar No. 082080)
christopher.kim@limruger.com
Lisa J. Yang (Bar No. 208971)
lisa.yang@limruger.com
LIM, RUGER & KIM, LLP
1055 West Seventh Street, Suite 280
Los Angeles, California 90017-2554
Telephone: (213) 955-9500
Facsimile: (213) 955-9511

Thomas A. Dubbs (*Pro Hac Vice*)
tdubbs@labaton.com
James W. Johnson (*Pro Hac Vice*)          Allyn Z. Lite (*Pro Hac Vice*)
jjohnson@labaton.com                       alite@litedepalma.com
Richard T. Joffe (*Pro Hac Vice*)          Bruce D. Greenberg (*Pro Hac Vice*)
rjoffe@labaton.com                         bgreenberg@litedepalma.com
Thomas G. Hoffman, Jr. (*Pro Hac Vice*)    Katrina Carroll
thoffman@labaton.com                       kcarroll@litedepalma.com
LABATON SUCHAROW LLP                       LITE DEPALMA GREENBERG, LLC
140 Broadway                               Two Gateway Center, 12th Floor
New York, New York 10005                   Newark, New Jersey 07102
Telephone: (212) 907-0700                  Telephone: (973) 623-3000
Facsimile: (212) 818-0477                  Facsimile: (973) 623-0858

*Attorneys for Lead Plaintiff the State of New Jersey, Department of Treasury, Division of Investment, Plaintiff International Brotherhood of Electrical Workers, Local 103 and Norfolk County Retirement System and Lead Counsel for the Class*

Thomas Bienert, Jr.                        Robert S. Green
tbienert@bmkattorneys.com                  rsg@classcounsel.com
BIENERT, MILLER & KATZMAN                  GREEN & NOBLIN, P.C.
903 Calle Amanecer, Suite 350             700 Larkspur Landing Circle, Suite 275
San Clemente, CA 92673                     Larkspur, CA 94939
Telephone: (949) 369-3700                  Telephone: (415) 477-6700
Facsimile: (949) 369-3701                  Facsimile: (415) 477-6710

*Attorneys for Plaintiff Mark V. Ripperda*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE STEC, INC. SECURITIES LITIGATION | No. SACV 09-01304-JVS (MLGx) |
| ——————————————— | **SUPPLEMENTAL DECLARATION OF THOMAS A. DUBBS** |
| This Document Relates to | |
| ALL ACTIONS. | |

1   THOMAS A. DUBBS declares as follows pursuant to 28 U.S.C. § 1746:

2          1.     I am an attorney at law licensed to practice before the Courts of the

3   State of New York and am admitted *pro hac vice* to practice before this Court in

4   the above-captioned matter.  I am a member of Labaton Sucharow LLP, Co-Lead

5   Counsel for Court-appointed Lead Plaintiff, the State of New Jersey, Department

6   of Treasury, Division of Investment ("New Jersey").  I make this Declaration

7   based on my personal knowledge.

8   **I.**    **Background**

9          2.     As alleged in the Third Consolidated Amended Complaint for

10  Violation of the Federal Securities Laws (the "TAC"), Defendant STEC, Inc.

11  ("STEC" or the "Company") manufactures data storage devices, including solid-

12  state drives ("SSDs," also known as "flash drives"), for computer systems.  ¶ 4.[1]

13  STEC's flagship product is the ZeusIOPS, a high-performance SSD.  ¶ 5.  STEC's

14  customers include original equipment manufacturers ("OEMs"), such as EMC,

15  IBM, Hitachi, Hewlett-Packard ("HP"), and Sun Microsystems ("Sun").  ¶ 3.

16         3.     As alleged in the TAC, Defendants Manouch Moshayedi and

17  Mehrdad ("Mark") Moshayedi (the "Moshayedi Brothers") founded STEC, then

18  named Simple Technology, Inc., in 1990.  ¶ 27.  At the beginning of the Class

19  Period, the Moshayedi Brothers held a combined 45% of the Company's common

20  stock.  ¶ 7.

21         4.     As alleged in the TAC, at all relevant times, Defendant Manouch

22  Moshayedi was STEC's Chief Executive Officer and Chairman of the Board of

23  Directors, ¶ 29; Defendant Mark Moshayedi was STEC's Chief Operating Officer,

24  Chief Technical Officer, President, and Secretary, as well as a member of its Board

25  of Directors and Equity Awards Committee, ¶ 30; and Defendant Raymond D.

26

27       [1] Unless otherwise indicated, all citations to "¶ __" refer to paragraphs in the

28  TAC.

Cook ("Cook") was STEC's Chief Financial Officer and Principal Accounting Officer, ¶ 31.

## II.   Complaints Filed in this Action

### A.   The Initial Complaints

5.   Beginning on November 6, 2009, several securities fraud class action complaints were filed on behalf of investors who had purchased or otherwise acquired STEC common stock between June 16, 2009 and November 3, 2009.  *See Jean v. STEC, Inc.*, No. 8:09-cv-01304-JVS-MLG (C.D. Cal. filed Nov. 6, 2009); *Sakhai v. STEC, Inc.*, No. 8:09-cv-01306-JVS-MLG (C.D. Cal. filed Nov. 6, 2009); *Greenwald v. STEC, Inc.*, No. 8:09-cv-01315-JVS-MLG (C.D. Cal. filed Nov. 9, 2009); *Munter v. STEC, Inc.*, No. 8:09-cv-01320-JVS-MLG (C.D. Cal. filed Nov. 10, 2009); *Fischer v. STEC, Inc.*, No. 2:09-cv-08536-JVS-MLG (C.D. Cal. Nov. filed 19, 2009); *Weinberger v. STEC, Inc.*, No. 8:09-cv-01460-CJC-RNB (C.D. Cal. filed Dec. 11, 2009).  On January 21, 2010, the Court issued an Order consolidating the six initial actions under the caption *In re STEC, Inc. Securities Litigation*, No. SACV-09-01304-JVS (MLGx) (the "Action").  ECF 54.

(a)   Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(A), a notice of pendency was published, advising investors of the deadline to seek appointment as lead plaintiff with respect to a class period between June 16, 2009 and November 3, 2009.

(b)   On February 8, 2010, the Court issued an Order appointing two individual STEC investors, Arman Rashtchi ("Rashtchi") and Keith Ovitt ("Ovitt"), as co-lead plaintiffs and Kahn Swick & Foti, LLC and Bernstein Litowitz Berger & Grossman LLP ("BLBG") as co-lead counsel.  ECF 61.

6.   On March 2, 2010, a putative class action was filed on behalf of investors who had purchased or otherwise acquired STEC stock between

November 4, 2009 and February 23, 2010.[2]  On March 26, 2010, the Court consolidated that action with the Action.  ECF 71.

## B.   The Consolidated Complaint

7.      On April 9, 2010, Rashtchi and Ovitt filed a Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint"), which alleged claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of investors who purchased or otherwise acquired STEC common stock between June 16, 2009 and February 23, 2010 (the "Class Period").  ECF 83.  In light of the expanded class period, the Court directed publication of a new notice of pendency and the lead plaintiff process was reopened.  ECF 71.

8.      On May 12, 2010, Defendants moved to dismiss the Consolidated Complaint.  ECF 89.  On June 11, 2010, Rashtchi and Ovitt opposed the motion, ECF 92, and, on June 28, 2010, Defendants filed a reply, ECF 113.  Although the motion was fully briefed, it was never decided because the Court appointed a new lead plaintiff.

