1  Christopher Kim (Bar No. 082080)
   christopher.kim@limruger.com
2  Norma Nava (Bar No. 266827)
   norma.nava@limruger.com
3  LIM, RUGER & KIM, LLP
   1055 West Seventh Street, Suite 2800
4  Los Angeles, California 90017-2554
   Telephone: (213) 955-9500
5  Facsimile: (213) 955-9511

6  Thomas A. Dubbs (*Pro Hac Vice*)              Allyn Z. Lite (*Pro Hac Vice*)
   tdubbs@labaton.com                            alite@litedepalma.com
7  James W. Johnson (*Pro Hac Vice*)             Bruce D. Greenberg (*Pro Hac Vice*)
   jjohnson@labaton.com                          bgreenberg@litedepalma.com
8  Richard T. Joffe (*Pro Hac Vice*)             LITE DePALMA GREENBERG, LLC
   rjoffe@labaton.com                            Two Gateway Center, 12th Floor
9  LABATON SUCHAROW LLP                          Newark, New Jersey 07102
   140 Broadway                                  Telephone: (973) 623-3000
10 New York, New York 10005                      Facsimile: (973) 623-0858
   Telephone: (212) 907-0700
11 Facsimile: (212) 818-0477

12 *Attorneys for Lead Plaintiff, the State of New Jersey, Department of Treasury,*
   *Division of Investment, Plaintiff International Brotherhood of Electrical Workers,*
   *Local 103, The Norfolk County Retirement System and Lead Counsel for the Class*

13

14 Thomas Bienert, Jr.                           Robert S. Green
   tbienert@bmkattorneys.com                     rsg@classcounsel.com
15 BIENERT, MILLER & KATZMAN                     GREEN & NOBLIN, P.C.
   903 Calle Amanecer, Suite 350                 700 Larkspur Landing Circle, Suite 275
16 San Clemente, CA 92673                        Larkspur, CA 94939
   Telephone: (949) 369-3700                     Telephone: (415) 477-6700
17 Facsimile: (949) 369-3701                     Facsimile: (415) 477-6710

18                  *Attorneys for Plaintiff Mark Ripperda*

19              **UNITED STATES DISTRICT COURT**

20              **CENTRAL DISTRICT OF CALIFORNIA**

21                  **SOUTHERN DIVISION**

22 IN RE STEC, INC. SECURITIES          )   No.  SACV 09-01304-JVS (MLGx)
   LITIGATION                           )
23                                      )   **THIRD CONSOLIDATED AMENDED**
                                        )   **COMPLAINT FOR VIOLATION OF**
24                                      )   **THE FEDERAL SECURITIES LAWS**
   This Document Relates To:            )
25                                      )   **CLASS ACTION**
       ALL ACTIONS                      )
26                                      )   **DEMAND FOR JURY TRIAL**
                                        )   Judge: Hon. James V. Selna
27 _____  )

28

# TABLE OF CONTENTS

Page

I.    NATURE AND SUMMARY OF THE ACTION ...........................................1

II.   JURISDICTION AND VENUE.................................................................7

III.  THE PARTIES ..........................................................................................7

      A.    The Plaintiffs .................................................................................7

      B.    The Issuer Defendant.....................................................................9

      C.    The Officer Defendants .................................................................9

      D.    The Director Defendant ...............................................................11

IV.   INDEMNIFIED NON-PARTIES.............................................................12

V.    FACTUAL BACKGROUND AND SUBSTANTIVE
      ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS......14

      A.    During the 2009 Third Quarter, the Exchange Act Defendants
            Misrepresented the Nature of a New Agreement With EMC,
            STEC's Largest Customer................................................................14

            1.    The Exchange Act Defendants had Consistently Described
                  Their ZeusIOPS Business as One That Eventually Would
                  Produce, *in the Ordinary Course*, Surging Sales to Each
                  ZeusIOPS OEM Customer .........................................................14

            2.    The Exchange Act Defendants Falsely Communicated that
                  the EMC Agreement was an Ordinary Course Contract
                  Whose Large Size had Resulted from an Increase in
                  EMC's Recurring Requirements ................................................19

                  (a)    The July 16, 2009, Press Release.......................................19

                  (b)    The August 3, 2009, Statements in the Prospectus,
                         and Second Quarter Earnings Release ..............................21

            3.    The Exchange Act Defendants Knew That Their
                  Representations About the EMC Agreement Were False.........26

(a)   Manouch Subsequently Admitted That the Exchange
      Act Defendants Always had Known That the EMC
      Agreement Was a One-Off Contract ..............................26

(b)   Manouch's Admission Also Means the Exchange Act
      Defendants Knew That EMC Would Not Continue
      Purchasing at the Same Volume ......................................26

(c)   STEC's Intimate Relationship With Its OEM
      Customers Also Supports the Exchange Act
      Defendants' Scienter ......................................................27

4.  The Exchange Act Defendants' Failure to File the EMC
    Agreement With the SEC, After Promising the SEC That
    Any Material One-Off Contracts With EMC Would Be
    Filed, is Additional Evidence of Their Scienter for Their
    Misleading Statements About the EMC Agreement ..................30

B.  During the 2009 Third Quarter, the Exchange Act Defendants
    Made Multiple Misleading Statements and Material Omissions
    Regarding Sales of ZeusIOPS to STEC's Other OEM Customers .....33

1.  The Exchange Act Defendants Falsely Represented That
    They Expected the Other OEMs to Increase Their
    ZeusIOPS Purchases During the Second Half of 2009 .............33

(a)   This Statement Was Made in the Prospectus for the
      Offering of the Moshayedis' Stock ..................................33

(b)   Subsequent Analyst Reports Reflected This
      Statement ........................................................................34

(c)   The Statement Was False ................................................37

(d)   The Statement Was Knowingly False When Made ..........38

i.    STEC's Knowledge of the Amount of Future
      Sales Was Greater for ZeusIOPS Than for
      STEC's Other Products ............................................38

ii.   STEC Ordered Inventory in Advance, in Order
      to Fill Expected ZeusIOPS Purchases ......................39

THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

iii.   At the Time When the Prospectus Was Issued,
       STEC had Ordered the Amount of Inventory
       Actually Needed for the Sales Subsequently
       Made During the Second Half of 2009 ....................40

(e)   Investors Were Surprised When the Truth Was
      Partially Disclosed on November 3, 2009........................42

      i.    Sales to the Other OEMs Were *Down* and
            Would Not Recover During 2009 ............................42

      ii.   The Other OEMs had Not Even Started
            Building Systems Incorporating ZeusIOPS ..............43

      iii.  IBM Was Only Offering ZeusIOPS as an
            Option, Not as a Standard Feature ...........................44

      iv.   Analysts Expressed Surprise .....................................44

(f)   Investors Were Surprised Again, When the
      Truth Was More Completely Disclosed on
      February 23, 2010.........................................................46

(g)   Too Late to Benefit Class Members, the Exchange
      Act Defendants Added a Key Cautionary Statement
      to Their Quarterly SEC Filings ..........................................48

2.   The Prospectus Omitted to Disclose That IBM Would Not
     Begin Purchasing for Volume Production During the
     Second Half of 2009, and Was Not Marketing ZeusIOPS
     as a Standard Feature in Its Systems ...........................................48

3.   STEC's September 10, 2009, Letter to the SEC Falsely
     Represented That One or More of the Other OEMs Was
     Ready to Purchase ZeusIOPS in Quantities Equivalent to
     Those Being Purchased Under the EMC Agreement.................50

4.   The Exchange Act Defendants' False Statement About Sun
     Supports Their Scienter for Their Misrepresentations
     About the Other OEMs, and Their Omissions About IBM .......51

C.   During the 2009 Third Quarter, the Exchange Act Defendants
     Made Misstatements and Omissions Regarding Competition for
     the ZeusIOPS..................................................................................54

THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1           1.    Omissions Regarding Competition ...........................................54

2                (a)    The Prospectus Gave No Warning
3                       that Competition Was Imminent ......................................54

4                (b)    On September 17, 2009,
5                       the Truth Was Partially Disclosed.....................................56

6                (c)    Defendants Had a Duty to Disclose
7                       the Imminence of Competition .......................................57

8           2.    The Prospectus Erroneously Denied
9                the Imminence of Competition.......................................57

10         3.    The Truth Was  More Completely
                Disclosed on November 3, 2009 .................................62

11         4.    Yet Another Partial Disclosure of the
12                Truth was Made on February 23, 2010 ......................................64

13     D.    The Exchange Act Defendants Artificially Inflated STEC's 2009
14         Second Quarter Revenue ...............................................66

15           1.    The Exchange Act Defendants Inflated STEC's 2009
16                Second Quarter Revenue With Unearned Income and
                Undisclosed Channel Stuffing Based on Shipments to
17                Customers Other Than EMC......................................68

18           2.    The Collapse of STEC's Revenue in the 2010 First Quarter
19                Shows That STEC's 2009 Second Quarter Revenue Was
                Inflated by $14 Million Regarding Sales to Customers
20                Other Than EMC ...................................................70

21     E.    The Exchange Act Defendants Inflated STEC's Revised 2009
22         Second Quarter Revenue Guidance.................................71

23  VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ....................................72

24     A.    After Inflating the Price of STEC's Stock, Defendants Manouch
25         and Mark Moshayedi Engaged In Massive Insider Selling ................72

26     B.    As STEC's Stock Price Began to Collapse, the SEC Launched a
27         Formal Investigation of the Moshayedis' Stock Sales........................73

28

C.    Only Days After Disclosing the SEC Investigation, STEC Made Golden Parachutes Available to the Officer Defendants ....................74

D.    Each of the Exchange Act Defendants' False Statements and Omissions Involved One of STEC's Core Operations........................74

E.    Each Officer Defendant Had a Motive and Opportunity to Commit Fraud..............................................................................75

VII.   THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS RELATING TO THE EXCHANGE ACT CLAIMS ........................................................................................76

A.    June 16, 2009 Press Release...............................................................76

B.    July 16, 2009 Press Release ..............................................................76

C.    August 3, 2009, SEC Filings..............................................................76

    1.    2009 Second Quarter Earnings Release ...................................76

    2.    Form 424B3 (Prospectus)............................................................77

    3.    Second Quarter 10-Q...................................................................79

D.    September 10, 2009, Publicly Filed Letter to the SEC .....................79

VIII.  LOSS CAUSATION ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS .........................................................................80

A.    The September 17, 2009, Partial Corrective Disclosure ....................80

B.    The November 3, 2009, Partial Corrective Disclosures......................81

    1.    Disclosure That the EMC Agreement Was Not an Ordinary Course Contract Indicative of Purchases by EMC Expected to Recur, and Sales to EMC Were Not Expected to Remain a Significant Percentage of STEC's Total Revenues in Every Quarter ..........................................................................81

    2.    Disclosure That Sales to the Other OEMs Were Not Expected to Increase During the Second Half of 2009 .............82

THIRD CONSOLIDATED  AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

3.    Disclosure That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009, and Was Not Offering ZeusIOPS as a Standard Feature in Its Systems.....................................................84

4.    Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement.........................................................84

5.    Additional Disclosure of Imminent Competition for the ZeusIOPS .................................................85

C.    The February 23, 2010, Additional Corrective Disclosures ...............86

1.    Additional Disclosure That the EMC Agreement Did Not Represent a New Recurring Level of EMC Purchases, And Sales to EMC Were Not Expected to Remain a Significant Percentage of STEC's Total Revenues in Every Quarter ..........86

2.    Additional Disclosure That the Other OEMs Would Not Be Increasing Their Purchases During the Second Half of 2009 .........................................................................................87

3.    Additional Disclosure That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009.........................................................................................88

4.    Additional Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement................................88

5.    Additional Disclosure of Imminent Competition for the ZeusIOPS .................................................89

6.    Disclosure That the Exchange Act Defendants Inflated STEC's 2009 Second Quarter Revenue and Revised Revenue Guidance.................................................................89

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE TO EXCHANGE ACT CLAIMS...........................................91

X.    NO SAFE HARBOR.............................................................................92

XI.    CLASS ACTION ALLEGATIONS RELATING TO ALL CLAIMS ........93

XII.    EXCHANGE ACT CLAIMS .................................................................96

COUNT I
 For Violation of Section 10(b) of the Exchange Act
 and Rule 10b-5 Against STEC and The
 Officer Defendants ........................................................................96

COUNT II
 For Violation of Section 20(a) of the
 Exchange Act Against Manouch Moshayedi,
 Mark Moshayedi and Raymond D. Cook....................................100

COUNT III
 For Violation of Section 20A of the
 Exchange Act Against Manouch Moshayedi and Mark Moshayedi..........101

XIII. FALSE STATEMENTS AND MISLEADING MATERIAL
 OMISSIONS RELATING TO THE SECURITIES ACT CLAIMS,
 AND SUBSTANTIVE ALLEGATIONS REGARDING SAME .............102

 A. Misstatements/Omissions in the Prospectus .....................................102

  1. Sales to the Other OEMs.........................................................102

  2. Sales to IBM ...........................................................................103

  3. The EMC Agreement ..............................................................103

  4. Sales to EMC as a Percentage of Total Quarterly Revenues ...103

  5. Competition ............................................................................104

   (a) Omission Regarding Competition...................................104

   (b) Misstatements Regarding Competition ...........................104

 B. Misstatements/Omissions in STEC's 2009 Second Quarter 10-Q,
  Incorporated by Reference into the Registration Statement and
  Prospectus.....................................................................................105

  1. Omission to File the EMC Agreement with the 10-Q .............106

  2. Omission to Explain in the MD&A Section That the EMC
   Contract Was a One-Off Contract ...........................................107

  3. 2009 Second Quarter Revenue.................................................107

  4. Quality and Reliability ............................................................107

THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

XIV.  SECURITIES ACT CLAIMS ...................................................................108

COUNT IV
    For Violation Of Section 11 of the Securities
    Act Against the Officer Defendants, Bahri and STEC ..............................108

COUNT V
    For Violation of Section 12(a)(2) of the Securities
    Act Against STEC, Manouch Moshayedi and Mark Moshayedi...............111

COUNT VI
    For Violation of Section 15 of the Securities Act Against the Officer
    Defendants .............................................................................................113

XV.    TIMELINESS OF SECURITIES ACT CLAIMS......................................114

XVI.  PRAYER FOR RELIEF ..........................................................................118

XVII. JURY DEMAND......................................................................................119

Court appointed Lead Plaintiff, the State of New Jersey, Department of Treasury, Division of Investment ("Lead Plaintiff" or "New Jersey"), individually and on behalf of a class of similarly situated persons and entities, by its undersigned counsel, for its Third Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws asserting claims against STEC, Inc. ("STEC" or the "Company") and the other Defendants named herein, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an investigation by its counsel which included, among other things: (i) review of information about the other Representative Plaintiffs obtained from them; (ii) review and analysis of documents filed publicly by STEC with the Securities and Exchange Commission (the "SEC"); (iii) review and analysis of press releases, news articles, earnings conference call transcripts and other public statements issued by or concerning STEC and other Defendants named herein; (iv) review and analysis of research reports issued by financial analysts concerning STEC's securities and business; (v) interviews of former STEC employees; (vi) interviews of employees and former employees of STEC's customers, such as computer manufacturing companies; (vii) review and analysis of news articles, media reports and other publications concerning the computer industry, and (viii) discovery taken from Defendants and non-parties.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     As detailed below, this case involves two brothers who, as founders and key officers of a high tech company, sold half of their stock in the Company for $267.8 million after they and one of the other officers had made a series of knowing misstatements and misleading omissions that artificially doubled the price of the stock. Shortly after the brothers sold their stock in a single secondary

1   offering, the falsity of their statements and omissions was disclosed, the price of

2   the company's stock collapsed back to its prior level, and the SEC commenced a

3   formal investigation that still is ongoing.