## C.   The Consolidated Amended Complaint

9.      On July 14, 2010, the Court issued an Order appointing New Jersey as Lead Plaintiff and approving New Jersey's choice of Co-Lead and Liaison Counsel to represent the putative class.  ECF 123.[3]

10.      On August 13, 2010, New Jersey and representative plaintiffs the International Brotherhood of Electrical Workers, Local 103 ("Local 103") and the Norfolk County Retirement System ("Norfolk County") (collectively, "Plaintiffs")

---

[2] *Meda v. STEC, Inc.*, No. SACV 10-00248 AG (ANx) (C.D. Cal. filed Mar. 2, 2010).

[3] The Court denied Ovitt and Rashtchi's motion pursuant to 28 U.S.C. § 1292(b) for an order certifying the Court's July 14, 2010 Order for interlocutory appeal. ECF 135.  The Ninth Circuit subsequently denied their petition for a writ of mandamus vacating the Order.  *See* ECF 144 (Order, *Rashtchi v. U.S. District Court (Selna)*, No. 10-72711 (9th Cir. filed Sept. 3, 2010)).

filed a Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "CAC").  ECF 131.  Plaintiffs alleged claims under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78-t1a, and Rule 10b-5 promulgated by the SEC under Section 10, 17 C.F.R. § 240.10b-5 (the "Exchange Act Claims"), and, as to Defendants' misrepresentations and omissions in connection with the Offering, under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o (the "Securities Act" and the "Securities Act Claims").  *Id.* ¶ 13.

   (a)   Local 103 alleged the Section 20A claim on behalf of all Class members who purchased STEC common stock contemporaneously with sales by the Moshayedi Brothers during the Class Period.  *Id.* ¶ 18.

   (b)   Norfolk County alleged the Securities Act Claims on behalf of all Class members who acquired STEC common stock pursuant or traceable to STEC's August 2009 secondary offering (the "Offering").  *Id.* ¶ 19.  The Securities Act Claims were alleged against Defendants; Rajat Bahri, a member of STEC's Board of Directors and Chair of its Audit Committee, *id.* ¶¶ 31-33; and the four investment banks that acted as underwriters with respect to the Offering (collectively, the "Underwriters"):  J.P. Morgan Securities Inc. ("J.P. Morgan Securities"), Deutsche Bank Securities Inc. ("Deutsche Bank Securities"), Barclays Capital Inc. ("Barclays Capital"), and Oppenheimer & Co. Inc. ("Oppenheimer").  *Id.* ¶¶ 34-41.

   11.   On January 10, 2011, the Court issued a tentative Order dismissing the CAC for failure to adequately plead falsity; the parties submitted on the tentative Order.  ECF 177.

**D.   The Second Amended Complaint**

   12.   On February 22, 2011, Plaintiffs filed a Second Consolidated Amended Complaint for Violation of the Federal Securities Laws (the "SAC").  ECF 178.

13.     On June 17, 2011, the Court granted the Underwriters' motion to dismiss the Securities Act Claims.  ECF 200.  The Court found that Plaintiffs had adequately stated claims for relief under the Securities Act, but that Norfolk County lacked standing because it did not acquire STEC stock pursuant or traceable to the Offering.  *Id.* at 20-21.  In the same Order, the Court sustained the Exchange Act Claims against Defendants STEC, the Moshayedi Brothers, and Cook.  *Id.* at 23.

14.     On July 17, 2011, the remaining Defendants answered the SAC.  ECF 203.

### E.     The Third Amended Complaint

15.     The TAC is filed herewith in connection with Plaintiffs' motion for preliminary approval of the proposed settlement of the Action (the "Settlement"). The purpose of this amendment is to add plaintiff Dr. Mark V. Ripperda ("Dr. Ripperda") as a proposed Class Representative.  ¶ 25.  Dr. Ripperda purchased STEC common stock on the Offering and held that stock until at least the first partial corrective disclosure alleged in the TAC.  ECF 335-11 (Ripperda Decl.) at Ex. A.  Therefore, he has standing to assert the alleged Securities Act Claims on behalf of similarly situated Class members.

### 1.     The Alleged Fraud

16.     Plaintiffs and Dr. Ripperda (collectively, "Class Representatives") contend that from mid-June 2009 through early August 2009, Defendants knowingly made material misrepresentations and omissions, including:

(a)     that an agreement signed by STEC with its largest customer, EMC, in the middle of 2009 for a huge volume of purchases to be made in the second half of 2009 (the "EMC Agreement") was an ordinary course contract whose size was determined solely by an increase in the customer's supply requirements such that a similar volume of purchases by the same customer could be expected on a regular recurring basis;

(b)     that purchases by EMC would remain "a significant percentage" of STEC's total revenues, including in the first quarter of 2010;

(c)     that, as of August 2009, STEC was expecting the volume of purchases by its other large customers (the "Other OEMs") to increase during the second half of 2009;

(d)     that, as part of the expected increase in purchases by the Other OEMs during the second half of 2009, STEC was expecting IBM to transition to a much larger volume of purchases during that period;

(e)     that, as of September 2009, one or more of the Other OEMs would have been willing and able to replace EMC as the purchaser under the EMC Agreement, or to purchase a similar amount of ZeusIOPS under a similar agreement;

(f)     that during the 2009 second quarter, STEC's reported revenue would grow, and then did grow, by an amount that—unknown to investors—had been artificially inflated; and

(g)     that, as of August 3, 2009, no competition existed for the ZeusIOPS, or was expected to emerge during 2009 or early 2010.  ¶ 9.

17.     Class Representatives allege that Defendants' misrepresentations and omissions had the effect of doubling the price of STEC's common stock in mid-2009.  ¶ 11.

18.     The TAC alleges that the Moshayedi Brothers took advantage of that artificial inflation to sell more than 50% of their own stock in the Company through the Offering, for a total of $267.8 million.  ¶ 12.

## 2.     The Partial Corrective Disclosures Alleged in the TAC

19.     Only a few weeks after the Offering, a series of partial corrective disclosures began to reveal the falsity of Defendants' misstatements and omissions, and, in turn, drove down the price of STEC's stock to below its pre-Class Period level.  ¶ 10.

20.     First, on September 17, 2009, a major drop in the price of STEC's common stock was allegedly caused by the revelation that an August 3, 2009 statement by Defendant Manouch Moshayedi that there was "no competition" for the ZeusIOPS was false, because such competition was imminent (the "September 17, 2009 Corrective Disclosure").  ¶¶ 193-95.

21.     Then, on November 3, 2009, the price of STEC's sock dropped dramatically in the immediate wake of several revelations (collectively, the "November 3, 2009 Corrective Disclosure"):

(a)     Manouch Moshayedi revealed, among other things, that

(i)      the EMC Agreement was a non-recurring "one-off type of a deal;"

(ii)     IBM's purchases of ZeusIOPS had "dropped off significantly in the third quarter" and that Sun's purchases of ZeusIOPS were below "normal volumes;" and

(iii)    none of the Other OEMs could have replaced EMC under terms similar to the EMC Agreement since the Other OEMs were not "selling to any degree yet" and were all "a year behind" EMC in product development, ¶ 173.

(b)     STEC also stated, in its fourth quarter revenue guidance, that purchases of ZeusIOPS in the second half of 2009 by the Other OEMs were not even going to match the level of ZeusIOPS purchases in the first half of 2009, let alone increase.  ¶ 144.