4     2.  This is a class action on behalf of all persons who purchased or

5   otherwise acquired STEC common stock between June 16, 2009, and February 23,

6   2010, inclusive (the "Class Period"), seeking to pursue remedies under the

7   Securities Exchange Act of 1934 (the "Exchange Act"), and the Securities Act of

8   1933 (the "Securities Act").

9     3.  STEC is a manufacturer of data storage devices for computer systems.

10  STEC's customers include original equipment manufacturers ("OEMs") such as

11  EMC, IBM, Hitachi, Hewlett-Packard ("HP") and Sun Microsystems ("Sun"),

12  who, in turn, manufacture high performance storage and server systems for large

13  enterprises.

14    4.  STEC claims to manufacture the industry's most comprehensive line

15  of solid-state drives ("SSDs," also known as "flash drives").  A solid state drive is

16  used for storing information in a computer system.  Whereas older hard disk drive

17  ("HDD") technologies stored information on electromechanical spinning disks, an

18  SSD has no moving parts, but instead retains information on static computer chips.

19  Because SSDs have no moving parts, they have certain performance advantages

20  over HDDs:  they are faster, more energy efficient and have longer service lives.

21  However, SSDs are significantly more expensive than HDDs.

22    5.  STEC's flagship product, the ZeusIOPS, is a high-performance SSD

23  advertised by the Company as being able to access stored data at much faster

24  speeds than both HDDs and other SSDs, due to the Company's proprietary

25  architecture.

26    6.  The Company was founded by the three Moshayedi brothers –

27  Manouch, Mehrdad ("Mark") and Masoud ("Mike")—in 1990.  Thereafter, the

28  Moshayedi brothers continued as STEC officers and directors.  At all relevant

times, Manouch was STEC's Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors.  At all relevant times, Mark was the Company's Chief Operating Officer ("COO"), Chief Technical Officer ("CTO"), President and Secretary, as well as a member of STEC's Board of Directors and Equity Awards Committee.  Mike, formerly the Company's President, retired in 2007, but retained at that time an 8.99% ownership interest in the Company.  Mike Moshayedi is not a Defendant.

7.    The Moshayedi brothers are also major shareholders of the Company. At the beginning of the Class Period they collectively held 45% of the Company's stock.

8.    As detailed herein, during the Class Period, Defendants issued or caused to be issued materially untrue statements and omissions that, among other things, created an inflated impression of STEC's revenue growth, and of conditions that supposedly ensured a near and long term continuation and even acceleration of that growth.

9.    In summary form, these materially untrue statements and omissions included:

(a)  that an agreement signed by STEC with its largest customer, EMC, in the middle of 2009 for a huge volume of purchases to be made in the second half of 2009 (the "EMC Agreement" or "Agreement") was an ordinary course contract whose size was determined solely by an increase in the customer's supply requirements such that a similar volume of purchases by the same customer could be expected on a regular recurring basis;

(b) that purchases by EMC would remain "a significant percentage" of STEC's total revenues, including in the first quarter of 2010;

(c) that, as of August 2009, STEC was expecting the volume of purchases by its other large customers (the "Other OEMs") to increase during the second half of 2009;

(d) that, as part of the expected increase in purchases by the Other OEMs during the second half of 2009, STEC was expecting IBM to transition to a much larger volume of purchases during that period;

(e) that, as of September 2009, one or more of the Other OEMs would have been willing and able to replace EMC as the purchaser under the EMC Agreement, or to purchase a similar amount of ZeusIOPS under a similar agreement;

(f) that during the 2009 second quarter, STEC's reported revenue would grow, and then did grow, by an amount that—unknown to investors—had been artificially inflated; and

(g) that, as of August 3, 2009, no competition existed for the ZeusIOPS, or was expected to emerge during 2009, or early 2010.

10.     As indicated by the chart below, the effect of these false statements and omissions was to dramatically inflate the price of STEC's stock during the second and third quarters of 2009.  On June 15, 2009, the day before the first alleged Class Period misstatement, the price of STEC stock closed at $18.02.  By August 3, 2009, the price had roughly doubled, to $35.50.  However, during the subsequent seven months, when the falsity of these statements and omissions was disclosed by successive partial corrective disclosures, STEC's stock price lost everything it had gained during the Class Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**COMPARISON OF STEC STOCK PRICE TO INDICES OF COMPARABLE COMPANIES**
from June 30, 2008 to July 30, 2010

*The Offering price was $31.00 per share.

15   11.   On August 3, 2009, when the false impression created by Defendants'

16   misstatements and omissions had resulted in a doubling of STEC's stock price,

17   STEC announced that it would issue a secondary offering of stock, comprised

18   entirely of stock held personally by Manouch and Mark Moshayedi (the

19   "Offering").  Also on August 3, 2009, Defendants made most of the false

20   statements and omissions alleged herein.

21   12.   Eight days later, on August 11, 2009, these two defendants ("the

22   Moshayedis") sold more than 50% of their STEC stock in the Offering, and

23   received thereby a total of $267.8 million.

24   13.   This was the biggest insider stock liquidation in the history of STEC,

25   and a departure from the pattern of the Moshayedis' other recent sales of STEC

26   stock.  The number of shares sold by the Moshayedis in the Offering was

27   collectively more than eleven times the number of shares they sold in the six

28

1    months before the Class Period and nearly twenty times the number of shares they

2    sold in all of 2008.

3        14.    Seven months later, as the price of STEC's stock was hitting a new

4    low, STEC announced that the SEC was conducting a formal investigation

5    involving trading in the Company's securities, and that the SEC had issued

6    subpoenas to certain of its employees in connection with that investigation,

7    including two of the Company's top officers:  Manouch, the Company's CEO, and

8    Mark, the Company's President and COO.  According to STEC's most recent

9    10-Q, filed on November 2, 2010, that investigation still is ongoing.

10       15.    Under Counts I through III, which Lead Plaintiff brings under the

11   Exchange Act, and only under such counts, Lead Plaintiff alleges that each of the

12   Officer Defendants (defined in paragraph 31, *infra*) and STEC (together, "the

13   Exchange Act Defendants") committed fraud, by making one or more of the

14   alleged materially untrue statements and/or omissions and by doing so with

15   knowledge of the falsity of each such misstatement or omission, and that each of

16   the Officer Defendants is liable as a control person.

17       16.    Under Counts IV through VI, which Lead Plaintiff brings under the

18   Securities Act, Lead Plaintiff alleges that each defendant—*i.e.*, each of the

19   Exchange Act Defendants plus Bahri (the Director Defendant)—is liable for each

20   of the untrue statements and omissions  that were made or incorporated into the

21   registration statement and/or prospectus for the secondary offering, and that each

22   of the Officer Defendants is also liable under the Securities Act as a control person.

23   Lead Plaintiff *does not allege fraud* as to any of its claims under the Securities Act.

24       17.    Because the only claims alleged against Bahri (the Director

25   Defendant) are claims under the Securities Act, Lead Plaintiff does not allege any

26   claim based on fraud against Bahri.

27

28

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k(a), 77l(a), 77o, Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), 78-t1(a), Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 78r.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1367.

20.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Defendant STEC maintains its principal place of business within this District, the Officer Defendants conduct business in this District, and many of the acts giving rise to the violations alleged herein, including the preparation and dissemination of materially false and misleading information and omissions, occurred in substantial part in this District.

21.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, without limitation, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III.     THE PARTIES

### A.     The Plaintiffs

22.     The State of New Jersey, Department of Treasury, Division of Investment is a large institutional investor, managing approximately $70.84 billion for the benefit of approximately 780,000 current and former public employees of the State of New Jersey.  As set forth in its certification previously filed herein, Lead Plaintiff purchased STEC common stock during the Class Period and suffered losses as a direct and proximate result of Defendants' wrongful conduct

1  alleged herein.  On July 14, 2010, the Court appointed New Jersey as Lead

2  Plaintiff.

3      23.    Representative Plaintiff the International Brotherhood of Electrical

4  Workers, Local 103 ("Local 103"), located in Dorchester, Massachusetts, oversees

5  the Electrical Workers Pension Fund, with assets of approximately $1.1 billion.

6  Local 103 alleges violations of Section 20A of the Exchange Act on behalf of itself

7  and all Class members who purchased STEC securities contemporaneously with

8  Defendants Manouch and Mark Moshayedi's sales of STEC stock during the Class

9  Period.  As set forth in its certification previously filed herein, Representative

10 Plaintiff Local 103 purchased STEC securities contemporaneously with the sales

11 of STEC securities by Manouch and Mark Moshayedi and suffered damage as a

12 result of the misconduct alleged herein.

13     24.    Representative Plaintiff the Norfolk County Retirement System

14 ("Norfolk County"), located in Massachusetts, provides retirement benefits to

15 8,200 active and retired employees from forty governmental units throughout the

16 County of Norfolk, Massachusetts, and manages more than $600 million in assets.

17 Norfolk County alleges violations of Sections 10(b) and 20(a) of the Exchange Act

18 on behalf of itself and all Class members.  As set forth in its certification

19 previously filed herein, Norfolk County purchased STEC common stock during the

20 Class Period and suffered losses as a direct and proximate result of Defendants'

21 wrongful conduct alleged herein.

22     25.    Representative Plaintiff Mark V. Ripperda ("Ripperda") is an investor

23 residing in Arizona.  Ripperda alleges violations of Sections 11, 12(a)(2) and 15 of

24 the Securities Act on behalf of himself and all Class members who acquired shares

25 of STEC common stock pursuant to, or traceable to, the registration statement (the

26 "Registration Statement") and/or prospectus (the "Prospectus") issued in

27 connection with the Offering.  As set forth in his certification previously filed

28 herein, Representative Plaintiff Ripperda purchased STEC securities in the

1    Offering, pursuant to the Registration Statement and Prospectus, and suffered

2    damages as a result of the false statements and/or omissions contained therein.

3        **B.**    **The Issuer Defendant**

4        26.    Defendant STEC is a California corporation with its principal place of

5    business located at 3001 Daimler Street, Santa Ana, California.  STEC purports to

6    be a leading global provider of solid-state computer memory drive technologies

7    and solutions tailored to meet the high-performance, high-reliability needs of

8    OEMs such as EMC, IBM, HP, Hitachi and Sun.  During the Class Period, STEC's

9    core business was its enterprise scale SSDs, such as the ZeusIOPS.  STEC claims

10   to manufacture the "most comprehensive line" of SSDs in the storage industry.

11       27.    Defendants Manouch and Mark Moshayedi, and their brother, Mike

12   Moshayedi founded STEC, then named Simple Technology, Inc., in 1990.  The

13   Company grew rapidly through acquisitions and expansions both domestically and

14   abroad.  In September 2000, the Company went public.  In 2007, STEC divested

15   its Consumer Division, and introduced its high-end, flagship product, the

16   ZeusIOPS.

17       28.    Throughout the Class Period (June 16, 2009 through February 23,

18   2010), the Company's stock traded in an efficient market on NASDAQ under the

19   ticker symbol, "STEC."  As of November 2, 2010, the Company had nearly 51

20   million shares of common stock outstanding.

21       **C.**    **The Officer Defendants**

22       29.    At all relevant times Defendant Manouch Moshayedi has been CEO,

23   Chairman of STEC's Board of Directors and a member of the Equity Awards

24   Committee.  During the Class Period, Manouch Moshayedi signed and certified

25   STEC's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act

26   of 2002, including, without limitation, the Company's quarterly report for the

27   second quarter of 2009 ("2009 second quarter Form 10-Q" or "2009 second quarter

28   10-Q") and the annual report for 2009 ("2009 Form 10-K" or "2009 10-K").  He

1   also signed the documents in connection with the Offering, including the

2   Registration Statement on Form S-3, and the Prospectus contained in the

3   Registration Statement.  Manouch Moshayedi sold 4.1 million shares of his STEC

4   common stock for $133,920,000 in the Offering.

5       30.   At all relevant times Defendant Mark Moshayedi has been STEC's

6   President, COO, CTO, and Secretary, as well as a member of the Company's

7   Board of Directors and a member of the Equity Awards Committee.  During the

8   Class Period, Mark Moshayedi signed STEC's SEC filings, including, without

9   limitation, the Registration Statement, and the 2009 10-K.  Mark Moshayedi sold

10  4.9 million shares of his STEC common stock for $133,920,000 in the Offering.

11      31.   Defendant Raymond D. Cook was first hired by STEC in November

12  2008.  At all times during the Class Period he was STEC's Chief Financial Officer

13  ("CFO") and Principal Accounting Officer.  Defendant Cook signed STEC's Class

14  Period SEC filings, including, without limitation, the Registration Statement, the

15  2009 second quarter 10-Q, the 2009 second quarter Earnings Release, the 2009

16  third quarter 10-Q, the 2009 third quarter Earnings Release, the 2009 10-K, the

17  2009 fourth quarter Earnings Release and STEC's September 10, 2009, letter to the

18  SEC.

19      32.   Because of their positions with the Company, Defendants Manouch

20  Moshayedi, Mark Moshayedi, and Raymond D. Cook (collectively, the "Officer

21  Defendants") each possessed the power and authority to control the contents of

22  STEC's quarterly reports, press releases, and presentations to securities analysts,

23  money and portfolio managers, and institutional investors.  They were provided

24  with copies of the Company's reports and press releases alleged to be misleading

25  prior to or shortly after their issuance, and had the ability and opportunity to

26  prevent their issuance or cause them to be corrected.  Because of their positions

27  with the Company, and their access to material non-public information, the Officer

28  Defendants knew that the adverse facts specified herein were being concealed from

1    the public, and that the positive representations being made were then materially

2    false and misleading.