22.     Finally, on February 23, 2010, Defendant Manouch Moshayedi announced that STEC did not expect any revenue from EMC in the first half of 2010, and that ZeusIOPS sales to the Other OEMs would not recover in the first quarter of 2010 (the "February 23, 2010 Corrective Disclosure").  ¶ 156.[4]  The day

---

[4] STEC also disclosed that the Moshayedi Brothers had been subpoenaed by the SEC as part of a formal investigation.  ¶¶ 14, 253.  The SEC is now prosecuting a civil action against Defendant Manouch Moshayedi for insider trading and some of
*(continued)*

1   after this new information came to light, STEC's common stock price fell

2   significantly.  ¶ 300.

3   ### 3.    The Indemnified Non-Parties

4   23.    The SAC named the Underwriters as defendants and alleged

5   Securities Act Claims against them.  ECF 178 ¶¶ 36-40, 334-40, 354-66.  The

6   Court dismissed Plaintiffs' Securities Act Claims for lack of standing.  ECF 200.

7   24.    Since Defendants STEC and the Moshayedi Brothers agreed to

8   indemnify the Underwriters against liabilities relating to the Offering that might

9   arise under the Securities Act, *see* Prospectus at S-29, the TAC does not allege

10  Securities Act Claims against the Underwriters (referred to in the TAC as the

11  "Indemnified Non-Parties").  *See* ¶¶ 37-45.

12  ### 4.    The Competition Claim

13  25.    The CAC alleged false and misleading statements and material

14  omissions related to the competition for ZeusIOPS.  Defendants allegedly

15  maintained that STEC had a virtual monopoly in the SSD market and that it faced

16  "no competition" (the "Competition Claim").  ECF 131 ¶ 140.  The CAC alleged

17  losses relating to the September 17, 2009 Corrective Disclosure that competition

18  for the ZeusIOPS was imminent.  ECF 131-1 ¶¶ 176-79.

19  26.    Based on the Court's tentative ruling dismissing the CAC, Plaintiffs

20  elected not to allege the Competition Claim or losses relating to the September 17,

21  2009 Corrective Disclosure in the SAC.  *See* ECF 178.

22  27.    The TAC reinstates the Competition Claim and losses resulting from

23  several partial disclosures relating to competition for ZeusIOPS, which were

24  included among the corrective disclosures that comprise the September 17, 2009

25  Corrective Disclosure, the November 3, 2009 Corrective Disclosure, and the

26

27  *(continued)*
    the same misstatements and omissions alleged in this Action.  *See SEC v.*

28  *Moshayedi*, No. 8:12-cv-01179-JVS-MLGx (C.D. Cal. filed July 19, 2012).

February 23, 2010 Corrective Disclosure.  ¶¶ 71-72, 187-223, 275-78, 298-99, 314-26, 366-71.

### 5.   Other Amendments

28.   The TAC includes additional allegations that Defendants made false and misleading statements regarding:

(a)   the quality of STEC's products, ¶ 203; and

(b)   Defendants' belief that purchases by EMC would remain "a significant percentage" of STEC's total revenue, including into the first quarter of 2010.  ¶¶ 76, 280, 301-04, 364-65.

29.   The TAC includes additional allegations indicative of Defendant Manouch Moshayedi's scienter:

(a)   that STEC was informed by EMC that EMC's demand for ZeusIOPS for the third quarter of 2009 was substantially less than half of what EMC had agreed to purchase for the second half of 2009;

(b)   that STEC made a secret side deal with EMC, pursuant to which EMC agreed to increase its purchases for the third quarter of 2009 in exchange for an additional discount on EMC's purchases in the fourth quarter of 2009; and

(c)   that on August 3, 2009, STEC issued its third quarter revenue guidance without disclosing the side deal, thereby concealing the fact that EMC's actual third quarter demand had fallen short of the average quarterly demand implied by the volume of the EMC Agreement.  ¶ 99.

30.   The TAC also includes allegations relating to the timeliness of the Securities Act Claims.  ¶¶ 411-27.

### III.     Plaintiffs Vigorously Prosecuted the Securities Act Claims

#### A.     Plaintiffs Vigorously Prosecuted the Securities Act Claims Through Their Vigorous Prosecution of the Exchange Act Claims

31.     The Exchange Act Claims and the Securities Act Claims alleged in this Action are based on the same factual predicate.[5]  Every misstatement or omission alleged under the Securities Act is identical to one or more of the misstatements or omissions alleged under the Exchange Act, *compare* ¶¶ 46-321 *with* ¶¶ 356-85—except for the alleged omission, under the Securities Act, to file the EMC Agreement with the SEC, *see* ¶ 101.[6]  Therefore, every effort to discover evidence sufficient to prove the elements of the Exchange Act Claims was, necessarily, an effort to prove the smaller set of elements comprising the related Securities Act Claims.

32.     Plaintiffs conducted an extensive pre-discovery investigation, which included, *inter alia*,

(a)     review and analysis of documents filed publicly by Defendants with the SEC;

(b)     review and analysis of press releases, news articles, and other public statements issued by or concerning Defendants;

(c)     review and analysis of research reports issued by financial analysts concerning STEC's securities and business;

(d)     interviews of former STEC employees;

(e)     interviews of employees and former employees of computer manufacturing companies; and

---

[5] The Court has previously recognized that the Exchange Act Claims and the Securities Act Claims are based on a "unified course of fraudulent conduct", *see* ECF 175 at 4, 14, and the "same foundation of facts", ECF 279 at 13.

[6] The factual details regarding the omission to file the EMC Agreement with the SEC (in violation of the Securities Act) are part of the allegations under the Exchange Act because the omission to file the EMC Agreement is also evidence of scienter.  *See* ¶¶ 100-12.

1    (f)    review and analysis of news articles, media reports, and other

2  publications concerning the computer industry.

3    33.    Plaintiffs engaged in significant and meaningful discovery regarding

4  the facts underlying the Action.

5    (a)    Co-Lead Counsel served interrogatories and notices to produce

6  documents on Defendants, which resulted in the production by Defendants of over

7  1.8 million pages of documents, including documents previously produced by

8  Defendants to the SEC in connection with the SEC's related investigation of STEC

9  and the Moshayedis (the "SEC Investigation").

10    (b)    Co-Lead Counsel also obtained over 248,000 pages of

11  documents from third parties, including EMC, the Other OEMs, the Underwriters,

12  STEC's auditor PricewaterhouseCoopers LLP ("PwC"), and financial analysts who

13  covered STEC during the Class Period.

14    (c)    Co-Lead Counsel deposed more than two dozen witnesses,

15  including Defendants and certain of their employees and various third parties,

16  including employees of EMC and the Other OEMs, as well as financial analysts

17  who covered STEC during the Class Period.[7]

18    34.    The Parties exchanged expert reports, with each side retaining

19  multiple experts.  Reports were rendered on the subjects of Class Members'

20  damages, the role of financial analysts in the market, the response of analysts to

21  Defendants' misrepresentations and omissions, and Defendants' duties under

22  regulations promulgated by the SEC.[8]

23

24

25

---

26    [7] Pursuant to a stipulation with Defendants, Plaintiffs were allowed to take 30 depositions.  ECF 262.