3         33.    As officers and controlling persons of a publicly-held company whose

4    common stock was, and is, registered with the SEC pursuant to the Exchange Act,

5    traded on NASDAQ, and governed by the provisions of the federal securities laws,

6    the Officer Defendants each had a duty promptly to disseminate accurate and

7    truthful information with respect to the Company's financial condition and

8    performance, growth, operations, financial statements, business, products, markets,

9    management, earnings, and present and future business prospects, and to correct

10   any previously-issued statements that had become materially misleading or untrue,

11   so that the market price of the Company's publicly traded common stock would be

12   based on truthful and accurate information.  The Officer Defendants'

13   misrepresentations and omissions during the Class Period violated these specific

14   requirements and obligations.  The Officer Defendants are therefore liable for the

15   false and misleading statements pleaded herein.

16   **D.**    **The Director Defendant**

17        34.    Rajat Bahri was, at all relevant times, a member of STEC's Board of

18   Directors, and Chair of the Board's Audit Committee.  During the Class Period,

19   Defendant Bahri signed the Company's SEC filings, including, without limitation,

20   the Registration Statement and the 2009 Form 10-K.

21        35.    STEC's Board of Directors has determined that Mr. Bahri is an "audit

22   committee financial expert," as that term is defined in Item 407(d)(5) of Regulation

23   S-K, which means that the Company's Board determined that Defendant Bahri has

24   the following attributes:

25        (a)    An understanding of generally accepted accounting principles

26   and financial statements;

27        (b)    The ability to assess the general application of such principles

28   in connection with the accounting for estimates, accruals and reserves;

11    THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1         (c)    Experience preparing, auditing, analyzing or evaluating

2 financial statements that present a breadth and level of complexity of accounting

3 issues that are generally comparable to the breadth and complexity of issues that

4 can reasonably be expected to be raised by the registrant's financial statements, or

5 experience actively supervising one or more persons engaged in such activities;

6         (d)    An understanding of internal control over financial reporting;

7 and

8         (e)    An understanding of audit committee functions.

9     36.    No allegation based on fraud is made against Defendant Bahri.

10 **IV.**    **INDEMNIFIED NON-PARTIES**

11     37.    Non-party Barclays Capital Inc. ("Barclays Capital") is an investment

12 bank that acted as an underwriter with respect to STEC common stock sold in the

13 Offering.  Barclays Capital's headquarters are located at 745 Seventh Avenue,

14 New York, New York 10019.

15     38.    Non-party Deutsche Bank Securities Inc. ("Deutsche Bank

16 Securities") is an investment bank that acted as an underwriter with respect to

17 STEC common stock sold in the Offering.  Deutsche Bank Securities' headquarters

18 are located at 60 Wall Street, New York, New York 10005.

19     39.    Non-party J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is an

20 investment bank that acted as an underwriter with respect to STEC common stock

21 sold in the Offering.  J.P. Morgan Securities' headquarters are located at 277 Park

22 Avenue, New York, New York 10172.

23     40.    Non-party Oppenheimer & Co., Inc. ("Oppenheimer") is an

24 investment bank that acted as an underwriter with respect to STEC common stock

25 sold in the Offering.  Oppenheimer's headquarters are located at 125 Broad Street,

26 New York, New York 10004.

27     41.    Barclays Capital, Deutsche Bank Securities, J.P. Morgan Securities

28 and Oppenheimer (together, "the Underwriters") acted as underwriters of the

Offering and distributed at least nine million shares of STEC common stock to investors. The distribution of shares to the Underwriters (excluding the 1,350,000 share over-subscription allotment) was:

| Name | Number of shares |
| --- | --- |
| J.P. Morgan Securities | 2,925,000 |
| Deutsche Bank Securities | 2,925,000 |
| Barclays Capital | 1,800,000 |
| Oppenheimer | 1,350,000 |

42.    In connection with the Offering, the Underwriter Defendants were granted an option for a period of thirty days to purchase up to an additional 1,350,000 shares to cover overallotments.

43.    The Underwriter Defendants received an underwriting discount of at least $11.16 million, indirectly paid by Lead Plaintiff and other Class members who purchased STEC common stock in the Offering.

44.    The Underwriters failed to conduct an adequate due diligence investigation, which was a substantial contributing factor leading to the harm complained of herein.

45.    As stated in the Prospectus, in connection with the Offering, Defendants Manouch Moshayedi, Mark Moshayedi and STEC agreed to indemnify each and all of the Underwriters against liabilities relating to the Offering, that might arise under the Securities Act.

**V.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS**

    **A.   During the 2009 Third Quarter, the Exchange Act Defendants Misrepresented the Nature of a New Agreement With EMC, STEC's Largest Customer**

        **1.   The Exchange Act Defendants had Consistently Described Their ZeusIOPS Business as One That Eventually Would Produce, *in the Ordinary Course*, Surging Sales to Each ZeusIOPS OEM Customer**

46.   Starting prior to the Class Period, and continuing through the time of the Exchange Act Defendants' misstatements and omissions, STEC consistently told investors that because, among other reasons, sales of ZeusIOPS are customized by STEC for each particular OEM customer, purchasing of ZeusIOPS by any given OEM could be expected to pass through a series of phases, with the volume of the OEM's purchases increasing by quantum leaps as the OEM passed from one phase to the next.

47.   STEC's Form 10-K for the year 2008, filed on March 12, 2009, states, "[p]roducts sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements," and "[w]e offer our [OEM] customers a comprehensive technology solution from concept to design to the creation of prototypes through volume production and testing."

48.   According to STEC, the first stage for any ZeusIOPS customer involves STEC selling the customer samples for the purpose of testing and evaluation.  If the first phase is successful, it results in the OEM "qualifying"

1  ZeusIOPS for use in one or more "system platforms," and increasing its purchases

2  of ZeusIOPS.[1]

3      49.    In the second phase—referred to by Manouch during STEC's 2009

4  second quarter earnings conference call as "pre production"—the OEM markets a

5  system of its own that incorporates ZeusIOPS, by sending its own samples to

6  multiple end-users, while purchasing an increased volume of ZeusIOPS from

7  STEC in order to create these samples.

8      50.    In the third and final phase, the OEM receives a stream of orders for

9  its system large and steady enough to justify what STEC's 2008 10-K refers to as

10  "volume production" of the OEM's system—also referred to by Manouch during

11  the 2009 second quarter conference call as "production," "full production," and

12  "full ramping production" of the OEM's system.  In this third and final phase, the

13  OEM purchases a substantially increased volume of ZeusIOPS to support the

14  OEM's substantially increased production of its system that incorporates

15  ZeusIOPS.

16      51.    In 2007, ZeusIOPS had not yet been qualified by any enterprise

17  storage OEM.  During STEC's earnings conference call on May 14, 2007,

18  Manouch stated that "we are still in the qualification stages [with ZeusIOPS]," and

19  "once this thing is qualified with customers, the volumes will be significant."

20      52.    On January 14, 2008, STEC announced that, after a year of

21  "collaborative effort" between STEC and EMC Corporation (described by *The*

22  *Wall Street Journal* as "the market-share leader in big computer storage systems")

23  EMC had "selected Zeus-IOPS" for "deployment" in certain "high-end networked

24

25

26      [1] According to STEC, an OEM makes at least some purchases of ZeusIOPS

27  even prior to ZeusIOPS having been qualified for the OEM's systems. Thus, during STEC's 2008 second quarter earnings conference call, Manouch stated that

28  STEC had sold a total $12.2 million of ZeusIOPS "mostly for qualifications."

1  storage systems." STEC stated "[t]his union signifies the first adoption of our

2  Zeus-IOPS SSDs in the enterprise storage and enterprise computing markets."

3      53.    Two months later, on March 5, 2008, during the year-end earnings

4  conference call for 2007, a STEC spokesperson stated that "[w]e expect production

5  levels to ramp for [EMC] in future quarters."

6      54.    Another two quarters later, in its 2008 third quarter 10-Q, STEC

7  reported that ZeusIOPS had been "qualified" for use on the platforms of "one of

8  the largest Enterprise Storage and Server OEMs." During STEC's 2008 third

9  quarter earnings conference call Manouch stated that sales of ZeusIOPS during the

10  first three quarters of 2008 had already grown substantially compared to sales

11  during 2007, "and this 2008 was just a sampling of what we can do in that type of

12  product [because] we haven't yet gone into *major production*[2] of this product line.

13  Once we do, I think the numbers will be *significantly* higher than what we are

14  doing today based on just eval[uations] and samples."

15      55.    Another two quarters later, during STEC's 2009 first quarter

16  conference call, Manouch stated that ZeusIOPS was now qualified at all five of the

17  largest enterprise storage OEMs, and indicated that EMC was now in "full

18  production" of systems incorporating ZeusIOPS.

19      56.    One quarter after that, during STEC's 2009 second quarter earnings

20  conference call, Manouch described EMC as being in "full ramping production,"

21  and added that once the other four OEMs—described by Manouch as being in "pre

22  production"—"start kicking in we will see *huge ramps* in sales of ZeusIOPS going

23  forward."

24      57.    According to STEC, although the volume of a given OEM's

25  purchases of ZeusIOPS would increase by quantum leaps as the customer passed

26  from pre qualification, to pre production, to volume production, an OEM's

27

28  _____

[2] Unless otherwise noted, all emphasis is added.

1  purchases could increase—although more gradually—at other times as well,

2  because, as stated in STEC's 2008 10-K, "the SSD market will continue to expand

3  over the next few years, aided by the continuation of the decline in Flash

4  component pricing," and because the continuous development of new applications

5  for SSDs would increase the variety of possible OEM systems and interested end

6  users.[3]

7      58.    Thus, as early as during the May 14, 2007, earnings conference call,

8  Manouch noted that one ZeusIOPS customer that was still in the qualification stage

9  "wants a much larger volume for qualification across their platforms," and that

10  "customers like that will pick up significantly."

11      59.    Thus too, according to STEC, the achievement of volume production

12  by a specific OEM did not mean the end of the growth in the volume of its

13  purchases from STEC, because the volume of its requirements was likely to

14  *continue* growing as ZeusIOPS was integrated into more and more of the OEM's

15  systems for sale to an increasing variety of end users—which is why, on August 3,

16  2009, during the second quarter earnings conference call, Manouch

17  interchangeably used the terms "full production" and "full *ramping* production."

18      60.    In sum, STEC made clear to investors that in the ordinary course of its

19  ZeusIOPS business, total sales of ZeusIOPS were likely to grow over time, and,

20

21      [3] During the May 14, 2007, earnings conference call, Manouch noted that

22  "everybody in every industry that we are seeing, small or large products that they

23  build, they are now trying to integrate Flash into it." As explained by *The Wall
Street Journal* on January 14, 2008, EMC originally expected that its systems

24  incorporating ZeusIOPS would only be purchased by financial institutions needing
to "handle hundreds of transactions a second," and, during STEC's 2008 first

25  quarter conference call, Manouch stated that systems incorporating ZeusIOPS had

26  not yet been sent by the OEMs "to anybody else besides the financial institutions."
However, Manouch immediately added, "I think as we go forward during the

27  year[,] in the second half of the year, we will see more and more applications

28  coming up."

not only were sales of ZeusIOPS to any given customer likely to grow over time, but also, they were likely to exhibit great spurts of growth as the customer transitioned from one phase of purchasing to the next.

61.   As reported by STEC during its quarterly earnings conference calls, from the time of STEC's first collaborative efforts with EMC during 2007 to create EMC systems incorporating ZeusIOPS, through the second quarter of 2009 when EMC achieved "full ramping production" of such systems, STEC's revenues from ZeusIOPS sales increased from quarter to quarter, and year to year by dramatic amounts.  These reported results appeared to confirm the scenario depicted by STEC of steadily increasing total ZeusIOPS sales, driven by the transitioning of purchasers—up to this point, especially EMC—from pre qualification, to pre production, to volume production of systems incorporating ZeusIOPS.

62.   For the year 2007—the year when STEC reportedly began its collaboration with EMC—STEC reported ZeusIOPS revenues of $11 million, with just the last quarter of 2007 accounting for $7 million of that total.

63.   For the next year—2008—STEC reported ZeusIOPS revenues of $52.7 million—making for a year-over-year increase of almost 400%.  During the year 2008 earnings conference call, Manouch stated that "[o]ur ZeusIOPS business is growing through the roof."

64.   Also during the year 2008 earnings conference call, Manouch predicted that STEC's ZeusIOPS revenues for just the *first half* of 2009 would match STEC's ZeusIOPS revenues for the entire year 2008.  An analyst for Capstone Investments commented that "STEC's guidance [for the first half of 2009] should be viewed as nothing short of spectacular."

65.   Halfway through 2009, STEC reported ZeusIOPS revenues of $57.7 million for just the second quarter alone—exceeding in that one quarter the total ZeusIOPS revenues reported for the entire previous year—and reported even larger ZeusIOPS revenues—$83.4 million—for the first *half* of 2009.

66.     These spectacular reported increases in ZeusIOPS revenues were driven by spectacular reported increases in ZeusIOPS sales to EMC.  Thus, during the first quarter of 2009—the last quarter prior to the Class Period—reported ZeusIOPS sales to EMC totaled $7.55 million; while during the second quarter of 2009, reported ZeusIOPS sales to EMC totaled $33.6 million—an increase of more than 300%.[4]

### 2.     The Exchange Act Defendants Falsely Communicated that the EMC Agreement was an Ordinary Course Contract Whose Large Size had Resulted from an Increase in EMC's Recurring Requirements

#### (a)     The July 16, 2009, Press Release

67.     On July 16, 2009, early in the third quarter, STEC issued a press release announcing an agreement with "one of its largest enterprise storage

---

[4] The amounts of EMC's ZeusIOPS purchases here alleged are derived from the following facts:  During the 2009 third quarter earnings conference call, Manouch affirmed an analyst's suggestion that EMC had purchased "$35 million" of ZeusIOPS during the 2009 *second* quarter.  However, that number can be made more precise:  According to STEC's Form 424B3 filed on August 3, 2009, EMC's *total* purchases from STEC during the 2009 second quarter accounted for 38.9% of STEC's *total* revenues for that quarter.  Because STEC's 2009 second quarter reported revenue was $86.4 million, the precise amount of EMC's 2009 second quarter purchases of ZeusIOPS cannot have been more than $33.7 million.  Manouch's statement demonstrates that, during this period, essentially *all* of EMC's purchases from STEC were for ZeusIOPS.  The amount of EMC's purchases of ZeusIOPS during the 2009 *first* quarter can be derived by subtracting the amount of EMC's purchases from STEC during the 2009 second quarter from the amount of EMC's purchases from STEC during the entire first half of 2009.  EMC's purchases from STEC during the entire first half of 2009, can, in turn, be derived from the fact that, according to STEC's 2009 second quarter 10-Q, EMC accounted for 27.5% of STEC's total revenues during the first half of 2009.  STEC's reported revenues during the first half of 2009 totaled $149.9 million.