27    [8] Depositions of the experts were scheduled to occur, and the Court's deadline for filing summary judgment motions was fast approaching, prior to the scheduled

28  November 6, 2012 trial date, when the Parties reached a settlement.

**B.** **Plaintiffs Continuously Searched for a Plaintiff with Standing to Allege the Securities Act Claims**

35. Throughout the prosecution of this Action, including during discovery and depositions, Plaintiffs diligently searched for a representative plaintiff with standing to assert the Securities Act Claims.[9]

36. The Court's June 19, 2012 Order stated that to have standing to bring the Securities Act Claims, a plaintiff must have purchased or otherwise acquired STEC stock traceable to the Offering and held that stock until at least the first alleged partial corrective disclosure. ECF 314 at 2.

**1.** **Investigation of Previously Known Plaintiffs**

37. None of the plaintiffs who filed the seven initial complaints, the Consolidated Complaint, and/or motions for appointment as lead plaintiff alleged that they purchased or otherwise acquired STEC stock pursuant or traceable to the Offering and held that stock until at least November 4, 2009.[10]

38. On January 6, 2012, the West Virginia Laborers' Trust Fund ("West Virginia"), represented by BLBG, moved for leave to intervene. ECF 228. West Virginia sought modification of the proposed class definition to exclude the Securities Act Claims. ECF 231 ¶¶ 14-17. In its motion to intervene in this Action, West Virginia asserted that it purchased STEC stock on the Offering but did not assert that it held that stock until at least the first alleged partial corrective disclosure. *See* ECF 333 at 25.

(a) West Virginia asserts Securities Act Claims arising from the Offering, against Defendants and the Underwriters on behalf of a putative class of

---

[9] *See* ECF 279 at 21 (staying Action for 60 days for all purposes other than discovery to permit Plaintiffs to find a class representative with standing); ECF 314 at 7 ("Should Plaintiffs discover an adequate Securities Act representative upon Class notification, the Court may revisit the class certification issue.").

[10] Only one of the initial complaints alleged Securities Act Claims. *See* Class Action Complaint for Violation of Federal Securities Laws ¶¶ 104-21, *Sakhai v. STEC, Inc.*, No. 8:09-cv-01306-JVS-MLG (C.D. Cal. Nov. 6, 2009) (ECF 1).

investors, in an action in the Superior Court of Orange County styled *West Virginia Laborers' Trust Fund v. STEC, Inc.*, No. 30-2011-0489022-CU-SL-CXC (Cal. Super. Ct. filed July 1, 2011) (the "State Court Action"). *See* ECF 250 at Ex. A.

(b)  The State Court Action arises out of the same set of facts as this Action and the complaint in the State Court Action includes substantial portions of the SAC, copied verbatim. ECF 249 at 4-5.

39.  After West Virginia moved to intervene, Plaintiffs issued a subpoena to West Virginia seeking production of its trading records with respect to its purchases and sales of STEC stock. *See* ECF 249 at 6-7. West Virginia did not produce its trading records in response to that subpoena.[11]

## 2. <u>Mailings, Advertisements, and Other Efforts to Find a Securities Act Plaintiff</u>

40.  Plaintiffs issued a document subpoena to each of the four Underwriters to obtain the names and addresses of all persons or entities who purchased on the Offering ("Offering Purchasers"). ECF 307-1 ¶ 2.[12] The Underwriters produced the relevant contact information in mid-April 2012. *Id.* ¶ 5. Immediately thereafter, Co-Lead Counsel sent a letter to each of the 464 Offering Purchasers, of which 212 were individuals and 252 were business entities. *Id.* ¶¶ 6-8. The letters described the Action and stated that Plaintiffs were seeking an investor who purchased STEC stock pursuant or traceable to the Offering. ECF 307-2 at Exs. A, B.[13]

---

[11] On March 7, 2012, the Court issued an Order denying West Virginia's motion to intervene. ECF 279 at 21.

[12] The Underwriters initially refused to produce contact information for the Offering Purchasers, but they agreed to produce that information after Plaintiffs filed a letter motion with Magistrate Judge Goldman. *See* ECF 307-1 ¶¶ 3-4

[13] Counsel for Plaintiffs retained Diane Karpman, Esq. of Karpman & Associates to ensure that the letters complied with all California ethics rules and restrictions. Karpman & Associates is one of the premiere legal ethics firms in California and exclusively serves the legal profession. Ms. Karpman reviewed, revised, and approved the letters described in paragraph 40.

1           (a)     One of the 252 business entities was Jeffries & Company, Inc.,

2    now known as Jeffries Group, Inc. ("Jeffries").  A Jeffries broker at the Harborside

3    Financial Center in Jersey City, New Jersey, purchased STEC common stock on

4    the Offering for a limited partnership client.  ECF 307-1 ¶ 9.

5           (b)     In response to the letter described in paragraph 40 *supra*, this

6    Jeffries office produced the names and addresses of 665 clients who purchased

7    STEC common stock during the Class Period, but not necessarily on the Offering.

8    In an abundance of caution, Co-Lead Counsel sent to each of these 665 individuals

9    or entities a letter that was identical in all material respects to the letter described in

10   paragraph 40 *supra*.  *See id.*

11       41.    On Monday, April 23, 2012, Co-Lead Counsel caused an

12   advertisement to be placed in *Investor's Business Daily*, which has a total audience

13   of 401,000 and a total distribution on Monday of 162,758.  ECF 307-1 ¶¶ 11-12.

14   The advertisement described the Action and stated that Plaintiffs were seeking an

15   investor who purchased STEC stock pursuant or traceable to the Offering.  ECF

16   307-2 at Ex. D.

17       42.    On May 10, 2012, Plaintiffs caused the same advertisement to be

18   placed in the Eastern Edition of *The Wall Street Journal*, which has a total

19   circulation of 733,611.  *See* ECF 307-1 ¶ 13; ECF 307-2 at Ex. G.[14]  The Eastern

20   Edition of *The Wall Street Journal* was selected because an analysis of the

21   geographical location of the 464 Offering Purchasers revealed that the vast

22   majority of them resided within the circulation area of the Eastern Edition.  ECF

23   307-1 ¶ 13.

24       43.    As a result of the mailings and advertisements, Co-Lead Counsel was

25   contacted by 23 investors, none of whom had standing to bring the Securities Act

26

27   _____

28   [14] Ms. Karpman also reviewed, revised, and approved the text of the advertisements described in paragraphs 41-42 prior to their publication.

1  Claims, as alleged in the SAC.  *Id.* ¶ 15.  Three of the 23 investors did not purchase

2  on the Offering.  *Id.* ¶ 17.  The other 20 investors purchased STEC stock on the

3  Offering but sold that stock prior to the first partial corrective disclosure alleged in

4  the SAC.  *Id.* ¶ 16.  Dr. Ripperda was among the 20 Offering Purchasers who

5  contacted Co-Lead Counsel in response to the mailings and advertisements.

6      44.    Finally, Co-Lead Counsel sought assistance from more than ten law

7  firms, including BLBG (counsel for Rashtchi, Ovitt, and West Virginia), in

8  identifying an adequate class representative.  None of these attorneys were able to

9  refer an investor who had standing to assert the Securities Act Claims, as alleged in

10  the SAC.  *Id.* ¶ 18.