1  customers"—later revealed to be EMC—to purchase $120 million worth of

2  ZeusIOPS SSDs *in the second half of 2009.*

3      68.    The EMC Agreement provided for average quarterly purchases of $60

4  million of ZeusIOPS by EMC during each of the quarters in the second half of

5  2009.  Compared to EMC's ZeusIOPS purchases during the 2009 second quarter—

6  approximately $33.7 million—the EMC Agreement provided for an increase in

7  average quarterly purchases of 78%.  Although this represented a significant

8  quarterly increase over the already high level of EMC's purchases during the 2009

9  second quarter, it was consistent with the scenario of increasing ZeusIOPS sales to

10  a customer in full production as consistently communicated by the Exchange Act

11  Defendants, and was actually a much smaller percentage increase than already had

12  happened in the 2009 second quarter, when EMC's ZeusIOPS purchases had

13  increased by 300%.

14      69.    Significantly, STEC's July 16 press release communicated that the

15  increased size of the average quarterly purchases promised by EMC under the

16  Agreement resulted not from any extraordinary circumstances or terms of the

17  contract, but, rather, from the asserted fact that "sales of [EMC's] enterprise

18  storage systems utilizing our ZeusIOPS drives *have grown significantly.*"

19      70.    Investors reasonably understood STEC's announcement as meaning

20  that the EMC Agreement was a contract signed in the ordinary course of STEC's

21  business, that the size of the contract had been determined solely by a rise in the

22  volume of EMC's recurring demand for ZeusIOPS, and that, going forward, EMC

23  would be purchasing roughly $60 million of ZeusIOPS every quarter.  Thus, on the

24  day of STEC's press release, an Oppenheimer analyst report stated:

25          STEC brought out the big gun today (checks suggest

26          EMC), and announced a $120M ZeusIOPS contract for

27          2H.  Relative to our prior model [for 2H] that included

28          [a] $60-$70M contribution from EMC, this news raises

our model by $50M. ***Looking ahead to '10, we now***
***expect rev from EMC alone of >$250M***

71.    In other words, based on STEC's press release, Oppenheimer was now predicting that, in the next year—2010—EMC would purchase a bit more than $60 million of ZeusIOPS *in each of the four quarters.*

72.    Not only did Oppenheimer understand STEC to be saying that the level of EMC's purchases would continue at $60 million per quarter, but also, Oppenheimer believed that such purchases would be made under subsequent contracts similar to the EMC Agreement.  Thus, the Oppenheimer report stated that "[we] believe/suspect that a similar supply contract with EMC for all of '10 must be in the works."

73.    Following STEC's July 16 assertions regarding the EMC Agreement, the price of STEC stock rose another 15.2%, or $4.20 per share in a single day, over the previous day's closing price, to close at $31.79 per share on July 16, 2009, on extraordinarily high trading volume.  STEC's stock price thus reached another all-time high.

**(b)    The August 3, 2009, Statements in the Prospectus, and Second Quarter Earnings Release**

74.    On August 3, 2009, in STEC's second quarter earnings release, the Exchange Act Defendants repeated their July 16 announcement, stating, essentially, that the EMC Agreement covered EMC's requirements for just the second half of 2009.  Thus, the earnings release stated that, during the Second Quarter, STEC had signed a "$120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer *for the second half of 2009.*"

75.    Also on August 3, 2009, in the Prospectus, STEC stated:
We expect continued *growth* in the sales of our Flash-
based SSD ZeusIOPS products through 2009 based on
the *accelerated adoption* of our ZeusIOPS SSDs by most

of our major enterprise-storage and enterprise-server OEM customers into their systems. *As part of this expected growth*, on July 16, 2009 we announced *an agreement with one of our largest enterprise-storage customers for sales of $120 million of ZeusIOPS SSDs to* be delivered in the second half of 2009.

Like the Exchange Act Defendants' other statements about the Agreement, on July 16, 2009, and August 3, 2009, not only did this statement omit the key fact that the Agreement was *not* made in the ordinary course of STEC's business, but also, this statement communicated a contrary impression by describing the Agreement solely as the result of EMC's "adoption" of ZeusIOPS into its systems and a resulting "growth" in EMC's purchases.

76.   Also in the Prospectus, STEC stated:

Sales to EMC as a percentage of our total revenues increased to 38.9% in the second quarter of 2009. In future periods, our revenues derived from EMC as a percentage of total revenues may increase and, in any event, we expect sales to EMC will represent a significant percentage of our total revenues for the foreseeable future.

This statement communicated that, for the foreseeable future, sales to EMC would remain a significant percentage of STEC's revenues in every quarter, which meant, among other things, that EMC's needs for the 2010 first quarter would not, in significant part, be filled by purchases under the EMC Agreement.

77.   On August 28, 2009, again reflecting investors' understanding that the $120 million contract was made in the ordinary course of STEC's ZeusIOPS business, and that going forward such contracts with EMC would be repeated every six months, an analyst report published by Needham stated that "[l]ooking

1    forward, we see a high likelihood of a ***follow-on contract order*** with at least

2    STEC's top OEM customer in 1H10 getting signed within the next 3 months."

3    　　　　78.   Eight days after the August 3, 2009, statements about the Agreement,

4    the Moshayedis sold their stock in the Offering for $267.8 million.

5    　　　　79.   Three months after the Offering, on November 3, during STEC's 2009

6    third quarter earnings conference call, Manouch admitted that, contrary to the

7    impression created by STEC's statements on July 16, 2009, and August 3, 2009,

8    "when we did sign the [EMC Agreement], we did—***this was a one-off type of a***

9    ***deal***," and added that "I don't think we are going to be asking our customer for

10   another commitment."

11   　　　　80.   Also during the 2009 third quarter earnings conference call, contrary

12   to the impression created by STEC's statements on July 16 and August 3 that the

13   volume of purchasing under the EMC Agreement would be repeated by EMC

14   going forward, Manouch admitted that "[EMC] might carry inventory of our

15   ZeusIOPS at the end of 2009 which they will use in 2010."

16   　　　　81.   STEC made the same disclosure in its 2009 third quarter earnings

17   release, also filed on November 3, 2009, which stated that "[w]e recently received

18   preliminary indications that our customer [who placed a $120 million supply

19   agreement with us for shipments covering the second half of 2009] might carry

20   inventory of our ZeusIOPS at the end of 2009 which they will use in 2010."

21   　　　　82.   As shown by the following exchange between Manouch and an

22   analyst during the November 3, 2009, earnings conference call, the November 3,

23   2009, disclosure contradicted investors' prior understanding that the EMC

24   Agreement represented a new level of purchasing by EMC, expected by STEC to

25   recur every six months.  Moreover, the exchange also shows that Manouch *knew*

26   that investors had been led to believe that the EMC Agreement covered only six

27   months worth of EMC's requirements.  Thus, the analyst asked,

28

23        THIRD CONSOLIDATED AMENDED COMPLAINT
　　　　　Lead Case No. SACV 09-01304-JVS (MLGx)

> If indeed EMC does carry some inventory . . . if the sell
> through *isn't as great as $120 million*, that would imply
> *the first quarter would most likely be smaller than what*
> *analysts are modeling* at right now, is that correct?

Manouch then responded:

> That is true and ***that is why we have put that in our***
> ***release.***

83.     Subsequently, on February 23, 2010, in STEC's earnings release for the 2009 fourth quarter and full year, the Exchange Act Defendants made another disclosure contrary to the misleading impression created by their statements on July 16 and August 3 that the EMC Agreement represented a new increased level of purchasing by EMC that would be repeated going forward.  Thus, the February 23, 2010, earnings release stated, "[W]e now anticipate this inventory carryover to continue to negatively impact our sales to this customer during the first *half* of 2010, as we do not expect any meaningful production orders from this customer during that time."

84.     The fact that the information in the February 23, 2009, earnings release contradicted the impression that had been created by the Exchange Act Defendants' statements on July 16 and August 3 is shown by an analyst report published by B. Riley on February 24, 2010, which stated "STEC's new guidance indicates that it expects EMC to take at least a whole year to work through its $120MM July 2009 order for ZeusIOPS SSDs; *this order was envisioned as meeting six months of demand*."

85.     Similarly, an analyst report published by Oppenheimer on February 24, 2010, stated, "Now that ***EMC's supply contract with STEC for $120M is indicative of a full-year run rate vs. half year***, we are resetting our '10E EPS . . . and dropping our PT . . . ."

86.    Still another analyst report—this one published by Deutsche Bank on February 23, 2010—suggested that the analyst had been misled regarding the ongoing level of EMC's requirements, stating "we had assumed EMC's demand for SSDs was higher than it now appears. . . . We now see EMC revenue of roughly *$35M/Q* in F2H-10, which *we believe has been EMC's true demand over the past few Qs*." Significantly, a purchase volume of $35 million per quarter—the volume proposed by the Deutsche Bank analyst as EMC's "true demand"—is only about *half* of the quarterly volume of purchases under the EMC Agreement, which is just another way of saying that the true period covered by the EMC Agreement was twice as long as investors had been led to believe. Also significantly, an EMC purchase volume of $35 million per quarter is only about the same as the volume that EMC had reportedly purchased during the 2009 *second* quarter ($33.6 million), the quarter that ended *just prior* to the announcement of the EMC Agreement—which, in turn, was quickly followed by the Moshayedis' sale of their stock.

87.    Like the Deutsche Bank report, a Thomas Weisel Partners report published on February 24, 2010, expressed a belief that investors had been misled. The report lowered the analyst's price target for STEC stock based on "our loss of confidence in STEC management."

88.    Ultimately, Manouch himself admitted that, although EMC had a certain recurring volume of demand for ZeusIOPS, in the words of the Deutsche Bank analyst, EMC's "*true* [quarterly] demand" was only about *half* of the quarterly volume of EMC's purchases under the EMC Agreement. Thus, during the 2010 first quarter earnings conference call, an analyst asked Manouch "So maybe your normalized quarterly revenue run rate for ZeusIOPS is somewhere between $30 million and $40 million. Is that a fair statement?" Manouch answered: "I can't speculate, but *those numbers seem to be logical*." Since quarterly purchases by the Other OEMs during each of the three quarters from the

2009 third quarter through the 2010 first quarter ranged from $6.7 million to $10.4 million,[5] that means the "normalized quarterly" requirements of EMC were [$30 million - $40 million] minus [$6.7 – 10.4 million], or, *at most*, about $33.3 million.

### 3. The Exchange Act Defendants Knew That Their Representations About the EMC Agreement Were False

#### (a) Manouch Subsequently Admitted That the Exchange Act Defendants Always had Known That the EMC Agreement Was a One-Off Contract

89. On July 16, 2009, when STEC announced the EMC Agreement, and on August 3, 2009, when STEC again touted the EMC Agreement, the Exchange Act Defendants already knew that the $120 million contract was an exceptional, one-time purchase agreement, *not* indicative of a new ongoing level of demand for STEC's ZeusIOPS product by EMC, and that, going forward, EMC would *not* be purchasing similar volumes every six months. Thus, on November 3, 2009, during STEC's third quarter earnings conference call, when Manouch admitted that the EMC Agreement was "a one-off type of a deal," he did not describe this fact as a new discovery. To the contrary, he stated "So *when we did sign* the [EMC Agreement], we did—*this was* a one-off type of a deal."

#### (b) Manouch's Admission Also Means the Exchange Act Defendants Knew That EMC Would Not Continue Purchasing at the Same Volume

90. The Exchange Act Defendants' knowledge on July 16, 2009, and August 3, 2009, that the EMC Agreement was "a one-off type of a deal," also was

---

[5] The calculation of ZeusIOPS purchases by the Other OEMs during each quarter of 2009 is explained below. The amount of their purchases during the first quarter of 2010 is derived from the fact that EMC made no ZeusIOPS purchases during that quarter and, according to Manouch's statement during the 2009 first quarter earnings conference call, STEC's ZeusIOPS revenues during that quarter were $10.4 million.

1 knowledge that, after the end of the period covered by the Agreement, EMC would

2 **not** continue buying at the same volume as under the Agreement, because, as

3 Manouch admitted, purchases from STEC at such a volume could not be made by

4 any of STEC's customers unless they entered into an agreement—such as the EMC

5 Agreement—in advance of the purchases.   Thus, during the August 3, 2009,

6 earnings conference call, when asked by an analyst whether STEC would sign

7 other agreements similar to the EMC Agreement, Manouch responded, "when you

8 get to a point where the amount of components that you need are extremely large,

9 we can't, or we won't, at least, go make those commitments to our suppliers and

10 bring the parts in on a whim.   We need to have [a] very solid forecast and **solid**

11 **commitments** in order to do that."   Because the Exchange Act Defendants always

12 had known that EMC would not be making any more such agreements—because

13 the Agreement was a "one off" contract—they also always had known that EMC

14 would not continue purchasing ZeusIOPS at volumes similar to its purchases under

15 the Agreement.

16                   **(c)      STEC's Intimate Relationship With Its OEM**

17                              **Customers Also Supports the Exchange Act**

18                              **Defendants' Scienter**

19          91.    The knowledge of the Exchange Act Defendants on July 16, 2009,

20 and August 3, 2009, that, after the term of the Agreement, EMC would *not* be

21 making recurring purchases of a volume similar to its purchases under the

22 Agreement is also supported by EMC's subsequent statement, made during its own

23 January 6, 2010, earnings conference call, that the EMC Agreement was not

24 intended to cover EMC's requirements only for the second half of 2009, but,

25 rather, "was **designed** to protect ourselves going into first quarter [2010] against

26 what we knew would be a tight supply environment."

27          92.    EMC's statement on January 6, 2010, is indicative not only of EMC's

28 knowledge, but also, of the Exchange Act Defendants' knowledge, given

1   Manouch's statement about STEC's need for advance warning regarding an

2   OEM's large supply requirements, and given STEC's prior statements, described

3   below, that STEC and EMC had a long-running, still ongoing, ***intensely intimate***

4   working relationship.

5        93.    Thus, on November 10, 2008, during STEC's 2008 third quarter

6   earnings conference call, a STEC spokesperson stated, "the largest Enterprise

7   Storage customer we are in production with, it took us ***over a year of daily and***

8   ***weekly meetings*** with our engineering team and their engineering teams, and we

9   went through more than 30 firmware revisions to optimize the performance of our

10   products with their system."

11        94.    Indeed, as far back as January 14, 2008, STEC announced that "EMC

12   and STEC [had] collaborated . . . . [o]ver the past year"—*i.e.*, starting a full two

13   and a half years before the EMC Agreement was signed,—declared that STEC was

14   "delighted to ***partner*** with EMC," and described EMC's selection of ZeusIOPS as

15   a "***union***" of STEC and EMC.