11      **C.**    **Plaintiffs Vigorously Prosecuted the Inflated Revenues Claims**

12      45.    Plaintiffs reviewed publicly available documents and documents

13  produced in discovery by Defendants and various third parties, including EMC and

14  the Other OEMs, relating to, *inter alia*, STEC's reported revenue; STEC's revenue

15  guidance; STEC's anticipated, forecast, or estimated sales of ZeusIOPS to its

16  customers; STEC's anticipated, forecast, or estimated revenue from ZeusIOPS

17  sales; any decline in STEC's ZeusIOPS sales, whether in total, or in regard to any

18  specific customer; customers' projected or actual requirements of ZeusIOPS;

19  ZeusIOPS inventory held by customers; communications between STEC and its

20  customers regarding ZeusIOPS; customers' production of systems incorporating

21  ZeusIOPS; STEC's purchase of inventory; any discount STEC gave to a customer

22  in return for such customer advancing purchases; and research reports published by

23  financial analysts concerning STEC's sales and revenues.

24      46.    Plaintiffs also reviewed documents produced by PwC, STEC's

25  auditor, relating to the procedures applied, work performed, evidence obtained, and

26  conclusions reached in the auditing engagement ("workpapers") concerning, *inter*

27  *alia*, PwC's quarterly review of STEC's 2009 second quarter revenue and PwC's

28  interim audit testing concerning STEC's 2009 second quarter revenue.

47.     Co-Lead Counsel questioned numerous deponents about Defendants' alleged inflation of STEC's reported revenues for the second quarter of 2009:

(a)     Defendant Cook and Michael Higa ("Higa"), Senior Vice President of Finance at STEC, were questioned about STEC's revenue recognition policies.  Raymond Cook Dep. Tr. at 159; Michael Higa Dep. Tr. at 17-23.[15]

(b)     Christopher Casella, Manager of Global Supply Chain at EMC, was questioned about return material authorization and negative revenue recognition.  Christopher Casella Dep. Tr. at 111-14.

(c)     Co-Lead Counsel questioned numerous deponents about whether Defendants engaged in channel stuffing in order to inflate STEC's reported revenues:

(i)     Defendant Manouch Moshayedi and Cindy Reese ("Reese"), Senior Vice President of Sun, were questioned about Manouch Moshayedi's insistence that Sun purchase more STEC products than it actually needed.  *See* Manouch Moshayedi Dep. Tr. at 192-94; Cindy Reese Dep. Tr. at 33-35.

(ii)     William Fahey ("Fahey"), Director of Sales at STEC, was questioned about excess inventory at EMC and shipping products to EMC at a time when EMC did not want additional products.  William Fahey Dep. Tr. at 143-60, 201-04.

(iii)     Anthony Anvari ("Anvari"), Vice President of Sales at STEC, was quested about Manouch Moshayedi's instruction to ship everything he could in the second quarter of 2009.  Anthony Anvari Dep. Tr. at 152-55.

---

[15] Lead Plaintiff is not filing the deposition transcripts cited herein because they are generally designated confidential.  *See* ECF 224; ECF 225.

(iv)   Higa was questioned about timing shipments according to internal revenue targets and incentives to sales employees.  Michael Higa Dep. Tr. at 33-40.

(v)   Thomas Vogtman ("Vogtman"), Director of Program Management – Japan Sales at STEC, was questioned about internal pressure to ship products.  Thomas Vogtman Dep. Tr. at 101-02.

(vi)   Mark Pridgen ("Pridgen"), Strategic Procurement Manager of HP, was questioned about STEC's insistence that HP increase volumes; HP's inventory of and demand for ZeusIOPS; pulling forward July purchase orders into June; and STEC's refusal to push out purchase orders.  Mark Pridgen Dep. Tr. at 74-77, 93-118.

(vii)   Michael Desens, Vice President of System and Power Development at IBM, was questioned about the timing of shipments from STEC and pushing out orders.  Michael Desens Dep. Tr. at 40-41.

(viii)   Lorenzo Salhi ("Salhi"), former Director of Sales for OEMs at STEC, was questioned about, *inter alia*, STEC sales employees inflating sales and revenue figures; pulling purchase orders from future quarters into earlier quarters; STEC's refusal to cancel orders; excess inventory held by HP and STEC's attempts to advance shipments to HP; offering discounts to dissuade customers from cancelling orders or to convince customers to take shipments early; and the timing of sales to Cisco.  Lorenzo Salhi Dep. Tr. at 87, 163, 151-59, 185-89, 193-94.

(ix)   Kevin Vassily ("Vassily"), Senior Research Analyst at Pacific Crest, was asked about STEC's allegedly false guidance and financial reporting and whether STEC engaged in channel stuffing to increase its revenues. Kevin Vassily Dep. Tr. at 263, 270-74.

1          (x)     Michael Crawford ("Crawford"), Director of Research at

2 B. Riley & Co., was asked about channel stuffing and whether STEC engaged in

3 channel stuffing. Michael Crawford Dep. Tr. at 117-18, 215.

         (d)     Co-Lead Counsel also questioned several deponents about

5 whether Defendants knowingly shipped defective products in order to inflate

6 STEC's reported revenues:

7          (i)     Defendant Mark Moshayedi was questioned about HP

8 issuing a stop shipment order because it had received defective products. Mark

9 Moshayedi Dep. Tr. at 128-29.

10          (ii)     Pridgen was questioned about HP returning defective and

11 unwanted products to STEC and STEC improperly charging HP for shipments.

12 Mark Pridgen Dep. Tr. at 48-49, 57.

13          (iii)     Vogtman was questioned about shipping defective

14 products to Hitachi. Thomas Vogtman Dep. Tr. at 102-21.

15          (iv)     Salhi was questioned about intentionally shipping

16 defective products. Lorenzo Salhi Dep. Tr. at 173-74.

17     48.     Co-Lead Counsel reviewed the transcripts of depositions taken by the

18 SEC, including the deposition of Defendant Mark Moshayedi, who was questioned

19 by the SEC about STEC's revenue recognition policies and moving EMC's buffer

20 inventory to fill revenue gaps. Mark Moshayedi SEC Dep. Tr. at 34, 192-94.

21     49.     Co-Lead Counsel attended the deposition of CW2, a marketing

22 employee for one of STEC's customers, who was questioned by Defendants about

23 STEC shipping empty boxes, defective products, and products that were not

24 ordered. CW2 Dep. Tr. at 43-45, 73.

25     50.     Co-Lead Counsel attended the deposition of CW3, a former sales

26 employee at STEC, who was questioned by Defendants about shipping defective

27 products; incorrectly reporting product failures to HP; shipping products to HP

28

1   despite a stop order; and moving sales into an earlier quarter to inflate sales

2   numbers.  CW3 Dep. Tr. at 29-39, 43, 48-54.

3       **D.    Plaintiffs Vigorously Prosecuted the Competition Claim**

4       51.    Plaintiffs reviewed publicly available documents and documents

5   produced in discovery by Defendants and various third parties, including EMC, the

6   Other OEMs, and financial analysts who covered STEC during the Class Period,

7   relating to, *inter alia*, actual and projected competition for STEC's ZeusIOPS.

8       52.    Plaintiffs reviewed documents relating to the September 17, 2009

9   research report issued by Betsy Van Hees ("Van Hees"), a Publishing Analyst at

10  Wedbush (the "Wedbush Report"), which asserted that there would be competition

11  for STEC's ZeusIOPS by the fourth quarter of 2009.  *See* ECF 335-7.