16        95.    Moreover, STEC's own statements show that its intimate relationship

17   with its OEM customers continues straight through such customers' production

18   phase. STEC's 2008 10-K, filed on March 12, 2009, states that "[d]uring our

19   customers' production phase, we provide extensive support which includes

20   training, system-level design, implementation and integration support." Indeed, as

21   an analyst observed during STEC's 2009 third quarter earnings conference call

22   without being contradicted by any Defendant, at that late date, a full quarter ***after***

23   the EMC Agreement had been signed, STEC *still* had its own engineers

24   "co-located with EMC."

25        96.    Still further support for the scienter of Manouch and the other

26   Exchange Act Defendants is provided by the timing of Manouch's admission that

27   "***when we did sign*** the [EMC Agreement], we did—***this was*** a one-off type of a

28   deal." This admission followed rather than preceded, not only the initial,

1    misleading explanation of the EMC Agreement, but also, the Moshayedi brothers'

2    sale of nine million of their own personal shares of STEC, for $267.8 million.

3    Moreover, the admission followed the misstatements about the Agreement and the

4    sale of the Moshayedis' stock so quickly that it came at the end of the same quarter

5    in which the misstatements were made and the stock was sold, and did so despite

6    the fact that, at the time of the admission, the EMC Agreement still had another

7    full quarter to run.

8         97.    Indeed, after Manouch's admissions during the November 3, 2009,

9    conference call, an analyst from Thrivent Asset Management indignantly pointed

10   out to Manouch that "in August, you guys are [sic] sold a majority position of your

11   stock," and then asked "are you considering buying any back?"

12        98.    Also significant is the fact that Manouch uses the term "we" in his

13   admission.  From the beginning, Mark Moshayedi knew as much about the

14   Agreement as Manouch did, because, as stated by a confidential witness who was

15   one of STEC's regional sales managers at the time when the Agreement was

16   executed and announced (Confidential Witness 1, or "CW1"), both Manouch and

17   Mark were heavily involved in the Company's large deals: "nothing happened at

18   that place without those two."[6]

19        99.    Also indicative of Manouch's scienter is the fact that, as Lead Plaintiff

20   first learned from discovery herein, near the end of July 2009, STEC was informed

21   by EMC that EMC's 2009 third quarter demand for ZeusIOPS was only $34.3

22   million—substantially less than half of the $120 million of ZeusIOPS that EMC

23   had agreed to purchase during the second half of 2009—and that EMC did not

24   intend to purchase more than $43 million in the 2009 third quarter.  STEC

25

26   _____

        [6] CW1 worked for STEC from February 2006 through July 2009.  He was the
27   Company's Regional Sales Manager for the San Francisco Bay Areas and Pacific
     Northwest.  He reported to Mike Nilsson, STEC's Worldwide Vice President of
28   Sales.

1   responded by making a secret side deal with EMC, pursuant to which EMC agreed

2   to increase its intended 2009 third quarter ZeusIOPS purchases to $55 million, in

3   return for STEC granting EMC an additional discount on EMC's 2009 fourth

4   quarter purchases. On August 3, 2009, based on, but without disclosing, this deal,

5   STEC was able to issue 2009 third quarter revenue guidance that concealed the fact

6   that EMC's actual third quarter demand fell well short of the average quarterly

7   demand implied by the volume of the EMC Agreement.

8       **4.    The Exchange Act Defendants' Failure to File the EMC**

9       **Agreement With the SEC, After Promising the SEC That**

10      **Any Material One-Off Contracts With EMC Would Be**

11      **Filed, is Additional Evidence of Their Scienter for Their**

12      **Misleading Statements About the EMC Agreement**

13      100.  Pursuant to Item 601(b)(10) of Reg. S-K and its instructions, "[e]very

14  contract not made in the ordinary course of business which is material to the

15  registrant," and, even if made in the ordinary course of business, "[a]ny contract

16  upon which the registrant's business is substantially dependent" must be filed with

17  the Form 10-Q or 10-K for the period during which the contract was executed.

18  Among other justifications for this requirement, disclosing to investors the terms of

19  the contract protects them from being misled into believing that a significant one-

20  time contract obtained, for example, by the registrant having made extraordinary

21  promises, is indicative of an ongoing trend in the issuer's results of operations.

22      101.  To this day, STEC has never filed the $120 million EMC Agreement

23  with the SEC.

24      102.  Moreover, no later than at the end of August 2009, STEC was on

25  notice that failure to file a "one-off" contract of such central importance to its

26  business as the EMC Agreement would be viewed as highly questionable by the

27  SEC. By letter dated August 28, 2009, the SEC wrote to STEC questioning,

28  among other things, STEC's failure to file other, much smaller agreements with

1    EMC that had been made during the previous year—when EMC accounted for a

2    much smaller proportion of STEC's business than it accounted for in 2009.

3        103.   Thus, by letter dated August 28, 2009, the SEC asked why no "master

4    agreement" with EMC, such as was referred to in STEC's 2008 10-K, had been

5    filed with that Form 10-K, given that, even at that early date, EMC already

6    accounted for 15.2% of STEC's total revenues.

7        104.   STEC's only proffered defense for this earlier failure was an argument

8    that STEC knew could not excuse its failure to file the EMC Agreement.  Thus, by

9    publicly filed letter, dated September 10, 2009, signed by Defendant Raymond

10   Cook, the Exchange Act Defendants responded to the SEC that, "STEC's master

11   agreements typically are non-exclusive and ***do not contain any binding long-term***

12   ***volume commitments*** . . . actual sales of STEC products are made through more

13   specific sales agreements such as individual purchase orders."

14       105.   The SEC was not satisfied with STEC's answer.  Thus, by letter dated

15   September 30, 2009, the SEC again wrote to STEC, stating

16           ***[I]t remains unclear to us how you have concluded that***

17           ***you are not substantially dependent upon any of your***

18           ***agreements with . . . EMC Corporation***, such that they

19           are not required to be filed pursuant to Item

20           601(b)(10(ii)(B) of Regulation S-K.  We note your

21           statements that STEC's master agreements typically are

22           non-exclusive and that they do not contain any binding

23           long-term volume commitments, and that actual sales are

24           made through more specific sales agreements such as

25           purchase orders. . . . ***With respect to any individual***

26           ***purchase order that accounted for a significant amount***

27           ***of the company's revenues, please advise how you***

28

1    ***concluded that any such purchase order is not required***

2    ***to be filed as a material contract under Item 601(b)(10)***.

3        106.   By publicly filed letter dated October 13, 2009, and again signed by

4    Raymond Cook, STEC responded that "STEC received over 100 individual

5    purchase orders from EMC related to 2008 deliveries. ***The amounts of these***

6    ***purchase orders ranged from $450 up to approximately $5.2 million for the***

7    ***largest individual purchase order***. . . .   As a result, STEC believes that none of the

8    individual EMC purchase orders received for 2008 shipments constitutes a material

9    contract under Item 601(b)(10) of Regulation S-K."

10       107.   Thus, the only excuse that STEC even attempted for its failure to file

11   any EMC agreement with the 2008 Form 10-K was that the largest actual purchase

12   order by EMC during 2008 was for only $5.2 million.  Obviously, such an

13   argument could not possibly excuse STEC's failure to file the EMC Agreement,

14   since that agreement was for $120 million—an amount *23 times larger* than

15   STEC's largest previous binding commitment from EMC.

16       108.   Moreover, while the SEC expressed concern about STEC's failure to

17   file any agreement with EMC during a period in 2008 in which EMC accounted for

18   as much as *15.2%* of STEC's revenues, EMC's importance to STEC subsequently

19   increased, until, by the second quarter of 2009, EMC accounted for *38.9%* of

20   STEC's revenues, as disclosed in STEC's Form 424B3 filed on August 3, 2009.

21       109.   Significantly, STEC's September 10, 2009, letter to the SEC ended

22   with a statement that "[*g*]*oing forward*, the Company will continue to assess each

23   quarter whether it is dependent upon any one agreement such that an exhibit filing

24   is required under Item 601(b)(10)(ii)(B)."  Nevertheless, even after making this

25   promise to the SEC, the Exchange Act Defendants still failed to file the EMC

26   Agreement—as they ***immediately*** should have done, attaching it to a Form 8-K.

27       110.   By failing to file the EMC Agreement with STEC's 2009 second

28   quarter 10-Q, or to file the Agreement with a Form 8-K immediately after

1   receiving the SEC's August 28, 2009, letter, the Exchange Act Defendants sent a

2   misleading message to investors that the EMC Agreement did not need to be filed

3   with the SEC, because it was a contract made in the ordinary course of business.

4       111.   By failing to file the EMC Agreement, the Exchange Act Defendants

5   also sent a misleading message that STEC's business was not "substantially

6   dependent on" the EMC Agreement.  This second misleading message was

7   reinforced by an explicit false statement made in STEC's September 10 letter to

8   the SEC, that "in the unlikely event a customer should default under a purchase

9   order or other sales agreement, STEC generally believes it could find a

10  replacement customer for the relevant product"—a statement that applied to all of

11  STEC's sales agreements, including the EMC Agreement.

12      112.   The Exchange Act Defendants' failure to file the EMC Agreement

13  with the SEC was a material violation of Reg. S-K.  Moreover, their failure to so

14  file it *after STEC's exchange of letters with the SEC* can only have been a *knowing*

15  violation.  The Exchange Act Defendants' failure to file the EMC Agreement with

16  the SEC therefore raises a strong inference that all of Defendants' false

17  statements/omissions regarding the EMC Agreement were made with an intention

18  to conceal the full truth about the Agreement from investors.

19  **B.      During the 2009 Third Quarter, the Exchange Act Defendants**

20          **Made Multiple Misleading Statements and Material Omissions**

21          **Regarding Sales of ZeusIOPS to STEC's Other OEM Customers**

22      **1.      The Exchange Act Defendants Falsely Represented That**

23              **They Expected the Other OEMs to Increase Their**

24              **ZeusIOPS Purchases During the Second Half of 2009**

25          **(a)      This Statement Was Made in the Prospectus for the**

26                  **Offering of the Moshayedis' Stock**

27      113.   At the same time that the Exchange Act Defendants made

28  misstatements regarding the EMC Agreement, they also stated falsely that they

expected ZeusIOPS sales to increase to most of their other OEM customers during the second half of 2009—which, at that time, had five months left to run.  Thus, in the Prospectus, filed on August 3, 2009, STEC stated:

> We expect *continued growth* in the sales of our Flash-based SSD ZeusIOPS products *through 2009* based on the accelerated adoption of our ZeusIOPS SSDs *by most of our major enterprise-storage and enterprise-server OEM customers* into their systems.

114.   Based on STEC's 2009 second quarter earnings release, also filed on August 3, 2009, investors knew that the reference in the Prospectus to STEC's "major enterprise-storage and enterprise-server OEM customers" included Fujitsu and Compellent, as well as the five OEM customers previously referenced during the 2009 first quarter conference call—EMC, IBM, HP, Hitachi and Sun.  The second quarter earnings release stated that one of the "highlights" of STEC's 2009 second quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage and Enterprise-Server OEM customers including IBM, Fujitsu, Compellent and HP."

**(b)     Subsequent Analyst Reports Reflected This Statement**

115.   Analysts' responses to STEC's assertion shows their understanding that STEC was predicting continued revenue growth based on the Other OEMs increasing their ZeusIOPS purchases during the second half of 2009.

116.   On August 3, 2009, an analyst report by Thomas Weisel Partners— which billed Thomas Weisel as "Experts in Growth"—noted that STEC had given an "upbeat outlook as the growth acceleration driven by the enterprise-SSD ZeusIOPS segment continues to ramp," and that "[t]he company expects . . . enterprise storage OEMs [to] continue ramping."

117.   On August 4, 2009, an analyst report issued by ThinkEquity LLC noted that STEC's product mix had shifted toward ZeusIOPS and that "[w]e

1   believe *2H09 should see* continuing upside to the consensus, with *ramps outside*
2   *EMC*."

3         118.   Also on August 4, 2009, an analyst report issued by Capstone
4   Investments stated that "STEC's SSD revenue acceleration over the last 12-months
5   has been nothing short of phenomenal," ZeusIOPS revenues grew during the
6   second quarter "as largest customer EMC continues its appetite for adoption during
7   FY09," and "[f]urther customer acceleration is likely *during 2H09* as IBM, HPQ,
8   [Compellent] and Fujitsu all begin to ramp from sampling orders towards full
9   production."

10        119.   Also on August 4, 2009, an analyst report issued by Needham stated
11  "STEC's string of successes continued in the June quarter, with strong growth in
12  ZeusIOPS and impressive margins.  We expect this trend to repeat as STEC's
13  customers ramp and deploy SSDs into the marketplace."

14        120.   On August 10, 2009, Wedbush Morgan ("Wedbush") initiated
15  coverage of STEC, with the analyst noting that STEC had "captur[ed] design wins
16  at leading OEMs" and had "secured a $120MM supply agreement with one of its
17  leading customers who we believe to be EMC."  The analyst then added that "[w]e
18  expect due to STEC's monopoly of the fibre channel SSD market [*i.e.*, with
19  ZeusIOPS] that it will likely secure similar supply agreements with the company's
20  other Tier I OEMs.  We expect these announcements to be positive catalysts *in the*
21  *near term* driving shares higher."  Although ZeusIOPS' monopoly of the fibre
22  channel SSD market was a reason why any customer deciding to purchase a fibre
23  channel SSD would buy it from STEC, the *timing* of the expected supply
24  agreements reported by this analyst—"in the near term"—clearly reflected STEC's
25  prediction in the Prospectus of "continued growth in the sales of our Flash-based
26  SSD ZeusIOPS products *through 2009* based on the *accelerated adoption* of our
27  ZeusIOPS SSD *by most of our major enterprise-storage and enterprise-server*
28  *OEM customers* into their systems."

121.   On August 16, 2009, an analyst report issued by Deutsche Bank, titled, "In the lead in a rapidly growing market," reported that, in addition to the purchases of ZeusIOPS by EMC, "STEC is also *ramping* new business with IBM, HP, Hitachi and Sun, and *we expect these customers' volumes to grow over the next few quarters*."

122.   On September 9, 2009, an analyst report issued by J.P. Morgan initiated coverage of STEC, describing it as "the high-growth story in our coverage universe and technology in general," and reporting as fact "the pending cascade of revenues as multiple OEM customers [of STEC's SSDs] prepare to ramp."