12      53.    Co-Lead Counsel questioned numerous deponents about competition

13  for STEC's ZeusIOPS and investigated, *e.g.*, whether EMC was planning not to

14  renew the EMC Agreement because it expected to start purchasing more cheaply

15  from STEC's competitors and whether STEC knew that and whether the Other

16  OEMs were refraining from purchasing from STEC because they were expecting

17  competition to emerge and force STEC to lower its pricing.  Several analysts were

18  also questioned about whether the issue of developing competition was important

19  to them and what they thought ultimately was disclosed about competition.  Both

20  Plaintiffs and Defendants sought to elicit information about STEC's competition to

21  support their side of the case.

22      (a)    Defendant Manouch Moshayedi was questioned about, *inter*

23  *alia*, competitors selling enterprise SSDs in 2009; the announcement in 2009 by

24  Hitachi and Intel, Inc. of plans to jointly develop enterprise SSD products, with the

25  first shipments expected in early 2010; whether in 2009 other companies

26  announced plans to enter the market; whether in 2009 EMC expected STEC to

27  have competition; exclusivity agreements with customers and whether they were

28  necessary if STEC was the only supplier; EMC's purchases from competitors in

1    2010 and competitors' pricing for EMC; EMC's qualification of competitors'

2    products; and potential competition from Samsung.  Manouch Moshayedi Dep. Tr.

3    at 81, 84-88, 99, 103-104, 204-206, 230-31, 302-306.

4              (b)    Defendant Mark Moshayedi was questioned about competition

5    for STEC's SSDs in 2007; competitive products first manufactured by Samsung

6    and Hitachi in the second half of 2010; EMC's qualification of Samsung as a

7    competitor; Seagate's announced plans to release an enterprise SSD; the

8    announcement in 2009 by Hitachi and Intel, Inc. of plans to jointly develop

9    enterprise SSD products, with the first shipments expected in early 2010; and

10   collaboration between Sun and Micron to develop enterprise SSDs.  Mark

11   Moshayedi Dep. Tr. at 19-20, 137-38, 140-42.

12             (c)    Defendant Cook was questioned about competition for STEC's

13   ZeusIOPS in 2009; the Wedbush Report and other analyst reports in 2009

14   regarding competition in the SSD market; and pressure on STEC's stock because

15   of competition.  Raymond Cook Dep. Tr. at 31-32, 132-36.

16             (d)    Fahey was questioned about competition for STEC's ZeusIOPS

17   in 2008; other SSD suppliers offering price quotes to EMC for the 2011 time-

18   frame; Samsung's pricing and Samsung's SSDs expected to be qualified in 2010;

19   and competition from Sandforce and Hitachi.  William Fahey Dep. Tr. at 123-25,

20   130-31, 136-38.

21             (e)    Anvari and Vogtman were also questioned about competition

22   for STEC's ZeusIOPS.  Anthony Anvari Dep. Tr. at 146; Thomas Vogtman Dep.

23   Tr. at 24-25.

24             (f)    Timothy Smith, Senior Director at EMC, was questioned about

25   STEC's ZeusIOPS and the development and availability to EMC of competitive

26   products; and STEC's pricing prior to EMC's qualification of a competitor.

27   Timothy Smith Dep. Tr. at 97-100, 181.

28

1   (g)   Reese was questioned about STEC's pricing and Sun's interest

2   in various other suppliers as potential replacements for STEC.  Cindy Reese Dep.

3   Tr. at 17-19.

4   (h)   Pridgen was questioned about HP's purchases of SSDs from

5   Samsung.  Mark Pridgen Dep. Tr. at 70.

6   (i)   Christopher Casella, Manager of Global Supply Chain for SSDs

7   at EMC, was questioned about conversations around January 2010 with

8   competitors or potential competitors of STEC about pricing.  Christopher Casella

9   Dep. Tr. at 116-17.

10   (j)   Van Hees was questioned about the EMC Agreement and

11   protection for STEC from its competitors; her industry checks regarding

12   competition; the Wedbush Report; competition from Samsung; and her concerns

13   that the competitive landscape would likely pose challenges to STEC's earnings

14   and revenues in the second half of 2010.  Van Hees Dep. Tr. at 18-19, 80-82, 93-

15   95, 125-28.  During that deposition, Van Hees was also questioned by Defendants

16   about her industry expectations in the middle of 2009 and in 2010; and statements

17   by EMC that it was actively working with competitors and looking for a second

18   source for enterprise SSDs.  *Id.* at 203-207.

19   (k)   Gary Hsueh, Executive Director at Oppenheimer, discussed

20   STEC's competition in response to questions asked by Co-Lead Counsel at various

21   points during his deposition.  Gary Hsueh Dep. Tr. at 102-103, 112-13, 131.  He

22   was also questioned by Defendants about his suspicion or concern about intensified

23   competition or the possibility that EMC might be qualifying a second source for

24   SSDs and whether EMC ever qualified a second source.  *Id.* at 162-63, 198-99.

25   (l)   Vassily was questioned about the competitive pressures on

26   STEC and a setback at Seagate, one of STEC's potential competitors.  Kevin

27   Vassily Dep. Tr. at 55-56, 73, 78-79.  During that deposition, Vassily was also

28   questioned by Defendants about competition in 2009 and 2010 for STEC's

1  ZeusIOPS; his statement in an analyst report that, as of June 2009, legitimate

2  competition in the enterprise storage space was still at least three to four quarters

3  away; sources of information published in his analyst reports regarding STEC's

4  competition; rumors of impending competition around November 2009; and the

5  competitive landscape as of February 24, 2010.  *Id.* at 195-203, 252-55.

6        (m)    Aaron Rakers ("Rakers"), Managing Director and Senior

7  Analyst at Stifel Nicolaus, was questioned about whether he had an understanding

8  that the EMC Agreement would continue and EMC potentially sourcing SSDs

9  from a company other than STEC in the future; statements in his analyst reports

10  that, as of July 2009, his checks continued to suggest that there would be no viable

11  competitor to STEC in the market for enterprise SSDs until mid-2010; the sources

12  of information published in his analyst reports regarding STEC's competition;

13  EMC's interest in other SSD suppliers.  Aaron Rakers Dep. Tr. at 49-54, 75-76.

14  During that deposition, Rakers was also questioned by Defendants about

15  conversations with EMC regarding STEC's competitive position.  *Id.* at 164.

16        (n)    Vijay Rakesh ("Rakesh"), Think Equity's Analyst covering

17  semiconductors, was questioned about STEC's competition in September 2009 and

18  November 2009; the potential for competition for STEC's ZeusIOPS; his estimate

19  that competition would come in early 2010; and his conversations with Defendant

20  Manouch Moshayedi regarding the competitive landscape.  Vijay Rakesh Dep. Tr.

21  at 88-89, 123-27, 130, 136.  During that deposition, Rakesh was also questioned by

22  Defendants about a statement in his March 13, 2009 analyst report that aggressive

23  competition for SSDs was on the horizon; analyst reports citing competition as a

24  risk to STEC in his analyst reports; and STEC's competition at or around the time

25  of the Offering.  *Id.* at 147-49, 154, 172-73, 182, 199-201.

26        (o)    Crawford was questioned about competition as a risk factor

27  STEC faced.  Michael Crawford Dep. Tr. at 239.  During that deposition, Crawford

28  was also questioned by Defendants about the risk that prices and margins would be

affected when other vendors emerged as competitors and investor concern regarding when and whether a competitor might emerge. *Id.* at 179-80, 184-85.