123.   Although, during the August 3, 2009, second quarter earnings conference call, Manouch did say that STEC's customers other than EMC were "maybe a quarter or two away from full ramping production," this statement did not contradict the statement in STEC's Prospectus that *increased sales were expected* from the OEMs other than EMC *during the second half of 2009.* For one thing, the Exchange Act Defendants had never said that ZeusIOPS sales would only increase when customers were in full production. On the contrary, the Exchange Act Defendants had consistently represented that increases in sales of ZeusIOPS could be expected quarter after quarter even in the absence of any OEM being in full production. As early as during the 2008 second quarter earnings conference call, before STEC had announced that any of its five large OEM customers was in full production or that any of the large OEMs had even "qualified" ZeusIOPS for any system, Manouch had asserted that "we have shown *quarter after quarter* that Zeus growth is [an] absolute possibility and it is happening." For another thing, on August 3, 2009, there were still five months— or almost two full quarters—left in 2009. Therefore, it would be consistent with the Other OEMs being "a quarter or two away from full production" if they began transitioning to full production before the end of the year. This is precisely the message received by the analyst from Capstone Investments, who reported on

1    August 4, 2009, that "[f]urther customer acceleration is likely *during 2H09* as

2    IBM, HPQ, CML and Fujitsu all begin to ramp from sampling orders *towards* full

3    production."

4                  **(c)**      **The Statement Was False**

5       124.    Contrary to the Exchange Act Defendants' statement that the Other

6    OEMs would increase their ZeusIOPS purchases during the second half of 2009,

7    ZeusIOPS purchases by the Other OEMs during the second half of 2009

8    *dramatically shrank*, from $42.2 million in the first half of 2009, to only $14.7

9    million in the second half of 2009.[7]

10      125.    The following table (with numbers representing millions) shows, for

11    each quarter of 2009, (1) total sales of ZeusIOPS, (2) sales of ZeusIOPS to EMC,

12    and (3) sales of ZeusIOPS to the Other OEMs:

| | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 |
|---|---|---|---|---|
| Total ZeusIOPS Revenues | $25.7 | $57.7 | $60.7 | $74.0 |
| EMC's ZeusIOPS Purchases | $7.6 | $33.6 | $54.0 | $66.0 |
| **The Other OEMs' ZeusIOPS Purchases** | **$18.1** | **$24.1** | **$6.7** | **$8.0** |

19      126.    Moreover, as further explained, *infra*, at the time when the Exchange

20    Act Defendants stated that they expected sales of ZeusIOPS to the Other OEMs to

21    grow during the second half of 2009, the Exchange Act Defendants knew that their

22    statement was false, and knew that, contrary to their statement, such sales would

23    drop—and drop dramatically.

24

25

26           [7] The amount of ZeusIOPS purchases by the Other OEMs has been calculated by

27    subtracting the amount of ZeusIOPS purchases by EMC from the total amount of
STEC's ZeusIOPS revenues. The total amount of STEC's quarterly ZeusIOPS

28    revenues was disclosed during STEC's quarterly earnings conference calls.

**(d)    The Statement Was Knowingly False When Made**

127.    As demonstrated, *infra*, the Exchange Act Defendants' knowledge, on August 3, 2009, that sales to the Other OEMs would drop during the second half of 2009 is shown by the fact that, as of August 3, 2009, these Defendants already had ordered almost the exact amount of supplies—*i.e.*, inventory—that ultimately was needed by STEC in order to sell the amount of ZeusIOPS to both EMC and the Other OEMs that actually was sold during the second half of 2009, while leaving STEC, at the end of 2009, with the amount of inventory on hand that, according to the Exchange Act Defendants themselves, was optimal.

**i.    STEC's Knowledge of the Amount of Future Sales Was Greater for ZeusIOPS Than for STEC's Other Products**

128.    Starting prior to the Class Period, the Exchange Act Defendants made clear to investors that their knowledge of the amount of future sales was greater for ZeusIOPS than for their other products.

129.    On March 12, 2009, during the 2008 fourth quarter earnings conference call an analyst asked Manouch, "[a]s your Zeus product line continues to grow as a piece of your overall mix, is this enabling you with any level of improved visibility within your business?" Manouch answered, "it does affect our visibility positively." As an example of STEC's greater knowledge of future sales when those sales are based on ZeusIOPS, Manouch then pointed out that, as of March 12, "[w]e've already said that the first half this year, we think that we're going to surpass what we did in last year."

130.    As an example of STEC's ability to accurately estimate future sales of ZeusIOPS, during the 2008 third quarter earnings conference call, Manouch pointed out that, as much as "6 quarters ago," STEC had estimated that sales of ZeusIOPS for the year 2008 would total $50 million. Six quarters—one and a half years—after making that estimate, during the 2008 fourth quarter earnings

1   conference call, the estimate apparently was verified, when STEC announced that

2   its ZeusIOPS sales for 2008 totaled $53 million.

3       131.   STEC's accurate knowledge of future demand for ZeusIOPS results

4   from the close collaboration between STEC and its ZeusIOPS customers, as

5   described by STEC in its January 14, 2008, press release regarding EMC, and by

6   Manouch during the 2008 third quarter earnings conference call—quoted, *supra*, in

7   paragraphs 51 and 91.[8]

8       132.   Without this close collaboration with its customers and the resulting

9   advance knowledge that STEC had of ZeusIOPS demand, STEC would not have

10  been able to implement what its 2008 10-K referred to as STEC's "strategy of

11  closely matching inventory levels with product demand."

12          **ii.    STEC Ordered Inventory in Advance, in Order**

13                      **to Fill Expected ZeusIOPS Purchases**

14      133.   As disclosed in STEC's quarterly SEC filings, the majority of STEC's

15  inventory is comprised of the raw materials that STEC needs to build its products.

16  As also disclosed in STEC's quarterly SEC filings, in order to prepare for *expected*

17  *future sales* of ZeusIOPS, STEC makes "non-cancelable inventory purchase

18  *commitments*." Thus, as stated in STEC's 2009 10-K, filed on February 23, 2010,

19  STEC makes such "non-cancellable inventory purchase commitments as a result of

20  the actual and *anticipated* growth in *orders* for our ZeusIOPS products."

21      134.   Thus, during the 2008 second quarter conference call, on August 4,

22  2008, Manouch stated that, for STEC's SSDs, "[w]e will see good *purchase orders*

23  and forecasts from major OEMs that carry on up to first quarter of 2009 [*i.e.*,

24

25

26      [8] As explained by CW2, the former Chief Technologist for Storage and Data

27  Management at Sun, when an OEM requires supplies of SSDs, it is to the advantage of the OEM to give its supplier advance notice of its requirements, in

28  order to avoid any bottlenecks in the chain of supply.

1  through two full future quarters] and *as a result, we locked in all the material that*

2  *was needed for all of that purchase order*."

3       135.   In short, as soon as STEC knows the amount of its future ZeusIOPS

4  sales, STEC makes non-cancellable inventory purchase commitments sufficient to

5  provide for those sales; and STEC usually knows the amount of its future

6  ZeusIOPS sales at least two quarters in advance of completing the sales.

7       136.   In addition to calibrating its non-cancelable inventory purchase

8  commitments to support its future ZeusIOPS sales, STEC also calibrates its non-

9  cancelable inventory purchase commitments so as to leave STEC with a certain

10  amount of inventory at the end of each quarter.  On May 11, 2009, during the 2009

11  first quarter earnings conference call, Manouch was asked whether STEC was

12  planning on changing its inventory level.  Manouch responded "I think our

13  inventory will remain in the $40 million range.  I think that is our goal, to keep it in

14  the $40 million range."

15                    iii.   **At the Time When the Prospectus Was Issued,**

16                           **STEC had Ordered the Amount of Inventory**

17                           **Actually Needed for the Sales Subsequently**

18                           **Made During the Second Half of 2009**

19       137.   Based on information from STEC's quarterly reports for the 2009

20  second, third and fourth quarters, the following chart shows both the amount of

21  inventory ordered in a given quarter for future use, and the amount of inventory

22  actually used in a given quarter to support the sales made in that quarter.  The

23  amount of inventory ordered for future use is the amount of "non-cancellable

24  inventory purchase commitments."  The amount of inventory actually used in a

25  given quarter to support the sales made in that quarter is, essentially, the "cost of

26  revenues" for that particular quarter.

27

28

**STEC Revenues and Inventory ($ 000's)**

| Reporting Period | 2Q 2009 | 3Q 2009 | 4Q 2009 |
|---|---|---|---|
| Net revenues | 86,350 | 98,293 | 106,004 |
| Cost of revenues | 43,177 | **49,478** | **52,078** |
| Non-cancelable inventory purchase commitments | **103,222** | 6,859 | 14,177 |
| Inventory | 37,656 | 35,555 | **42,739** |

138.   As shown in the preceding chart, the cost of STEC's revenues—*i.e.*, the amount of inventory actually used by STEC in order to make its sales—in the third and fourth quarters of 2009 was, in turn, $49.5 million and $52 million. Therefore, for the entire second half of 2009, STEC's cost of revenues was ***$101.5 million***.

139.   As also shown in the preceding chart, the non-cancelable inventory purchase commitments made by STEC in *advance* of the second half of 2009, during the second quarter of 2009, was ***$103 million***, almost exactly equal to the cost of the total sales that STEC actually made during the second half of 2009.

140.   Moreover, during the 2009 third quarter when STEC was falsely announcing that it expected ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, STEC's non-cancelable inventory purchase commitments were a de minimis $6.9 million—which was just enough to bring STEC's total inventory on hand at the end of 2009 to $42.7, almost exactly equal to the $40 million goal announced by Manouch during the 2009 first quarter earnings conference call.

141.   If, in August, when they made their misstatements, the Exchange Act Defendants had really expected ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, they would have ordered inventory sufficient to

support such increased sales. Instead, at the same time when the Exchange Act Defendants were publicly stating an expectation that sales to the Other OEMs would *increase*, they were ordering just enough inventory to provide for sales of ZeusIOPS to the Other OEMs that would ***drop by more than $27 million*** during the second half of 2009, as compared to the first half of 2009.

### (e) Investors Were Surprised When the Truth Was Partially Disclosed on November 3, 2009

#### i. Sales to the Other OEMs Were *Down* and Would Not Recover During 2009

142. On November 3, 2009, during STEC's 2009 third quarter earnings conference call, Manouch not only admitted that the EMC Agreement was a "one-off type of a deal," but also, that "the rest of the [ZeusIOPS] account did not come along as fast as we had anticipated. So, therefore, ***their numbers were down***."

143. Manouch added that IBM's purchases of ZeusIOPS "dropped off significantly in the third quarter" and that Sun's purchases of ZeusIOPS were below "normal volumes."

144. Also during the November 3, 2009, conference call, and in STEC's 2009 third quarter earnings release—filed on the same day—STEC issued its fourth quarter revenue guidance. The increase in fourth quarter revenues predicted by this guidance—only $2.7 to $4.7 million—was substantially less than the expected increase in fourth quarter sales to EMC under the EMC Agreement—$12 million. Because any increased sales of ZeusIOPS during the fourth quarter therefore would be attributable to the EMC Agreement, there would be no fourth quarter recovery of ZeusIOPS sales to the Other OEMs. Moreover, because there would be no recovery of ZeusIOPS sales to the other OEMs during the fourth quarter, ZeusIOPS sales to the Other OEMs during the entire second half of 2009 were not even going to *match* the level of such sales during the *first half* of 2009,

much less would there be any *increase* in such sales as compared to during the first half of 2009.

### ii.    The Other OEMs had Not Even Started Building Systems Incorporating ZeusIOPS

145.   One analyst noted that these results were contrary to the Exchange Act Defendants' prior representations regarding their ability to forecast ZeusIOPS sales.  The analyst stated: *"Your visibility seems to have changed.  I don't want to, I guess, use any adjectives.  Let's just say it's changed*, but when do you believe the prior visibility returns.  Is it really going to solely revolve around your largest customer or have there been some other dynamics that have kind of changed your near-term visibility here?"

146.   Responding to this question, Manouch disclosed for the first time that *the Other OEMs had not even started "building in SSDs into their systems,*" and that, for practical purposes, *they could not even be considered customers*. Manouch stated, "you really can't have very good visibility with having one single customer. . . . we'll get to extremely good visibility once the IBMs, the Suns, the Hitachi Data Systems and the HPs of the world come along and start building in SSDs into their systems as well."

147.   When another analyst suggested that most of the Other OEMs "aren't selling to any degree yet," Manouch responded, "exactly."  Then Manouch added that "five customers worldwide dominate the whole enterprise storage markets, and that's EMC, IBM, Hitachi Data Systems, HP, and Sun," and that STEC would be "back to the races" when these OEMs' "customers start seeing systems with SSDs on board."

148.   Given Manouch's prior statement that STEC and one of its ZeusIOPS customers had needed "over a year of daily and weekly meetings . . . to optimize the performance of our [ZeusIOPS] products with [the customer's] system," the Exchange Act Defendants already knew at the time of their misstatements on

1  August 3, 2009, that, as Manouch admitted three months later, the Other OEMs

2  had not yet started to build ZeusIOPS into their systems.[9]  Nevertheless, on August

3  3, 2009, not only did the Exchange Act Defendants falsely state that sales of

4  ZeusIOPS to the Other OEMs were expected to increase during the second half of

5  2009, but also, they even failed to warn investors that the Other OEMs had not yet

6  begun to build ZeusIOPS into their systems.

7                    iii.    **IBM Was Only Offering ZeusIOPS as an**

8                             **Option, Not as a Standard Feature**

9        149.   Asked by another analyst why IBM's ZeusIOPS "ramp is slow,"

10 Manouch disclosed for the first time that IBM was only "selling SSDs as an

11 option" rather than as a standard part of the IBM system.  Manouch stated:

12 "Selling SSDs as an option versus as part of the product is quite difficult. . . . If

13 you're going out there and SSD is the first thing that you are offering your

14 customer in terms of an upgrade for your system, that might change their mind."

15                    iv.    **Analysts Expressed Surprise**

16       150.   The November 3, 2009, disclosures that the Other OEMs were not

17 going to increase their ZeusIOPS purchases during the second half of 2009 caught

18 investors by surprise.

19       151.   Thus, an analyst report about STEC issued by Oppenheimer on

20 November 3, 2009, stated that STEC's "results/outlook" for the third/fourth

21 quarters were "worrisome," and that the "Q4(Dec.) outlook for $101-$103 in rev

22 [was] even more troubling."  The analyst went on to say "[t]he trouble is twofold:

23 1) sell-through at primary customer EMC, 2) longer inception in new business at

24

25       [9] On November 10, 2008, when a STEC spokesperson described having had
   "over a year of daily and weekly meetings . . . to optimize the performance of our
26 [ZeusIOPS] products within [our customer's] system," he was describing what he
   considered to be standard procedure for sales of ZeusIOPS.  His point was that the
27 need for such a lengthy and intimate cooperation between the SSD seller and its
   customer was a "big barrier to entry," and, as Manouch added, "one of the reasons
28 why you don't see too many competitors come into this market."