(p)     Jeffrey Schreiner, Senior Research Analyst at Capstone, was questioned about the EMC Agreement and protection for STEC from its competitors, as well as the competitive landscape in 2009.  Jeffrey Schreiner Dep. Tr. at 61-62, 95-97, 116-17.

54.     Co-Lead Counsel attended the deposition of Steven L. Henning, Ph.D., CPA, an expert retained by Lead Plaintiffs, who was questioned by Defendants about whether he was aware of any suppliers of enterprise SSDs in 2009 other than STEC and when  STEC's competitors were qualified with EMC. Steven Henning Dep. Tr. at 130-32.

55.     Co-Lead Counsel reviewed the transcripts of depositions taken by the SEC, during which several deponents were questioned about STEC's competition:

(a)     Defendant Manouch Moshayedi was asked by the SEC about competition around the time of the EMC Agreement and in 2010; communications with EMC regarding competitors and competitive pricing; and what Fahey and Chris Coeney, a field application engineer, both of whom were at the EMC factory, told him regarding EMC's alternatives to STEC's ZeusIOPS.  Manouch Moshayedi SEC Dep. Tr. at 251-57, 261, 264.

(b)     Defendant Mark Moshayedi was asked by the SEC about communications in 2009 and 2010 with EMC regarding competitors and competitive pricing.  Mark Moshayedi SEC Dep. Tr. at 142-44, 207-08.

(c)     Masoud ("Mike") Moshayedi, who co-founded STEC with his brothers Manouch and Mark Moshayedi and was President of the Company prior to his retirement in 2007, was questioned by the SEC about the Wedbush Report and what Manouch and Mark Moshayedi told him regarding STEC's competition. Mike Moshayedi SEC Dep. Tr. at 130-31, 136-37.

1        (d)     Fahey was questioned by the SEC regarding when he heard about competition from EMC and whether in 2010 EMC would qualify other suppliers.  William Fahey SEC Dep. Tr. at 89-92.

56.     Co-Lead Counsel attended the deposition of Roberto Basilio, Vice President of Hardware Product Management at Hitachi, who was questioned by Defendants about whether in 2009 Hitachi procured SSDs from manufacturers other than STEC and when other suppliers became available to Hitachi.  Robert Basilio Dep. Tr. at 24-28.

**E.**     **Plaintiffs Vigorously Prosecuted the Securities Act Claims Against the Underwriters**

57.     The Offering was underwritten by the four Underwriters:  J.P. Morgan Securities, Deutsche Bank Securities, Barclays Capital, and Oppenheimer.  Prospectus Supplement at S-27 (Aug. 7, 2009).  The lead underwriters (a/k/a "joint bookrunners") of the Offering were J.P. Morgan Securities and Deutsche Bank Securities.

58.     The Underwriters were named as defendants in both the CAC and the SAC.  However, as noted, the Court dismissed the class claims against the Underwriters on June 17, 2011.

59.     On November 9, 2011, Plaintiffs issued subpoenas out of the Southern District of New York to each of the Underwriters (the "Underwriter Subpoenas").  The Underwriter Subpoenas sought the production of documents relating to, *inter alia*, the due diligence performed by the Underwriters in connection with the Offering, all communications with STEC personnel regarding the Offering, and the identities of all Offering Purchasers.[16]

---

[16] Plaintiffs issued supplemental subpoenas out of the Central District of California to each of the Underwriters seeking the identities of the Offering Purchasers.  After a discovery dispute concerning the production of the Offering Purchasers' addresses, which Plaintiffs raised with Magistrate Judge Goldman on March 28, 2012, the Underwriters eventually produced that information.

60.     After protracted negotiations concerning the scope of discovery, lead underwriters J.P. Morgan Securities and Deutsche Bank Securities produced to Plaintiffs a total of 668,105 pages of documents responsive to the Underwriter Subpoenas.  In addition, the other two underwriters produced a total of 63,876 pages of documents.

61.     The Underwriters' document productions included all of the due diligence documents that they had produced to the SEC in connection with the SEC Investigation.  Significantly, the Underwriters' production included the "Commitment Committee" memorandum that each firm drafted in connection with the Offering.  The Commitment Committee memoranda described the due diligence procedures performed by each Underwriter and contained each Underwriter's rationale for participating in the Offering—including a detailed analysis of STEC's financial position, competitive position, and business prospects—based on public information, STEC's internal documents, and interviews with STEC's managers, auditors, and customers.

62.     In addition, on April 2, 2012, Plaintiffs deposed Sherri Scribner ("Scribner"), a financial analyst at Deutsche Bank Securities who was part of the Deutsche Bank Securities engagement team for the Offering, and who subsequently initiated coverage of STEC as a securities analyst on August 16, 2009.[17]  Scribner was questioned about, *inter alia*, Deutsche Bank Securities' Commitment Committee memorandum; due diligence with respect to the Offering; Scribner's involvement with the Offering; and Scribner's interaction with another analyst at Deutsche Bank Securities who published research reports on STEC prior to the Offering.  Sherri Scribner Dep. Tr. at 22-23, 29-36, 44-57, 62-81.  During

---

[17] BLBG wrongly asserted in its opposition at p. 9: "Lead Plaintiff apparently did not even depose any of the four investment banks that acted as underwriters with respect to the August 11, 2009 offering (the "Offering"), upon which the Securities Act Claims are based."

1  that deposition, Scribner was also questioned by Defendants about due diligence

2  for the Offering.  *Id.* at 247-52, 278-79, 295.

3      63.    It is Co-Lead Counsel's understanding that, pursuant to the

4  Underwriting Agreement, the Underwriters are being indemnified by STEC with

5  respect to this Action.

6      **F.**    **Settlement**

7          **1.**    **Negotiations Among the Settling Parties**

8      64.    The Settlement resulted from extensive negotiations that were

9  undertaken over the course of nearly nine months with the assistance of the

10  Honorable Layn R. Philips, a former Federal Judge, who was retained by the

11  Parties as a mediator.

12      65.    In the fall of 2011, Co-Lead Counsel and counsel for the STEC

13  Defendants (the "STEC Defendants' Counsel"), contacted Judge Phillips to request

14  his assistance in mediating this case.  After ensuring that no conflicts existed,

15  Judge Phillips agreed to do so.

16      66.    The Parties first met with Judge Philips for a formal, full-day

17  mediation session on January 5, 2012.  In advance of this session, Co-Lead

18  Counsel and the STEC Defendants' Counsel submitted detailed, comprehensive

19  mediation statements.  Along with Co-Lead Counsel, a representative of Lead

20  Plaintiff (a Deputy Attorney General) attended and actively participated in the

21  mediation session.

22      67.    During the January 2012 mediation session, Judge Phillips engaged in

23  numerous discussions with Co-Lead Counsel and the STEC Defendants' Counsel

24  in an effort to find common ground between the parties' respective positions.

25  However, although the January 2012 mediation session narrowed some of the

26  Parties' differences, it did not lead to a resolution.

27

28

68.     Thereafter, the Parties ceased all mediation discussions, deciding to pursue discovery.  During this time, Judge Phillips was generally kept apprised of the litigation, including the progress of discovery.