                                    44        THIRD CONSOLIDATED AMENDED COMPLAINT
                                              Lead Case No. SACV 09-01304-JVS (MLGx)

HPQ/IBM. ***Both were linchpins of our Outperform thesis; now they go out the window***."

152.   Another analyst report about STEC issued on November 4, 2009—this one by Wedbush—was titled "Down for the Count After Last Night's Blindsided Knock out Punch; Downgrade to Neutral and Reducing PT to $18." In addition to noting the fact that EMC "had likely built inventory of [STEC's] flagship ZeusIOPS," the report described "Q4 guidance" as "disappointing," and stated "we were ***completely caught off guard*** by the stall in the adoption rates of SSDs and its negative impact to near-term earnings and revenue."

153.   Still another analyst report about STEC issued on November 4, 2009—this one by B. Riley—focused on both the disclosure about EMC and "sputtering demand from STEC's other enterprise storage customers." The report noted that "another stumbling block in the period is IBM, which still is expected to be the next storage customer to embrace SSDs in volume. IBM . . . is not generating meaningful revenues yet—in part, STEC stated, due to the fact that ***Big Blue is marketing the drives as an option vs. coming out and leading upgrade sales efforts with SSDs***."

154.   Finally, an analyst report about STEC by J.P. Morgan issued on November 18, 2009, noted that, during the November 3, 2009, earnings conference call, "STEC attempted to convey [the] message . . . . that enterprise SSD adoption is still in the *early days* of the adoption phase," and that "[a]s a result, we think investors are ***better prepared for more bumps*** along the way *until multiple OEMs beyond EMC take product*." The report added that "STEC's stock stands to languish pending greater clarity on the EMC and IBM ramps."

**(f)     Investors Were Surprised Again, When the**
**Truth Was More Completely Disclosed on**
**February 23, 2010**

155.   On February 23, 2010, during its 2009 fourth quarter and year-end earnings conference call, STEC reported its 2009 fourth quarter ZeusIOPS revenues—$74 million—which confirmed that sales of ZeusIOPS to the Other OEMs during the second half of 2009 had sharply declined from what such sales had been during the first half of 2009; and that ZeusIOPS sales to the Other OEMs in the 2009 fourth quarter were no more than 33% of what such sales had been in the 2009 second quarter.

156.   Also on February 23, 2010, in STEC's fourth quarter/end of year earnings release, and during the 2009 fourth quarter/end of year earnings conference call, STEC issued its revenue guidance for the first quarter of 2010— $33 to $35 million.  That guidance disclosed that ZeusIOPS sales to the Other OEMs would not recover even during the 2010 first quarter, and that the Exchange Act Defendants' misstatement regarding expected growth of such sales during the second half of 2009 was a highly material misstatement, and not just an estimate that had been off by a month or two.  Because, on February 23, 2010, STEC also announced that no revenue from EMC was expected in the 2010 first quarter, this meant that the estimate of $33 to $35 million was an estimate of the total amount of 2010 first quarter revenue that STEC was expecting to receive from its non-EMC customers for all of STEC's products.  This was at least $17.8 million less than the amount of non-EMC related revenue that STEC had received during the second quarter of 2009.

157.   Also on February 23, 2010, during STEC's fourth quarter earnings conference call, Manouch made a disclosure showing that the statement in the Prospectus about expected growth in ZeusIOPS sales to the Other OEMs had been wrong by *at least* half a year.  Thus, an analyst noted that "it sounds like you're not

1  expecting any [2010 first quarter] revenue from EMC.  But do you expect some

2  revenue from some of your other Zeus customers?"  Without any apparent basis,

3  Manouch initially responded that "[o]n the rest of the customers, everyone is

4  growing very slowly."  Then, more revealingly, he added, "we put second half of

5  this year as the time to see growth again in this market."

6      158.   Investors were surprised by both the 2009 fourth quarter results and

7  the 2010 first quarter revenue guidance as both of these applied to the Other

8  OEMs.

9      159.   Thus, on February 24, 2010, a Needham report on STEC stated it was

10  "revising estimates lower once more" because, among other reasons, fourth quarter

11  ZeusIOPS revenue was "below our original estimate."  This meant revenue from

12  the Other OEMs—not from EMC—was below what Needham had expected,

13  because analysts had known since the third quarter what the amount of fourth

14  quarter revenues from EMC would be, because revenues from EMC for the second

15  half of 2009 had been fixed by the EMC Agreement.

16      160.   Thus also, on February 24, 2010, J.P. Morgan lowered its STEC stock

17  price target to $12.50 from $42, after noting that STEC's 2010 first quarter revenue

18  guidance was more than $60 million below J.P. Morgan's prior estimate.  Because,

19  after STEC's November 3, 2009, disclosures, investors already knew that EMC

20  would not be purchasing as much as $60 million in the 2010 first quarter, at least a

21  portion of J.P. Morgan's prior overestimate of STEC's 2010 first quarter revenues

22  had been an overestimate of revenues from the Other OEMs.  J.P. Morgan

23  commented that "the disappearance of sustainable revenue momentum up-ended

24  our prior view" and that "[t]he flow-through effects of this reset are staggering to

25  the overall model, which is why we are downgrading to Neutral."

26

27

28

(g)     **Too Late to Benefit Class Members, the Exchange Act Defendants Added a Key Cautionary Statement to Their Quarterly SEC Filings**

161.   STEC's 2009 10-K was issued on the last day of the Class Period, February 23, 2010.  In this 10-K, for the very first time, the Exchange Act Defendants added the following cautionary statement:

> [O]ur SSDs are currently offered as options in our customers' systems.  Therefore, the demand for these SSDs is unpredictable and fully dependent on end user requirements.  Unless and until our SSDs are offered as a standard feature in our customers' systems, our demand visibility will continue to be limited.

162.   The same statement has appeared in every subsequent 10-Q filed by STEC.  Thus, as late as November 2, 2010—a full fifteen months after the Exchange Act Defendants issued their false statement in the Prospectus that they expected increased sales of ZeusIOPS to the Other OEMs during the second half of 2009, the Exchange Act Defendants are still warning investors that STEC's SSDs are being offered only as "options" rather than as "a standard feature" in the systems of STEC's customers.  Investors who purchased STEC's stock during the Class Period never had the benefit of this warning.

2.     **The Prospectus Omitted to Disclose That IBM Would Not Begin Purchasing for Volume Production During the Second Half of 2009, and Was Not Marketing ZeusIOPS as a Standard Feature in Its Systems**

163.   Shortly before the start of the Class Period, on May 11, 2009, during the 2009 *first* quarter earnings conference call, while talking about IBM's purchases of ZeusIOPS, Manouch stated "we feel that come third quarter, they will go in full production in all of these products."

164.   Subsequently, on August 3, 2009, the message that IBM would soon be increasing its purchases of ZeusIOPS was reinforced by a statement in STEC's 2009 second quarter earnings release that a "highlight" of the 2009 *second* quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage and Enterprise Server OEM customers, including IBM" and several Other OEMs.

165.   Also on August 3, 2009, the Exchange Act Defendants issued the Prospectus, which stated that "[w]e expect *continued growth* in the sales of our Flash-based SSD ZeusIOPS products *though 2009* based on the accelerated adoption of our ZeusIOPS SSDs *by most of our major enterprise-storage and enterprise-server OEM customers* into their systems."

166.   The Prospectus was misleading because, in addition to the fact that, as explained, *supra*, the Exchange Act Defendants did *not* expect ZeusIOPS sales to the Other OEMs to increase during the second half of 2009, the Prospectus also failed to disclose that IBM was not expected to reach full production of systems incorporating ZeusIOPS at any time during the second half of 2009, and that IBM was offering ZeusIOPS only as an option, and not as a standard feature in its systems.

167.   For the same reasons that, on August 3, 2009, the Exchange Act Defendants knew that ZeusIOPS sales to the Other OEMs were not going to increase during the second half of 2009—and, in fact, would decline during the second half of 2009—they also knew that IBM was not going to reach full production of systems incorporating ZeusIOPS at any time during the second half of 2009, and, in fact, would decrease its purchases during the 2009 third quarter.

168.   Although, during the 2009 second quarter earnings conference call, which also took place on August 3, 2009, Manouch stated that the Other OEMs "are taking a *little bit* longer than expected in terms of full production," he did not disclose that sales to IBM were actually expected to drop during the 2009 third

1  quarter, and that IBM was not expected to reach full production at any time within

2  the second half of 2009.

3  169.  Manouch also failed to disclose that IBM was offering ZeusIOPS only

4  as an "option," and not as a standard feature in its systems, the reason that

5  Manouch subsequently gave when asked during the November 3, 2009, third

6  quarter conference call "why [IBM's] ramp is slow."

7  170.  Because of STEC's intimate relationship with its OEM customers—

8  especially as regards the design of the OEMs' systems—the Exchange Act

9  Defendants already knew, at the time of the issuance of the Prospectus, that IBM

10  was offering ZeusIOPS only as an "option" and not as a standard feature in their

11  systems.

12  171.  The failure of the Exchange Act Defendants to qualify the statement

13  in the Prospectus about increased sales to the Other OEMs during the second half

14  of 2009 as it regarded IBM was a materially misleading omission, as shown by the

15  fact that, subsequent to STEC's issuance of the Prospectus, on September 9, 2009,

16  a J.P. Morgan analyst report discussing STEC's ZeusIOPS customers stated that

17  "we look for IBM to ramp to volume in 2H 2009."

18  **3.  STEC's September 10, 2009, Letter to the SEC Falsely**

19  **Represented That One or More of the Other OEMs Was**

20  **Ready to Purchase ZeusIOPS in Quantities Equivalent to**

21  **Those Being Purchased Under the EMC Agreement**

22  172.  On September 10, 2009, in its publicly filed response to the SEC's

23  inquiries concerning STEC's contracts with EMC, STEC stated that "in the

24  unlikely event a customer should default under a purchase order or other sales

25  agreement, STEC generally believes it could find a replacement customer for the

26  relevant product."  This statement was intended to address STEC's then-current

27  sales agreements, as well as STEC's past sales agreements, as shown by the fact

28  that the statement was made in the present tense.

173.   This statement was knowingly false when made because, as subsequently disclosed, during STEC's November 3, 2009, third quarter earnings conference call, the Exchange Act Defendants knew that none of STEC's other customers could have replaced EMC under the EMC Agreement.  Thus, during the November 3, 2009, conference call, Manouch confirmed an analyst's statement that STEC's other large customers besides EMC "aren't selling to any degree yet" and added that they were all "*a year behind*" EMC.

174.   Moreover, during the November 3, 2009, earnings conference call, when an analyst asked "are you expecting any other supply agreements from any of your other qualified customers," Manouch responded "I would say that IBM would be the next guy that comes along," while also admitting that IBM's purchases of ZeusIOPS—which had never been described by STEC as rising to the level of volume production—had "*dropped off significantly* in the third quarter," and that, at present, IBM could not even be considered a "customer."[10]

**4.   The Exchange Act Defendants' False Statement About Sun Supports Their Scienter for Their Misrepresentations About the Other OEMs, and Their Omissions About IBM**

175.   Shortly before the start of the Class Period, on May 11, 2009, during STEC's first quarter earnings conference call, in a series of statements, Manouch falsely represented that Sun already was in "full production" of systems incorporating ZeusIOPS.

176.   First, Manouch stated that all of the five biggest enterprise storage OEMs had qualified ZeusIOPS, including EMC, Sun, IBM, HP and Hitachi.

177.   Second, Manouch stated that "for now we only have *two* customers in full production."

---

[10] Manouch stated "you can't have very good visibility with having one single customer. . . . we'll get to extremely good visibility once the IBMs [and other OEMs besides EMC] come along and start building in SSDs into their systems."

178.   Third, and finally, Manouch stated that IBM, Hitachi and HP "are not in full production."

179.   As a result of these statements, investors could only conclude that EMC and Sun were *both* in "full production" of systems incorporating ZeusIOPS. For example, on May 12, 2009, an analyst report about STEC published by Oppenheimer stated that "EMC and Sun has [sic] started volume production of ZeusIOPS-based storage servers."  Also on May 12, 2009, another analyst report about STEC, published by Capstone Investments, stated that "[c]urrent momentum is being driven primarily by two current customers (SUN/EMC)."

180.   Information provided by a knowledgeable confidential witness establishes that Manouch's statements on May 11, 2009, about Sun already having started "full production" of systems incorporating ZeusIOPS were knowingly false when made.

181.   Confidential Witness 2 ("CW2") was an employee at Sun from January 1999 through June 2009.  From January 2005 through June 2009, he was Sun's Chief Technologist for Storage and Data Management.  According to CW2, in the Spring of 2009, Sun purchased less than 100 Zeus SSDs from STEC, at approximately $1,000 per unit—a total purchase of only $100,000—for use solely for testing and development in Sun's series 7000 Unified Storage System.  According to CW2, up until his departure from Sun, at the end of June 2009, Sun had never ordered ZeusIOPS for volume production.

182.   Given the importance of ZeusIOPS to STEC, Manouch's key role at STEC, and his comprehensive knowledge of STEC's ZeusIOPS business—as demonstrated during STEC's earnings conference calls—Manouch cannot have been unaware that his statement about Sun was false.

183.   Manouch's subsequent efforts to disguise the falsity of his statements during the 2009 first quarter earnings conference call further supports his scienter for these false statements.

184.   Thus, during STEC's 2009 second quarter earnings conference call, while investors were distracted by the news regarding the EMC Agreement, Manouch dropped his assertion that *two* of STEC's customers were in full production—without acknowledging that he was saying anything new—and stated that "*one* customer [is] in production, four customers are *still in pre production*."

185.   Still later, during STEC's 2009 third quarter earnings conference call, when he was forced to admit that ZeusIOPS sales to the OEMs other than EMC had declined, Manouch gave an explanation about the lack of ZeusIOPS sales to Sun that essentially reiterated his previous false statement that Sun had been ordering ZeusIOPS for full production:

> In terms of ***Sun, obviously Sun has been a very large
> customer for us over the past few quarters***.  We've hit a
> snag with a deal [*i.e.*, a merger] that they are involved in
> at this point.  And once that gets through—solved, we
> feel that we'll be back to the normal volumes that we
> have been doing.

186.   Manouch's willingness to knowingly make false statements about Sun, both before and during the Class Period, provides additional support for his scienter regarding STEC's false statement in the Prospectus that STEC expected increased sales to the OEMs other than EMC during the second half of 2009, and for STEC's omission to qualify the statement in the Prospectus specifically as it regarded IBM.