69.     Then, in May 2012, Co-Lead Counsel and STEC Defendants' Counsel agreed that further formal mediation in the wake of the completion of extensive fact discovery might prove fruitful.  Therefore, they scheduled a formal, full-day mediation with Judge Phillips for July 30, 2012.  In advance of this session, Co-Lead Counsel and STEC Defendants' Counsel submitted detailed, comprehensive mediation statements informed by their extensive mutual discovery.  The July 2012 mediation session was also attended by client representatives from the parties, including a Deputy Attorney General from New Jersey and the General Counsel of STEC, who were actively involved in the discussions.

70.     Although the mediation in July 2012 was productive in terms of focusing the areas of dispute and narrowing the settlement range, the Parties were not able to reach an agreement.

71.     In August 2012, Dr. Ripperda agreed to serve as a class representative on behalf of investors who acquired STEC stock pursuant or traceable to the Offering and held that stock until at least the September 17, 2009 Corrective Disclosure, the first partial corrective disclosure alleged in the TAC.[18]

72.     Co-Lead Counsel referred Dr. Ripperda to Thomas Bienert, Jr. ("Bienert") of Bienert Miller & Katzman and Robert S. Green ("Green"), of Green & Noblin, P.C.  After Dr. Ripperda retained them as counsel, Bienert and Green reviewed the pleadings, the discovery record, and other aspects of the Action prior

---

[18] Dr. Ripperda initially contacted Co-Lead Counsel on April 24, 2012 to discuss the Action.  At that time, Dr. Ripperda provided to Co-Lead Counsel his trading records, which show that he had purchased STEC common stock on the Offering but had sold that stock prior to November 4, 2009 and, thus, did not have standing to assert the Securities Act Claims alleged in the SAC.

to joining the Parties in settlement negotiations.  *See* Ex. B (Green Decl.) ¶¶ 7-9; Ex. C (Bienert Decl.) ¶ 6.

73.     On September 5, 2012, the Parties met in New York for a third and final mediation session with Judge Philips.[19]  The mediation was attended by counsel for the Parties, an Assistant Attorney General from New Jersey, the General Counsel of STEC, and counsel for Dr. Mark Ripperda.[20]  Bienert and Green and actively participated in the negotiations.  Ex. B ¶ 11; *see also* Ex. C ¶ 7. At the close of the third day of mediation, the Parties had narrowed their areas of dispute, but there was no agreement reached.

74.     After additional discussions by telephone over the next two days, the Parties, including Dr. Ripperda, reached agreement and signed a Memorandum of Understanding on September 11, 2012, which set forth, subject to the preparation of formal stipulations of settlement, the material terms and conditions of the combined $35.75 million settlement.  The Settlement Agreement was executed on October 5, 2012.  ECF 328-1.

## 2.   Negotiations Between Class Representatives' Counsel

75.     In October 2012, Co-Lead Counsel and counsel for Dr. Ripperda participated in additional negotiations with the assistance of Judge Philips regarding the allocation of the Settlement between class members with only Exchange Act Claims and those with both Exchange Act and Securities Act Claims.

76.     On October 22, 2012, Judge Philips held a conference call solely on the issue of allocation, at which time Lead Plaintiff and Co-Lead Counsel accepted

---

[19] Bernie Schneider, a colleague of Judge Philips, began the mediation.  Judge Philips arrived later and jointly conducted the mediation with Mr. Schneider.

[20] Counsel requested that Dr. Ripperda attend the mediation.  However, because Dr. Ripperda is an Emergency Room physician in Arizona, it was not possible for him to arrange his schedule to attend in person.  Instead, he communicated with counsel via e-mail and was available during the mediation by telephone.  Ex. D (Ripperda Declaration) at 7.

1    the allocation proposed by Dr. Ripperda and his counsel, whereby class members

2    with Securities Act Claims would receive a 25% premium on their recovery.

3         77.    The loss causation and damages expert retained by Lead Plaintiff to

4    assist in creating the Plan of Allocation, Professor John D. Finnerty, has opined

5    that a premium of 25% to Securities Act Claims, as compared to Section 10(b)

6    claims, is reasonable.  *See* Ex. E.

7    **IV.    Exhibits**

8         78.    Attached hereto are true and correct copies of the following exhibits:

9         (a)    Declaration of Samuel S. Cornish in Support of Final Approval

10   of Settlement, and Reimbursement of Lead Plaintiff's Reasonable Costs and

11   Expenses Relating to Its Representation of the Class (Ex. A);

12        (b)    Declaration of Robert S. Green in Support of Amended motion

13   for Preliminary Approval of Settlement (Ex. B);

14        (c)    Declaration of Thomas H. Bienert, Jr., in Support of Amended

15   Motion for Preliminary Approval of Settlement (Ex. C);

16        (d)    Second Declaration of Mark V. Ripperda in Support of

17   Amended Motion for Preliminary Approval of Settlement (Ex. D);

18        (e)    Declaration of John D. Finnerty, Ph.D. (Ex. E);

19        (f)    Notice of Pendency and Proposed Settlement of Class Action

20   and Fairness Hearing, *In re Countrywide Fin. Corp. Sec. Litig.*, No. CV07-05295

21   MRP (MANx) (C.D. Cal.) (Ex. F);

22        (g)    Notice of Pendency of Class Action and Proposed Settlement,

23   Settlement Fairness Hearing and Motion for Attorneys' Fees and Reimbursement

24   of Litigation Expenses, *In re Rait Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD

25   (E.D. Pa.) (Ex. G);

26        (h)    Notice of Pendency and Partial Settlement of Class Action, *In

27   re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 01-cv-1541-REB-CBS (D. Col.) (Ex. H);

28

1        (i)    Notice of Pendency and Settlement of Class Action, *Schwartz v.*

2    *TXU Corp.*, No. 02-CV-2243-K (N.D. Tex.) (Ex. I);

3        (j)    Notice of Proposed Class Action Settlement, Right to

4    Exclusion, and Hearing, *In re Waste Mgmt.*, *Inc. Sec. Litig.*, No. H-99-2183 (MH)

5    (S.D. Tex.) (Ex. J);

6        (k)    Notice of Proposed Settlement, Motion for Attorneys' Fees and

7    Fairness Hearing, *In re Tyco Int'l, Ltd. Sec. Litig.*, No. 02-1335-PB (D.N.H.) (Ex.

8    K);

9        (l)    Notice of Pendency of Class Action and Proposed Settlement,

10   Settlement Fairness Hearing, and Motion for Attorneys' Fees and Reimbursement

11   of Litigation Expenses, *In re Isolagen, Inc. Sec. & Derivative Litig.*, No. 06-md-

12   01741 (E.D. Pa. 2008) (Ex. L);

13       (m)    Notice of (1) Pendency of Class Action and (2) Hearing on

14   Proposed Settlement and Attorneys' Fee Petition and Right to Share in Net

15   Settlement Fund, *In re SFBC Int'l Inc. Sec. & Derivative Litig.*, No. 2:06-cv-

16   000165-SRC (D.N.J. 2007) (Ex. M); and

17       (n)    Order Denying Plaintiffs' Motion for Class Certification,

18   *Schwartz v. Lights of Am., Inc.*, No. CV 11-01712 JVS(MLGx) (C.D. Cal. June 15,

19   2012) (Ex. N).

20

21   I hereby declare under penalty of perjury that the foregoing is true and correct.

22   Executed at New York, New York, on December 14, 2012.

23

24               /s/ *Thomas A. Dubbs*

25               Thomas A. Dubbs (*Pro Hac Vice*)

26

27

28