**C.**   **During the 2009 Third Quarter, the Exchange Act Defendants Made Misstatements and Omissions Regarding Competition for the ZeusIOPS**

**1.**   **Omissions Regarding Competition**

**(a)**   **The Prospectus Gave No Warning that Competition Was Imminent**

187.   STEC's revenue growth during the half year preceding the filing of the Prospectus was publicly attributed by STEC, in significant part, to the high margin that STEC reported on its sales of the ZeusIOPS.  This high margin, in turn, was publicly attributed by STEC to the absence of any competition for the ZeusIOPS.  Thus, during the 2009 second quarter earnings conference call, Manouch stated, "[w]e think that go forward, on a go forward basis, our margins will remain in the 50 to 60% area.  As you know, we have no competition at this stage."  Moreover, because future prospects for STEC's business depended in substantial part on how much longer STEC would be able to maintain its monopoly on high end SSDs, the question of when STEC expected to be faced with competition for the ZuesIOPS  became a question of great importance to investors.

188.   Investors knew that, because no SSD with capabilities sufficient to make it competitive with the ZeusIOPS would be purchased in substantial quantities by any OEM who had not first qualified such competing SSD, one or another of STEC's OEM customers would be the first to know when competition for the ZeusIOPS was imminent.  Moreover, because the qualification process could take as much as nine months—as shown by Manouch's statement during STEC's 2008 first quarter earnings conference call that, "we have started qualification in many of the storage OEMs and we expect them to also ramp up by the end of this year"—one or another of STEC's OEM customers would have months advance notice of the appearance of competition for the ZeusIOPS.

THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

189.   Furthermore, as demonstrated below, investors were told by STEC
that, based on STEC's close relationship with its OEM customers, STEC itself
would be able to obtain advance notice of the appearance of competition for the
ZeusIOPS.

190.   Thus, just prior to the beginning of the Class Period, during STEC's
2009 first quarter earnings conference call, Manouch had the following exchange
with one of the analysts following STEC:

Sean Hannan [Needham & Company]:

> [I]f I can ask around the competitive environment, have
> any of your customers actually shared with you any
> feedback in terms of where some other enterprise SSD
> hopefuls might be in terms of either having a viable
> product and might enter competition as a second source,
> or are they really only going to inform you once a second
> vendor has been qualified?

Manouch Moshayedi:

> Well, **we feel that we have a good relationship with all
> of our customers, where we would know these types of
> information beforehand.** But it is always up to the
> customer. **Up to this point, I don't think that there is
> anyone coming out with a product that is going to be
> in competition with ZeusIOPS.** There are multiple
> vendors who are trying to qualify products that compete
> with our Mach8IOPS product line, but nothing in the
> ZeusIOPS range yet. **And I don't foresee anything still
> for 2009.** (Emphasis added.)

191.   As shown by the foregoing exchange, Manouch had informed investors that, as of May 5, 2009—the date of the foregoing exchange—no product potentially competitive with the ZeusIOPS was even available, much less qualified, and none was expected to become available during 2009.

192.   Moreover, on August 3, 2009, in the Prospectus filed on that day, no warning was given to investors that STEC's expectation had changed regarding whether competition would emerge before the end of 2009, or soon thereafter.

193.   Still further, on August 3, 2009, during STEC's second quarter earnings conference call, Manouch made his statement, quoted, *supra*, in paragraph 313, that "[a]s you know, we have no competition at this stage" (emphasis added), and "[w]e think that go forward, on a go forward basis, our margins will remain in the 50 to 60% area"—implying that investors could rely on what they previously had been told by STEC, and that the lack of competition would continue "on a go forward basis."

**(b)     On September 17, 2009,**

**the Truth Was Partially Disclosed**

194.   Only six weeks after the filing of the Prospectus, on September 17, 2009, WedBush Morgan published an analyst report titled "Checks Indicate Q3 Beat Likely in Cards; but Expect Changing Competitive Landscape to Pressure [STEC] Shares Downward," which further stated, among other things, that

[o]ur industry checks indicate that one of STEC's Tier I OEM enterprise customers is in final qualification stages with Toshiba for its Single Level Cell (SLC) NAND-based serial attached SCSI (SAS) interface SSD.  **While we had expected STEC's competitors to gain design wins at its OEMs, we believed this would likely not occur until [the first half of 2010].**

1           Industry checks lead us to believe a leading Hard Disk

2           Drive (HDD) OEM is **likely set to introduce** a SLC

3           SATA/SAS SSD and possibly a Multi-Level-Cell (MLC)

4           SSD drive **in Q4**.  (Emphasis added).

5               **(c)**     **Defendants Had a Duty to Disclose**

6                     **the Imminence of Competition**

7       195.   Given the statements about competition made by Manouch before and

8 contemporaneously with the filing of the Prospectus—*i.e.*, during STEC's first and

9 second quarter earnings conference calls—STEC had a duty to disclose in the

10 Prospectus that expectations by STEC and its OEM customers for the emergence

11 of competition had changed, and that the appearance of competitive products, as

12 well as their qualification, was expected before the end of 2009.

13       196.   Defendants' negligent failure to disclose such a change in

14 expectations and/or to discover and disclose such changed expectations was a

15 material omission in the Prospectus.

16       197.   Additional disclosures, described, *infra*, made subsequent to the

17 September 17, 2009, WedBush Morgan report, would show that the WedBush

18 Morgan report was only a partial disclosure of the material truth about competition

19 that had been omitted from the Prospectus.

20           **2.**     **The Prospectus Erroneously Denied**

21                 **the Imminence of Competition**

22       198.   The Prospectus also included the following false and misleading

23 representations that it would be difficult for competitors to catch up with STEC:

24           We believe that we are a technology leader in solid-state

25           storage due to our nearly 20 years of focus on advanced

26           memory solutions.  Throughout our history, we have

27           delivered advanced memory and storage solutions to a

28           wide range of customers in various market segments, and

1    we continue to develop products to meet the need of

2    enterprises to constantly improve the retention of, and

3    access to, critical data at high performance levels.

4    **Our solutions**

5    The key features of our products include:

6    • *Proprietary controller IC technology.*  In order to be

7    first-to-market with innovative storage technologies,

8    we design the fundamental logic for our SSD

9    products.  The controllers within our various SSD

10   products are the key to enabling high levels of

11   performance and reliability.

12   • *High degree of customization.*  Products sold to our

13   customers are typically customized by our design and

14   engineering teams to meet our customers' specific

15   design requirements.

16                               * * *

17   • *High reliability.*  Our products are built utilizing

18   sophisticated error detection and correction processes

19   to provide high data reliability and integrity.  In

20   addition, our products are designed to withstand high

21   levels of shock and vibration as well as extreme

22   temperature fluctuations.

23        199.   These statements were materially false and misleading when made.

24   STEC's products did not have "high levels of performance and reliability" or

25   "meet . . . customers' specific design requirements."  In truth, Defendants

26   negligently disregarded that competition would likely enter the market within the

27   next six months.  For example, Defendants negligently disregarded that STEC's

28   competitor, Pliant Technology ("Pliant"), had begun sampling an enterprise SSD

with customers and expected an initial qualification in the fourth quarter. They also negligently disregarded that other competitors, such as Hitachi, were on track to qualify its SSD in early 2010. Defendants negligently disregarded this and other information showing actual competition at least as early as July 2, 2009, when an industry-specific website, Enterprise Storage Forum, published an article entitled "Solid State Drive Developers Try To Catch STEC."

200. Defendants also negligently disregarded that STEC faced the risk that its customers would seek new vendors to develop and qualify better products, and not continue its relationship with STEC if it continued to send non-existing, faulty, untested, refurbished, and/or damaged products as new; fail to deliver promised product features; lied to customers; and continued to be unable to integrate its products with its key OEMs or generate sufficient demand from end-user customers.

201. Indeed, Defendant Manouch Moshayedi later admitted in a September 21, 2009 interview (after the Moshayedis had unloaded their stock), STEC "never expected to be a single source in this market forever," and Defendants knew that "[i]t's perfectly inevitable that people will have second or third qualified vendors in this market."

202. Defendants' August 3, 2009 statements and omissions regarding competition were also materially false and misleading because Defendants failed to disclose the significant negative financial impact that STEC would face once competitors entered the market. While STEC was oversupplying its largest customer, EMC, other customers were having trouble integrating STEC products and routinely rejecting faulty products. As new competition would be entering the market at the end of 2009 and beginning of 2010, STEC's largest customer would have no need for its products, while other customers would lack desire for its products.

203.   The foregoing statements trumpeting the quality and reliability of STEC's products were materially false and misleading when made for the additional reason that, as detailed herein, Zeus was not an "enterprise-optimized storage devise with an unprecedented combination of performance and energy efficiency" nor was it "reliab[le]." In truth, Defendants negligently disregarded that STEC's customer had trouble integrating Zeus with their systems. Moreover, STEC's products, including Zeus, had material problems including, *inter alia*, unusually high failure rates, bugs, software issues, hardware wear leveling, thermal problems, poor coding, problems with the controllers, and battery problems.

204.   As described, *supra*, in paragraph 194, on September 17, 2009, WedBush Morgan published an analyst report on STEC that identified important, newly public, adverse information regarding competition for STEC's Zeus, which Defendants had adamantly and repeatedly denied could exist.

205.   The report, entitled "Checks Indicate Q3 Beat Likely in Cards; but Expect Changing Competitive Landscape to Pressure Shares Downward," disclosed for the first time that the "competitive landscape" was "intensifying," and that STEC's "'window of opportunity' to maintain a market leadership position and secure design wins at Tier I OEMS in the SATA/SAS SSD enterprise market ahead of the competition may be closing."

206.   As demonstrated, *supra*, in paragraph 194, the report explained in part:

> Our industry checks indicate that one of STEC's Tier I
> OEM enterprise customers is in final qualification stages
> with Toshiba for its Single Level Cell (SLC) NAND-
> based serial attached SCSI (SAS) interface SSD. While
> we had expected STEC's competitors to gain design wins

THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1    at its OEMs, we believed this would likely not occur until

2    [the first half of 2010].

3

4    Industry checks lead us to believe a leading Hard Disk

5    Drive (HDD) OEM is likely set to introduce a SLC

6    SATA/SAS SSD and possibly a Multi-Level-Cell (MLC)

7    SSD drive in Q4.

8

9    207.    Thus, it was revealed for the first time that, contrary to Defendants'

10   statements (including just a month earlier on the day the Company filed the

11   Registration Statement and Prospectus) that there is not, and would not be in the

12   foreseeable future, any competition for STEC's enterprise scale products, at least

13   one competitor, Toshiba, was in the process of qualifying a competitive SSD

14   product with one of STEC's top-tier customers.  Wedbush Morgan thus cut its

15   12-month price target from $45 to $39.

16   208.    Not only did this report disclose that new competitors were entering

17   the market with products that would threaten STEC's business, but it also revealed

18   that one such competitor, Toshiba, was in the final qualification stage with one of

19   STEC's own customers.  Thus, the market learned that the undisclosed risk, that

20   STEC's bad business practices could result in its own customers seeking other

21   vendors for product development, was beginning to materialize.

22   209.    In reaction to this news, STEC's stock collapsed $6.37 per share to

23   close at $31.53 per share on September 17, 2009 – a one-day decline of over 16%,

24   on volume of more than 21.3 million shares.

25   210.    Barron's noted immediately the impact of the new negative

26   information on the stock price.  In a September 17, 2009 article entitled "STEC:

27   New Competition Coming In Enterprise SSDs, Wedbush Says," Barron's reported

28

61    THIRD CONSOLIDATED AMENDED COMPLAINT
Lead Case No. SACV 09-01304-JVS (MLGx)

1   that "STEC shares are under pressure this morning from a cautious note by

2   Wedbush Morgan analyst Betsy Van Hees."

3        211.   Defendants quickly responded to counteract this negative news.  Two

4   business days after the Wedbush Morgan report, on September 21, 2009, STEC

5   published a "whitepaper" entitled "STEC Addresses Advantages, Key

6   Differentiators and Competitive Aspects of Enterprise Solid State Drives (SSDs)"

7   and Defendant Manouch Moshayedi conducted an interview in an attempt to

8   reassure investors that STEC did not, in fact, face competition.  During that

9   interview he reassured investors: "You don't snap your fingers and get there.  Just

10  because Pliant announced (a new line of products), doesn't mean competition."

11       212.   In a September 25, 2009 analyst report, B. Riley & Co. recognized

12  that "investors have sheared nearly 32% off STEC's market cap, spurred by

13  recognition of encroaching competition from both established SSD players and

14  new entrants to the market." B. Riley & Co. nevertheless raised STEC to a "Buy,"

15  citing STEC's representations that the Company "is shipping enviable volumes of

16  ZeusIOPS drives to EMC, and has yet to see the production ramp from IBM,

17  Hitachi and Sun, let alone newer customers."

18       **3.    The Truth Was  More Completely**

19             **Disclosed on November 3, 2009**

20       213.   STEC's disclosures on November 3, 2009, constituted, among other

21  things, an additional partial disclosure that the ZeusIOPS was facing existing or

22  imminent competition.  The announcement that STEC's largest customer might

23  carry excess ZeusIOPS inventory into 2010, *see* supra, ¶¶ 78-79, and that the Other

24  OEMs were not expected to purchase a volume of ZeusIOPS during the second

25  half of 2009 equal to the volume they had purchased during the first half of 2009,

26  *see* supra, ¶ 141, especially when combined with repeated statements by these very

27  same OEMs that they were "bullish" on SSDs, further disclosed that the OEMs

28  were turning away from the ZeusIOPS and toward competitive products.

214.   Thus, on November 3, 2009, during STEC's third quarter earnings conference call, an Oppenheimer analyst stated:

> [T]here's just a lot of skepticism right now around your company and its ability to compete, and if you look at some of these numbers, and the fact that in the press release you are basically saying that EMC is having trouble selling through SSD drives on their product, it doesn't seem to stack up.  EMC is still pretty bullish on this and in terms of the drives that have to be sold through, $55 million, going to $65 million for EMC, is only 18% growth, so it's not that aggressive.

215.   In an effort to prevent complete disclosure of the truth, Manouch responded to the Oppenheimer analyst with assertions that "there is absolutely no competition today for our ZeusIOPS product line in any of our customers," and that "[t]here is not one single competitor out there."  He continued,

> [i]f there were competitors coming in, we would estimate that they would come in somewhere around mid-2010. And if they were to go qualify with a product that actually does qualify, it would be somewhere around first or second quarter of 2011.

216.   Also during the November 3, 2009, earnings call, in a further attempt to prevent complete disclosure of the truth, Manouch asserted that the only problem with ZeusIOPS sales was a lack of effort by the OEMs' sales forces, and a lack of knowledge on the part of potential end users.  He further stated that, to address this problem, STEC had arranged for a joint marketing program with EMC, which also had been offered to each of the Other OEMs, pursuant to which STEC would provide a "bonus" to any OEM sales person who sold a system with ZeusIOPS drives "onboard," while the OEM would provide discounts to end users